Aaron Greenspan
Think Computer Corporation
3260 Hillview Avenue
Palo Alto, CA 94304-1226
(415) 670-9350
legal@thinkcomputer.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**



E-Filing     ADR

FILED

NOV 14 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**THINK COMPUTER CORPORATION,**

    Plaintiff,

        v.

**ROBERT VENCHIARUTTI,** in his official
capacity as Deputy Commissioner of the California
Department of Financial Institutions; **WILLIAM
HARAF,** in his official capacity as Commissioner
of the California Department of Financial
Institutions; **TRACI STEVENS,** in her official
capacity as Acting Secretary of the California
Business, Transportation and Housing Agency;
**JACOB A. APPELSMITH,** in his official capacity
as Senior Advisor to the Governor of the State of
California; **EDMUND G. BROWN, JR.,** in his
official capacity as Governor of the State of
California; and **KAMALA HARRIS,** in her official
capacity as Attorney General of the State of
California,

    Defendants.

Case No.: **CV 11-05496**

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
JURY DEMAND**

HRL

Plaintiff Think Computer Corporation hereby states as follows:

## INTRODUCTION AND SUMMARY

1. Each year, billions of dollars worth of retail transactions are processed through electronic means via plastic debit and credit cards. These plastic cards have largely taken the place of cash and coin in the United States, and their issuance by banks has become the source of enormous controversy for a variety of reasons. Cards are expensive for merchants to process and frequently levy onerous interest rates on those consumers who are unable to pay their bills in a

1

timely fashion. Yet despite all of the problems associated with plastic payment cards, there are only four major issuers, and otherwise barely any meaningful competition exists.

2. Money transmitters, non-bank entities that handle funds on behalf of third-parties on a regular basis, are well-positioned to introduce products competitive with plastic cards, with one caveat: they are currently regulated by a patchwork of state laws ("Money Transmission Laws" or "MTLs"), that have been gradually introduced in almost every state since the mid-1960s. These statutes initially came into being in response to specific money order scandals affecting particular localities, until many years later, when large financial corporations realized that they could also be effective tools used as barriers to entry, at which point they began to proliferate.

3. This case arises from the efforts of a regulatory agency of the State of California, namely the Department of Financial Institutions (DFI), to enforce the 2010 Money Transmission Act (MTA), one of approximately forty-seven MTLs involving domestic money transmission. The DFI, under the leadership of Defendant William Haraf, has repeatedly refused to divulge public information obviously necessary to apply for a license with a reasonable chance of approval. The DFI has further made false statements regarding Plaintiff; threatened to prosecute Plaintiff and Plaintiff's principals for operating as a money transmitter even in jurisdictions outside of California where Plaintiff was otherwise legally permitted to do so; and enforced the MTA on an arbitrary and capricious basis based on the "personal experience" of DFI staff, including Defendant Robert Venchiarutti.

4. Over a period of several months, Plaintiff's attempts to resolve its differences with the DFI ultimately involved requesting assistance from Defendant Traci Stevens, Acting Secretary of the California Business, Transportation and Housing Agency (BTH) that oversees DFI, and Defendant Edmund G. Brown, Jr., Governor of the State of California, who oversees

BTH. Plaintiff's requests to the Governor for assistance were eventually delegated to and summarily dismissed by Defendant Jacob A. Appelsmith, Senior Advisor to the Governor.

5.    All states, including the State of California, are bound by the United States Constitution to refrain from issuing and regulating state-wide currencies, and to refrain from regulating interstate commerce. Defendants have unlawfully attempted to do at least the latter by arbitrarily restricting the flow of dollars into and out of California, and by specifically prohibiting payment processors from conducting interstate commerce without meeting requirements that are impossibly difficult to satisfy forty-seven times over for all but a very few enormous organizations.

6.    Plaintiff, a private corporation, provided money transmission and stored value services legally in the State of California through June 30, 2011, prior to a deadline established by the MTA for existing money transmitters per California Financial Code § 1872 (the "Compliance Deadline"). After the deadline, without the ability to file an application for licensure with a reasonable chance of approval by the DFI, Plaintiff ceased operations in California and nationwide. This caused damage to Plaintiff's reputation, business operations, competitive edge, and earnings.

7.    Many of Plaintiff's competitors whose activities also clearly fell within the scope of the MTA continued operating regardless, either unaware of or unconcerned about the new law and the potential criminal penalties for violation. Plaintiff's reputation was indisputably harmed by the DFI's arbitrary enforcement efforts when many individuals in the technology and finance industries reasonably questioned what Plaintiff had done "wrong" to deserve regulatory scrutiny from which Plaintiff's many unlicensed competitors were effectively exempt.

8.   Consequently, Plaintiff eventually filed thirty-three formal complaints about unlicensed money transmitters with the DFI (see attached Schedule A), to highlight the erratic and arbitrary nature of its enforcement efforts.

9.   The inhibition of Plaintiff's ability to conduct interstate commerce is a symptom of a broken financial regulatory system that has been hijacked by expensive lobbyists, that uses the phrase "consumer protection" as a thin veneer for supporting wealthy private interests, and that cannot keep up with the pace of changing technology.  The associated problems in California, though exacerbated by the inept bungling of bureaucrats in that state, apply generally to all states with MTLs.  By policy and practice, the California DFI and all similar state regulatory institutions have violated, and are violating, the rights of any non-bank entity seeking to act as a conduit by which other parties can conduct interstate commerce.  Such entities include thousands of payroll processors, law firms, real estate agents, escrow services, private universities, and technology companies.

10.   To remedy these violations of administrative law and constitutional violations and put an end to the ongoing harm caused by Defendants, Plaintiff Think Computer Corporation seeks declaratory and injunctive relief invalidating the California MTA and all MTLs and prohibiting their enforcement.  Plaintiff further seeks monetary damages from the State of California for the irreparable harm done to the company's reputation, competitive edge, earnings, and future potential.

## JURISDICTION

11.   This action raises questions under Article I, Section 8, Clause 3 (the "Commerce Clause") of the United States Constitution, as well as Article I, Section 10, Clause 1 of the United States Constitution.

12. This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and has jurisdiction over state law and common law claims pursuant to the doctrine of pendant jurisdiction.

13. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. 1343(3); the requested damages under 28 U.S.C. 1343(3); and attorney's fees under 42 U.S.C. § 1988.

## VENUE

14. Venue is proper under 28 U.S.C. § 1391 in the Northern District of California because a substantial part of the actions or omissions giving rise to this case occurred within this District, and at least one Defendant resides or operates within this District.

## THE PARTIES

### Plaintiff

15. Plaintiff Think Computer Corporation ("Think") is a privately-held Delaware corporation with its headquarters located at 3260 Hillview Avenue, Palo Alto, CA 94304-1226 in Santa Clara County, in this District. Its President and CEO is Aaron Greenspan.

### Defendants

16. Defendant Robert Venchiarutti is Deputy Commissioner, Money Transmitters of the California DFI. He is responsible for the policies and procedures carried out by the DFI relating to money transmission and stored value, including enforcement of the MTA. Defendant Venchiarutti works at least part-time in the San Francisco office of the DFI, within this District. He is sued in his official capacity.

17. Defendant William Haraf is Commissioner of the California DFI. He is responsible for the policies and procedures carried out by the DFI, including enforcement of the MTA.

Defendant Haraf works at least part-time in the San Francisco office of the DFI, within this District. He is sued in his official capacity.

18. Defendant Terri Stevens is Acting Secretary of the California Business, Transportation and Housing Agency (BTH). She supervises the DFI and is responsible for enforcement of the MTA. She is sued in her official capacity.

19. Defendant Edmund G. Brown, Jr. is Governor of the State of California. He supervises the BTH and is responsible for enforcement of the MTA. He is sued in his official capacity.

20. Defendant Kamala Harris is Attorney General of the State of California. Defendant Harris (hereinafter, the "Attorney General") is responsible for the enforcement of the MTA and is sued in her official capacity.

## FACTUAL BACKGROUND

### A. The 2010 California Money Transmission Act

21. On August 20, 2010, the California General Assembly voted for passage of Assembly Bill 2789, the Money Transmission Act. The MTA, sponsored exclusively by a financial industry lobbying group called The Money Services Round Table (which counts several multi-billion dollar corporations as its members) and written with the assistance of Defendant Venchiarutti, combined three prior California laws regulating financial institutions into one. It also established new requirements for entities wishing to transmit money domestically (i.e. within the United States). Prior to the MTA, only money transmitters dealing in the international transmission of funds had been regulated by California law.

22. Former California Governor Arnold Schwarzenegger signed the bill on September 30, 2010 and the MTA became law effective January 1, 2011, with a 180-day grace period allowing existing, unlicensed money transmitters to continue operations until July 1, 2011, at

which point an application for a license was required to be on file with the DFI in order to legally proceed with money transmission.

23. Congress's prior passage of the USA PATRIOT Act made penalties for violating any state money transmission law especially severe. § 373 of the USA PATRIOT Act modified 18 U.S.C. 1960 by broadening the meaning of an "unlicensed money transmitting business" to, according to the Commonwealth of Massachusetts, "eliminate the need to prove that the business knowingly operated without a license. In addition, the definition includes anyone who fails to register as a money transmitter with FinCEN."[1]

24. California is one of forty-six states (plus the District of Columbia and certain U.S. territories) that enforce MTLs related to domestic money transmission and stored value (see attached Schedule B). Each MTL requires the entity wishing to transmit money in that jurisdiction to fill out completely different forms; pay different application fees on differing bases; raise surety bonds of differing amounts in the absence of a federal insurance program for money transmitters similar to the Federal Deposit Insurance Corporation (FDIC); meet different minimum net worth and/or asset size requirements; provide fingerprints and data for criminal background checks in differing formats; register with different state agencies unrelated to finance for differing purposes; wait different lengths of time for approval; and post-licensure, to provide different reports at different frequencies containing different data to different agencies.

25. Despite the existence of organizations such as the Money Transmitter Regulators Association, of which Defendant Venchiarutti is Vice-President, and which counts most states with MTLs as its members, there is absolutely no standardization between states in any regard related to the regulation of money transmission.

---

[1] http://www.mass.gov/?pageID=ocaterminal&L=4&L0=Home&L1=Business&L2=Banking+Industry+Services&L3=Industry+Letters&sid=Eoca&b=terminalcontent&f=dob_patriot&csid=Eoca.

26. The United States Department of the Treasury does coordinate the registration of money transmitters through its FinCEN division, but this function exists mainly as a data collection mechanism to prevent fraud due to the requirements of the federal Bank Secrecy Act (BSA).

27. The MTA's specific requirements for new money transmitters wishing to hold and transmit funds domestically or internationally are complex and among the most onerous in the nation when compared with the requirements of most other states. The MTA requires $500,000 in "tangible net worth" (shareholder equity) at all times, in addition to a $250,000 surety bond for companies engaging in money transmission, a $500,000 surety bond for companies providing stored value products, a non-refundable $5,000 application fee, a criminal background check, a business plan, pro-forma financial statements for three years, audited past financial statements, the formal paper application, and a pre-application interview.

28. In contrast, many other states have different requirements. The State of Alabama requires a $25,000 surety bond with its MTL application, a fee under $500, and no interview. The State of Pennsylvania requires a $1,000,000 surety bond with its MTL application but has no tangible net worth requirement. The State of Hawaii requires a $1,000 scalable surety bond with its MTL application and prefers digital fingerprints, which the State of Louisiana disallows.

29. Banking is a close analog to money transmission, and on a relative basis, the state regulatory regime for banks, managed by the parties enumerated in the attached Schedule B, including Defendants, generally involves even more stringent financial prerequisites for applicants wishing to obtain bank charters. There are two key differences, however. First, while a bank could decide to apply for a charter in any given state, it could instead choose to apply for a national charter, allowing it to operate in all fifty states without having to file fifty applications, raise fifty times as much capital, and report to fifty separate regulators. Money transmitters have

no such option due to MTLs.  Second, national charters are made possible by an insurance

network that covers every licensed institution nationwide, regardless of location, charter type or

asset size, in the form of FDIC insurance for banks or National Credit Union Administration

(NCUA) insurance for credit unions.  These types of insurance work because premiums paid by

the insured parties cover each other.  In contrast, each money transmitter's premiums insure only

itself.  Though bond underwriters are able to offset *their* risk by collecting bond premiums from

multiple entities, the risk to consumers remains the same, and the cost to bondholders (the money

transmitters) is enormous.

30.  Due to the wildly different requirements for licensure, the MTA and all MTLs have

an effect equivalent to that of establishing intangible currencies on a state-by-state basis.  In a

hypothetical purely digital society, one that the United States is quickly moving toward, currency

can be defined as a set of restrictions on information that is used to represent debts.  The

equivalent of a state-issued currency in such a society is therefore a set of restrictions on

monetary transfers within each state by each state, which is functionally equivalent to the present

set of MTLs.

31.  Though the apparatus for a federal regulator of money transmitters already exists in

the form of the Department of the Treasury's Financial Crimes Enforcement Network (FinCEN),

its power is severely limited by state regulators.  Despite nominal goals of consumer protection,

MTLs so restrict the competitive environment and so fragment the regulatory regime that

consumers are actually harmed by monopolistic business practices and regulatory arbitrariness to

an extent that vastly exceeds the extremely limited protection offered by surety bonds.

32.  Investors who might support small corporations in their efforts to acquire licenses are

generally spooked by the regulatory uncertainty surrounding money transmission.  The MTA

and all MTLs therefore have a chilling effect on competition in the payment processing market, as well as other markets that involve money transmission.

33. The MTA restricts entities wishing to do business with California residents, and not just entities physically located in California. Therefore, despite being a state law, the MTA's scope extends far beyond California's borders, encompassing the entire nation. Even though California law enforcement has no jurisdiction outside of the state, the combined influence of the USA PATRIOT Act and the DFI's policy of referring all offenders to the regional United States Attorney's Office means that the State of California effectively polices the entire country, as does each state's financial regulator. This, too, has a chilling effect on competition in the financial sector.

### B.  Think's Actions as a Money Transmitter Prior To Passage of the MTA

34. Plaintiff began researching, designing and investing in the FaceCash mobile payment system ("FaceCash") in late 2008, well before any domestic MTL had been proposed in California. Plaintiff formally launched FaceCash in May, 2010. The FaceCash system had several aims: first and foremost, to lower payment processing, or interchange, fees for businesses small and large. In addition, FaceCash was designed to simplify the process of computing taxes and accounting reports generally for merchants, and to make electronic receipts and coupons a reality for consumers. The system achieved this through the use of Think's proprietary software and patent-pending technology. By the end of June, 2011, despite facing regulatory constraints in the vast majority of the country that posed a problem for national retailers otherwise extremely interested in the payment system, Think had signed up twenty-five merchants and approximately 500 consumers for FaceCash.

35. Working on a pre-paid debit model, FaceCash involved holding consumer deposits in a pooled bank account until such time as a consumer requested a withdrawal from their given

FaceCash account, or the money was spent at a participating merchant. Due to the necessity of holding consumer deposits for the model to succeed, Plaintiff's activities fell within the scope of the MTA.

36. On June 30, 2011, prior to the MTA's compliance deadline, the risk posed to consumers by Plaintiff's money transmission activities was extremely minimal, if not zero. Up until the deadline, Plaintiff's average daily money transmission volume was close to zero as Plaintiff had only successfully finished the merchant side of the product two days prior. Plaintiff's cash assets always exceeded its liabilities to FaceCash depositors by a significant factor. By design, Plaintiff did not extend credit to FaceCash consumers, nor did Plaintiff make loans as a bank might. Plaintiff also carefully tracked account balances and fraud rates (which were minimal), meaning that even in the highly unlikely event of default Plaintiff could still afford to refund every consumer's funds.

37. No formal complaints were filed with any regulatory agency against Plaintiff, including the DFI, prior to the Compliance Deadline or as of the date of this briefing. Nor has Plaintiff ever been named as a defendant in any civil lawsuit, any criminal charge, or any legal proceeding involving money transmission in any way.

38. Plaintiff contacted the DFI by telephone in mid-2010 to ensure that it was in compliance with any applicable state laws. The call was short: Mr. Julio Prada informed Plaintiff that no license was necessary for domestic money transmission and hung up.

39. Plaintiff next contacted the DFI by e-mail on April 1, 2011 to inquire as to the status of money transmission law in California after reading an article suggesting that policies had changed. Mr. Prada responded promptly indicating, "We now regulate domestic and stored value money transmission activities (effective January 1, 2011)," and began arranging for the

mandatory pre-filing meeting to take place between Plaintiff and DFI. The DFI ultimately scheduled the meeting for June 14, 2011, roughly two weeks before the Compliance Deadline.

40. Prior to the meeting, Plaintiff attempted to open a dialog between the DFI, members of the California General Assembly, and Plaintiff regarding the extreme magnitude of the MTA's prerequisite filing requirements. Defendant Venchiarutti unilaterally quashed these efforts by terminating a planned conference call, stating that the DFI had a practice of not communicating with legislators via conference call.

41. On June 14, 2011, Plaintiff's Chief Executive Officer, Mr. Aaron Greenspan, and Mr. Christian Kalva (a/k/a Jerry Klein), a full-time contractor for Plaintiff, attended a mandatory pre-interview meeting at the San Francisco offices of the DFI. Present at the interview from the DFI were Defendant Venchiarutti and two DFI staff members: Mr. Julio Prada, and Mr. Omar Shahin.

42. At considerable expense, Plaintiff provided the DFI with a copy of the company's audited 2010 financial statements ahead of the interview, per the DFI's written requirements. In person, Defendant Venchiarutti incorrectly denied that the DFI required audited financial statements, but claimed to have reviewed them nonetheless. Unbeknownst to Plaintiff and the DFI, these statements contained a serious error caused by the auditor that made Plaintiff appear to have $145,000 less in tangible shareholder equity than it did in actuality on December 31, 2010. The auditor later issued re-stated financial statements for Plaintiff.

43. To the surprise of Plaintiff, the tenor of the interview was extremely hostile. After Mr. Prada and Mr. Shahin briefly introduced themselves, Defendant Venchiarutti dominated the conversation in a bullying, patronizing, unprofessional and condescending manner, generally not conductive to the advancement of the license application process. Defendant Venchiarutti frequently cut off Mr. Greenspan's attempts to speak. Several specific statements made by

Defendant Venchiarutti in this pointed fashion altered Plaintiff's impression of the DFI's actual policies toward licensure under the MTA:

    a) Defendant Venchiarutti began by insisting that Plaintiff would need to raise at least "$20 million" of capital, not $500,000 as stated in the MTA, with venture capital being the implied source of funding, based on his "personal experience," which was that all money transmitters required at least "three years" to achieve profitability.

    b) In response to Plaintiff's shock at the false assumptions embodied by Defendant Venchiarutti's opening statement, Defendant Venchiarutti asked whether Plaintiff believed the meeting to be "a classroom exercise," in a clear reference to Mr. Greenspan's and Mr. Klein's relatively younger age.

    c) As the meeting continued, Defendant Venchiarutti implied various figures as the actual minimum amount of capital necessary to successfully apply for a license, including "$1 million," "$2 million," and at one point, "$80 million."

    d) When Mr. Greenspan questioned Defendant Venchiarutti's basis for such figures and asked general questions about the MTA appropriate given the purpose of the meeting, Defendant Venchiarutti falsely accused him of expressing intent to violate the MTA, and exclaimed that he should, "choose [his] words carefully in this room." He proceeded to threaten to have Mr. Greenspan incarcerated.

    e) Defendant Venchiarutti stated "I don't care if you have the greatest product in the world!..." implying that Plaintiff would not be granted a license under any circumstances. He also stated that he did not believe that Plaintiff could raise the necessary capital to apply for a license, and that even if it did, the DFI

would "need" to conduct a thorough background check on all investors to make sure that they were actually legitimate sources of funding.

f)  Defendant Venchiarutti further suggested that Plantiff's technology had to be deficient since Plaintiff had not raised outside capital, an insulting statement based on profoundly incorrect assumptions about technology and venture capital investing in general and Plaintiff in particular.

g)  Defendant Venchiarutti falsely suggested that Plaintiff was "already insolvent" and that Plaintiff was unable to control its rate of spending. Though both statements were demonstrably untrue, by this point Mr. Greenspan decided not to volunteer any further information of any kind to Defendant Venchiarutti.

h)  Defendant Venchiarutti stated that for years (necessarily meaning prior to the passage of the MTA), the DFI had an unwritten policy of not approving applications filed by money transmission entities with tangible net worth less than one million dollars.

i)  In response to Mr. Greenspan's repeated direct question as to whether or not the DFI had received any formal complaints regarding FaceCash, Defendant Venchiarutti falsely asserted that the DFI had received complaints from "someone—I think it was your competitors complaining about you." Defendant Venchiarutti later admitted that the DFI had not actually received any complaints about FaceCash to the best of his knowledge.

j)  At the conclusion of the meeting, Defendant Venchiarutti refused to provide a business card to Mr. Greenspan when asked, and stated that Plaintiff was still welcome to apply for a license, if that was what Plaintiff really wanted to do.

The implication that Plaintiff's application would be denied was unmistakable.

44.  Since the end of 2010, but prior to the June 14 interview, Think had raised approximately $500,000 in additional funding from family members of Mr. Greenspan, placing Plaintiff's tangible shareholder equity well above the written statutory minimum of $500,000 established by the MTA.  Updated financial statements reflecting the infusion of funding were not yet available from Plaintiff's auditors at the time of the June 14 interview, and given the threat concerning extensive background checks on investors, Mr. Greenspan felt uncomfortable disclosing such information to Defendant Venchiarutti for fear that it might somehow be used against Plaintiff or Mr. Greenspan's family.

45.  Mr. Greenspan followed up with Defendant Venchiarutti via e-mail after the meeting, and continued to have difficulty establishing the true minimum net worth required by the DFI in order to apply for a license under the MTA.

46.  Given that state MTL applications generally require the applicant to indicate if a license has ever been rejected for any reason, on June 30, 2011 Mr. Greenspan decided that Plaintiff could not run the likely risk of nationwide rejection, and opted to shut down FaceCash in California and nationwide.

47.  Mr. Greenspan enlisted the informal assistance of Ms. Eileen Newhall, Staff Director of the California Senate Banking and Financial Institutions Committee, to try to ascertain the DFI's unwritten requirements.  Despite repeated attempts to communicate with Defendant Venchiarutti, Ms. Newhall was unsuccessful at achieving this goal.

48.  Mr. Greenspan further requested formal assistance from Assemblyman Richard Gordon, representing the 21st District, including Palo Alto, where Plaintiff is located and where Mr. Greenspan resides.  Assemblyman Gordon's District Director, Mr. Jeremy Dennis, at first

attempted to establish a constructive dialog with Defendant Venchiarutti, and then with

Defendant Venchiarutti's supervisor, Defendant Haraf. Mr. Dennis reported back to Mr.

Greenspan that Defendant Haraf had forwarded a voicemail left by Mr. Dennis intended only for

Defendant Haraf back to Defendant Venchiarutti, and that Defendant Venchiarutti had followed

up by leaving a threatening voicemail for Mr. Dennis instructing him never to call his boss again.

Mr. Dennis called this episode the worst communications breakdown he had seen in his career in

government, but eventually grew so frustrated at the lack of progress that he delivered an

ultimatum: that either Plaintiff could apply for a license without knowing the prerequisite

requirements, or proceed of its own accord without the assistance of the Assemblyman. When

Mr. Greenspan refused to do so on behalf of Plaintiff, citing the non-refundable $5,000

application fee and inter-linked nature of MTL license application processes, Mr. Dennis

unilaterally withdrew Assemblyman Gordon's office from providing any further assistance to

Plaintiff.

    49. Before withdrawing, Mr. Dennis put Mr. Greenspan in touch with DFI Senior

Counsel Tony Lehtonen. In his first e-mail communication with Plaintiff, Mr. Lehtonen wrote,

"My experience is that required levels are established only after a transmitter applicant's

application." Mr. Greenspan and Mr. Lehtonen subsequently exchanged several e-mails and

spoke on the phone several times. On September 12, 2011, Mr. Greenspan sent Mr. Lehtonen

several documents, including documents that had already been submitted to the DFI, and

Plaintiff's re-stated audited financial statements. Mr. Greenspan also informed Mr. Lehtonen

that Plaintiff had received additional investment since the date of the audited financial statements

which resulted in Plaintiff's net worth being well above the statutory threshold. Though Mr.

Lehtonen was unable to provide answers to any questions posed by Plaintiff during these calls, at

various points he did state the following:

a)  He believed Mr. Greenspan's concerns and tone to be reasonable and not as
    extreme as what he had been led to believe by others at the DFI;

b)  He had been told that money transmitters generally needed three years to
    become profitable;

c)  He could not remember the last time that the DFI had licensed a money
    transmitter with only the $500,000 statutory minimum in tangible net worth;

d)  He had not previously been aware of the documents submitted to the DFI by
    Plaintiff;

e)  It was possible that the DFI's regulations had not kept pace with technological
    developments;

f)  The DFI would probably not actively investigate any unlicensed money
    transmitters;

g)  The DFI legal department was surprised by and confused by the need for the
    domestic money transmission regulations embodied by the MTA, which many
    DFI attorneys considered a waste of time and resources.

50. On October 17, 2011, when Mr. Greenspan called to inquire again as to the DFI's
actual prerequisites for filing a license application under the MTA, Mr. Lehtonen told Mr.
Greenspan that he had been instructed that he was no longer allowed to speak any further with
him and immediately hung up.

51. As of the date of this filing, all efforts to clarify the basis for the MTA's
requirements, as well as the actual requirements themselves, through telephone calls, e-mails,
and written letters to the DFI, Defendant Stevens of the BTH Agency, the Governor's office,
members of both houses of the California legislature, and members of both houses of Congress,
have been unsuccessful.

## C. DFI's Arbitary Enforcement of the MTA and the Effects Thereof on Plaintiff

52. The MTA exempts certain classes of entities from the law's requirements, but the list of exemptions is not exhaustive, causing some institutions to violate the statute on a daily basis (at least since July 1, 2011).

53. Private universities, for example, are not exempt from the MTA, but frequently issue stored value instruments to students under names such as "Crimson Cash" (offered by Harvard University), "Cardinal Dollars" (offered by Stanford University) and "TechCASH" (offered by MIT) that can be used either on campus or to transmit money to area merchants via routine purchases. Such money transmission systems are designed to temporarily eliminate the need for debit and credit cards, protecting students from predatory lending practices frequently targeted at youth with limited or non-existent credit history. These programs are extremely common nationwide at institutions that enroll California residents, yet not a single institution of higher education is registered in California as a money transmitter with the DFI, making university presidents and trustees criminally liable.

54. Other types of entities regularly violate state money transmission statutes, including the MTA. These institutions include:

    a)  Payroll processors, which draft funds on behalf of clients in advance of tax and benefit deadlines;

    b)  Real estate agents, which handle funds for buyers and sellers of homes;

    c)  Law firms, which regularly collect funds from clients to forward to courts, government agencies and adverse parties;

    d)  Construction companies, which use client funds to pay for materials and equipment; and

    e)  Technology companies, which facilitate electronic payments.

55. News of the FaceCash shut down was widely publicized and regarded as an important event in the technology industry, and the payments industry in particular. Plaintiff immediately lost the actual and potential revenue streams from its established FaceCash merchants, the ability to sign up California consumers for the service, and the standing to realistically enter into partnership negotiations with device manufacturers and other key partners. At least one prospective merchant cancelled his agreement to use Think software for purposes aside from FaceCash directly due to the regulatory uncertainty surrounding the MTA. The news clearly damaged Think's reputation, and many individuals who learned of the events blamed Think and its management for the interruption in service.

56. Due to the shut down, Plaintiff refunded over $40,000 to depositors, incurring higher-than-average bank transfer fees as a result.

57. Directly due to the regulatory uncertainty surrounding the MTA and other MTLs, Plaintiff was subsequently rejected as an investment opportunity by several prominent venture capital firms, eliminating virtually the only source of funding large enough to realistically allow Plaintiff to comply with the MTA.

58. Due to the effects of the MTA, one of Plaintiff's key full-time software developers resigned in late June, 2011, leaving the company without the individual who had designed crucial parts of the FaceCash system software.

59. Due to the DFI's interpretation of the MTA's scope as being nationwide, Plaintiff was unable to grow FaceCash to a national scale, leading to a loss of prospective revenues and presenting a window of opportunity for Plaintiff's competitors. Some of Plaintiff's competitors took advantage of this opportunity to conduct money transmission illegally without fear of being noticed, putting Plaintiff at an even further disadvantage.

60. Due to Plaintiff's forced inability to operate the FaceCash system without risking criminal prosecution, FaceCash merchants were forced to once again pay higher per-transaction fees to their original payment service providers.

61. With some prospective applicants such as Plaintiff, the DFI used criminal prosecution as a threat not only when appropriate, but whenever questions of *any kind* regarding its actions were raised. Yet with other prospective applicants, the DFI turned a blind eye, even when entities were actively engaged in money transmission on a massive scale that would be evident from reading any newspaper.

62. On October 13, 2011, three and a half months after FaceCash shut down, the DFI relented and issued an order signed by Deputy Commissioner Robert Venchiarutti "exempting" Plaintiff from the portion of the MTA that purported to regulate California companies activities in states outside of California. The order did not however exempt Plaintiff from any of the MTA's requirements within California. Therefore, FaceCash remained shut down.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Failure to Allow Review of Proposed California Regulations (1 CCR § 44)

63. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

64. Defendants, acting under color of state law, policy and practice, have enacted regulations that are vague, overbroad, arbitrary and obfuscatory with regard to the prerequisite requirements necessary to obtain a license for money transmission in the State of California. Defendants have conditioned the ability to obtain such a license on the subjective emotional reaction of the examiner, and not on the requirements of the statute that Defendants are obligated to enforce. After repeated requests from Plaintiff and members of the California legislature, Defendants continue to refuse to disclose the real requirements to apply for a license.

65. The only publicly available written record of Defendants' actual prerequisite policies, far exceeding those written in the statue, is a single unattributed quotation contained within an article entitled "Think Computer Ends Mobile Payments in California" in *American Banker*, stating, "A department spokeswoman says the actual amount needed is 'more than $1 million.'" However, *American Banker* is a trade publication owned and operated by SourceMedia, Inc. and not an official publication of the DFI.

66. Defendants have established said regulations without the opportunity for appropriate public discourse through a hearing and comment period as required by 1 CCR § 44.

67. Defendants have repeatedly failed to provide a copy of said regulations in writing, despite insisting that the regulations represent a longstanding unwritten policy of the DFI.

68. Because of Defendants' actions, Plaintiff has suffered and continues to suffer irreparable harm that cannot be fully obviated by an award of monetary damages.

69. Plaintiff is entitled to damages in an amount determined by the Court and the reasonable costs of this lawsuit, including its reasonable attorneys' fees.

## SECOND CLAIM

### Arbitrary Enforcement of the Law in Violation of Due Process Rights Under the California Constitution

70. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

71. Article I, Section 7(a) of the California Constitution provides that a person may not be deprived of liberty or property without due process of the law.

72. Defendants' unwillingness to provide crucial, unprivileged information necessary for Plaintiff to exercise its right to file an application for licensure under the MTA with a reasonable chance of approval constitutes a violation of Plaintiff's due process rights under the California Constitution.

73. Defendants' numerous false, misleading, careless and baseless statements intended to dissuade Plaintiff from exercising its right to file an application for licensure under the MTA with a reasonable chance of approval constitute a further violation of Plaintiff's due process rights under the California Constitution.

74. At least as early as October 17, 2011, Defendants' sudden institution of a policy refusing to allow further communication with Plaintiff constitutes a further violation of Plaintiff's due process rights under the California Constitution.

75. Defendants, acting under color of law and consumer protection, have selectively enforced its vague, overly broad, and often unwritten regulations in a manner so arbitrary and capricious that they are comfortable citing unwritten policy based on only their own "personal experience" as necessary to justify any given application's approval or rejection, with no opportunity for public comment.

76. Because of Defendants' actions, Plaintiff has suffered and continues to suffer irreparable harm that cannot be fully obviated by an award of monetary damages.

77. Plaintiff is entitled to damages in an amount determined by the Court and the reasonable costs of this lawsuit, including its reasonable attorneys' fees.

## THIRD CLAIM

### Taking of Plaintiff's Property in Violation of Due Process Rights Under the California Constitution

78. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

79. Article I, Section 7(a) of the California Constitution provides that a person may not be deprived of liberty or property without due process of the law.

80. Prior to the enactment of the MTA, Plaintiff's use of its computer systems and other assets to route money on behalf of others fully complied with all federal and state licensing requirements.

81. Plaintiff relied on this existing state of legal and regulatory affairs in purchasing, designing, and maintaining its operations.

82. Plaintiff has a vested property right and constitutionally-protected interest in continuing to utilize its assets in this manner without the unduly onerous restrictions imposed by the State through the MTA, plainly aimed at extinguishing such use without exposing the State or previously-licensed entities to legal repercussions.

83. The MTA is facially unconstitutional as a violation of the California Constitution's guarantees of due process, and has deprived Plaintiff of income attributable to this existing, lawful use of property.

## FOURTH CLAIM

### False Light

84. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

85. Plaintiff brings this cause of action pursuant to California Government Code §§ 815, 815.2 and 820.

86. On September 19, 2011, Defendant Appelsmith, in his capacity as Senior Advisor to the Governor, responded to a letter sent by Plaintiff to Defendant Brown. Defendant Appelsmith made several false statements in his response.

87. Plaintiff posted a link to a scanned digital image of Defendant Appelsmith's written response on the FaceCash web site to keep interested parties informed of FaceCash's ambiguous legal status due to the effects of the MTA. Consequently, many thousands of individuals read Defendant Appelsmith's response.

88. Defendant Appelsmith issued another written response dated October 28, 2011 in reply to Plaintiff's e-mail communications regarding the DFI's arbitrary and capricious enforcement practices. This written response was also scanned and made accessible from the FaceCash web site.

89. Both of Defendant Appelsmith's written responses placed Plaintiff in a false light in the public eye.

90. **First Statement Made by Defendant Appelsmith that Placed Plaintiff in a False Light in the Public Eye**

    a) In his September 19, 2011 response, Defendant Appelsmith wrote, "I understand you have been afforded another opportunity to meet with the Department of Financial Institutions and the Department has assigned a specific member of their staff to work with you directly." The first part of this statement is false and the second part of this statement is misleading.

    b) Plaintiff, DFI and BTH personnel were scheduled to meet on September 14, 2011, until Mr. Greenspan inadvertently learned that that Defendant Stevens expected Mr. Greenspan to appear in Sacramento on that day for a 9:00 A.M. meeting, several hundred miles from Plaintiff's headquarters, at Plaintiff's expense. Mr. Greenspan proposed a conference call at no expense to any of the parties instead, to which Mr. Lehtonen at the DFI agreed. Defendant Stevens instead cancelled the meeting and any potential conference call. After the meeting was cancelled no additional opportunity to meet with BTH and/or DFI was offered. The statement that "you have been afforded another opportunity to meet with the Department of Financial Institutions" was and is therefore false, and the implication that Plaintiff had ignored or was ignoring

an opportunity to resolve the situation, while continuing to write letters about it, placed Plaintiff in a false negative light.

c) Though Mr. Lehtonen was available to discuss Plaintiff's concerns with Mr. Greenspan for a short period of time, the statement "the Department has assigned a specific member of their staff to work with you directly" necessarily implies an ongoing open line of communication with the specific staff member. In fact, this open line of communication ceased when Mr. Lehtonen hung up on Mr. Greenspan unprovoked and never spoke with him again. Thus, the statement is misleading and creates a false implication that Plaintiff's concerns would actually be addressed by the DFI.

91. **Second Statement Made by Defendant Appelsmith that Placed Plaintiff in a False Light in the Public Eye**

a) In his September 19, 2011 response, Defendant Appelsmith wrote, "Jointly, everyone has been committed to making sure your company received fair and equitable consideration under existing law." This statement is false.

b) In the context of the letter, "everyone" refers to the DFI, the BTH Agency, and the Governor's office. Yet the hostile behavior of Defendant Venchiarutti at the DFI, the indifferent written responses received from Defendant Stevens at the BTH Agency, the indifferent verbal responses received from Mr. Adrian Mata in the Governor's office, and Defendant Appelsmith's own written response directly contradict the fanciful notion that anyone had any commitment to making sure that Plaintiff received fair and equitable consideration under the law.

c) Plaintiff filed thirty-three formal complaints with DFI regarding active unlicensed money transmitters, indicating that Plaintiff was not in fact receiving anywhere close to "fair and equitable" consideration.

d) Defendant Appelsmith's statement created an impression that Plaintiff's grievances were unreasonable and unfounded, and that Plaintiff had done something wrong to cause it to be necessary for FaceCash to shut down while other unlicensed money transmitters continued operating, which portrayed Plaintiff in a false negative light.

e) Defendant Appelsmith's politically correct statement is so clearly contradicted by voluminous evidence as to be offensive to any rational person.

92. **Third Statement Made by Defendant Appelsmith that Placed Plaintiff in a False Light in the Public Eye**

a) In his September 19, 2011 response, Defendant Appelsmith wrote, "Irrespective of the final outcome, all branches of government have applied due diligence to this situation...everyone has worked within their purview to provide FaceCash with appropriate guidance, and as important...every effort has been made to encourage sound business practices in the state." Each part of this statement is false.

b) Despite Defendant Appelsmith's letter, on September 19, 2011, Plaintiff still could not file an application for a license under the MTA due to ambiguity surrounding the tangible net worth prerequisite caused by the DFI, reflecting the fact that at least some "appropriate guidance" was severely lacking.

c) The "guidance" provided by Defendant Venchiarutti was neither professional nor "appropriate."

d) Plaintiff filed thirty-three formal complaints with DFI regarding active unlicensed money transmitters, indicating that Defendants were anything but concerned with encouraging "sound business practices," unless Defendants actually believed that the MTA did not encourage sound business practices.

f) Defendant Appelsmith's statement created an impression that Plaintiff's grievances were unreasonable and unfounded, and that Plaintiff had done something wrong to cause it to be necessary for FaceCash to shut down while other unlicensed money transmitters continued operating, which portrays Plaintiff in a false negative light.

g) Defendant Appelsmith's politically correct statement is so clearly contradicted by voluminous evidence as to be offensive to any rational person.

93. **Fourth Statement Made by Defendant Appelsmith that Placed Plaintiff in a False Light in the Public Eye**

a) Defendant Appelsmith's October 28, 2011 response (which was oddly postmarked six days later, only after Plaintiff had filed twenty-seven additional formal complaints with the DFI) contained two sentences: "As I indicated to you in my letter last month, I have reviewed this matter closely and am satisfied that the State's regulators have handled it appropriately. Although you are not satisfied with the result, it is one that is compelled by statutory directives that the State is obligated to follow." The second sentence of this two sentence letter is false.

b) Defendant Appelsmith does not specify which "statutory directives" in particular he refers to, but whatever they may be, the statement remains false. The DFI is in fact permitted by Financial Code § 1806 to exempt any entity

from the requirements of the MTA so long as the Commissioner finds it in the "public interest." Certainly no legitimate statute could obligate Defendant Venchiarutti to ridicule and insult prospective license applicants.

    c) Defendant Appelsmith's statement created an impression that Plaintiff's grievances were unreasonable and unfounded, and that Plaintiff had done something wrong to cause it to be necessary for FaceCash to shut down while other unlicensed money transmitters continued operating, which portrays Plaintiff in a false negative light.

94. The total effect of Defendant Appelsmith's statements was to disparage Plaintiff in the public eye given the widespread interest in the substance of the State's answers to Plaintiff's concerns.

95. After Mr. Greenspan wrote an essay highlighting as one of its main points the DFI's inconsistent enforcement of the MTA, several individuals wrote responses clearly indicating that his reputation and that of Plaintiff had been deeply harmed, simply for Plaintiff's desiring impartial enforcement of the law.

## FIFTH CLAIM

### Violation of Plaintiff's Fourteenth Amendment Due Process Rights (42 U.S.C. § 1983)

96. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

97. Defendants have established customs, policies, patterns, and practices of enforcing the MTA under color of law, and have deprived Plaintiff of its due process rights in violation of the Fourteenth Amendment to the United States Constitution.

98. The MTA and all MTLs, in that they effectively extinguish a legally valid, vested right to use of property, is facially unconstitutional as a violation of Plaintiff's rights to due process under the Fourteenth Amendment to the United States Constitution.

99. The restriction of money transmission by states is unreasonable and onerous in that it illegitimately and arbitrarily singles out small entities and new entities wishing to conduct interstate commerce and wishing to provide a conduit for others to conduct interstate commerce, constituting a violation of Plaintiff's right to Equal Protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution.

100. All conditions precedent to the bringing of this action have occurred or have been exhausted.

101. Plaintiff has incurred and will incur costs for attorneys and other necessary fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

102. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to declaratory relief and a preliminary and permanent injunction invalidating and restraining enforcement of the California MTA and all MTLs.

## SIXTH CLAIM

### Violation of the Commerce Clause

103. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

104. The MTA and all MTLs violate the Commerce Clause of the United States Constitution by directly regulating interstate and foreign commerce and purporting to regulate conduct that occurs in other States and Nations.

105. The MTA and all MTLs violate the Commerce Clause by regulating, on its face and in its practical effect, the channels of interstate and foreign commerce and the use of these channels of interstate and foreign commerce.

106. By design and in practical effect, the MTLs impermissibly regulate conduct occurring outside of their respective states by making it a crime to offer money transmission services to entities with no connection to or presence in the local market.

107.Defendants have suppressed constitutionally protected interstate trade and commerce in order to protect the narrow interests of a select few special interests, who in some cases sponsored MTL legislation due to their perceived benefits.

108.Defendants are purporting to act within the scope of their authority under state law in enforcing and implementing the MTA.

109.Defendants are liable to Plaintiff for proper redress under 42 U.S.C. § 1983 because the MTA deprives Plaintiff of the rights, privileges, and immunities secured by the Commerce Clause of the United States Constitution.

110.Plaintiff has no adequate remedy at law.

## SEVENTH CLAIM

### Violation of the Commerce Clause

111.Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

112.MTLs violate the Commerce Clause by imposing excessive and unreasonable burdens on interstate and foreign commerce that are disproportionately large relative to the purported local benefits of the MTLs, which are in many cases negative. The MTLs impose significant burdens on Plaintiff (and other prospective and active money transmitters) in connection with their conduct of interstate commerce, as well as burdens on consumers and merchants wishing to use money transmitters to conduct interstate commerce.

113.Among other burdens imposed by MTLs, executives and directors of applicants for licensure must have their fingerprints taken again and again and again and again in order to provide various state regulators with data to conduct criminal background checks. Additionally, each MTL requires its own surety bond of an arbitrary fixed amount not commensurate with an applicant's deposits on hand. In aggregate, the financial requirements for all of the MTLs combined are so high that most businesses simply cannot afford to enter the industry without

immense amounts of capital, even if a business only plans to hold a single dollar on behalf of a third party.

114. MTLs are an inappropriate manner in which to regulate money transmission in the modern age. Today and for the foreseeable future, nationwide internet access and ubiquitous mobile device usage combine to make it difficult, and at times impossible, to determine the true physical location of a consumer wishing to pay for goods or services, constituting an unreasonable and unnecessary burden on money transmitters that serves no consumer protection or other purpose.

115. The local benefits of the MTLs, namely, protection of local consumers, are practically zero, or negative given the local costs. Only *registered* MTLs that can afford to meet the high financial burden of applying are covered by surety bonds, leaving the businesses posing the highest risk to consumers, meaning those that are unregistered, completely uninsured. Therefore, even with MTLs in place, consumers are still at risk if they happen to pick the "wrong" money transmitter. Simultaneously, those money transmitters that are available in the marketplace are more likely to be one of a handful of companies that can afford to meet the requirements of all MTLs nationwide, leading to higher prices for consumers. In practice, the MTLs as they are currently structured give consumers a choice between being scammed by unlicensed thieves, or gouged by conglomerates wielding monopoly power.

116. The MTLs are therefore not justified by any valid public welfare, consumer protection, or pro-competitive purpose unrelated to economic protectionism.

117. Defendants are purporting to act within the scope of their authority under state law in enforcing and implementing the MTLs.

118. The notion that each state's currency might be valued differently was anticipated and explicitly discouraged by the country's founding fathers. In Federalist Paper No. 44, James Madison wrote (emphasis added):

> In addition to these persuasive considerations, it may be observed, that the same reasons which show the necessity of denying to the States the power of regulating coin, prove with equal force that they ought not to be at liberty to substitute a paper medium in the place of coin. *Had every State a right to regulate the value of its coin, there might be as many different currencies as States, and thus the intercourse among them would be impeded; retrospective alterations in its value might be made, and thus the citizens of other States be injured, and animosities be kindled among the States themselves.* The subjects of foreign powers might suffer from the same cause, and hence the Union be discredited and embroiled by the indiscretion of a single member. No one of these mischiefs is less incident to a power in the States to emit paper money, than to coin gold or silver. The power to make any thing but gold and silver a tender in payment of debts, is withdrawn from the States, on the same principle with that of issuing a paper currency.

The wide discrepancies between the various requirements for money transmission licenses in each state are clearly tantamount to each state's ability to regulate the value of its own coin.

119. The combined net effect of the MTA and all MTLs is one of the states regulating interstate commerce. With all such laws exempting banks from regulation, and banks lacking any competitive downward pressure on pricing for money transmission services, consumers and merchants suffer the consequences. Banks have therefore enjoyed a near-monopoly on payment services within the United States, while less-risky money transmission services, which do not make loans, have only been able to qualify for all of the licenses necessary to operate nationwide on the rarest of occasions.

120. Defendants are liable to Plaintiff for proper redress under 42 U.S.C. § 1983 because the MTLs deprive Plaintiff of the rights, privileges, and immunities secured by the Commerce Clause of the United States Constitution.

121. Plaintiff has no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the following relief:

A. A declaratory judgment stating that the MTLs, including the 2010 California Money Transmission Act, violate the United States Constitution and are unenforceable;

B. A preliminary and permanent injunction enjoining the Defendants from implementing or enforcing the MTLs, including the 2010 California Money Transmission Act;

C. Monetary damages in the amount of $25,000,000.00 for infringing upon Plaintiff's exercise of its ability to conduct interstate commerce, and for effecting the loss of Plaintiff's entire business, and for causing irreparable harm to Plaintiff's brand, reputation and future prospects;

D. General damages according to proof;

E. Special damages according to proof;

F. Punitive damages against Defendant Venchiarutti;

G. Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law;

H. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demand a trial by jury in this action of all issues so triable.

Respectfully submitted this 14th day of November, 2011.

Aaron Greenspan
Think Computer Corporation
3260 Hillview Avenue
Palo Alto, CA  94304-1226
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: legal@thinkcomputer.com