1  Michael Brooks Carroll (Bar #54904)
   Kevin A. Flautt (Bar #257892)
2  LAW OFFICES OF MICHAEL BROOKS CARROLL
   300 Montgomery Street, Suite 650
3  San Francisco, California 94104
   Telephone: (415) 788-7600
4  Facsimile: (415) 421-7379
   carroll_law@sbcglobal.net

5
   Attorneys for Plaintiff
6  THINK COMPUTER CORPORATION

7               UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
8                     San Jose Division

9  THINK COMPUTER CORPORATION,          )   Case No. CV11-05496-HRL
                                        )
10         Plaintiff,                   )   **FIRST AMENDED COMPLAINT FOR**
                                        )   **DECLARATORY AND INJUNCTIVE RELIEF**
11     v.                               )   **AND JURY DEMAND**
                                        )
12  ROBERT VENCHIARUTTI, in his official )  **Complaint Filed: November 14, 2011**
   capacity as Deputy Commissioner of the )  **Trial Date: None Set**
13  California Department of Financial    )
   Institutions; WILLIAM HARAF, in his officia )
14  capacity as Commissioner of the California )
   Department of Financial Institutions; TRACI )
15  STEVENS, in her official capacity as Acting )
   Secretary of the California Business,      )
16  Transportation and Housing Agency; JACOB )
   A. APPELSMITH, in his official capacity as )
17  Senior Advisor to the Governor of the STATE )
   OF California; EDMUND G. BROWN, JR. in )
18  his official capacity as Governor of the State of )
   California; and KAMALA HARRIS, in her )
19  official capacity as Attorney General of the )
   State of California,                   )
20                                        )
           Defendants.                    )
21

22      Plaintiff Think Computer Corporation (hereinafter, "Plaintiff" or "Think") hereby alleges and

23  states as its claims against the Defendants, and each of them, as follows:

24                  <u>INTRODUCTION AND SUMMARY OF THE CASE</u>

25      1.   Each year, billions of dollars worth of retail transactions are processed through electronic

26  means via plastic debit and credit cards.  These plastic cards have largely taken the place of cash and

27  coin in the United States, and their issuance and commercial exploitation by banks has become the

28  source of controversy and debate as to the ultimate beneficial effect on our economy for a variety of

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

1

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

1   reasons.  Plastic debit and credit cards are expensive for merchants to process and their issuing banks

2   frequently levy onerous interest rates on those consumers who are unable to pay their bills in a timely

3   fashion.  There are only four major issuers of such plastic debit and credit cards, and otherwise barely

4   any meaningful competition exists, to the detriment of the consumers and merchants who use them.

5   However, the development and proliferation of the internet as the dominant medium of electronic

6   commerce which, as the United States Supreme Court has recognized, "now makes it possible for an

7   entity to have a significant economic presence in a state absent any physical presence there," means that

8   even relatively small business entities could develop and effectively offer in interstate commerce

9   electronic payment options for consumers and merchants that would effectively compete with such

10   plastic debit and credit cards.

11        2.   FaceCash is a patent-pending mobile payment system and intellectual property developed

12   and owned by Plaintiff to provide an alternative to plastic payment cards for consumers and merchants.

13   FaceCash works on the premise that an in-person payment can be effected using only a simple barcode

14   and a digital image of the consumer's face, without the need for a plastic payment card at all.  Upon

15   scanning the barcode, presented either on a smartphone or a wallet-sized slip of paper, an image of the

16   consumer's face appears on a FaceCash-enabled cash register for the merchant to confirm.  Funds are

17   subsequently debited from the consumer's pre-paid FaceCash account, which account is in turn stored

18   in a bank account administered by Think.  While it was operational, Think offered FaceCash to

19   participating merchants at flat rate of 1.5% per transaction, representing a much lower rate than the

20   average interchange fee of approximately 3.3% charged by banks for the acceptance of credit and debit

21   cards.  Integration at the point of sale was accomplished through the use of FaceCash Register, Think's

22   web-based point of sale system, or the FaceCash Application Programming Interface ("API"), which

23   connected the payment network to existing digital cash registers offered by third-party vendors.  Think

24   began working on the accounting software behind FaceCash in 2001, and on the mobile applications

25   and point of sale software necessary to complete the system in 2008.  In all, the FaceCash system

26   represents more than a decade's worth of work on the part of roughly twenty talented individuals.

27        3.   Money transmitters, non-bank entities that handle funds on behalf of third-parties on a

28   regular basis, would be well-positioned to introduce products such as FaceCash that are effectively

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

1  competitive with plastic cards, except for one caveat: money transmitters are currently regulated by a

2  patchwork of state laws ("Money Transmission Laws" or "MTLs"), that have been gradually introduced

3  in almost every state since the mid-1960s.  These statutes initially came into being slowly, in response

4  to specific money order scandals affecting particular localities, until later, when large financial

5  corporations realized that MTLs could also be effective tools used as barriers to the entry of

6  competitors, at which point MTLs began to proliferate as a result of the lobbying efforts on behalf of

7  these large financial business entities that dominate the consumer payment financial services market.

8      4.   This case concerns present, on-going and continuous violations of rights of Plaintiff and

9  other similarly situated persons and entities protected by the United States Constitution and its

10 Amendments, constituted by and arising from the California Money Transmission Act ("MTA"),

11 enacted in 2010 and made effective on January 1, 2011, as Article 3 (commencing at Section 1810),

12 Chapter 14, Division 1 of the California Financial Code, and the efforts of a regulatory agency of the

13 State of California [namely, the Department of Financial Institutions ("DFI")] and the State of

14 California's responsible officials to enforce the MTA and regulations adopted thereunder against

15 Plaintiff and other similarly situated persons and entities through the promulgating and enforcement of

16 requirements for the licensure of providers of money transmission services.  The MTA, and the actions

17 of the Defendants named herein in enforcing the licensure requirements of the MTA on Plaintiff and

18 other similarly situated persons and entities of modest financial size relative to the size of large business

19 interests (who successfully lobbied for the MTA and such licensure requirements and who dominate the

20 consumer payment financial services markets), constitute a regulation and regulatory conduct that

21 places a burden on interstate commerce.  Such burden unreasonably and arbitrarily discriminates against

22 the relatively small business entities that wish to conduct interstate commerce by providing money

23 transmission services that originate or terminate in California in favor of the large business interests

24 who successfully lobbied for the MTA, and that is excessive in relation to the putative benefits to the

25 State of California and its consumer citizens.  Moreover, the DFI, under the leadership of Defendant

26 William Haraf, has repeatedly refused to divulge public information obviously necessary to apply for a

27 license with a reasonable chance of approval.  The DFI has further made false statements regarding

28 Plaintiff; threatened to prosecute Plaintiff and Plaintiff's principals for operating as a money transmitter

3

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

1  even in jurisdictions outside of California where Plaintiff was otherwise legally permitted to do so; and

2  enforced the MTA on an arbitrary and capricious basis based on the "personal experience" of DFI staff,

3  including Defendant Robert Venchiarutti.

4      5.   The California MTA is but one of approximately forty-seven MTLs involving domestic

5  money transmission enacted by states of the United States of America.

6      6.   Over a period of several months, Plaintiff's attempts to resolve its differences with the DFI

7  ultimately involved requesting assistance from Defendant Traci Stevens, Acting Secretary of the

8  California Business, Transportation and Housing Agency ("BTH") that oversees DFI, and from

9  Defendant Edmund G. Brown, Jr., Governor of the State of California, who oversees BTH.  Plaintiff's

10  requests to the Governor for assistance were eventually delegated to and summarily dismissed by Jacob

11  A. Appelsmith, Senior Advisor to the Governor.

12      7.   All states, including the State of California, are bound by the United States Constitution to

13  refrain from issuing and regulating state-wide currencies, and to refrain from regulating interstate

14  commerce.  Defendants have unlawfully attempted to do at least the latter by arbitrarily restricting the

15  flow of dollars into and out of California through money transmitters, and by specifically prohibiting

16  payment processors from conducting interstate commerce without meeting licensure requirements of the

17  MTA that are impossible to satisfy forty-seven times over for all but a very few enormous financial

18  business entities that dominate the consumer payment financial services market.

19      8.   Plaintiff, a private corporation, provided money transmission and stored value services

20  legally in the State of California through June 30, 2011, prior to a deadline established by the MTA for

21  existing money transmitters (the "Compliance Deadline") per California Financial Code §2172

22  (previously §1872 prior to January 1, 2012).  After the deadline, without the ability to file an application

23  for licensure with a reasonable chance of approval by the DFI, Plaintiff ceased operations in California

24  and nationwide.  This caused damage to Plaintiff's reputation, business operations, competitive edge,

25  and earnings.

26      9.   Many of Plaintiff's competitors whose activities also clearly fell within the scope of the

27  MTA continued operating notwithstanding the enactment of the MTA, either unaware of or

28  unconcerned about the new law and the potential criminal penalties for violation thereof.  Plaintiff's

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

reputation was harmed by the DFI's arbitrary enforcement efforts because many individuals in the technology and finance industries constituting Plaintiff's intended market reasonably questioned what Plaintiff had done "wrong" to deserve regulatory scrutiny from which many unlicensed competitors of Plaintiff were being exempted by the DFI's arbitrary and capricious enforcement actions.

10.   Consequently, Plaintiff eventually filed thirty-four formal complaints with the DFI about unlicensed money transmitters (see, Schedule A attached hereto), to highlight the erratic, arbitrary and discriminatory nature of Defendants' enforcement efforts.

11.   The chilling of Plaintiff's ability to conduct interstate commerce is a symptom of a non-evenhanded and discriminatory financial regulatory system that has been hijacked by expensive lobbyists working for large and financially powerful business interests, that uses the phrase "consumer protection" as a thin and contrived veneer for supporting such large and financially powerful business interests, and which financial regulatory system cannot keep up with the pace of changing technology and the potential technological benefits offered for individual consumers and merchants through even relatively small, but technologically current, money transmitter businesses such as Plaintiff.  By policy and practice, the California DFI and the individual Defendants named herein, have violated and are continuing to violate, the rights of any non-bank entity seeking to act as a conduit by which other parties can conduct interstate commerce.  Such entities include thousands of payroll processors, law firms, real estate agents, escrow services, private universities, and technology companies.

12.   To remedy these present, on-going and continuous constitutional violations and put an end to the ongoing harm caused by Defendants, Plaintiff Think Computer Corporation seeks declaratory and injunctive relief invalidating the California MTA and prohibiting its enforcement against Plaintiff.

## JURISDICTION

13.   This action raises questions under Article I, Section 8, Clause 3 (the "Commerce Clause") of the United States Constitution, as well as Article I, Section 10, Clause 1 of the United States Constitution.

14.   This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

15. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(3); and attorney's fees under 42 U.S.C. § 1988.

## VENUE

16. Venue is proper under 28 U.S.C. § 1391 in the Northern District of California because a substantial part of the actions or omissions giving rise to this case occurred within this District, and at least one Defendant resides or operates within this District.

## THE PARTIES

### Plaintiff

17. Plaintiff Think Computer Corporation is a privately-held Delaware corporation with its headquarters located at 884 College Avenue, Palo Alto, CA 94306-1303 in Santa Clara County, in this District. Its President and CEO is Aaron Greenspan.

### Defendants

18. Defendant Robert Venchiarutti is Deputy Commissioner for Money Transmitters of the California DFI. He is responsible for the policies and procedures carried out by the DFI relating to money transmission and stored value, including enforcement of the MTA. Defendant Venchiarutti works at least part-time in the San Francisco Office of the DFI, within this District. He is sued in his official capacity.

19. Defendant William Haraf is Commissioner of the California DFI. He is responsible for the policies and procedures carried out by the DFI, including enforcement of the MTA. Defendant Haraf works at least part-time in the San Francisco Office of the DFI, within this District, and is the direct superior of Defendant Venchiarutti. He is sued in his official capacity.

20. Defendant Terri Stevens is Acting Secretary of the California Business, Transportation and Housing Agency (BTH). She supervises the DFI, and as the direct superior of Defendant Haraf is responsible for enforcement of the MTA. She is sued in her official capacity.

21. Defendant Kamala Harris is Attorney General of the State of California. As the chief law enforcement officer of the State, Defendant Harris (hereinafter, the "Attorney General") is responsible for the enforcement of the MTA and is sued in her official capacity

6

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

22.   Defendant Edmund G. Brown, Jr. is Governor of the State of California.  He supervises the BTH and is responsible for enforcement of the MTA as the State's chief executive and direct superior of Defendant Stevens.  He is sued in his official capacity.

## FACTUAL BACKGROUND

**A.**     **The 2010 California Money Transmission Act**

23.   On August 20, 2010, the California General Assembly voted for passage of Assembly Bill 2789, the Money Transmission Act.  The MTA, sponsored exclusively by a financial industry lobbying group called "The Money Services Round Table" (which counts among its members American Express, Western Union, Travelex, and MoneyGram International—all billion-dollar corporations) and written with the assistance of Defendant Venchiarutti, combined three prior California laws regulating financial institutions into one.  It also established new requirements for entities wishing to transmit money domestically (*i.e.*, within the United States).  Prior to the enactment of the MTA, only California money transmitters dealing in the international transmission of funds had been regulated by the State of California.

24.   The MTA does not represent The Money Services Round Table's first attempt to game the legislative system in its own favor.  Through a former state legislator, Marvin S.C. Dang (later disgraced for ignoring his multiple conflicts of interest while lobbying for banks during the 2008 mortgage crisis), the same group was successful in lobbying the legislature of the State of Hawaii to pass Act 153 in 2006, only two years after the Hawaii State Auditor had issued a scathing report specifically criticizing the proposed regulation of money transmission.  In this report, the Hawaii State Auditor concluded:

"In addition to offering little needed consumer protection, the proposed regulation provides few added benefits for consumers.  The proposed record keeping requirements are unnecessary, as best business practices already recommend record retention for potential tax auditing purposes.  Receipt requirements and transaction disclosures are regulated by the competitive market."

"Furthermore, according to the administration's justification for the proposed legislation, the Division of Financial Institutions does not intend to enforce the record keeping, receipt, and transaction disclosure requirements.  Requirements that are not enforced offer no reliable benefit to consumers."

"From our survey of other jurisdictions, some with licensing programs estimate the cost of regulation to be at least $100,000 per year.  A licensing program can potentially cost both licensees

and state government significant sums, and can also be costly to consumers, both in fees charged and time spent."

25.   The MTA was initially presented to the DFI by lobbyists for the aforementioned The Money Services Round Table and its large corporate members as an unsigned bulleted list dated February 23, 2010.  The last bullet in this list, under the heading "ADVANTAGES," disingenuously stated, "The Bill reflects a DFI-Industry consensus."

26.   On September 30, 2010, Governor Arnold Schwarzenegger signed into law California AB 2789, the California Money Transmission Act (the "MTA"), and the MTA became law effective January 1, 2011, with a 180-day grace period allowing existing, unlicensed money transmitters to continue operations until July 1, 2011, at which point an application for a license was required to be on file with the DFI in order to legally continue to conduct business as a money transmitter.

27.   Congress's prior passage of the USA PATRIOT Act had imposed severe penalties for violations of any state money transmission law.  Thus, §373 of the USA PATRIOT Act has been construed as modifying 18 U.S.C. § 1960 by broadening the meaning of an "unlicensed money transmitting business" to, according to the Commonwealth of Massachusetts, "eliminate the need to prove that the business knowingly operated without a license.  In addition, the definition [of "unlicensed money transmitter"] includes anyone who fails to register as a money transmitter with FinCEN."[1]

28.   The imposition of federal penalties for the violation of any state money transmission statute creates a fundamental prejudice against well-intentioned entrepreneurs who lack *mens rea* to violate federal law, but are precluded from becoming licensed by the legal requirements of any state in which they operate as a money transmitter.  Thus, those entrepreneurs who hope to create a money transmission technology useful to consumers and/or offer a valuable service in a neighborhood store, must confront the specter of 18 U.S.C. §1960(a), which provides: "Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both."  Even if such entrepreneurs retain counsel, implement appropriate risk controls, and apply for money transmission licenses in their respective home states, the full weight of the federal law enforcement system, including

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

---

[1] http://www.mass.gov/?pageID=ocaterminal&L=4&L0=Home&L1=Business&L2=Banking+Industry+Services&L3=Industry+Letters&sid=Eoca&b=terminalcontent&f=dob_patriot&csid=Eoca.

8

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

the penal system, is ready and waiting to punish as a violation of federal law the violation of some state's MTL that will ineluctably follow.  For such a criminal violation to occur merely requires a money transmitter to transact routine business from any state in which it is licensed into California or any other state in which it is not licensed and cannot ever become licensed because of the arbitrary and constitutionally impermissible barriers to interstate commerce imposed by the licensure requirements of the MTLs of California and such other states.  In the context of the current fragmented and inconsistent state regulatory systems for money transmission, the federal statute is much easier to violate without having any criminal *mens rea* than it is to comply with, and the absence of a uniform, federally enacted and enforced system for nationwide licensing requirements of money transmitters, coupled with the arbitrary and constitutionally impermissible licensure requirements imposed by the State of California and certain other states, needlessly criminalizes behavior that is intended to benefit society and chills interstate commerce by precluding new entrants into the marketplace, and by restricting the free flow and implementation of technological developments in payment systems that are designed to benefit merchants and consumers and would stimulate competition in the consumer credit and payment markets.

29. California is one of forty-six states (plus the District of Columbia and certain U.S. territories) that enforces MTLs related to domestic money transmission and stored value (see attached Schedule B).  Each MTL requires the entity wishing to transmit money in that jurisdiction to fill out completely different forms; pay different application fees on differing bases; raise surety bonds of differing amounts in the absence of a federal insurance program for money transmitters similar to the Federal Deposit Insurance Corporation (FDIC); meet different minimum net worth and/or asset size requirements; provide fingerprints and data for criminal background checks in differing formats; register with different state agencies unrelated to finance for differing purposes; wait different lengths of time for approval; and post-licensure, to provide different reports at different frequencies containing different data to different agencies.

30. Despite the existence of organizations such as the so-called "Money Transmitter Regulators Association," of which Defendant Venchiarutti is Vice-President, and which counts most states with

9

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

MTLs as its members, there is absolutely no standardization or uniformity between states in any regard related to the regulation of money transmission.

31.   The United States Department of the Treasury does coordinate the registration of money transmitters through its FinCEN division, but this function exists mainly as a data collection mechanism to prevent fraud due to the requirements of the federal Bank Secrecy Act ("BSA").

32.   The MTA's specific requirements for new money transmitters wishing to hold and transmit funds domestically or internationally are complex and among the most onerous in the nation when compared with the requirements of most other states.  The MTA requires $500,000 in "tangible net worth" (shareholder equity) at all times, in addition to a $250,000 surety bond for companies engaging in money transmission, a $500,000 surety bond for companies providing stored value products, a non-refundable $5,000 application fee, a criminal background check, a business plan, pro-forma financial statements for three years, audited past financial statements, the formal paper application, and a pre-application interview.  These minimum figures do not scale downward depending upon on an applicant's size, volume of business, or risk model.

33.   In contrast, many other states have different, and less onerous, requirements.  The State of Alabama requires a $25,000 surety bond with its MTL application, a fee under $500, and no interview. The State of Pennsylvania requires a $1,000,000 surety bond with its MTL application but has no tangible net worth requirement.  The State of Hawaii requires a $1,000 scalable surety bond with its MTL application and prefers digital fingerprints, which the State of Louisiana disallows.  The State of Maryland charges one application fee in even-numbered years, and another application fee in odd-numbered years.  Though different states take different lengths of time to evaluate MTL applications, all routinely take several months to reach their respective conclusions.

34.   Banking is a close analog to money transmission, and on a relative basis, the state regulatory structure for banks (managed by the parties enumerated in the attached Schedule B, including Defendants) generally involves even more stringent financial prerequisites for applicants wishing to obtain bank charters. There are two key differences, however.  First, while a bank could decide to apply for a charter in any given state, it could instead choose to apply for a national charter, allowing it to operate in all fifty states without having to file fifty applications, raise fifty times as much capital, and

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

1   report to fifty separate regulators.  Money transmitters have no such option due to MTLs.  Second,

2   national charters are made possible by an insurance network that covers every licensed institution

3   nationwide, regardless of location, charter type or asset size, in the form of FDIC insurance for banks or

4   National Credit Union Administration ("NCUA") insurance for credit unions.  These types of insurance

5   work because premiums paid by the insured parties cover each other.  In contrast, each money

6   transmitter's premiums insure only that money transmitter.  Though bond underwriters are able to offset

7   *their* risk by collecting bond premiums from multiple entities, the risk to consumers remains the same,

8   and the cost to bondholders (the money transmitters) is enormous.

9       35.   Banking and money transmission further differ because while state-chartered banks are

10   conducive to the saving and loaning of money on a local level, money transmission inevitably requires

11   crossing state and sometimes national borders.  Current MTL requirements in many states require

12   money transmitters to register as taxable entities in each respective state, often leading to confusing

13   situations where multiple states in which the money transmitter has no physical nexus demand the

14   payment of state income tax on fee revenue derived from interstate transactions.  When federal income

15   tax and the company's home state are factored in along with the taxing of the non-physical nexus state,

16   money transmitters can be taxed up to four times on the same revenue-producing transaction.

17       36.   Due to the different and conflicting requirements for licensure, the MTA and all MTLs

18   have an effect equivalent to that of establishing unconstitutional intangible currencies on a state-by-state

19   basis.  In a hypothetical purely digital society, one that the United States is quickly moving toward,

20   currency can be defined as a set of restrictions on information that is used to represent debts.  The

21   equivalent of a state-issued currency in such a society is therefore a set of restrictions on monetary

22   transfers within each state by each state, which is functionally equivalent to the present set of MTLs.

23       37.   Though the apparatus for a federal regulator of money transmitters already exists in the

24   form of the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"), its

25   power is severely limited by state regulators.  Despite nominal goals of consumer protection, MTLs so

26   restrict the competitive environment and so fragment the regulatory regime that consumers are actually

27   harmed by monopolistic business practices and regulatory arbitrariness to an extent that vastly exceeds

28   the extremely limited protection offered by surety bonds.  The Consumer Financial Protection Bureau

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

1   ("CFPB") of the U.S. Department of the Treasury is reported to be investigating the regulation of non-

2   bank financial entities, but has yet to issue any corresponding regulations.

3       38. Investors who might support small corporations in their efforts to acquire licenses are

4   generally spooked by the regulatory uncertainty surrounding money transmission. The MTA and all

5   MTLs therefore have a chilling effect on competition in the payment processing market, as well as other

6   markets that involve money transmission.

7       39. The MTA restricts all entities wishing to do business with California residents, and not just

8   entities physically located in California. Therefore, despite being a state law, the MTA's scope and

9   reach extend far beyond California's borders, encompassing the entire nation. Even though California

10  law enforcement has no jurisdiction outside of the state, the combined influence of the USA PATRIOT

11  Act and the DFI's policy of referring all offenders to the regional United States Attorney's Office mean

12  that the State of California effectively polices the entire country. This, too, has a discriminatory effect

13  on interstate commerce and a chilling effect on competition in the consumer payment financial services

14  market.

15      **B.**   **Think's Business Activities as a Money Transmitter Prior To Passage of the MTA**

16      40. Plaintiff began researching, designing and investing in the FaceCash mobile payment

17  system ("FaceCash") in late 2008, well before any domestic MTL had been proposed in California.

18  Plaintiff formally launched FaceCash in May, 2010. The FaceCash system had several aims: first and

19  foremost, to lower payment processing, or interchange, fees for businesses small and large. In addition,

20  FaceCash was designed to simplify the process of computing taxes and accounting reports generally for

21  merchants, and to make electronic receipts and coupons a reality for consumers. The system achieved

22  this through the use of Think's proprietary intellectual property and patent-pending technology. By the

23  end of June, 2011, despite facing regulatory constraints in the vast majority of the country that posed a

24  problem for national retailers otherwise extremely interested in FaceCash, Think had signed up twenty-

25  five merchants and approximately 500 consumers for FaceCash.

26      41. Working on a pre-paid debit model, FaceCash involved holding consumer deposits in a

27  pooled bank account until such time as a consumer requested a withdrawal from their given FaceCash

28

FIRST AMENDED COMPLAINT- Case No. CV11-05496-HRL

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

1    account, or the money was spent at a participating merchant.  Due to the necessity of holding consumer

2    deposits for the model to succeed, Plaintiff's activities fell within the scope of the MTA.

3        42.  On June 30, 2011, prior to the MTA's Compliance Deadline, the risk posed to consumers by

4    Plaintiff's money transmission activities was extremely minimal, if not zero.  Up until the deadline,

5    Plaintiff's average daily money transmission volume was close to zero as Plaintiff had only successfully

6    finished the merchant side of the product two days prior.  Plaintiff's cash assets always exceeded its

7    liabilities to FaceCash depositors by a significant factor.  By design, Plaintiff did not extend credit to

8    FaceCash consumers, nor did Plaintiff make loans as a bank might.  Plaintiff also carefully tracked

9    account balances and fraud rates (which were minimal); even in the highly unlikely event of default

10   Plaintiff could still afford to refund every consumer's funds in full.

11       43.  No formal complaints were filed with the DFI or any regulatory agency against Plaintiff

12   prior to the Compliance Deadline or, to Plaintiff's knowledge, as of the date of the commencement of

13   this action.  Nor has Plaintiff ever been named as a defendant in any civil lawsuit, any criminal charge,

14   or any legal proceeding involving money transmission in any way.

15       44.  Plaintiff contacted the DFI by telephone in mid-2010 to ensure that it was in compliance

16   with any applicable state laws.  The call was short: Mr. Julio Prada informed Plaintiff that no license

17   was necessary for domestic money transmission and hung up.

18       45.  Plaintiff next contacted the DFI by e-mail on April 1, 2011 to inquire as to the status of

19   money transmission law in California after an article suggested that policies had changed.  Mr. Prada

20   responded promptly, indicating, "We now regulate domestic and stored value money transmission

21   activities (effective January 1, 2011)," and began arranging for the mandatory pre-filing interview to

22   take place between Plaintiff and DFI.  The DFI ultimately scheduled the meeting for June 14, 2011,

23   roughly two weeks before the Compliance Deadline.

24       46.  Prior to the meeting, Plaintiff attempted to open a dialog between the DFI, members of the

25   California General Assembly, and Plaintiff regarding the extreme magnitude of the MTA's prerequisite

26   filing requirements.  Defendant Venchiarutti unilaterally quashed those efforts by terminating a planned

27   conference call, stating that the DFI had a practice of not communicating with legislators via conference

28   call.

13

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

47. On June 14, 2011, Plaintiff's Chief Executive Officer, Mr. Aaron Greenspan, and Mr. Christian Calva (a/k/a Jerry Klein), a full-time contractor for Plaintiff, attended a mandatory pre-filing interview at the San Francisco offices of the DFI. Present at the interview from the DFI were Defendant Venchiarutti and two DFI staff members: Mr. Julio Prada, and Mr. Omar Shahin.

48. At considerable expense, Plaintiff had prepared and provided the DFI with a copy of the company's audited 2010 financial statements ahead of the interview, per the DFI's written requirements. In person at the June 14 meeting, Defendant Venchiarutti inaccurately disputed that the DFI required audited financial statements from Think, but claimed to have reviewed them nonetheless. [Unbeknownst to Plaintiff, these audited financial statements contained a serious error caused by the auditor that made Plaintiff appear to have $145,000 less in tangible shareholder equity than Think actually had as of December 31, 2010. The auditor later issued re-stated financial statements for Plaintiff, which corrected such error and which Plaintiff provided to DFI Senior Counsel Tony Lehtonen on September 12, 2011.]

49. To the surprise of Plaintiff, the tenor of the State's interview was one of directing extreme hostility towards the Plaintiff and its representatives. After Mr. Prada and Mr. Shahin briefly introduced themselves, Defendant Venchiarutti dominated the conversation in a threatening, bullying, patronizing, unprofessional and condescending manner, intentionally not conducive to the advancement of the license application process. Defendant Venchiarutti frequently cut off Mr. Greenspan's attempts to speak. Several specific statements made by Defendant Venchiarutti made clear, certain and final what the DFI's actual intentions were regarding licensure under the MTA for Plaintiff:

a) Defendant Venchiarutti began by stating that Plaintiff would need to raise at least "$20 million" of capital, not $500,000 as stated in the MTA, with venture capital being the implied source of funding, based on his "personal experience," which was that all money transmitters required at least "three years" to achieve profitability.

b) In response to Mr. Greenspan's expression of surprise at Defendant Venchiarutti's opening statement, Defendant Venchiarutti then asked whether Plaintiff believed the meeting to be "a classroom exercise," in a clear reference to Mr. Greenspan's and Mr. Klein's relatively younger age.

c) As the meeting continued, Defendant Venchiarutti implied various figures as the actual minimum amount of capital necessary to successfully apply for a license, including "$1 million," "$2 million," and at one point, "$80 million."

14

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

d) When Mr. Greenspan questioned Defendant Venchiarutti's basis for such figures and asked general questions about the MTA—all appropriate questions given the purpose of the meeting—Defendant Venchiarutti falsely accused him of expressing intent to violate the MTA, and exclaimed that Mr. Greenspan should, "choose [his] words carefully in this room." Defendant Venchiarutti proceeded to threaten to have Mr. Greenspan incarcerated, describing in particular how he, Defendant Venchiarutti, would "call the Sheriff." Mr. Greenspan reasonably understood these statements of Defendant Venchiarutti as a credible threat of criminal prosecution.

e) Defendant Venchiarutti admitted that he was generally ignorant as to the effect of technological developments, such as the introduction of Apple's iPhone and similar devices, on the payment industry and companies within it.

f) Defendant Venchiarutti stated, "I don't care if you have the greatest product in the world!," implying that Plaintiff would not be granted a license under any circumstances. Defendant Venchiarutti also stated that he did not believe that Plaintiff could raise the necessary capital to apply for a license, and that even if it did, the DFI would "need" to conduct a thorough background check on all investors to make sure that they were actually legitimate and acceptable sources of funding for Plaintiff.

g) Defendant Venchiarutti further stated that Plaintiff's technology had to be deficient since Plaintiff had not raised outside capital, an insulting statement based on profoundly incorrect assumptions about technology and venture capital investing in general and Plaintiff in particular.

h) Defendant Venchiarutti further stated falsely that Plaintiff was "already insolvent" and that Plaintiff was unable to control its rate of spending. Though both statements were demonstrably untrue, by this point Mr. Greenspan decided not to volunteer any further information of any kind to Defendant Venchiarutti.

i) Defendant Venchiarutti effectively issued a threat to drive Plaintiff into bankruptcy by verbally highlighting his power to audit, and the MTA's requirement that the "reasonable cost" of DFI audit examinations must be paid for by the company being audited.

j) Defendant Venchiarutti stated that "for years" (necessarily meaning prior to the passage of the MTA), the DFI had an unwritten policy of not approving applications filed by money transmission entities with tangible net worth less than one million dollars.

k) In response to Mr. Greenspan's repeated direct question as to whether or not the DFI had received any formal complaint regarding FaceCash, Defendant Venchiarutti falsely asserted that the DFI had received complaints from "someone—I think it was your competitors complaining about you." Defendant Venchiarutti later admitted that the DFI had not actually received any complaint about FaceCash to the best of his knowledge.

l) At the conclusion of the meeting, Defendant Venchiarutti refused to provide a business card to Mr. Greenspan when asked, and stated facetiously that Plaintiff was still welcome to apply for a license, if that was what Plaintiff really wanted to do. The intended implication and inference of Defendant Venchiarutti, that Plaintiff's application would be denied, was unmistakable.

15

50. Since the end of 2010, but prior to the June 14 interview, Think had raised approximately $500,000 in additional funding from family members of Mr. Greenspan, placing Plaintiff's tangible shareholder equity well above the written statutory minimum of $500,000 established by the MTA. Updated financial statements reflecting the infusion of such additional funding were not yet available from Plaintiff's auditors at the time of the June 14 interview, and given the threat concerning extensive background checks on investors, Mr. Greenspan felt uncomfortable disclosing such information to Defendant Venchiarutti at the June 14 interview for fear that it might somehow be used against Plaintiff or Mr. Greenspan's family. Such additional funding was specifically disclosed to and discussed by Plaintiff with the DFI's Senior Counsel Tony Lehtonen on September 12, 2011, and was reflected in amended audited financial statements Plaintiff [provided to the DFI through Mr. Lehtonen on September 12, 2011].

51. Mr. Greenspan followed up with Defendant Venchiarutti via e-mail after the meeting, and continued to have difficulty establishing the true minimum net worth required by the DFI in order to apply for a license under the MTA.

52. Given that state MTL applications generally require the applicant to indicate if a license has ever been rejected for any reason, on June 30, 2011 Mr. Greenspan decided that Plaintiff could not run the likely risk of nationwide rejection, and opted to shut down FaceCash in California and nationwide.

53. Mr. Greenspan enlisted the informal assistance of Ms. Eileen Newhall, Staff Director of the California Senate Banking and Financial Institutions Committee, to try to ascertain the DFI's unwritten requirements. Despite repeated attempts to communicate with Defendant Venchiarutti, Ms. Newhall was unsuccessful at achieving this goal. Ms. Newhall stated that Defendant Venchiarutti had told her at one point that the DFI's actual requirement was $1.5 million in tangible net worth, another arbitrary figure not among the many other arbitrary figures set forth during the mandatory interview meeting on June 14, 2011.

54. Mr. Greenspan further requested formal assistance from Assemblyman Richard Gordon, representing the 21st District, including Palo Alto, where Plaintiff is located and where Mr. Greenspan resides. Assemblyman Gordon's District Director, Mr. Jeremy Dennis, at first attempted to establish a constructive dialog with Defendant Venchiarutti, and then with Defendant Venchiarutti's supervisor,

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

16

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

1  Defendant Haraf.  Mr. Dennis reported back to Mr. Greenspan that Defendant Haraf had forwarded a

2  voicemail left by Mr. Dennis intended only for Defendant Haraf back to Defendant Venchiarutti, and

3  that Defendant Venchiarutti had followed up by leaving a threatening voicemail for Mr. Dennis

4  instructing him never to call his boss again.  Mr. Dennis called this episode the worst communications

5  breakdown he had seen in his career in government, but eventually grew so frustrated at the lack of

6  progress that he delivered an ultimatum: that either Plaintiff could apply for a license without knowing

7  the prerequisite requirements, or proceed of its own accord without the assistance of the Assemblyman.

8  When Mr. Greenspan refused to file a written application on behalf of Plaintiff, citing the non-

9  refundable $5,000 application fee and the nationally inter-linked nature of MTL license application

10  processes, Mr. Dennis unilaterally withdrew Assemblyman Gordon's office from providing any further

11  assistance to Plaintiff.

12      55.  Before withdrawing, Mr. Dennis put Mr. Greenspan in touch with DFI Senior Counsel Tony

13  Lehtonen.  In his first e-mail communication with Plaintiff, Mr. Lehtonen wrote, "My experience is that

14  required levels are established only after a transmitter applicant's application."  Mr. Greenspan and Mr.

15  Lehtonen subsequently exchanged several e-mails and spoke on the phone several times.  On September

16  12, 2011, Mr. Greenspan sent Mr. Lehtonen several documents, including documents that had already

17  been submitted to the DFI, and Plaintiff's re-stated audited financial statements.  Mr. Greenspan also

18  informed Mr. Lehtonen that Plaintiff had received additional investment since the date of the audited

19  financial statements which resulted in Plaintiff's net worth being well above the statutory threshold.

20  Though Mr. Lehtonen was unable to provide answers to any questions posed by Plaintiff during these

21  calls, at various points Mr. Lehtonen did state the following:

22      a)  He believed Mr. Greenspan's concerns and tone to be reasonable and not as extreme

23          as what he had been led to believe by others at the DFI;

24      b)  He had been told that money transmitters generally needed three years to become

25          profitable;

26      c)  He could not remember the last time that the DFI had licensed a money transmitter

27          with only the $500,000 statutory minimum in tangible net worth;

28

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

    d)  He was not aware of any written guidelines used by the DFI in evaluating money transmission applications, and consequently could not provide guidance regarding the unwritten minimum net worth requirement;

    e)  He was not aware of the documents already submitted to the DFI by Plaintiff;

    f)  It was possible that the DFI's regulations had not kept pace with technological developments;

    g)  The DFI would probably not actively investigate any unlicensed money transmitters;

    h)  The DFI legal department was surprised by, confused by and "appalled" at the need for the domestic money transmission regulations embodied by the MTA, which many DFI attorneys considered a waste of time and resources;

    i)  Mr. Greenspan could call him any time and he would be glad to talk.

56.  In response to Think's objections and repeated requests over a period of months, on October 13, 2011 Defendant Venchiarutti on behalf of Defendant Haraf and the DFI issued an "Order" (the "October Order") purporting to exempt Think alone from having to comply with the provisions of the MTA in providing money transmission services to consumers, merchants and anyone outside of the State of California, so that Think could conduct operations in states where it already had valid MTLs, but conditional on Think not providing money transmission services to persons, consumers, merchants and anyone located in California and Plaintiff not advertising, soliciting or holding itself out as providing money transmission services to persons, consumers, merchants and anyone located in California.  Such Order necessarily meant that regardless of Think's application status, the California DFI intended and still intends to enforce the MTA beyond the State of California's borders on transactions originating and existing in interstate commerce.  The DFI's and Defendants' position is that the California law it is authorized to enforce has supremacy over the laws of any other states under which the money transmitter may be in compliance.  (This assertion of California's supremacy by Defendant Venchiarutti was first manifested in Mr. Greenspan's first telephone call with Defendant Venchiarutti, in which Defendant Venchiarutti derided the State of Nevada for having less stringent MTL application requirements than California.)

FIRST AMENDED COMPLAINT- Case No. CV11-05496-HRL

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

57. The finality of the October Order was established by the fact that it specifically forbade Think from conducting business in the State of California without clarifying the specific MTL application requirements about which Think had inquired time and again and respectfully protested time and again when answers were not forthcoming. Since the October Order was delivered to Plaintiff alongside a letter signed by DFI Senior Counsel, Defendants intended that the Order be legally binding and in effect as of the date of the Order, unlike the non-binding letter. Furthermore, on October 17, 2011, when Mr. Greenspan called to inquire again as to the DFI's actual prerequisites for filing a license application under the MTA, Mr. Lehtonen told Mr. Greenspan that he had been instructed that he was no longer allowed to speak any further with him and immediately hung up. This abrupt halt in communications, contrary to Senior Counsel Lehtonen's earlier promise that Mr. Greenspan could call him any time, indicated that the October Order was absolutely final, and that from the DFI's perspective, Think had no further recourse of any kind except to apply for a license without knowledge of the associated requirements in advance. Prior correspondence from Mr. Dennis in Assemblyman Gordon's office explicitly echoed this view.

58. As of the date of this filing, all efforts to clarify the basis for the MTA's requirements, as well as the actual requirements themselves, through telephone calls, e-mails, and written letters to the DFI, Defendant Stevens of the BTH Agency, the Governor's office, members of both houses of the California legislature, and members of both houses of Congress, have been unsuccessful.

**C.**    **DFI's Arbitrary Enforcement of the MTA and the Effects Thereof on Plaintiff**

59. The MTA exempts certain classes of entities from the law's requirements, but the list of exemptions is not exhaustive, causing some institutions to violate the statute on a daily basis (at least since July 1, 2011).

60. Private universities, for example, are not exempt from the MTA, but frequently issue stored value instruments to students under names such as "Crimson Cash" (offered by Harvard University), "Cardinal Dollars" (offered by Stanford University), "ACCESS Card" (offered by Santa Clara University), and "TechCASH" (offered by MIT) that can be used either on campus or to transmit money to area merchants via routine purchases. Such money transmission systems are designed to temporarily eliminate the need for debit and credit cards, protecting students from predatory lending practices

FIRST AMENDED COMPLAINT- Case No. CV11-05496-HRL

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

frequently targeted at youth with limited or non-existent credit history. These programs are extremely common nationwide at institutions that enroll California residents, yet not a single institution of higher education is registered in California as a money transmitter with the DFI, making university presidents and trustees criminally liable.

61.   Other types of entities regularly violate state money transmission statutes, including the MTA. These institutions include:

    a)   Payroll processors, which draft funds on behalf of clients in advance of tax and benefit deadlines;

    b)   Real estate agents, which handle funds for buyers and sellers of homes;

    c)   Law firms, which regularly collect funds from clients to forward to courts, government agencies and adverse parties;

    d)   Construction companies, which use client funds to pay for materials and equipment; and

    e)   Technology companies, which facilitate electronic payments.

62.   News of the FaceCash shutdown was widely publicized and regarded as an important event in the technology industry, and the payments industry in particular. Plaintiff immediately lost the actual and potential revenue streams from its established FaceCash merchants, the ability to sign up California consumers for the service, and the standing to realistically enter into partnership negotiations with device manufacturers and other key partners. At least one prospective merchant cancelled his agreement to use Think software for purposes aside from FaceCash directly due to the MTA. The enforced shutdown of FaceCash badly damaged Think's and Mr. Greenspan's reputation, and many individuals who learned of the events blamed Think and its management for the interruption in service.

63.   Due to the shutdown of FaceCash, Plaintiff refunded over $40,000 to depositors, incurring higher-than-average bank transfer fees as a result.

64.   Directly due to the regulatory uncertainty surrounding the MTA and other MTLs, Plaintiff was subsequently rejected as an investment opportunity by several prominent venture capital firms, eliminating virtually the only source of funding large enough to realistically allow Plaintiff to comply with the MTA.

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

65.   Due to the effects of the MTA, one of Plaintiff's key full-time software developers resigned in late June, 2011, leaving the company without the individual who had designed crucial parts of the FaceCash system software.

66.   Due to the DFI's interpretation of the MTA's scope and reach as being nationwide, Plaintiff was unable to grow FaceCash to a national scale, leading to a loss of prospective revenues and presenting a window of opportunity for Plaintiff's competitors.  Some of Plaintiff's competitors took advantage of this opportunity to conduct money transmission illegally without fear of being noticed, putting Plaintiff at an even further disadvantage.

67.   Even if the nationwide scope and reach of the MTA were proper, the disparity in money transmission requirements from state to state would still make it impossible for Plaintiff, or virtually any new company that was not a large business entity, to satisfy the legal requirements for operation as money transmitter in interstate commerce.

68.   Due to Plaintiff's forced inability to operate the FaceCash system without risking criminal prosecution, FaceCash merchants were forced to once again pay higher per-transaction fees to their original payment service providers.

69.   With some prospective applicants such as Plaintiff, the DFI used criminal prosecution as a threat not only when appropriate, but whenever questions of *any kind* regarding its actions were raised. Yet, with other prospective applicants, the DFI turned a blind eye, even when entities were actively engaged in money transmission on a massive scale that would be evident from reading any newspaper.

70.   Plaintiff filed thirty-four formal complaints with the DFI regarding unlicensed money transmitters operating in California to highlight the erratic and arbitrary nature of its enforcement efforts.  Plaintiff received no confirmation that these complaints had been received or examined until November 18, 2011, four days after the institution of these proceedings.  Notably, Facebook Payments, Inc., a subsidiary of Facebook, Inc., one of the largest companies mentioned in Plaintiff's complaints, applied for a money transmission license on December 13, 2011, only twenty-five days after the DFI replied to Plaintiff.  For months prior to its application date, Facebook Payments, Inc. had been operating its unlicensed money transmission system in broad daylight, earning mentions in the popular press, selling pre-paid cards in thousands of grocery stores and large retailers in California, and

processing millions of dollars worth of transactions.  Neither its executives nor its business were subject

to any negative repercussions for operating without a license.

71.  Through Cal. Financial Code §2172 (previously §1872 before January 1, 2012), the MTA

provided a six-month exemption window starting January 1, 2011 for existing California money

transmitters, and another exemption window for each new applicant from the date of its application,

provided that it "file an application for a license pursuant to this chapter by July 1, 2011."  This

permitted early applicants to continue legally operating as money transmitters for the duration of their

respective examination periods.  Given that Plaintiff began the application process on June 14, 2011,

prior to July 1, 2011, Plaintiff requested permission from the DFI to continue operating FaceCash under

this clause via DFI Senior Counsel Lehtonen and retired Chief Deputy Carol Chesborough (who

continues to work at DFI part-time).  This request was denied.  In contrast, Facebook Payments, Inc.

filed its application for licensure under the MTA almost six months after July 1, 2011, and its as-yet-

unlicensed business, already in violation of state and federal law for months, has continued to operate

ever since.  This is but one example of several glaring inconsistencies in the DFI's enforcement of the

MTA.

72.  As of January 13, 2012, Plaintiff has filed a claim for damages with the California

Government Claims Program.  Though to date Plaintiff has not filed a written application for licensure

under the MTA in California, a substantial controversy meriting judicial review exists nonetheless.

Plaintiff began the license application process by attending the mandatory June 14, 2011 pre-filing

interview, at which point Mr. Greenspan was told that Plaintiff would fail to meet the DFI's unwritten

criteria for licensure if it attempted to continue the application process.  Therefore, Think has been

prevented from filing an application for licensure, it has already suffered irreparable harm due to the

forced shutdown of its operations related to FaceCash, and it will suffer even greater harm without the

Court's swift intervention.

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

22

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

## CLAIMS FOR RELIEF

## FIRST CLAIM

**Against All Defendants For Violation of Plaintiff's Fourteenth Amendment Due Process Rights**

**(42 U.S.C. § 1983)**

73.   Plaintiff realleges and incorporates by this reference each and every allegation set forth in paragraphs 1 through 72, inclusive, of this Complaint as if the same were fully set forth herein.

74.   By engaging in the conduct alleged hereinabove, Defendants have established customs, policies, patterns, and practices of enforcing the MTA under color of law, and have deprived Plaintiff of its due process rights, in violation of the Fourteenth Amendment to the United States Constitution.

75.   Because the MTA effectively extinguishes a legally valid, vested right to use of property in interstate commerce, the MTA is facially unconstitutional as a violation of Plaintiff's rights to due process under the Fourteenth Amendment to the United States Constitution.

76.   The restriction of money transmission by the State of California in the MTA is unreasonable and onerous in that the MTA illegitimately and arbitrarily singles out small entities and new entities wishing to conduct interstate commerce and wishing to provide a conduit for others to conduct interstate commerce, constituting a violation of Plaintiff's right to Equal Protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution.

77.   Defendants' unwillingness to provide crucial, unprivileged information necessary for Plaintiff to exercise its right to file an application for licensure under the MTA with a reasonable chance of approval constitutes a violation of Plaintiff's due process rights under the United States Constitution.

78.   Defendant Venchiarutti's numerous false, misleading, careless and baseless statements intended to dissuade Plaintiff from exercising its right to file an application for licensure under the MTA with a reasonable chance of approval constitute a further violation of Plaintiff's due process rights under the United States Constitution.

79.   Defendant Venchiarutti's direct threats to deliberately cause harm to Plaintiff, and other Defendants' failure to mitigate his actions, constitute a further violation of Plaintiff's due process rights under the United States Constitution.

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

80.  Defendants' willful failure to take corrective action over a course of several months with regard to Plaintiff's reasonable requests constitutes a further violation of Plaintiff's due process rights under the United States Constitution.

81.  At least as early as October 17, 2011, Defendants' sudden institution of a policy refusing to allow further communication with Plaintiff constitutes a further violation of Plaintiff's due process rights under the United States Constitution.

82.  Defendants, acting under color of law for the purported goal of consumer protection, have selectively enforced the MTA's vague, overly broad, and often unwritten regulations in a manner so arbitrary and capricious that they are comfortable citing unwritten policy based on only their own "personal experience" as necessary to justify any given application's approval or rejection, with no opportunity for public comment.

83.  All conditions precedent to the bringing of this action have occurred or have been exhausted.

84.  Plaintiff has incurred and will incur costs for attorneys and other necessary fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

85.  Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to declaratory relief and a preliminary and permanent injunction invalidating and restraining enforcement of the California MTA.

## SECOND CLAIM

### Against All Defendants For Violation of the Commerce Clause

86.  Plaintiff realleges and incorporates by this reference each and every allegation set forth in paragraphs 1 through 85, inclusive, of this Complaint as if the same were fully set forth herein.

87.  The MTA violates the Commerce Clause of the United States Constitution by directly regulating interstate and foreign commerce and purporting to regulate conduct that occurs in other States and Nations.

88.  The MTA violates the Commerce Clause by regulating, on its face and in its practical effect, the channels of interstate and foreign commerce and the use of these channels of interstate and foreign commerce.

24

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

89. The MTA violates the Commerce Clause by purporting to make California law always the supreme law in the archetypal money transmission scenario, which necessarily involves transferring funds between two parties that may each have a separate and distant physical nexus in separate states, and where the parties have not stipulated that a particular state's law shall govern the transaction.

90. By design and in practical effect, the MTA impermissibly regulates and chills legally authorized or permissible conduct occurring outside of the State of California by making it a crime for entities with no connection to, presence in or nexus in the State of California to offer money transmission services in the State of California.

91. Defendants have suppressed and chilled constitutionally protected interstate trade and commerce in order to protect the narrow interests of a select few special interests, who sponsored the MTA due to its perceived benefits to them.

92. The MTA and its licensure requirements as imposed by the Defendants named herein do not regulate money transmitters evenhandedly with only "incidental" effects on interstate commerce, but rather discriminate against interstate commerce, and the MTA places a burden on interstate commerce that "is clearly excessive in relation to the putative local benefits."

93. Defendants are purporting to act within the scope of their authority under state law in enforcing and implementing the MTA.

94. All conditions precedent to the bringing of this action have occurred or have been exhausted.

95. Defendants are liable to Plaintiff for proper redress under 42 U.S.C. § 1983 because the MTA deprives Plaintiff of the rights, privileges, and immunities secured by the Commerce Clause of the United States Constitution.

96. Plaintiff has incurred and will incur costs for attorneys and other necessary fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

97. Pursuant to 42 U.S.C. §§1983 and 1988, Plaintiff is entitled to declaratory relief and a preliminary and permanent injunction invalidating and restraining enforcement of the California MTA.

**THIRD CLAIM**

**Against All Defendants For Violation of the Commerce Clause**

98.  Plaintiff realleges and incorporates by this reference each and every allegation set forth in paragraphs 1 through 97, inclusive, of this Complaint as if the same were fully set forth herein.

99.  The MTA violates the Commerce Clause by imposing excessive and unreasonable burdens on interstate and foreign commerce that are disproportionately large relative to the purported local benefits of the MTA, which are in many cases negative.  The MTA imposes significant burdens on Plaintiff and other prospective and active money transmitters in connection with their conduct of interstate commerce, as well as burdens on consumers and merchants wishing to use money transmitters to conduct interstate commerce.

100. Among other burdens imposed by the MTA, executives and directors of applicants for licensure must have their fingerprints taken again and again and again and again in order to provide various state regulators with data to conduct criminal background checks.  Additionally, the MTA requires its own surety bond of an arbitrary fixed amount not commensurate with an applicant's deposits on hand or any other measure of risk.  While the MTA's requirements alone are already excessive, in aggregate, the financial requirements for complying with the MTA and all of the other applicable MTLs combined are so high that otherwise bona fide and legally compliant businesses simply cannot afford to enter the payment industry, even if such a business only plans to hold a single dollar on behalf of a single third party.

101. The mechanisms encompassed by the MTA are inappropriate for regulating money transmission in the modern age and are consequently ineffective.  Today and for the foreseeable future, nationwide internet access and ubiquitous mobile device usage combine to make it difficult, and at times impossible, to determine the true physical location of a consumer wishing to pay for goods or services, constituting an unreasonable and unnecessary burden on money transmitters that serves no consumer protection or other purpose.

102. According to a study conducted by at least one State's Auditor, the purported local benefits of MTLs, including but not limited to the MTA, namely, protection of local consumers, are practically zero or negative given the local costs.  Only *registered and licensed* money transmitters that can afford

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

26

to meet the high financial burden of applying for licensure in California are covered by surety bonds, leaving the businesses posing the highest risk to consumers, meaning those that are unregistered, completely uninsured. Therefore, even with the MTA in place, consumers are still at risk if they happen to pick the "wrong" money transmitter. The restriction on trade through the elimination of market entrants leads to higher prices for consumers. In practice, the MTA as it is currently structured imposes on consumers a prejudicial Hobson's choice between being scammed by unlicensed thieves, or being gouged by conglomerates wielding monopoly power to impose high fees.

103. The enormous size of each corporate entity capable of possessing nationwide MTL licenses, and the sheer number of the money transmission transactions in which each such corporate entity is engaged, dwarfs and outpaces the protective ability of the surety bond obtained by such licensed corporate entity, which would yield mere pennies on the dollar in the event of a default. The MTA is therefore not justified by any valid public welfare, consumer protection, or pro-competitive purpose unrelated to economic protectionism.

104. Defendants are purporting to act within the scope of their authority under state law in enforcing and implementing the MTA.

105. The notion that each state's currency might be valued differently was anticipated and explicitly discouraged by the country's founding fathers. In *Federalist Paper No. 44*, James Madison wrote:

> In addition to these persuasive considerations, it may be observed, that the same reasons which show the necessity of denying to the States the power of regulating coin, prove with equal force that they ought not to be at liberty to substitute a paper medium in the place of coin. *Had every State a right to regulate the value of its coin, there might be as many different currencies as States, and thus the intercourse among them would be impeded; retrospective alterations in its value might be made, and thus the citizens of other States be injured, and animosities be kindled among the States themselves.* The subjects of foreign powers might suffer from the same cause, and hence the Union be discredited and embroiled by the indiscretion of a single member. No one of these mischiefs is less incident to a power in the States to emit paper money, than to coin gold or silver. The power to make any thing but gold and silver a tender in payment of debts, is withdrawn from the States, on the same principle with that of issuing a paper currency. (emphasis added).

The wide discrepancies between the various requirements for money transmission licenses in each state are clearly tantamount to each state's impermissibly regulating the value of its own coin.

106. The combined net effect of the MTA and all applicable MTLs is one of the states regulating interstate commerce. With all such laws exempting banks from regulation, and banks lacking

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

FIRST AMENDED COMPLAINT- Case No. CV11-05496-HRL

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

any competitive downward pressure on pricing for money transmission services, consumers and merchants suffer the consequences.  Banks have therefore enjoyed a near-monopoly on payment services within the United States, while less-risky money transmission services, which do not make loans, have only been able to qualify for all of the licenses necessary to operate nationwide on the rarest of occasions.

107.  Defendants are liable to Plaintiff for proper redress under 42 U.S.C. § 1983 because the MTA deprives Plaintiff of the rights, privileges, and immunities secured by the Commerce Clause of the United States Constitution.

108.  Plaintiff has no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the following relief:

A.  A declaratory judgment adjudicating that the California Money Transmission Act violates the United States Constitution and is unenforceable;

B.  A preliminary and permanent injunction enjoining the Defendants from implementing or enforcing the California Money Transmission Act against Plaintiff;

C.  A judgment awarding Plaintiff reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

D.  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: January 31, 2012.

Respectfully submitted,

LAW OFFICES OF MICHAEL BROOKS CARROLL

By: */s/ Michael Brooks Carroll*
Michael Brooks Carroll, Esq.
Attorneys for Plaintiff THINK COMPUTER CORPORATION

FIRST AMENDED COMPLAINT- Case No. CV11-05496-HRL

Michael Brooks Carroll (Bar #54904)
Kevin A. Flautt (Bar #257892)
LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 788-7600
Facsimile: (415) 421-7379
carroll_law@sbcglobal.net

Attorneys for Plaintiff
THINK COMPUTER CORPORATION

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**San Jose Division**

| | |
|---|---|
| THINK COMPUTER CORPORATION, | Case No. CV11-05496-HRL |
| Plaintiff, | **SCHEDULE A TO FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND** |
| v. | |
| ROBERT VENCHIARUTTI, in his official capacity as Deputy Commissioner of the California Department of Financial Institutions; WILLIAM HARAF, in his official capacity as Commissioner of the California Department of Financial Institutions; TRACI STEVENS, in her official capacity as Acting Secretary of the California Business, Transportation and Housing Agency; JACOB A. APPELSMITH, in his official capacity as Senior Advisor to the Governor of the STATE OF California; EDMUND G. BROWN, JR. in his official capacity as Governor of the State of California; and KAMALA HARRIS, in her official capacity as Attorney General of the State of California, | |
| Defendants. | |

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

FIRST AMENDED COMPLAINT- Case No. CV11-05496-HRL

LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, CA 94104

## SCHEDULE A

### Complaints Filed with the California DFI Regarding Unlicensed Money Transmitters

October 19, 2011

1. Academy of Art University
2. Pomona College
3. Stanford University
4. University of Southern California

October 26, 2011

5. Airbnb, Inc.
6. Facebook, Inc.

November 2, 2011

7. CheckPoint HR
8. Cimbal, Inc.
9. CompuPay, Inc.
10. Corduro, Inc.
11. Corporate Payroll Services
12. Dwolla, Inc.
13. Fidelity HR Services
14. GTM Payroll Services, Inc.
15. Interlogic Outsourcing, Inc.
16. Loyola Marymount University
17. Mobibucks
18. Netchex
19. Occidental College
20. Padgett Payroll Services
21. Paychex, Inc.
22. Paycom Payroll
23. Paycor, Inc.
24. PayCycle, Inc.
25. Paylocity Corporation
26. Paypro Corporation
27. Payroll People, Inc.
28. Santa Clara University
29. Sprint Nextel Corporation
30. TimePlus Payroll Services
31. University of San Diego
32. Verizon Communications, Inc.
33. Zaarly, Inc.

November 7, 2011

34. Clover Network, Inc.

FIRST AMENDED COMPLAINT- Case No. CV11-05496-HRL