Michael Brooks Carroll (Bar #54904)
Kevin A. Flautt (Bar #257892)
LAW OFFICES OF MICHAEL BROOKS CARROLL
300 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 788-7600
Facsimile: (415) 421-7379
carroll_law@sbcglobal.net

Marvin Cable, Esq. (BBO #680968)
LAW OFFICES OF MARVIN CABLE
P.O. Box 1630
Northampton, MA 01061
Telephone: (413) 268-6500
Facsimile: (413) 268-6500
law@marvincable.com

Attorneys for Plaintiff
THINK COMPUTER CORPORATION

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**San Jose Division**

| | |
|---|---|
| THINK COMPUTER CORPORATION, | Case No. CV11-05496-HRL |
| Plaintiff, | |
| v. | **REQUEST FOR JUDICIAL NOTICE** |
| ROBERT VENCHIARUTTI, *et al.*, | **Before the Honorable Howard R. Lloyd** |
| Defendants. | **Complaint Filed: November 14, 2011**<br>**First Amended Complaint Filed: January 31, 2012**<br>**Trial Date: None Yet Set** |

Plaintiff Think Computer Corporation hereby requests that the Court take judicial notice of the following legislative exhibits, true and correct copies of which are attached hereto. These exhibits concern the legislative history of the California Money Transmission Act.

Generally, agency reports, legislative hearing transcripts, and testimony before legislative bodies are properly the subject of judicial notice. Fed. R. Evid. 201; *see United States v. Penn Foundry & Mfg. Co.*, 337 U.S. 198, 216 (1949) ("The official communications which disclose … policy … like reports, rules and regulations of agencies or other communications to Congress, are equally reliable and authoritative and need no further proof."); *Tempel v. United States*, 248 U.S. 121, 130 (1918) (taking judicial notice of a report by the Secretary of War); *Aramark Facility v. Service Employees*, 530 F.3d 826 n.4; *L.H. v. Schwarzenegger*, 519 F. Supp. 2d 1072, 1079 (E.D. Cal. 2007) (granting judicial notice of a Senate Report); *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1107 (N.D. Cal. 2004) (granting judicial notice of various Congressional hearing transcripts and other legislative materials).

**Exhibit A:** March 11, 2013 California State Assembly Banking and Finance Committee Hearing Agenda;

**Exhibit B:** March 11, 2013 California State Assembly Banking and Finance Committee Hearing Background Paper;

**Exhibit C:** March 11, 2013 California State Assembly Banking and Finance Committee Hearing Transcript;

**Exhibit D:** March 11, 2013 California State Assembly Banking and Finance Committee Hearing Testimony and Public Comment Materials.

1

Respectfully submitted on March 14, 2013,

FOR THE PLAINTIFF:

Marvin Cable, Esq.
BBO#:  680968
LAW OFFICES OF MARVIN CABLE
P.O. Box 1630
Northampton, MA 01061
P: (413) 268-6500
F: (413) 268-6500
E: law@marvincable.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2013, the foregoing document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be served via first-class mail to those indicated as non-registered participants.

Marvin Cable, Esq.

2

**<u>EXHIBIT A</u>**
**March 11, 2013 California State Assembly Banking and Finance Committee Hearing
Agenda**

Assembly Committee on Banking & Finance
Emerging Technology and the California Money Transmission Act

March 11, 2013
2:00p.m
California State Capitol, Room 444

I.  **Opening Remarks:**

- Chair, Assemblymember Roger Dickinson

- Vice Chair, Assemblymember Mike Morrell

II.  **Regulation of the Money Transmission Act:**

- Teveia Barnes, Commissioner, Department of Financial Institutions

III.  **Assessments of Emerging Payment Technology, The Money Transmission Act & Consumer Protection:**

- Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

- John Muller,  Vice President & General Counsel, PayPal Inc.

- Michelle Jun, Senior Attorney, Consumers Union

- Rob Barnett, Vice President-Assistant General Counsel at Automatic Data Processing, Inc.

IV.  **Public comment.**

**EXHIBIT B**
**March 11, 2013 California State Assembly Banking and Finance Committee Hearing**
**Background Paper**

# EMERGING TECHNOLOGY AND THE CALIFORNIA MONEY TRANSMISSION ACT

## Assembly Committee on Banking & Finance

## March 11, 2013

## Assemblymember Roger Dickinson, Chair

Mark Farouk-Chief Consultant
Kathleen O'Malley-Senior Consultant
Tiffany Morrison-Committee Secretary

On August 3, 2000, the National Conference of Commissioners on Uniform State Laws (NCCUSL) issued its first draft of a model act to provide a uniform regulation for money services business.  One of the main drivers behind the creation of a uniform model act was to address concerns arising from potential money laundering activities and that states had begun to implement differing regulatory frameworks.  A final version of the act was ratified by NCCUSL on August 6, 2004.  Alaska, Arkansas, Iowa, Vermont, and Washington implemented the model act in its entirety.  The creation of the model act did not end the patch work of state regulation.  Instead, each state made their own changes and additions to the act.

On September 30, 2010, AB 2789 was signed into law by then Governor Arnold Schwarzenegger.  AB 2789 established the California Money Transmission Act (MTA).  The MTA combined the regulatory and licensing requirements of the Transmission of Money Abroad Law, the Travelers Check Act and the Payment Instruments Law.  In addition to these changes, the MTA includes licensing for domestic money transfer and non-bank issued stored value.  The MTA is administered by the California Department of Financial Institutions (DFI).  Currently, there are approximately 71 MTA licensees, according to data available on DFIs website.

## <u>WHAT IS MONEY TRANSMISSION?</u>

At the most basic level money transmission is the transfer of funds involving three parties, 1) Sender 2) Money transmitter and 3) Recipient.  The transfer of funds may be intrastate, interstate, or international.  Typically this service is conducted at a physical location where the sender of funds pays a fee to the remittance service and the money is then wired to the recipient.  Though, as will be discussed later, emerging technologies are breaking up this old model.

Large money transmitters may have a home office, transaction clearing centers, service center (s), regional offices, and branches.  They may also contract with agents.  Agents may include established businesses such as grocery stores, truck stops, check cashers, pharmacists, travel agents and supermarket chains.  The money transmission home office pays its agents using a fee schedule that provides predetermined charges for money transmission.

This is how the traditional model of money transmission works.  A sender enters an agent location and wishes to send $500 to a recipient in another location.  The sender provides the agent the funds and instructions for delivery to the recipient.  The agent takes the funds and instructions and usually enters the transaction into a computer terminal owned by the money transmitter and that is linked to the money transmitter's processing system.  Upon receiving the instructions, the money transmitter will contact its appropriate receiving

agent for payout to the recipient.  The sender and/or receiving agent will inform the recipient that the transmitted funds are available for pick-up.  The availability of funds to the recipient may range from minutes to several days depending upon the location and availability of the receiving agent and money transmitter's delivery policy.  While computers are the typical means for the transferring of money, telephone lines and fax machines are still widely used.

According to World Bank estimates, remittances totaled $414 billion in 2009, of which $316 billion went to developing countries that involved 192 million migrant workers.  For some individual recipient countries, remittances can be as high as a third of their Gross Domestic Product (GDP).  The top recipients in terms of the share of remittances in GDP included many smaller economies such as Tajikistan (45%), Moldova (38%), and Honduras (25%).

Historically, the money transmission involved face-to-face transaction between the consumer and transmitter agent that would accept the consumer's money and transmit those funds to another agent outside of the United States for delivery of those funds to the consumer's family or friends.  These transactions were dominated primarily by a few large transmitters such as Western Union and MoneyGram.  Subsequent to the issuance of the draft NCCUSL money transmission act, states across the country amended their statutes to provide enhanced regulation to foreign and domestic transmission and non-bank issued stored value.  Forty eight states and the District of Columbia have money transmission licensing statutes.

As will be discussed later in this document, the definition of money transmission can be quite broad, both legally and interpretatively.  Furthermore, the traditional model of money transmission has changed as emerging technologies are changing the way businesses accept payments and the way that consumers send money or pay for goods and services.

**<u>Highlights of the MTA:</u>**

The following are some highlights of California's MTA (Financial Code Sections 2000-2172):

1) Defines "payment instrument" as a check, draft, money order, traveler's check, or other instrument for the transmission or payment of money or monetary value, whether or not negotiable. The term does not include a credit card voucher, letter of credit, or any instrument that is redeemable by the issuer for goods or services provided by the issuer or its affiliate.

2) Defines "receiving money for transmission" or "money received for transmission" as receiving money or monetary value in the United States for transmission within or

outside the United States by electronic or other means. The term does not include sale or issuance of payment instruments and stored value.

3)  Defines "Stored value" as monetary value representing a claim against the issuer that is stored on an electronic or digital medium and evidenced by an electronic or digital record, and that is intended and accepted for use as a means of redemption for money or monetary value or payment for goods or services. The term does not include a credit card voucher, letter of credit, or any stored value that is only redeemable by the issuer for goods or services provided by the issuer or its affiliate, except to the extent required by applicable law to be redeemable in cash for its cash value.

4) Requires licensing for domestic money transmittal services.  Prior to enactment, licensing was only required for international money transfer.

5) Provides for regulation of non-bank issued stored value cards that may be offered by licensees.  In order to offer non-bank stored value the seller of stored value must be licensed.

6) Prohibits a person from engaging in the business of money transmission in California or advertising, soliciting, or holding itself out as providing money transmission unless licensed.

7) Requires specified information to be included in an application for a license which shall be in the form proscribed by the commissioner of DFI.

8) Authorizes the commissioner to conduct an examination of an applicant, at the applicant's expense, and would require the commissioner to approve an application for a license if the commissioner makes specified findings, including that the applicant has adequate net worth and is competent to engage in the business of receiving money for transmission.  In order to meet the net worth requirements a licensee that sells or issue payment instruments or stored value must maintain securities on deposit on a surety bond of no less than $500,000 or 50% of the average daily balance of outstanding payment instruments and stored value in CA.  A licensee engaged in money transmission must either maintain securities or a surety bond not less than $250,000 no more than $2,000,000.

9) Requires licensees to file audit reports with the commissioner within 90 days after the end of each fiscal year.

10) Imposes various fees and would require the commissioner to levy assessments on licensees for the purposes of administering these provisions regulating money transmission including:

a)  A $5,000 application fee;

b) An annual license fee of $2,500;

c) An annual branch office fee of $125 per branch office;

d) An annual $25 fee for each branch employee; and,

e) For licensees that sell or issue payment instruments, an annual assessment based on the volume and aggregate face amounts of payment instruments and stored value issued or sold in California.

11) A licensee must maintain specified eligible securities including and/or a surety bond and maintain $500,000 in net-worth.

12) Requires a licensee to provide specified notices and disclosures to customers, including a notice relative to a customer's right to a refund, disclosures relating to rates of exchange, a notice indicating that payment instruments are not insured, and a notice providing information on making complaints to the commissioner against a licensee.

13) Requires licensees to maintain financial records for a 3-year period.

14) Mandates each licensee to file with the commissioner a certified copy of every receipt form used by it or by its agent for receiving money for transmission prior to its first use.

15) Authorizes the commissioner to suspend or revoke a license if the commissioner finds that a licensee or agent of a licensee has, among other things, violated the provisions of the act or engaged in fraud or unsound practices and would authorize the commissioner to assess specified civil penalties against a person that violates these provisions.

16) Makes it a crime for a person to engage in the business of money transmission without a license or for a person to intentionally make a false statement, misrepresentation, or false certification in a record filed or required to be maintained under these provisions.

17) Exempts from licensing,

a) The United States or a department, agency, or instrumentality thereof, including any federal reserve bank and any federal home loan bank.

b) Money transmission by the United States Postal Service or by a contractor on behalf of the United States Postal Service.

c) A state, county, city, or any other governmental agency or governmental subdivision of a state.

d) A commercial bank or industrial bank, the deposits of which are insured by the Federal Deposit Insurance Corporation or its successor, or any foreign (other nation) bank.

e) Electronic funds transfer of governmental benefits for a federal, state, county, or local governmental agency.

f) A board of trade designated as a contract market under the federal Commodity Exchange Act (7 U.S.C. Secs. 1-25, incl.) or a person that, in the ordinary course of business, provides clearance and settlement services for a board of trade to the extent of its operation as or for such a board.

g) A person that provides clearance or settlement services pursuant to a registration as a clearing agency or an exemption from registration granted under the federal securities laws to the extent of its operation as such a provider.

h) An operator of a payment system to the extent that it provides processing, clearing, or settlement services, between or among persons excluded by this section, in connection with wire transfers, credit card transactions, debit card transactions, stored value transactions, automated clearing house transfers, or similar funds transfers, to the extent of its operation as such a provider.

i) A person registered as a securities broker-dealer under federal or state securities laws to the extent of its operation as such a broker-dealer.

18) If the commissioner finds all of the following with respect to an application for a license, the commissioner shall approve the application:

a) The applicant has adequate tangible shareholders' equity, as specified in Section 2040 to engage in the business of money transmission and the financial condition of the applicant is otherwise such that it will be safe and sound for the applicant to engage in the business of money transmission.

b) The applicant, the directors and officers of the applicant, any person that controls the applicant, and the directors and officers of any person that controls the applicant are of good character and sound financial standing.

c) The applicant is competent to engage in the business of money transmission.

d) The applicant's plan for engaging in the business of money transmission affords reasonable promise of successful operation.

e) It is reasonable to believe that the applicant, if licensed, will engage in the business of money transmission and will comply with all applicable provisions of this chapter and of any regulation or order issued under this chapter.

**FEDERAL LAW & REGULATIONS:**

Federal Regulation E, the Electronic Funds Transfer Act (EFTA) was amended via the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) to include regulation of international remittances and money transfer.  Section 1073 of Dodd-Frank expanded the scope of EFTA to include requirements concerning remittance disclosures to consumers.  The Consumer Financial Protection Bureau (CFPB) has been tasked with creating rules to implement these changes.  Last year, CFPB released draft rules that were to take effect February of 2013.  However, CFPB postponed the final rules until later in the year to work out potential compliance issues.

A brief description of the new requirements:

- Money transmitters will be required to provide customers with written pre-payment disclosures containing information about the specific transfer, such as the exchange rate, applicable fees and taxes, and the amount to be received by the designated recipient.

- Money transmitters will be required to provide a written receipt when payment is made. The receipt must include the information provided on the pre-payment disclosure, as well as additional information, such as the date of availability, the recipient's contact information, and information regarding the customer's error resolution and cancellation rights. As an alternative, the new money transmitter regulation allows money transmitters to give customers a single written disclosure prior to payment containing all of the information required on the receipt, so long as the money transmitter also provides proof of payment such as a stamp on the earlier document.

- The pre-payment disclosures and receipts must be provided in English and in each of the foreign languages principally used by the money transmitter to advertise, solicit, or market money transfer services at a particular office. If you offer customers the ability to make money transfers using text message or a mobile application, the new money transmitter regulation provides additional guidance on how to provide the required disclosures.

- If, (i) due to the laws of a recipient country or (ii) the method by which transactions are made in the recipient country, a money transmitter cannot determine certain amounts that are required to be disclosed, exceptions permit the money transmitter to disclose an estimate of the amount of currency to be received, rather than the actual amount.

- Money transmitters will be required to provide customers with a 30-minute cancellation period that allows a customer the opportunity to review both the

prepayment disclosure and the receipt to ensure that the transfer was sent as the customer intended. If a customer requests, a money transmitter must promptly provide the customer a notice describing the customer's "error resolution" and cancellation rights, using specified language or substantially similar language. Even after the cancellation period has passed, customers will have a right to a refund or other remedy if an error occurs in a transaction.

- In the event a customer timely requests the cancellation of a money transfer, the new money transmitter regulation requires money transmitters to provide customers with a refund, at no additional cost to the customer, the total amount of funds provided by the customer, including any fees and, to the extent not prohibited by law, taxes imposed in connection with the money transfer, within three business days of receiving the request to cancel the money transfer.

The United States Department of Treasury under the Financial Crimes Enforcement Network (FinCEN) requires registration of money services businesses (MSB). According to FinCEN an MSB includes any person doing business, whether or not on a regular basis or as an organized business concern, in one or more of the following capacities, and that meets a threshold of $1,000 per day or more transactions:

- Currency dealer or exchanger.

- Check casher.

- Issuer of traveler's checks, money orders or stored value.

- Seller or redeemer of traveler's checks, money orders or stored value;

- Money transmitter.

FinCEN registration does not apply to a bank or a person regulated or registered with the Securities and Exchange Commission. Entities registered with FinCEN must make electronic filings under the Bank Secrecy Act (BSA). As of July 1, 2012, all such filings must be electronic and made through the BSA E-Filing System. Reports that must be filed through this system include, but are not limited to:

- Currency Transaction Report (FinCEN Form 104)
- Designation of Exempt Person (FinCEN Form 110)
- Suspicious Activity Report (Form TD F 90-22.47)
- Suspicious Activity Report by the Securities and Futures Industries (FinCEN Form 101)
- Suspicious Activity Report by Money Services Business (FinCEN Form 109, formerly 90-22.56)
- Suspicious Activity Report by Casinos and Card Clubs (FinCEN Form 102)
- Currency Transaction Report by Casinos (FinCEN Form 103, formerly 8362)

- Registration of Money Services Business (FinCEN Form 107)
- Report of Foreign Bank and Financial Accounts (Form TD F 90-22.1)

## EMERGING TECHNOLOGIES:

The last five years have witnessed technological changes that have drastically altered the old business model of remittances, as well as, the ways in which consumers pay for goods and services.   Whereas, the traditional model involved visiting the location of a money transmitter agent, new technologies have completely changed the way in which customers send and use money.

Now a consumer wishing to send money to another person for goods, services, or simply as a remittance to family or friends, has various online services to choose from, including applications utilizing smart phones.  The way in which consumers pay for goods and services has transcended checks and credit cards and is rapidly evolving with electronic payment systems and new innovative payment networks.  Large financial institutions are also getting on the bandwagon as several large financial institutions (BofA, Chase, and even Golden 1 Credit Union) are offering money transfer services using smart phone and web based applications.

In the payments space, typical five channels have been available, 1) Cash 2) Check (Paper or Check 21 substitute check) 3) Automated Clearing House (ACH) transaction 4) Credit/debit/stored value and 5) Wire transfers.  Emerging technologies have created new payment methods such as web payments, contactless payments, mobile payments, Bitcoin and other virtual currency.

Between December 2011 and January 2012, the Federal Reserve Board conducted a survey of consumers concerning the use of mobile financial services (http://www.federalreserve.gov/econresdata/mobile-devices/files/mobile-device-report-201203.pdf).  The following are brief findings from their report.

1) Mobile phones and mobile Internet access are in widespread use.

   a) 87 percent of the U.S. population has a mobile phone.

   b) 44 percent of mobile phones are smartphones (Internet-enabled).

   c) 84 percent of smartphone users have accessed the Internet on their phone in the past week.

2) The ubiquity of mobile phones is changing the way consumers access financial services.

a) 21 percent of mobile phone owners have used mobile banking in the past 12 months.

b) 11 percent of those not currently using mobile banking think that they will probably use it within the next 12 months.

c) The most common use of mobile banking is to check account balances or recent transactions (90 percent of mobile banking users).

d) Transferring money between accounts is the second most common use of mobile banking (42 percent of mobile banking users).

3) Mobile phones are also changing the way consumers make payments.

a) 12 percent of mobile phone owners have made a mobile payment in the past 12 months.

b) The most common use of mobile payments was to make an online bill payment (47 percent of mobile payment users).

c) 21 percent of mobile payment users transferred money directly to another person's bank, credit card, or Paypal account.

4) Perceptions of limited usefulness and concerns about security are holding back the adoption of mobile financial services.

a) The primary reason why mobile phone users had not yet adopted mobile banking was that they felt their banking needs were being met without the use of mobile banking (58 percent).

b) Concerns about the security of the technology were the primary reason given for not using mobile payments (42 percent) and the second most common reason given for not using mobile banking (48 percent).

c) More than a third of mobile phone users who do not use mobile payments either don't see any benefit from using mobile payments or find it easier to pay with another method.

5) The "underbanked" make significant use of mobile financial services.

a) The underbanked make comparatively heavy use of both mobile banking and mobile payments, with 29 percent having used mobile banking and 17 percent having used mobile payments in the past 12 months.

b) 62 percent of the underbanked who use mobile payments have used it to pay bills.

c) 10 percent of the completely unbanked reports using mobile banking in the past 12 months, and 12 percent have made a mobile payment.

Mobile payment devices and systems are turning into new and innovative ways for businesses to accept electronic payments.

In addition to the money transmission licensing acts across 48 states, James Freis, Director of FinCEN testified on June 29, 2012, in front of the U.S. House Committee on Financial Services,

> *FinCEN's regulations also have made it clear that the acceptance and transmission of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another person or location, by any means, constitutes money transmission, and that any person wherever located doing business wholly or in substantial part within the United States engaging in money transmission, regardless of any other business lines the person is engaged in – such as the provision of telecommunication services – would likely be a money services business under FinCEN's regulations, and as such must register and comply with all the reporting, recordkeeping, and monitoring requirements applicable to a money transmitter.*

<u>Payment networks:</u>

Payment networks are the infrastructure, made up of multiple parties, that provide for the processing of electronic financial transactions, most notably, credit card transactions.  A typical credit card transaction has four parties: the customer, the bank that issued the customer's card, the merchant, and the merchant's bank.  The merchant typically receives less than the merchant's bank as the transaction is discounted due to the interchange rate (paid to network) and any fees paid to the merchant bank.   The largest payment networks are Visa, MasterCard, Discover and American Express.    The top issuers of credit cards are American Express, JP Morgan Chase, Bank of America, and Citigroup.

The interchange fee paid by merchants has been the source of great controversy between merchants and payment networks and issuing banks.   Interchange fees are set by the payment networks and can vary based on type of card used and transaction volume.  The largest criticism of interchange fees have been 1) they are uncompetitive, as fee competition among the established networks is fairly non-existent.  2) Medium and small merchants have no ability to negotiate on the fee schedule, 3) Network rules prohibit passing the fee along to customers.

One of the most contentious fights concerning interchange involved the "Durbin amendments" to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. The Durbin amendment specified that financial institutions with assets over $10 billion could only charge interchange fees that are "reasonable and proportional to the actual cost."  The Durbin Amendment also gave the Federal Reserve the power to regulate debit card interchange fees, and on December 16, 2010, the Fed proposed a maximum interchange fee of 12 cents per debit card transaction, which CardHub.com estimated would cost large banks $14 billion annually.  On June 29, 2011, the Fed issued its final rule, which holds that the maximum interchange fee an issuer can receive from a single debit card transaction is 21 cents plus 5 basis points multiplied by the amount of the transaction.

On July 13, 2012, a settlement between retailers and the payment card industry (Visa, MasterCard, several banks) over interchange fees was reached.  The settlement will not be implemented until it receives court approval.  The settlement only applies to credit cards not debit cards.

The settlement establishes:

- Cash payment: $6.05 billion
- Credit interchange modification: 10 basis points for eight months. Anticipated value is approximately $1.2 billion
- Ability to charge "checkout fees" at the point of sale for customers paying with a credit or charge card.  Fee cannot exceed 4%. This includes American Express and Discover although they were not parties to the settlement.
- Ability to form buying groups to negotiate interchange rates collectively

The settlement allows members of the class to opt-out of the damages portion of the settlement agreement if they prefer to litigate independently for more damages.  No retailer can opt-out of the forward looking injunctive portion of the settlement, related to rule changes such as the surcharge.  The defendants have the right to terminate the settlement agreement should more than 25% of the merchants opt out of the damages portion. Retailers have until October, 2012, to opt-out.

California enacted Civil Code Section 1748.1 in 2005 which prohibits a retailer in any sales, service, or lease transaction with a consumer may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means. A retailer may, however, offer discounts for the purpose of inducing payment by cash, check, or other means not involving the use of a credit card, provided that the discount is offered to all prospective buyers.

This law will still prohibit retailers from charging a surcharge in California although there is a settlement.

States do not have the ability to regulate interchange rates between retailers, banks and the card networks.  The main area of nexus is how retailers pass along those charges to customers.  As mentioned previously, CA prohibits retailers from imposing a surcharge; however this restriction does not apply to non-retailers, such as government agencies.  It's foreseeable that we may see legislation prohibiting fees for these non-retail entities.

The emergence of alternative payment networks has arisen in large part from the desire of merchants to mitigate the fees and costs associated with the traditional payment networks.

## **ALTERNATIVE PAYMENT NETWORKS**:

Growth in technology has assisted with the rapid development of alternative payment networks.  PayPal started in 1998 to allow people to send money without sharing financial information.  The bulk of PayPal's business came from its relationship with Ebay (Ebay now owns PayPal) in which buyers paid for goods on Ebay via Paypal's service.  PayPal is currently the global leader in processing payments with over $115 billion processed annually.

Square Inc. a payment processing company that began by offering a credit card reader to businesses in order to process credit card transactions including software to facilitate payments.  Square is on track to process $10 billion in payments a year.   They also offer smart phone app that allows customers to pay for goods and services with participating merchants.  Square's main focus has been providing its services to small merchants like food trucks or taxi drivers.  Square makes money by charging a 2.75% fee for every transaction.

Alipay reports a registered user base of approximately 600 million, and is accepted for online payment at many retail websites and service providers in China. They process more than 8.5 million transactions a day, and are partnered with more than 65 financial institutions including Visa, MasterCard, and all national banks in China.  Alipay also provides payment solutions for more than 500,000 external Chinese merchants for online retail, virtual gaming, digital communications, commercial services, air ticketing, and utility fee payment transactions.

Popmoney lets you send money from your bank account to anyone using their name and email address or mobile number.  Popmoney was developed by CashEdge (now part of Fiserve) and is offered through 1,400 US financial institutions (including US Bank and Citi) and processes nearly $50 billion in online fund transfers annually.

The Intuit Payment Network was developed to provide small businesses with an inexpensive way to get paid electronically. The service moves money directly from a sender's bank account to a receiver's bank account for one low flat fee of 50 cents. The network also offers several other ways to get paid: through QuickBooks invoice links, by credit card, ecommerce buttons, and through custom web links. Intuit, the maker of QuickBooks, Quicken, and TurboTax has over 240,000 merchants using the Intuit's credit card processing service.

ClearXchange (CXC) was formed in 2011 as the first network created by financial institutions to let customers send person-to-person payments directly from their checking and savings accounts with only the recipient's mobile number or email address. CXC is equally owned by Bank of America, JPMorgan Chase, and Wells Fargo. Although their service is just out of pilot mode, the three founding partner banks, when combined, reach over 50% of all U.S. online and mobile banking customers.

Dwolla was created in 2008 as an alternative payment network to help lower interchange fees for merchants.  Dwolla allows consumers and organizations to send and receive money for only 25 cents per transaction, no matter how high the transfer amount. The company currently processes over $50 million per month in transactions and have signed up more than 100,000 users.  Dwolla is currently not licensed as a money transmitter in California. These developments in payments provide businesses with multiple options for accepting payments for goods and services.  Additionally, these innovations are creating an active competitive payment processing marketplace where businesses have the ability to price shop for these services.

The previous list of companies is only a small sample of companies operating in this space. For a list of money transmitters licensed in California, visit http://www.dfi.ca.gov/Directory/money_transmitters.html.

<u>Stored Value:</u>

An additional expanding model in the money transmission business is the use of stored value, typically via a pre-paid card, but new technology is growing the use of stored value across new mediums.   The MTA regulates the issuance of non-bank stored value.  The exempts stored value offered by a bank, or stored value on what is known as a "closed-loop" system.  A closed loop system is typically a gift card or some other item representing monetary value that can only be used within the network of a given retailer or merchant. Money transferred via traditional means using an agent, or via computer can often be loaded onto a stored value device and provided to the receiver.

## ISSUES & QUESTIONS FOR DISCUSSION:

- The emerging technologies that bring convenience to the consumer and competition to the market can create regulator confusion. As these technologies avoid storefront locations or traditional banking relationships, regulatory frameworks must keep up in order to remain relevant and clear, not just for consumers, but for those that desire to innovate.

- The road to becoming licensed as a money transmitter in California can create significant compliance costs. These costs can occur before the actual transmission business is off the ground. Licensing fees, net-worth reserves, bonding requirements, audited financial statements, as well as, compliance with Federal money laundering laws are among the costs that payment start-ups must consider. Many of these costs could be borne multiple times over if a potential licensee wishes to become licensed in more than one state. Policy makers may want to consider establishing a scaled approach to licensing in so far as potential transaction volume dictates net-worth requirements. Furthermore, it may be difficult to mitigate some compliance costs, but what policies and/or regulations may be necessary to avoid uncertainty in regards to these costs?

- The MTA creates a potential chicken and egg scenario. Many start-ups in the payments business rely on venture capital funding. Funding is difficult when one is not licensed to conduct business, yet one cannot acquire a license without sufficient funding. Furthermore, this conundrum creates difficulties in creating pilot projects or limited test runs of products because these market tests could be illegal, yet it is difficult to determine success of an innovation without testing.

- Do we need a clearer definition of "money transmission" to clarify when a business that is sending money from point A to point B is not engaged in transmitting money? Additionally, what clarifications may be needed to ensure that the MTA statute provides for functional regulation with a rapidly changing payment system landscape?

- What can policy makers do to ensure a correct balance between removing barriers to market entry while also providing sufficient state oversight?

- Each state has its own set of money transmission requirements that all differ from each other to varying degrees. As mentioned previously, these differences can potentially create barriers for new companies. Often, the requirements of different states may be slightly different, but functionally the same in wanting to ensure that a licensee is not financially over-leveraged and that consumers are appropriately

protected.  However, policy makers and regulators may wish to consider efforts to create some uniformity, or even reciprocity in licensing.  However, before embarking on creating the potential for reciprocity it is vital that California standards are standards that other states may wish to copy and in turn, offer reciprocity for California licensees.  Policy makers may want to consider encouraging California regulators to work with other state regulators to design more uniform regulations and standards.

- An idea circulating among some observers is that the Legislature should repeal the MTA.  This idea may reflect frustration with compliance and regulatory difficulties facing existing and potential future licensees, a repeal of the MTA would lead to dangerous consequences.  First, the repeal of the MTA would not provide the state with specific enforcement and licensing authority over entities that transmit money, issue payment instruments (money orders, traveler's checks) or non-bank issuers stored value.  A complete repeal of the MTA could leave California with little oversight over entities that take consumer money and transfer it to other parties.  If an entity offers services as a payment system that has no net-worth or bonding requirements then what protections would consumers have to recover lost funds, or for the state to hold them accountable?  The purpose behind financial asset requirements is to ensure that if the consumer's funds are in jeopardy they have some recourse for potential recovery.  This is not to say that numerous federal laws and regulations don't also regulate this area of operations.  However, just like mortgage lending, the state has a vested interest in maintaining authority over practices that directly impact California consumers and specifically the safety and soundness of these entities.

**<u>Legislative Responses</u>**:

On February 21, 2013 Assemblymember Dickinson, Chair of Assembly Banking & Finance introduced AB 786.  Initially, this legislation includes clarifications on issues relating to net-worth requirements, the use of certain types of accounts to fulfill liquidity requirements, clarifications on what entities are not money transmitters, and enhanced enforcement powers.  AB 786 is viewed as a starting point for further discussion involving reform of California's MTA.

**EXHIBIT C**
**March 11, 2013 California State Assembly Banking and Finance Committee Hearing
Transcript**

1
               **CALIFORNIA STATE ASSEMBLY**
          **COMMITTEE ON BANKING AND FINANCE**

2

3

4
           TRANSCRIPT OF OVERSIGHT HEARING
EMERGING TECHNOLOGY AND THE CALIFORNIA MONEY TRANSMISSION

5
                     ACT

6

7
               MARCH 11, 2013

                2:00 P.M.

8
        CALIFORNIA STATE CAPITOL, ROOM 444

9

10
   APPEARANCES:

11
   Chair, Assemblyman Roger Dickinson (Dem – 7)

   Vice Chair, Assemblyman Mike Morrell (Rep – 40)

12
   Assemblyman Katcho Achadjian (Rep – 35)

   Assemblyman Ed Chau (Dem – 49)

13

   Teveia Barnes, Commissioner, California Department of

14
   Financial Institutions

15
   Thomas Brown, Lecturer, UC Berkeley Law School and

   Partner, Paul Hastings, LLP

16

   John Muller, Vice President and General Counsel,

17
   PayPal, Inc.

18
   Michelle Jun, Senior Attorney, Consumers Union

19
   Rob Barnett, Vice President and Assistant General

   Counsel, Automatic Data Processing, Inc.

20

   Aaron Greenspan, President & CEO, Think Computer

21
   Corporation and CodeX Fellow, Stanford Law School

22
   Ron Garret, Ph.D., Entrepreneur, Investor

23
   Manuel Cosme, California Chairperson, National

   Federation of Independent Business

24

25

1

1    HEARING CALLED INTO SESSION

2    (2:00 P.M.)

3

4              CHAIRMAN DICKINSON:  We will call the Banking

5    and Finance Committee to order for our hearing of March

6    11th, 2013. Welcome to those of you who have joined us this

7    afternoon.  As you may know, we're on a somewhat limited

8    schedule since we're anticipating being back in session on

9    the floor at about 3:45 to hear from the Chief Justice today

10   for her State of the Judiciary.  So we're going to get

11   started here even in the absence of a few more members.

12   Hopefully we'll have some come join us during the course of

13   the hearing, but I do want to give a chance for those we've

14   asked to come testify to be able to do so without being too

15   — too truncated.  So, we'll get started.

16              California is at the center of technological

17   innovation and development.  I think we're all both aware

18   and proud of that fact.  Our state is a wealth of knowledge

19   and innovation, especially in our collective wisdom and our

20   intellectual power that resides with those who lead tech —

21   the technological revolution in our state, in our nation,

22   and indeed around the world.  And in fact the technology

23   that emerges almost on a daily basis is rapidly changing the

24   world around us as well.

25

1          Among the developments in the financial

2    services field, the way in which we send money, either for

3    goods or services, or to family and friends, is one of those

4    areas that has been rapidly evolving.  According to a survey

5    by the Federal Reserve, 21% of mobile phone owners have used

6    mobile banking in the last twelve months.  11% of those not

7    currently using mobile banking think that they probably will

8    use it within the next twelve months.  The most common use

9    of mobile banking is to check account balances or recent

10   transactions.  And transferring money between accounts is

11   the second-most common use of mobile banking.  21% of mobile

12   payment users transferred money directly to another person's

13   bank, credit card, or PayPal account.  Interestingly, the

14   "underbanked" make comparatively heavy use of both mobile

15   banking and mobile payments, with 29% having used mobile

16   banking and 17% having used mobile payments in the past

17   twelve months.

18          The U.S. mobile payments market is predicted

19   to reach $90 billion by 2017.  Traditional global remittance

20   payments are expected to reach $534 billion by 2015, and the

21   percentage of payments made using mobile technology is

22   expected to increase year-over-year.  In California, as in

23   other states, the regulation of remittances and mobile

24   payments falls under the Money Transmission Act, or MTA.

25   The MTA regulates the non-bank, foreign and domestic

1  transfer of money and issuance of stored value.  Licensees

2  under the MTA must demonstrate appropriate financial

3  capacity reserves for safety and soundness.

4          The purpose of our hearing today is to give

5  us an overview of the interaction between this law, the

6  current MTA, and growing and changing technology.  The ways

7  in which we move money are complex, with an ecosystem made

8  up of mobile payments, internet applications, point of sale

9  applications, SMS remittances and traditional face-to-face

10  transactions.  I have introduced AB 786 as a bill designed

11  to be a starting point to bring some common sense reforms to

12  our money transmission laws.  Hopefully so that it will

13  account for the changes in technology and ensure that we do

14  not inhibit innovation even as we maintain appropriate and

15  sufficient consumer protections.  I look forward to working

16  with the members of — of the Committee, of interested

17  parties and stakeholders, as we move forward with, with

18  considering how best to shape this legislation to accomplish

19  the objectives that I've, that I've just enumerated.

20          With that I'll ask our Vice Chair if he has

21  any comments he'd like to make before we go to our

22  witnesses.

23          VICE CHAIRMAN MORRELL:  No, not a whole lot

24  of comments but it's good to be here.  And um, we've got a

25  lot on our agenda this year; a lot of complicated issues and

4

1   I'm sure we'll get through them, and — so thank you for

2   everything Mr. Chair.

3                   CHAIRMAN DICKINSON:  Thank you.  With that,

4   we'll ask our first witness, Commissioner Barnes from the

5   Department of Financial Institutions if she would come

6   forward and join us for whatever remarks she would like to

7   make.

8                   COMMISSIONER BARNES:  Thank you, Chairman

9   Dickinson and Vice-Chairman Morrell and — .

10                  CHAIRMAN DICKINSON:  Good afternoon.

11                  COMMISSIONER BARNES:  And, uh, given the

12  truncated time that we have this afternoon I am fine with

13  simply starting with your questions and going from there.

14                  CHAIRMAN DICKINSON:  That would be fine.

15                  COMMISSIONER BARNES:  Any questions?

16                  CHAIRMAN DICKINSON:  So, let's start with,

17  how do you see the operations currently, of, of the

18  Department with respect to regulating money transmissions,

19  how is the implementation of the MTA working in your view at

20  this point?

21                  COMMISSIONER BARNES:  Thank you.

22                  CHAIRMAN DICKINSON:  Maybe, I'm sorry, maybe

23  we should just back up a step and for some — we have some

24  new members and others who may not be so familiar with this,

25  with this area, so perhaps you might take a minute or two

1  and explain what it is that the Department's doing with

2  respect to the MTA's implemention and then — and then we

3  can go from there to other questions.

4  　　　　　COMMISSIONER BARNES:  The Money Transmission

5  Act, what we call the MTA, was actually a combination of

6  three different Acts: the Traveler's Check Act, the Payment

7  Instrument Law, and the Transmission of Money Abroad Law —

8  were all brought together in 2010 in an effort by actually,

9  this Committee, to streamline the regulatory requirements

10  that were put upon financial institutions, financial service

11  providers that were doing money orders, traveler's checks,

12  and money transmission.  At the time in 2010 we were only

13  doing money transmission regulations on licensees that

14  transmitted funds abroad.  And the money transmission; the

15  Transmission of Money Abroad Law had been in existence from

16  what I can gather well over sixty years.  So it wasn't a new

17  law.

18  　　　　　What happened in 2010 in bringing these three

19  laws together is that in the interest of consumer

20  protection, uh, California decided to streamline the

21  regulatory burden because we had some companies that were

22  required to get three different licenses all regulated by

23  the DFI; so if they issued money orders, traveler's checks

24  and payments abroad, it was considered a burden and everyone

25  could understand that they would consider it a burden to

1  have three separate licenses with three separate types of

2  examination process.  So to bring those three laws together

3  in 2010 with the understanding that while there was a need

4  to streamline the law, the legislature also, it is my

5  understanding at looking at the legislative intent — wanted

6  to maintain the protection of the consumer, and the DFI

7  views the MTA as we now — as it is now enacted and we're

8  administering it — as a consumer protection act.  With that

9  in mind, we saw that in 2010 effected — effective as of

10  January 1st, 2011, the MTA now covers not only transmissions

11  abroad, but also domestic transmission.  It also now covers

12  non-bank open-loop stored value, and by stored value, it's

13  the, it's the, um, the cards, or any medium where you can

14  have value, money, use your credit card to um — or the

15  internet — to set aside value that the consumer can use to

16  redeem products and services.

17           The MTA made it clear and continued the

18  concept that if the stored value was used like a Starbucks

19  card, and Starbucks issued a card, a stored value card, and

20  that consumer used that card only to purchase Starbucks

21  products that that transactions, those, that, um, activity

22  would not be regulated.  However, if the stored value was

23  used to purchase other products and services from third

24  parties, that would be regulated.  And I think the easiest

25  way to think about it, and the way we think about it as DFI,

1   and recognize that we are the regulators for other

2   institutions who hold other people's money in trust.  We

3   regulate banks, we regulate credit unions and while it's not

4   a deposit, we view the holding of other people's money as —

5   as a trust.  And the Money Transmission Act, we administer

6   it, in a manner to make sure that the institutions who have

7   a license and who we regulate are operating in a safe and

8   sound manner because they're holding consumer funds in

9   trust.

10              The MTA in 2010 expanded the safety and

11  soundness licensing to keep pace with new technologies while

12  at the same time continuing to protect the consumer.  So

13  technology and the internet was very much top of mind when

14  this law was expanded to include domestic transmissions as

15  well as internet fund transmissions.  The question has been

16  raised as to whether or not the MTA is working as intended.

17  I strongly believe that the MTA is working as intended.  I

18  actually think that the fact that we're having a hearing

19  today to talk about the MTA and how it's being applied and

20  administered by DFI is one more indication that it is

21  working as intended, because the bulk of the comments that

22  we have received in understanding the MTA have come not from

23  the licensees in the financial sector, but from the

24  licensees in the technology sector and in the internet

25  sector.

1          And I want to be clear that DFI does not

2   regulate technology.  We don't regulate software; we don't

3   regulate the internet.  That our role and responsibilities

4   as enumerated in the law — which as the Commissioner I am

5   tasked with implementing and enforcing — our role is to

6   protect the consumer, ensure that the financial institutions

7   who hold other funds — other people's money in trust, do it

8   in a safe and sound manner, that they not only have the

9   capital that they need, but they also to start a business —

10  but they also have the wherewithal to continue the business

11  that they will be in existence beyond the initial three

12  years that, uh, their management has the skills and the

13  experience to protect these funds and to operate with

14  policies and procedures that are safe and sound, um, and

15  that they're following the law.  That they're following not

16  only California's laws, but the Bank Secrecy Act laws, the

17  Money Trans — um, the um, money laundering laws, and some

18  other similar laws that have come out of Washington as well

19  as California to protect the consumer.  So yes, is the MTA

20  working as intended?  It is.  That being the case, there's

21  still work that can be done.

22          I am almost celebrating my one-year

23  anniversary with the Department of Financial Institutions as

24  Commissioner.  And in January, in our January monthly

25  bulletin we announced that we will be issuing regulations to

1   provide some clarity and information because I think the

2   folks who have questions about the Money Transmission Act

3   are those who come from the technology side and from the

4   internet side, and we, uh, intend to add some clarity to

5   that process.  Thank you.

6              CHAIRMAN DICKINSON:  Thank you.  I'm glad you

7   answered that — the question about, "is the MTA working as

8   intended from your point of view?"  As you know, in the

9   letter inviting you here this afternoon we had a number of

10   additional questions.  So maybe, maybe we could just go

11   through those, and then we'll see if the Committee members

12   have other, other questions.  So the — the next question is

13   how many entities are currently licensed under the MTA; how

14   many are currently under consideration; of those that have

15   applied, how many licensed have been denied and what were

16   the reasons for denial.

17              COMMISSIONER BARNES:  Right.  We have

18   currently have 23 that have MTA licensees — licenses.  There

19   are 20 applications that are, um, under consideration.  Of

20   those who have applied, no one has been denied.  Just to

21   also give you some additional information, we've had 42

22   applications that have been filed since January 1, 2011.

23   Um, we have issued 26 new licenses since January 1, 2011,

24   and we have, uh, advised over 20 entities that they are not,

25

1   um, they are, do not come under the Money Transmission uh,

2   Act.  And a couple of more statistics that might be helpful.

3           When the MTA was being discussed in 2010, DFI

4   at that time, had expected, rightly or wrongly, expected

5   about five to seven applications a year.  They did not

6   expect 42 applications in the last uh, two years.  And, um,

7   so, I think, uh, in addition to the 42 applications they

8   have had over 130 —

9           Oh.  We have 73 licenses.  What did I say?

10  Seventy — we have 73 licenses.  Yes.  I thought I had missed

11  somebody.

12          But we also have had over 130 inquires in the

13  last two years, which far exceeds any inquiries in any other

14  licenses that we have.  And so that's why it's important to

15  have both regulations and orders with respect to the Money

16  Transmission Act: to give clarity to, um, how we are, uh,

17  administering these laws — this law.

18          CHAIRMAN DICKINSON:  So you — you referred to

19  42 applications and 26 licenses granted in this.  Now, was

20  that in the last…

21          COMMISSIONER BARNES:  Two years.

22          CHAIRMAN DICKINSON:  In the last two years.

23          COMMISSIONER BARNES:  Mm-hmm.

24          CHAIRMAN DICKINSON:  So — and no denials.

25  Does that mean that there are 16 still under consideration?

1          COMMISSIONER BARNES:  There's actually 20 if

2  my add — if my math isn't adding up.  Some companies have —

3  may have withdrawn their application.  So in the process —

4  uh, the uh, the application process we actually, um, reach

5  out to companies, or companies that reach out to us — we

6  have pre-filing meetings where we sit down with them, um, to

7  understand their business.  We look at who owns the — who

8  has control of the funds — basically, flow charts, to follow

9  the money.  Where's the money?  Who has — who has the money?

10  Whose name's on the money?  Um.  And how do they control it?

11  Uh, and there have been applications where we have

12  determined in sitting down with the applicants that they

13  actually are not in control of the money, someone else is in

14  control of the money — someone who has a license is in

15  control of the money, and so, uh, we have given them, uh,

16  clarification that if they continue to operate in that

17  manner then they would not fall under the MTA.

18          I think the other thing that has happened is

19  there have been, as part of these pre-filing meetings, uh,

20  some companies in the process of their application may

21  determine that it's better for them to, um, uh, work with

22  another, uh, entity, like a bank that we regulate in DFI so

23  that they don't require a money transmission license.  And

24  so someone may either put their application, um, um — I

25  wanna say "pause" — they might wanna suspend their

1  application for a period of time to see if they can partner

2  with another licensed money transmitter, or they might

3  decide to withdraw their application completely.

4           CHAIRMAN DICKINSON:  So, so — so is it then

5  correct — there's somewhere between 16 and 20 — in that

6  neighborhood — applications pending?

7           COMMISSIONER BARNES:  So, actually pending…

8  Currently, there are 20 under consideration.

9           CHAIRMAN DICKINSON:  Okay.  Uh…  And can you

10  describe for us the average length of time it takes to get

11  an application through the process, recognizing some

12  instances that, as you just described, people will suspend

13  their application for one reason or — or another.

14           COMMISSIONER BARNES:  Right.  Our — our

15  internal performance goal is to process applications within

16  120 days.  We actually average around, between I would say —

17  average 95 days to process.  And, and…  But bear in mind

18  that if we are talking to an applicant and they ask us to —

19  if we ask for additional information, or they're in, uh,

20  merger discussions — they'll ask us to suspend their

21  application until they come back to us.  But while it is an

22  active process, and it's not been suspended, it takes an

23  average, um, I would say 95 days — between 92 and 96 days.

24           CHAIRMAN DICKINSON:  So except for those that

25  may be in some state of suspension, at the initiation of the

1  applicant for, for the applications that are currently under

2  consideration, we could conclude that those were filed some

3  time within the last four to five months?

4            COMMISSIONER BARNES:  N — no.  There… I…

5  Some have been filed within the last four to five months and

6  some have been longer…

7            CHAIRMAN DICKINSON:  I'm just taking you at

8  your 95 days, roughly for processing.

9            COMMISSIONER BARNES:  Right.  95 days for

10  processing.  And we also, there are times when we ask for

11  additional information.  So, for example, if we're talking

12  to an applicant, and, um, we're trying to determine their

13  source of capital, their source of strength, and they have a

14  parent company and they've provided us with information

15  about their, um, their, the, the money — the applicant, but

16  not necessarily their parent, or there's an additional

17  source of, uh, of, of, um, capital for them we may ask for

18  additional information from them on that.  And during that

19  period they may ask us to suspend the application while they

20  gather that information for us.

21            CHAIRMAN DICKINSON:  Some have said that they

22  feel the barriers to — to, uh, getting approval, are, um,

23  too steep.  The bonding and some of the other requirements

24  especially if they are smaller volume — intend to operate on

25  a smaller volume, dollar volume, in their money transmission

1  work.  Have you seen anything, or made any observations that

2  would allow you to comment on that concern that's been

3  raised?

4                COMMISSIONER BARNES:  Uh…

5                Money transmitters who are applying for a

6  license are asking the State, now that we are regulating

7  them, to be allowed to hold other people's money. Lots of

8  money.  We're talkin' hundreds of thousands into the

9  billions of dollars of other people's money, for some period

10  of time.  Some of them hold them for a couple of days.  Some

11  of them hold them for…months.  Some of them can hold them

12  for much longer periods of time.  I view the holding of

13  other people's monies in the same vein as I view holding

14  bank deposits and credit union deposits.

15                The criteria that is in the MTA in terms of

16  fees has been in existence for money transmitter who

17  transmitted monies abroad since 1989.  These are the same

18  fee schedules — since 1989.  These — the capital

19  requirements are actually less than the capital requirements

20  that we would insist on for a *de novo* bank or a *de novo*

21  credit union.  The MTA lists some twenty-odd items that as

22  Commissioner I am required to consider.  And, I believe that

23  the MTA's list of inquire — items to be considered, as well

24  as what I'm supposed to determine is again there to protect

25

1   the consumer.  Each of these provisions is to protect the

2   consumer.

3           I would hope that applicants, even if there

4   weren't a Money Transmission Act, that they would understand

5   that the business that they are going into is a very serious

6   business — when you're holding other people's money in

7   trust.  And that you should have adequate capital to weather

8   a storm.  You should have adequate reserves to protect your

9   customers if there should be some difficulties in your

10  financial condition.  So, I don't think of it in terms of

11  whether it's a barrier to entry.  I think of it in terms of,

12  are these protections for the consumer appropriate.  They

13  were appropriate since — for over sixty years for the money

14  transmitters who were transmitting it abroad.  They're

15  similar to the provisions that protect consumers at banks.

16  And they're similar to the provisions that the members of a

17  credit union.  So I don't think they're barriers to entry.

18  I think they're consumer protections.

19           CHAIRMAN DICKINSON:  Okay, thank you.  Um,

20  Mr. Achadjian?

21           ASSEMBLYMAN ACHADJIAN:  Thank you, Mr. Chair.

22  A question on holding onto somebody else's money.  I can see

23  why they shouldn't hold onto somebody else's money for

24  longer than, maybe, the hours or the few days it requires to

25  clear a check.  If you were to deposit a check, large check

1    with me, or regardless of the amount, and now, if you don't

2    have a working relationship with a given bank, in other

3    words, they don't know of your background, they probably

4    want to hold onto that amount until the check clears the

5    other side before they release the, the cash.  I see that

6    good — makes good business sense if it's done properly for

7    the duration that it takes to clear a check.  Even if you

8    were to deposit a check in a savings account, and you were

9    able to collect interest from the moment you deposit — which

10   is great — but if you were to take money out, they probably

11   say, "not for 24 hours," or "72 hours," just to be sure that

12   the check is going to clear the other bank that the person

13   did have checks.  Otherwise, anyone can come and deposit a

14   check, then turn around, write a check on that money knowing

15   that it's gonna bounce, or it's a fraud, so, when you come

16   up with regulations, what are you taking into consideration,

17   not just to protect the consumer, but also protect those who

18   are in the business of serving the consumer?

19              COMMISSIONER BARNES:  Uh…

20              First and foremost I'm going to be thinking

21   about the consumer.  I'm also going to be thinking about the

22   safety and soundness of the financial service company.  And,

23   so, in looking at the regulation, um, we'll be looking at

24   whether they're in good funds.  I think that's where your

25   question is going.  I'm not going to want to put the

1  financial services company, um, at risk, for, uh, if the

2  funds aren't — aren't available.

3          But in our regulations of and supervision of

4  money transmitters that's really not been an issue.  More of

5  an issue has been, uh, last week we received a, uh,

6  complaint from a lawyer whose client, uh, is an employer,

7  who, the employer company is in California and the employer

8  hired a payroll processing company outside of the State of

9  California to do their payroll.  And the payroll process —

10  let's say non-California payroll processing company was —

11  was doing payroll for a California company and they were

12  supposed to take the funds from the employer and then write

13  checks to their employer's employees and also do the

14  withholding and pay the federal and state taxes.  And this

15  non-California payroll processing company did not make the

16  payroll for the employer, did not pay the taxes or do the

17  withholding, and as a consequence, both protecting the

18  employer who now has to still have that liability to do the

19  taxes, and still has the liability, uh, to their employees —

20  has to make up those funds.  And if we were regulating that

21  out-of-state California — and we're looking into whether or

22  not they should have applied for a license — if we were

23  regulating that company, we would be looking at their

24  processes and, and policies and procedures for how they take

25  monies and how they distribute the monies in accordance with

1   the instructions in the contracts that they have with their

2   customer, which is the employer.

3              ASSEMBLYMAN ACHADJIAN:  That — that's

4   something I'm with you, I have no problem there.  The

5   companies are outside California, are they required to be

6   bonded?

7              COMMISSIONER BARNES:  Well they're required —

8   required to be licensed.  If there was…  We're still looking

9   into this, just came in.  But let's say, hypothetically,

10  they did take the money from the California, uh, company,

11  the employer, um, and they did have control of those funds,

12  they, under the MTA, should have been licensed.  They should

13  have…  We should be looking at them from a safety and

14  soundness perspective, which would have…  Are they going to

15  continue to exist, uh, in California?  And operate in a safe

16  and sound manner?  Which deals with your question about

17  making sure they have good funds before they let the funds

18  released?  And also are they in compliance with consumer

19  protection laws in the State of California as well other

20  consumer protection laws as well as Bank Secrecy and money

21  laundering.

22              ASSEMBLYMAN ACHADJIAN:  And I'm all with you

23  that policies should apply for outside, or even inside,

24  California.  They do comply with California laws; that they

25  are licensed and insured.  In case they go bankrupt we don't

1  want people who our payroll depends on that, that they're

2  down the wire like the company has.

3              COMMISSIONER BARNES:  Right.  In California

4  there's not insurance like FDIC insurance, or for credit

5  unions, NCUA insurance, but there's in the MTA, and had been

6  in the MTA, for, because of our former laws with, uh, Money

7  Transmission Abroad, the concept of eligible securities.

8  And, money transmitters even before 2011 in California are

9  required to maintain eligible securities, which is

10  effectively, um, liquidity, and also protection for the

11  consumer if the money transmitter were to go into bankruptcy

12  that there should be eligible securities equal to 100% of

13  their money transmissions and stored value, uh, in the

14  United States.  And so that is what I consider the

15  functional equivalent of, um, uh, the, uh, the FDIC

16  insurance or NCUA insurance.  So that's why it's also

17  important to have money transmitters licensed in California

18  so that we can give assurances and regulate that they are in

19  compliance with the eligible security requirements as well

20  as the bonding requirements.

21              CHAIRMAN DICKINSON:  Thank you.  Mr. Chau?

22              ASSEMBLYMAN CHAU:  Thank you.  Uh, uh, yes, I

23  have two questions.  First of all, um, this is follow-up to

24  my colleague's question.  So all licensees, whether out-of-

25  state or not, are required to post a surety bond in short,

1  or no?  Or do — do they need to have enough assets to cover

2  the amount of the money being transferred?

3            COMMISSIONER BARNES:  Yes, all licensees have

4  an eligibility requirement.  And the question is, if they

5  operate completely outside of California, so they are in

6  another state, you know…

7            ASSEMBLYMAN CHAU:  Right.

8            COMMISSIONER BARNES:  They're in Hawaii, they

9  uh, only deal with consumers in Hawaii; they have no

10 transmissions in California, we do not license them.  But

11 all licensees; money transmitter — money transmission

12 licensees in California are required to maintain eligible

13 securities equal to 100% of…

14            ASSEMBLYMAN CHAU:  Of the money being

15 transferred?

16            COMMISSIONER BARNES:  Right.

17            ASSEMBLYMAN CHAU:  So then that, actually,

18 that number fluctuates, uh, depending on, you know, what the

19 amount of the trans — you know, the funds being transferred…

20            COMMISSIONER BARNES:  Yes, it — yes, it can

21 fluctuate, yes.

22            ASSEMBLYMAN CHAU:  Now second question, just

23 to follow up on your opening remarks, you said that the MTA

24 is operating, uh, as intended, yet there is room for

25 improvement.  Essentially, that's what you said.  And I

1  think the chair, um, posed one question in reference to the

2  application process.  Um, so, I think that — that

3  application process could be streamlined probably.  But

4  besides that issue, what other issues, um, do you see that

5  we need to look into.  For example, how do we improve the

6  system a little bit more?

7           COMMISSIONER BARNES:  Okay.  Well first, I

8  want to be clear that in adding clarity to the MTA I believe

9  the orders and the regulations that we're going to be

10  issuing will add clarity and help to improve the process,

11  but I…  I have to tell you, I think the law as written today

12  is very important because that app — all those items that

13  have been listed to be considered I think are very, very

14  important for, uh, whoever is regulating money transmitters;

15  whoever is holding other people's money, whoever is

16  effectively holding a deposit of somebody else's money.

17           All of those items that are listed, are

18  really, I wouldn't necessarily streamline that, except to

19  the extent we determine…  I would keep them on the books,

20  keep them in the law, and, but clarify in the regulations

21  that, for example, if we were to identify a, a money

22  transmitter that I would say is low-risk, like they have

23  only one product, and one geographic, they don't do anything

24  internationally, it's really simple, they don't take cash…

25  In looking at everything, um, listed in the MTA to be

1  considered by DFI, what already — uh, the MTA already allows

2  the Commissioner to take all of those things into

3  consideration, uh, and look at the quality of the

4  management, the assets, and the sorts of strength for the

5  applicant.  But I would not, um, want to take any of these

6  tools away — to say that you don't have to send financial

7  statements for the last three years.  We would want to look

8  — be able to look at the quality of the earnings, you know;

9  are there any iss — balance sheet issues.  Those protections

10  I would say need to remain.  By the same token, we can give

11  some clarity from a regulatory perspective as to how we look

12  at all of these items.

13                ASSEMBLYMAN CHAU:  So then…

14                COMMISSIONER BARNES:  Because we don't treat

15  every applicant — it's really an art form in the sense that

16  we don't treat every applicant exactly the same.  So a money

17  transmitter that's been operating in thirty-five states that

18  comes to us, you know we're going to be able — and they're

19  being examined by other states — we're going to have the

20  benefit of those prior examinations.  We work with other

21  states in developing joint exams and joint protocols.  So we

22  have the flexibility to be able to look at that money

23  transmitter, go down the list, but how we get comfort on all

24  of these items may be a different — a different way.  It may

25  that we're getting comfort from some of their other

1    examinations.  But I think all of these indicia of risk, all

2    of these areas are important to consider to protect the

3    consumer, and I would ask that if there are amendments to

4    the Money Transmission Act, which is certainly within your

5    purview to do — and you did in 2010 — that we don't do

6    anything that's going to harm the consumer.

7                        ASSEMBLYMAN CHAU:  Sure.

8                        CHAIRMAN DICKINSON:  Do you have one — any

9    more — one more follow-up?

10                       ASSEMBLYMAN CHAU:  Just one quick; I'm sorry.

11   Um, how do we, the State of California, stack up against

12   other states in terms of, um, procedures or otherwise, or

13   whether or not…  Are we more stringent than other states, or

14   are we just about, uh, on the average, just similar to other

15   states?

16                       COMMISSIONER BARNES:  Um, we were — so the,

17   my un — we were the last state really to come in 2010 to the

18   party of regulating.  I think, um, uh, eh, I think we

19   provide greater protection for our consumers.  I know that

20   there are some money transmitters that are startups

21   that…decided to go to other states to…start their business.

22   Um, uh, or they've decided to work with, um, money

23   transmitters that are already licensed here.  I think we may

24   protect our consumers better than some other states.  I

25   haven't done a, uh, a state-by-state comparison.  I did see

1    the 50-state analysis.  Um, but I would also caution that

2    California has more money transmissions than any other state

3    in the Union.  In fact, the next three states under

4    California in terms of money transmission don't add up to

5    how many money transmissions that we have in this State.

6    And so, I think for, for, for those reasons it is important

7    to maintain that while we may be different from other — from

8    our sister states in how we regulate money transmissions,

9    um, there's a reason for that difference.  And that being,

10   uh, a State where technology, innovation, is key, and where

11   technology and innovation is going to be developed in a

12   manner that's going to make it easier and better for

13   consumers to put funds in the hands of other people, I think

14   that's a good thing.  I encourage it.  I want to be able to

15   use those — those technologies myself.  But I also want to

16   be sure that California continues to protect, uh, the

17   consumer.

18              CHAIRMAN DICKINSON:  One last thing, uh… Have

19   you seen instances where, uh, an application hasn't been

20   pursued or has been stymied by the necessity of, of

21   obtaining the bonds and the securities that we've been

22   talking about, and yet it's difficult to get them because a

23   license hasn't been, um, issued.  It's a chicken and egg

24   issue.  Have you seen any of that in the applications?

25              COMMISSIONER BARNES:  We have…

1          We have a lawsuit before us so I can't say I

2   haven't seen it.  We have a laws — we have been sued…by an

3   individual, a company, who have made, um, those and similar

4   assertions.  Um, I'm not at liberty to really discuss that.

5   If this Committee would be interested in having a better

6   understanding of DFI's response to those types of statements

7   and allegations, we can share with you our briefs.

8          We are being represented by the Attorney

9   General's office, and um, I think the briefs might be able

10  to give you guidance, better guidance, in that regard.

11          CHAIRMAN DICKINSON:  I think we would be

12  interested in that.  Thank you, Commissioner.

13          COMMISSIONER BARNES:  Thank you.

14          CHAIRMAN DICKINSON:  I appreciate your, uh,

15  comments this afternoon.  And now we will turn to our, our

16  panel.  And if you could please, uh, come forward.  First we

17  have Thomas Brown, who is a lecturer at the UC Berkeley Law

18  School, and a partner in Paul Hastings LLP; John Muller,

19  Vice-President and General Counsel of PayPal, Inc.; Michelle

20  Jun, uh, Senior Attorney, Consumers Union, or "Yoon," I'm

21  not sure, is it…

22          MS. JUN:  It's "Juhn."

23          CHAIRMAN DICKINSON:  Jun, okay.  Um, Rob, Rob

24  Barnett, Vice-President and Assistant General Counsel at

25  Automatic Data Processing, Inc.  And thank you, um, thank

1   you for being with us this, this afternoon.  And in light of

2   our time if you could try to keep your opening remarks to

3   about five minutes, then that'll give the Committee members

4   time to delve into the issues with you.  And if it's

5   agreeable to you, if we could just go in the order that I

6   introduced each of you, so Mr. Brown, you'd be first.

7            MR. BROWN:  Thank you Chairman Dickinson and

8   members of the Committee, it's an honor to be here to talk

9   about a – a subject that tends not to get the same level of

10  attention, uh, on an annual basis as the business of moving

11  money from place to place.  There's — there's something

12  about the ability to engage directly with financial services

13  via um, an iPad or an iPhone or another instrument of mobile

14  technology that seems to get people excited and I think

15  helps to explain some of the reason why we're all – why

16  we're all here.

17            Um, I've provided written testimony to the

18  Committee and, and am open to taking questions on anything

19  that I addressed there.  With my oral remarks I wanted to

20  make, um, a couple of very short points and then save time

21  to take questions.

22            So the first is that, um, uh, the, the

23  consumer financial services industry both, um, in the State

24  of California, in the United States, is – and is

25  appropriately – a highly-regulated business.  Um, uh, and

1  the set of statutes that govern this business include things

2  like the Truth In Lending Act, uh, the Electronic Funds

3  Transfer Act, uh, in the State of California we of course

4  have the Money Transmission Act, and, and, the consumers'

5  interests in interacting with financial services are largely

6  met through those traditional, um, consumer protection

7  statutes.  There are a separate set of requirements for

8  indust — for industry participants that are interested in

9  being in this business, and those relate to the primary

10  reason that we're here, and are reflected in things like the

11  California Money Transmission Act.  And those are the issues

12  that fall under the general heading of safety and soundness.

13  Um, how much money do you need to have in order to support

14  the activity associated with your program?  So, um, both

15  Assemblymember Achadjian and Assemblymember Chau asked a

16  question about capitalization requirements with respect to

17  businesses that are interested in moving money from one

18  consumer to another.  And the answer, um, uh, just to

19  embellish a little bit on what, um, Commissioner Barnes

20  offered is: they're actually threefold in California.

21           So one is if I receive money, um, to transmit

22  it to another, I am required to hold eligible securities

23  that back those funds on a dollar-for-dollar basis.  So that

24  distinguishes the money transmission business from the

25  banking business.  So, the banking business, we sometimes

1    talk about fractional deposits?  Right, so for each dollar

2    of volume that the bank is holding they need to hold some

3    fraction of that in eligible securities.  So if you were in

4    the money transmission business, to be clear, right, a

5    business that we theoretically think of as "less regulated,"

6    uh, you are required to hold a dollar in eligible securities

7    for every dollar of float volume.  So that's one element of

8    the capital requirement.

9              You're also then required to have, to meet a

10   certain threshold of capitalization.  So the statute sets

11   the minimum threshold as $500,000.  As a practical matter in

12   California, uh, that threshold is, um, the minimum is two

13   million, uh, or, up, up...  As a practical matter it's

14   $2,000,000.

15             Um, then the third is that you're then on top

16   of both the capitalization requirements – so the equity on

17   your balance sheet, in addition of course to having that

18   one-to-one dollar backing of every volume in the system,

19   you're then required to post a bond.  Right.  This is an

20   *extraordinary* amount of safety and soundness for a business

21   that at the end of the day is not all that complicated.

22   One.  And then two, all of the themes that I sort of laid

23   out in my testimony was that, that even though I obtain a

24   license in California, to the extent I seek to offer that

25   service on a nationwide basis, I then have to get a license

1  in each state.  And, and some of you may have seen the

2  survey that I put together of, um; the handy bible of state

3  licensing requirements.  Uh, you're required to obtain a

4  license in each of the states in which you do business.  And

5  I believe that that is an onerous load of regulation on the

6  safety and soundness side.  And, as the Commissioner

7  articulated in her remarks, has suppressed innovation both

8  here in the State of California, uh, and around the country.

9  It makes it more difficult to achieve the electronification

10  of payments, which is something that all of us in California

11  have an interest in facilitating.  So those are the points

12  that I wanted to articulate and I'm happy to take any

13  questions.

14           CHAIRMAN DICKINSON:  Thank you.  We'll turn

15  to Mr. Muller.

16           MR. MULLER:  Thank you.  Thank you, Chairman,

17  and thank you to the other members of the Committee for the

18  opportunity to testify.  My name is John Muller, and I'm the

19  Vice President and General Counsel at PayPal, a California

20  company based in, in San Jose, and part of the eBay family

21  of companies.  We've been in business since 1999 and we've

22  been regulated under the Money Transmission Act and its

23  predecessor since 2002, so, more than ten year now.  Um, and

24  that is part of a – a decision we made fairly early on in

25  the company's history about the company's business model.

1   Um, and really our, our attempt to follow customer demand.

2   Um, the company started, uh, with the, the hot mobile device

3   of its time, which was the Palm Pilot, and an assumption in

4   1999 that soon most people would own Palm Pilots and they

5   would all want to send each other money through the Palm

6   Pilot.  We quickly learned from customer demand that that

7   wasn't the case, um, but that there was an interest in

8   people using the internet and e-mail, which were much more

9   widely distributed, um, as the method for sending each other

10  money, and then we quickly learned that in fact, most people

11  wanted to use this new payment method, not just to send each

12  other money, in a traditional type of remittance, but to buy

13  things, um to buy goods and services.  First, on the eBay

14  marketplace, which is how we wound up as part of the eBay

15  company, uh, and then eventually, with small businesses and

16  larger businesses all over the country starting to operate

17  their own web sites.  And as part of that, um, we had to

18  decide, will we follow the traditional, um, payment

19  processing model at the time (and still to a large extent,

20  today), where the customer gives their financial information

21  to the merchant, and then the merchant sends it through the

22  payment processing system, usually, the card networks; or,

23  would we have the merchant, I'm sorry, the consumer, "shop

24  without sharing," as we call it.  So, shop without having to

25  share their financial information with the merchant, and

1  only share it with PayPal as the trusted intermediary.

2  That's what we decided to do.  In that context, it's really

3  the consumer who is pushing the money through the system,

4  um, rather than the merchant who is pulling the money, and

5  so at that point it starts to look more like a traditional

6  remittance, and as a result, we did get our license back in,

7  in 2002 as I mentioned.

8          Um, so the license, uh, has not inhibited our

9  growth overall.  We have grown, uh, over those ten years to

10  a point where last year we, we processed worldwide

11  approximately 165 billion in transmissions, again, almost

12  all of that for the purchase of goods and services, or

13  charitable donations, um, and uh, we have overall had a good

14  relationship with the Department of Financial Institutions

15  under the Act, and its predecessor; we haven't necessarily

16  agreed on every point of interpretation, um, but we have had

17  an open relationship.

18          And so I think our perspective is similar to

19  the Commissioner's: there are some opportunities for

20  improvement, um, in particular there are some elements of

21  the Act that are still based on the traditional remittance

22  world, of cash-based transactions, or of transactions that,

23  where there is a delay between the sending of the money and

24  the receipt of the payment by the recipient, whereas in our

25  case and the case of other recent technology payment

1 entrants, in most cases the receipt of the money by the

2 recipient, usually a seller, is, is uh, immediate. So we

3 think there are opportunities for improvement, but it is an

4 Act we have been able to operate under successfully for

5 these years, and I'll leave it at that in the interest of

6 time. And thank you.

7 CHAIRMAN DICKINSON: Okay, um, thank you.

8 I'm sure we'll come back to you about what those areas of

9 improvement are that you see. Ms. Jun.

10 MS. JUN: Thank you. Good afternoon, my name

11 is Michelle Jun, and I am a Senior Attorney with Consumers

12 Union, the policy and advocacy arm of Consumer Reports,

13 whose mission is to work towards a fair, just and safe

14 marketplace for all consumers, and to empower consumers to

15 protect themselves. We thank the Committee and the

16 Commissioner for putting on this hearing today that's

17 focused on the Money Transmission Act.

18 The MTA provides individual consumers with

19 greater assurance that the companies who they entrust in to

20 transfer their money are not fly-by-night operations. There

21 is no federal law which provides for this type of oversight.

22 Thus, it is important that the focus of this hearing is on

23 protecting consumers in our State, who use, and often rely

24 on money transmission services. Section 2002 of the

25 California Financial Code, or the preamble to the MTA,

1  states this purpose of the law, which is "to protect the

2  interests of persons in this State who use money

3  transmission services."  It is clear that the Legislature

4  intended that the MTA is for consumer protection.

5            We stress that this Committee must continue

6  to maintain its focus as it explores the MTA, particularly

7  in light of the many consumers who rely on money

8  transmission services, as they either cannot or do not want

9  to utilize mainstream financial services.  A weak money

10  transmission law, of the lack of a money transmission law,

11  would most certainly have disparative impact on the more

12  financially vulnerable populations, including communities of

13  color, immigrants, the unbanked and underbanked.  In

14  reference to an FDIC report, underbanked populations include

15  about 43 million adults and 21 million households.  These

16  households use non-bank money orders or non-bank check

17  cashing services, payday loan institutions, rent-to-own

18  agreements or pawn shops on a regular basis.  Blacks,

19  Hispanics and Native Americans are the most likely Americans

20  to be underbanked.

21            Additionally, the manner in which consumers

22  have used money transmission services has changed

23  substantially where they have been made — where they may be

24  subject to losing more money than they had before if they

25  conducted their business with a less-than-stable or

1    trustworthy company.  In the past, money transmission

2    services were single transactions, such as with a traveler's

3    check, or international money transfers.  With the advent of

4    electronic payments, there is a greater potential for

5    consumers to lose more money as they utilize payment

6    instruments such as pre-paid and payroll cards.  Further,

7    this growth in alternative financial services is projected

8    to grow enormously with wider, and the expected universal

9    adoption of, mobile payments.  Compliance with the MTA is

10   necessary in shoring up public confidence, which benefits

11   the larger marketplace.  Without public confidence in MT –

12   in money transmission services, consumers who do not need to

13   use a less secure method are less likely to use an

14   alternative payment method.  Why would a consumer decide to

15   use a payment in which they are unsure about the solvency or

16   the general credibility of the company behind it, over

17   pulling out an existing credit or debit card?  We are not

18   the only skeptics.

19            An IBM executive quoted in a recent *San*

20   *Francisco Chronicle* article stated, "You have to offer them

21   a compelling reason to use mobile payments.  At a very, very

22   minimum, it has to be just as convenient, just as broadly

23   accepted, and just as safe."

24            Consumers Union encourages this Committee,

25   and others, to make sure that the MTA continues to pro-- to

1  best protect consumers who make money transmission services.

2  While we certainly want to see the continuation of payments

3  innovation, we believe that protecting consumers' money

4  always takes precedence, particularly for the most

5  financially vulnerable.

6           For many consumers who use money transmission

7  services, they do not use them for the novelty of making a

8  new way to pay, but rather, rely on the money transmission

9  services to send money to loved ones or to pay bills.

10  Technologies will come and go, but making sure that people's

11  hard-earned money is safe should always be and remain the

12  focus of the MTA.  Thank you.

13           CHAIRMAN DICKINSON:  Thank you for those,

14  those comments, we appreciate that.  Uh, Mr. Barnett,

15  hitting clean-up.

16           MR. BARNETT:  Thank you, Chair.

17           CHAIRMAN DICKINSON:  Welcome.

18           MR. BARNETT:  Thank you, Chairman Dickinson

19  and other members of the, uh, the Committee for the

20  opportunity to uh, to present, uh, this afternoon.  I'm here

21  actually in somewhat of a dual capacity.  I'm here on behalf

22  of the, uh, National Payroll Reporting Consortium, who, uh,

23  actually comprises I think probably eleven or twelve of the

24  top payroll, um, service providers, in the country.  So a

25  very large group, providing, um, payroll type benefits,

1  payroll services and other, um, payroll-related services to

2  1.5 million employers across the country.  Uh, I'm also here

3  in my capacity as Assistant General Counsel and Vice

4  President for our ADP, Automatic Data Processing, uh, and

5  obviously ADP, everyone knows, does payroll, but ADP also

6  does a — a host of other activities that include money-type,

7  money transmission-type activities.  Uh, and I think one of

8  the points that I'd just like to make as part of the opening

9  remarks is that one of the things that I've heard very

10  clearly here, and even Commissioner Barnes pointed out, the

11  purpose and intent of the statute itself was consumer

12  protection.  And, um, whether intentional or not, the, the

13  impact, uh, and reality is that it goes much beyond just

14  simple "consumer protection."  Certainly you can define

15  "consumer", "consumer" as very broad, or you can look as it

16  as individuals or services to individuals, as opposed to

17  services to, um, other corporations or businesses, which

18  most service providers in the payroll space obviously are

19  providing services to employers, not to individuals.

20            Uh, and I think from our perspective

21  obviously there are a lot of payroll laws that regulate, um,

22  wage payments and whatnot, uh, and certainly there are

23  federal laws that regulate, through the IRS and other, um,

24  uh, laws, the payment of — of tax payments and that type of

25  activity.  Um, but one of the issues, or one of the

1 challenges that we've faced is, given the very broad nature

2 of the definition of "money transmission," uh, it

3 essentially picks up any and all activity — um, basically

4 you take money from one party on behalf of that party and

5 then with instructions to transmit it to another and you're

6 considered a money transmitter.  And, uh, you know the — the

7 effect of that is that you end up regulating, uh, a vast

8 number of business-to-business transactions, which from the

9 basis of the statute, the intent expressed in the statute

10 was really more of a consumer protection statute, not one to

11 regulate business activity.

12          Um, certainly not here necessarily to argue

13 whether it should apply or not apply to businesses, uh,

14 generally, but I think one of the challenges that we've had

15 in dealing with the — the Department of Financial

16 Institutions — who, in our case has been outstanding,

17 they've worked with us very closely, uh, in trying to

18 address and, uh, deal with some of the challenge that we've

19 had, so we certainly have no issues with the DFI and

20 certainly appreciate their partnership — but one of the

21 challenges is around the fact that the statute, as

22 previously mentioned, is, was really drafted with the

23 mechanics for over-the-counter, cash-based money

24 transmission, which in our case, you know, we don't take

25 cash.  Everything that we do is bank-to-bank essentially,

1   uh, and so the, the mechanics of the statute are designed

2   such that they really, uh, require things like receipts and

3   rights to refunds and things that make perfect sense in the

4   context of a consumer transaction, but do not necessarily

5   make as much sense in the context of business-to-business

6   transactions.  And it's created a significant, um, challenge

7   for us — you know, obviously, ADP, we have resources, that's

8   not the issue, and we certainly are very seriously committed

9   to our compliance with laws and, and doing the things that

10  we need to do to protect, um, you know, the — the value of,

11  of the services we provide to our clients, and we take our —

12  we take our role as a transmitter of money and a holder of

13  other people's money quite seriously.  We've been in this

14  business for well over 60 years and have, have, you know,

15  weathered a lot of storms and been able to get through a lot

16  of things that a lot of people haven't.  But one of the, you

17  know, the issues for us is trying to comply with some of

18  these technical requirements in the statute that are really

19  designed for over-the-counter money transmission.  It makes

20  it difficult, because obviously, you know, for example, we,

21  you know, we — we do the receipt requirement.  We have

22  600,000 clients across the country that we do all types of

23  money movement activities for.  And delivering a receipt to

24  someone when you're doing a bank-to-bank transfer that's

25  pre-authorized and in agreement — we have agreements with

1   all of our clients that govern the relationship, and

2   identify how it is and when it is we can take money — uh,

3   having to deliver a receipt, uh, in connection with that is

4   — is, is a challenge.  It's not impossible, but it's

5   certainly a challenge and one that most payroll providers

6   aren't set up to do in an electronic world.  Um, once again,

7   we're just not taking cash.

8            Uh, and you know, some of the other

9   requirements, right to refund language once again, we have

10  contracts that govern exactly when it is that we are to

11  deliver the money to whom, and under what circumstances.

12  Um, and so under the statute you're required to essentially

13  tell people that they have the right to refund within 10

14  days, and in an over-the-counter transaction that makes

15  sense, um, but in the context of a business-to-business

16  transaction, it's — it's much more of a challenge.  It makes

17  less sense in that context.  And then there's just other

18  things like consumer notices; you're required to put signs

19  out giving consumers notice of their, their rights.  And

20  once again, we don't even have facilities where individual

21  consumers can walk in and buy our services.  Right?  We have

22  salesforces that deal directly with people.

23            So I — I think, you know, one of the

24  challenges and one of the things that we see as an

25  opportunity to within the statute is — is, is potentially

1   looking at the definition of "money transmission" and — and

2   figuring out and deciding whether or not that was really the

3   intent to have it be applied so broadly to so many people.

4   Um, you know, certainly on — on behalf of the payroll

5   consortium, um, you know, most of those folks in that group

6   don't feel that, you know, it was necessarily intended to

7   apply to them, um, but we're here, and you know ADP, we've

8   applied for a license and we've been working through that

9   process.  Um, but essentially, you know, at some point we

10  have to figure out whether or not was that the intent, or

11  not the intent, and if it was, then maybe there just needs

12  to be some tweaks to the mechanics to address some of these

13  other issues.  Um, I'd also offer up that there are a host

14  of other businesses that I'm just not sure were necessarily,

15  uh, intended, uh, to be covered by this.  I mean, you know,

16  accounts payable businesses, um, COBRA tax credit services—

17  these are all things that, although you know sort of are

18  related to payroll, or actually are provided by a lot of the

19  people that don't even do payroll, they might do these types

20  of services separate, wholly apart from actual, um, payroll-

21  type-providing services.  And so, I think it brings in a

22  very vast, and a wide group of businesses that are

23  potentially regulated.  You know, in this environment,

24  obviously, more regulation, um, you know, is difficult in

25  the State given resources, and uh, so it's our feeling it

1  needs to be looked at and decided whether or not if that's

2  the intent and that's the direction it wants to go then

3  mechanically it really needs to work in that context.  Thank

4  you.

5          CHAIRMAN DICKINSON:  Thank you for comments,

6  all—all four of you.  And let me, um, let's start where we

7  ended.

8          MR. BARNETT:  Sure.

9          CHAIRMAN DICKINSON:  I'd like to explore this

10 just a little bit more with you, Mr. — Mr. Barnett.  Is it—

11 is it your view that — that payroll processors in particular

12 ought not to been seen as money transmitters in the sense of

13 the — of the statute, or would you — would you advocate that

14 business-to-business transactions in general be treated

15 differently than under the Money Transmission Act?  Or

16 something else?  Or a third…

17         MR. BARNETT:  Yeah.  I, once again, I'm not

18 necessarily here to argue that it should *not* be regulated

19 necessarily.  I can only look at the actual — the law as

20 it's written and the legislative intent, and what seems to

21 be the intent at the time it was drafted.  And the intended

22 purpose, which was really governing over-the- — over-the-

23 counter money transmission activities, right?  The

24 traditional Western Union-type activities.

25

1          Um, I think, you know, obviously there's a

2     lot of folks here that are, that are being affected by the

3     fact that it's very broad, but, um, I would think that

4     payroll providers, or certainly companies, in you know,

5     sophisticated companies in business-to-business-type

6     transactions, they should be soph — or, you know, not all

7     are sufficiently sophisticated enough to necessarily protect

8     themselves, but they are individual consumers for the most

9     part.  And so, the intent of providing consumer protection

10    unless you take a very broad read of "consumer," um, I think

11    the statute the way it's drafted and the broad nature of it

12    goes well beyond that intent.

13          CHAIRMAN DICKINSON:  Uh, I assume you would

14    grant the point that there are small businesses and maybe

15    even sometimes large businesses, that aren't necessarily all

16    that sophisticated or — or aware of what their exposure may

17    — may be such as, a contracting with a payroll processor,

18    or, or an entity to take care of paying of taxes, you know

19    those kinds of things, and they may be at risk of — of

20    fraud, or misrepresentation in those transactions.  We had a

21    very, very controversial and, and, uh, visible case of that

22    involving Sacramento County, just a couple of years ago,

23    which is, uh, not an unsophisticated organization, I can

24    tell you that from first-hand experience, and yet—and yet,

25    fell victim to using a firm in another state that literally

1  robbed the County — that's tax money — and wasn't discovered

2  until the IRS found that some things didn't reconcile and

3  brought it to the attention of the County.  So, you wouldn't

4  necessarily exclude businesses from needing some form of

5  protection, you're just arguing that maybe the notion of the

6  traditional consumer in that context is — is not that broad.

7  Is that — is that fair to say?

8        MR. BARNETT:  That is fair.  I mean,

9  unfortunately, right, there are bad apples in every

10  industry.

11        CHAIRMAN DICKINSON:  Right.

12        MR. BARNETT: I'm not going to say that

13  payroll providers are all great.  And, uh, I'd like to think

14  that the eleven or so that are part of the Consortium, we'd

15  like to think that we're above that type of activity.  Um,

16  but certainly there are you know, there — there's needs to

17  regulate at different levels across all businesses.  Um, so

18  yeah, I would agree.  I think the challenge for us really is

19  the mechanics of the statute, right, is this — you know, if

20  the intent is to regulate all activities, is this the right

21  mechanical structure for that.  Um, and, and as I pointed

22  out earlier, the Commissioner and her staff uh, in the DFI,

23  have been very cooperative in trying to work with us, but

24  they, you know, at times have felt at times have felt as

25  though there are some constraints with what they can and

1  can't do because of what's in the statute.  And so I think

2  for us, you know, the biggest challenge is just sort of

3  conforming to the mechanical natures of the statute.  Um,

4  so, I'm not necessarily going to argue that there shouldn't

5  be regulation.  I think there are, as I've pointed out other

6  areas in the law that do provide protection, as the

7  Commissioner pointed out, there was an unfortunate

8  circumstance that they're now aware of, and that does happen

9  from time to time, but that — that sort of activity would

10  also fall under, you know, IRS examination; there would be

11  other places where there could be protections for businesses

12  like that, maybe apart from the MTA itself.

13           CHAIRMAN DICKINSON:  Okay.  Mr. Achadjian,

14  did you want to follow up on this?  No?

15           ASSEMBLYMAN ACHADJIAN:  I had a question but

16  it got answered through the conversation, so thank you.

17           CHAIRMAN DICKINSON:  Okay.  Thank you.  Uh,

18  Mr. Brown, I wanted to come back — back to you.  Uh, and I

19  neglected to say this the first time around, but Go Bears.

20           MR. BROWN:  [Laughter] Indeed.

21           CHAIRMAN DICKINSON:  You did, you did give us

22  in your written submission some suggestions — oh, I'm sorry,

23  Mr. Barnett, I just, one thing that occurred to me.  Is ADP,

24  uh, licensed as a money transmitter in other states?

25

1            MR. BARNETT:  Yes, we are, we currently have

2  46 applications, and two that are pending, one with

3  California and one with Rhode Island.

4            CHAIRMAN DICKINSON:  Okay.  So there's —

5  there's not enough deviation from state to state that you

6  haven't sought a license in essentially all the states that

7  are regulating?

8            MR. BARNETT:  That's fair.  I think there was

9  a question earlier to the Commissioner maybe as to whether

10  or not the — the laws are applied.  I mean, there are 27

11  states or so that have laws very similar to California.  And

12  our, our, our sense is that in having had conversations with

13  other states as part of the licensing process, um, my sense

14  is that a lot of the states, or some portion of the states,

15  um, do not look at it as broadly as, er, as California does.

16  I think as part of our conversation with the — with the DFI,

17  they've made it pretty clear that there really is no concept

18  of unregulated money movement in California.

19            And in other states, even though the statutes

20  are relatively similar, for whatever reason, some of those

21  states have chosen to regulate *some* activities, like, you

22  know, stored value for example, sale of checks, that type of

23  activity that under a lot of statutes is actually

24  enumerated, but other types of activities they haven't had

25  an interest in necessarily regulating, so…  Um, I wouldn't

1   say that it's necessarily — it's just I, you know maybe it's

2   the interpretation, maybe it's resources, I'm not sure what

3   it is.  But I think California takes a much more, uh, much

4   broader interpretation of the definition of "money

5   transmission."  And — and it's, based upon the statute, it's

6   not unfair.  It's a fair — it's a fair reading of the

7   statute 'cause it is very broad.

8                CHAIRMAN DICKINSON:  Mm-hmm.  Okay.  I'm

9   sorry, Mr. Brown, I wanted to come back to you — back to

10  you.  Um, one of your suggestions was some type of

11  reciprocity be granted by California to, to — to other

12  states.  I'm assuming that, uh, you would apply some

13  standard to that and I'm not quite sure how it's

14  articulated, but to ensure that we're not granting

15  reciprocity in cases where we thought another state's

16  statute was um, less protective of consumers than — than

17  California's.

18                MR. BROWN:  So, um, I think any proposal on

19  reciprocity is going to need to recognize California's

20  interest in maintaining, um, uh, some assurance with respect

21  to safety and soundness criteria.  Though, I really do think

22  that it is helpful to distinguish between "consumer

23  protection" and "safety and soundness."  Um, we can make

24  arguments that safety and soundness requirements, um,

25  ultimately protect consumers, uh, but those, but that is —

1  that is not the primary objective of a safety and soundness

2  requirement.  The safety and soundness requirement does two

3  things: it preserves the institution, uh, institutional

4  integrity, um, and, and it serves a bit of a barrier to

5  entry.  Right, I mean, so, so, things that go to protecting

6  safety and soundness are by design, designed to filter out

7  certain institutions.  So that's sort of, one.  Only

8  secondarily do they protect, um, consumers' interests, and

9  then not always.  But we, you know, we can come back to that

10  issue as well.

11           Uh, I do think, um, echoing the earlier

12  remarks about the definition of "money transmission" and how

13  that standard is interpreted in California, there is some

14  cleanup work that can be done with respect to the MTA.  Um,

15  as I pointed out in the written submission, the definition

16  under the existing Act is circular.  Um, if you actually

17  trace through the definitions, "money transmission" is

18  ultimately defined as "money transmission."

19           CHAIRMAN DICKINSON:  [Laughter]

20           MR. BROWN:  Um, uh, I would tell my students

21  that we can hope for better in drafting statutory text?  Um,

22  uh, so, at a high level…  But then, there's a more

23  particular area of disagreement between California and other

24  states, and that's with respect to this issue as, of the

25  payee agent.  Um, I mean, at an abstract level, we should

1  all recognize *everybody* receives money from some people and

2  gives it to others.  Uh, like, that happens a lot at my

3  house.  I have two teenage girls.  Um, and there's a lot of

4  receiving money and giving it to others.  Um, uh, but then

5  traditional businesses also receive money and give it to

6  others.  Um, you know I happen to be a partner at a law

7  firm.  We receive money from clients and we pay it out to,

8  you know, associates and staff and then ultimately to

9  ourselves and we don't — we don't necessarily think of that

10  act as triggering some sort of special-case regulation, even

11  though we're sort of "holding other people's money" at some

12  level.  And so I do think that we can be more precise as to

13  what "money transmission" actually means, right, so when —

14  when money is in float, or not at rest, maybe that's what

15  "money transmission" means, but when I'm giving money to

16  somebody who is the agent of — has been appointed by the

17  person to whom that money is ultimately owed, as their

18  agent, that seems like not so much "money transmission."

19  And at least two states have explicitly recognized that.

20  New York, and it's built into a couple of um, state

21  statutes.  So I do think that's another area where the

22  Committee, um, can look, and to help relieve some of the

23  pressure on — on DFI, particularly as we start to see

24  financial services combine with, with other services through

25  mobile technologies.

49

1         Um, uh, um, one of my favorite—one of my

2  favorite sort of quasi-payment application is Uber. I don't

3  know if anybody has ever used it; it's gotten a little of

4  attention for other reasons. But I don't necessarily think

5  of Uber as a payment app. Right? Um, getting in a cab,

6  it's helped me locate the cab, and then I get out of the

7  cab, and then there's money, um, movement associated with

8  that application, but I don't think of Uber as a payment

9  provider, though there's some ways of looking at the statute

10  that might subject them…

11         CHAIRMAN DICKINSON: So let's — let's pause

12  on that, cause that…

13         MR. BROWN: Mm-hmm.

14         CHAIRMAN DICKINSON: That — maybe that's a

15  fruitful way of illustrating this. I mean, I've not used

16  Uber…

17         MR. BROWN: Mm-hmm.

18         CHAIRMAN DICKINSON: …but what I've read, it

19  suggests that you contact Uber and you — you let Uber know

20  your location; Uber contacts a taxi or, or…

21         MR. BROWN: A towncar, or whathaveyou…

22         CHAIRMAN DICKINSON: …a towncar, and, um,

23  directs it to your — your location. But there's no transfer

24  of — of money in that. To my knowledge, I mean, but maybe

25  you can, you can expand?

1          MR. BROWN:  Well, so, so what, so what

2  happens with, um, many transactions of that archetype, and

3  there are many, and it's not just Uber that uses that basic

4  — that same basic structure, is, um, when I get out of the

5  towncar, it will, it will trigger a charge to the payment

6  credentials that I have on file with that service provider.

7  Uh, and it will then also trigger another transaction to

8  that service provider; now, I believe in Uber's case they

9  are the agent of payee for the people who have contracted

10  with Uber to help them find customers.  Um, but, so that

11  gives, gives an example.

12          But there are many, many, many others.  Many

13  electronic downloads are delivered through things that look

14  like marketplaces.  Right?  Where I go on, say, iTunes, and

15  download a Taylor Swift song.  Right?  So, turns out, Taylor

16  Swift gets paid, and I pay somebody, um, and we're — I'm

17  paying one person and that same person is then paying Taylor

18  Swift, but again, that – that doesn't have the feel of, of a

19  traditional transaction at say Western Union, where I go up

20  to a counter and give somebody money and I ask them to send

21  it halfway around the world, even though, you know, Taylor

22  Swift may for all I know be in London right now.  You know,

23  um, uh, but so this gets at the difference between money

24  transmission and other types of transactions.

25

1          ASSEMBLYMAN ACHADJIAN:   I believe to be part

2    of the organization you have an account established, so when

3    you call, and they send you a cab or whoever they have a

4    contract with, they are reaching out your account and

5    withdraw that money and pay the cab company and keep their

6    percentage, whatever that might be.

7          MR. BROWN:   Correct.   Um, but, but, for when

8    you get out of the cab, um…

9          ASSEMBLYMAN ACHADJIAN:   It's already paid

10   for.

11          MR. BROWN:   You are, but your obligation to

12   the driver — this is, I think, the key distinction, right —

13   your obligation to the driver is released, even if that

14   intermediary fails to deliver funds to the driver, you as

15   the consumer are protected as a matter of contract, in that

16   case, though there are federal overlays that are important

17   here, too.   I mentioned the Electronic Funds Transfer Act

18   and Regulation Z ealier.   Um, your obligation to the driver

19   is satisfied by your successful payment to the intermediary,

20   in this case, Uber.   And for me, that sort of breaks the

21   money transmission chain, even though funds are ultimately

22   being delivered to the driver.

23          ASSEMBLYMAN ACHADJIAN:   Just to follow up my

24   question to the Commissioner.   If you go to a Western Union,

25   and let's say I want to transfer money to you in another

1  part of the area, and I write a check, if they don't have a

2  guarantee that that check will clear, don't they have the

3  right to hold onto it for whatever the new technology allows

4  them to clear that check?

5            MR. BROWN:  Um, so I…

6            ASSEMBLYMAN ACHADJIAN:  That's where I was…

7            MR. BROWN:  That's where your question was

8  going.

9            ASSEMBLYMAN ACHADJIAN:  My question was

10  going, as, are we going to regulate both sides, too, so

11  there's a balance?  Or, in support of consumer, then we're

12  penalizing the…

13            MR. BROWN:  …the business provider.  That's

14  an excellent point, and not, not — um, not one that I had,

15  um — not one that I had given sort of a lot of thought to.

16  But it does go to one of the sort of fundamental challenges

17  of operating in these businesses, as, uh, um, Mr. Muller can

18  attest, right, is that consumers will engage in transactions

19  with you and present themselves as though they have funds,

20  and then turn out not to.  Um, and then, frequently you have

21  an obligation to pay the recipient of those funds,

22  independent of whether the consumer actually has the funds,

23  and, and — and that, that is the fundamental risk that you

24  as the intermediary, um, take on.  And so your point about

25

1 receiving a check that may not be good is, uh, is an

2 excellent one.

3       ASSEMBLYMAN ACHADJIAN:  Because if it was to

4 happen on a weekend when my bank is closed and I don't have

5 the cash to forward it to you, I want to write a check;

6 Western Union is open around the clock, then there is a …

7 problem.  Unless we address it early on.

8       MR. BROWN:  Yes.

9       CHAIRMAN DICKINSON:  Uh, I thought if, and I

10 want to make sure I heard you — you correctly, uh, I thought

11 you made, uh, a remark, uh, to the effect of the safeness

12 and soundness evaluation or criteria *can* operate as a

13 barrier to — to entry and in a way that's not necessarily

14 protective of consumers.  Did, did — is that the essence…

15       MR. BROWN:  That's a, um…

16       CHAIRMAN DICKINSON:  …of what you said…

17       MR. BROWN:  That's a — that's a fair

18 statement, um, there's also — there are also some examples

19 of instances where things that we think of as, as benefiting

20 consumers via safety and soundness have actually worked

21 against that interest, and I'll use one example: there's an

22 interesting paper that's been published on this that when

23 you trace the evolution of deposit insurance in the United

24 States, it turns out that state-mandated deposit insurance

25 tended to make banks less safe on — on average.  Um, uh,

1   controlling for all other factors, because it reduces a

2   dimension along which banks are then competing for the

3   attention of consumers, which is not an argument against

4   deposit insurance, it's just a recognition that things that

5   we do, however well intentioned, can have, um, uh,

6   unintended consequences that work against the benefit that

7   we're — we're trying to implement.  So, this particular

8   study looked at, um, developments in state laws at the turn

9   of the century around branch banking and deposit insurance,

10  which were two, you know, progressive innovations designed

11  to help ensure the safety and soundness of the financial

12  institutions, right, one by allowing some diversification,

13  the other by insuring deposits.  Turned out, branch banking

14  tended to make banks more — make them safer, because they

15  could be in more geographic areas, and deposit insurance,

16  um, tended to make them less safe.

17          So, um, so that's one, but more generally,

18  safety and soundness criteria do serve as a barrier to

19  entry.  I mean, if I need, as a potential innovator, an

20  entrepreneur, who wants to offer a new mobile payment

21  application on, um, uh, an iPad, if I need to go to DFI and

22  spend either 120 days or in some cases several *years* sort of

23  working with the Commissioner and staff to have my

24  application approved, right, that, that necessarily slows

25  down the degree to which people are introducing

1   applications.  Now, we might think that that's a tradeoff

2   worth making.  But, it is definitely a tradeoff.  Uh, and

3   the higher we make the capitalization requirements and the

4   more that we assess fees, we can expect that there's going

5   to be less entry.  People will choose to spend their

6   entrepreneurial energies elsewhere.

7              CHAIRMAN DICKINSON:  Sometimes you want to

8   prevent people from entering the market because they

9   shouldn't be in the market.

10             MR. BROWN:  Yes.

11             CHAIRMAN DICKINSON:  Uh, other times, uh,

12  barriers to entry can operate as an economic device that,

13  that advan — gives some an advantage to the disadvantage of

14  others.  Do you have a — do you have a point of view about

15  how the California statute operates in that, in that

16  respect?

17             MR. BROWN:  Um, I do, and my — and my point

18  of view here, is sort of view informed by a little bit of

19  history in the evolution of the statute.  Uh, so, um, for me

20  PayPal is actually a fascinating case.  So for PayPal, a

21  money transmission license was an alternative to a claim

22  that they were — at least this is the story that I have

23  learned over time, um, uh, again, um, Mr. Muller can

24  embellish — was an alternative to being told that they were

25  a bank, but operating without a bank charter.  So, uh,

1    California in its willingness to provide a license provided
2    an answer to that claim, a claim that had been raised both
3    by the State of Louisiana and by the State of New York, if
4    memory serves.  Um, so, so, and because it was somewhat a
5    lower bar and you could support other business operations
6    through a money transmission license that you couldn't
7    support if you had a bank charter.  Um, uh, but this was at
8    a time when California's Money Transmission Act only applied
9    if you were operating and sending funds overseas, one.  Two,
10   at that point in time, California's Money Transmission Act
11   actually preceded the development of what's known as the um,
12   what was promulgated by um, uh, the institute for, for state
13   law development, the Uniform Money Transmission Act.
14   California's actually became an inspiration for the Money —
15   the Uniform Money Transmission Act.  And with the
16   development of the Uniform Money Transmission Act and the
17   application to all businesses involved in receiving money on
18   a domestic basis, you saw the creation of a barrier to entry
19   where one had not existed before.  Um, uh, and, and — I am
20   familiar, um, both anecdotally — and more anecdotally than
21   every, anything with, um, with a degree to which
22   California's now adoption of significant capital
23   requirements has led people to either go to states, to test
24   their products, that don't have a licensing requirement, or
25   to find somebody who's already a member of the club and to

1  obtain permission to use their charter or their license to

2  offer it.  So, yeah, uh, and that doesn't strike me as a

3  positive development.

4           CHAIRMAN DICKINSON:  So I want to give Ms.

5  Jun a chance if she wants to weigh in on — on this, because,

6  um, one side of the coin is consumer protection, um; perhaps

7  the other side of the coin, at least one dimension, barriers

8  to – to entry.  On the other hand, unreasonable barriers

9  means less competition, um, less choice for consumers, and

10  presumably higher prices for – for consumers.  I mean

11  certainly when we, back in the eighties, talked about

12  airline deregulation and interstate trucking deregulation

13  and all those they were driven by much of the same kind of

14  discussion and principle applied to different subjects.  But

15  I'm curious if you want to comment on this point.

16           MS. JUN:  Sure, I think there are a number of

17  levels I think I can answer that question, but I think the

18  first thing that I want to mention, um, has to do with

19  whether or not consumers would benefit from increased

20  competition.

21           Um, one thing that comes to mind is the

22  Durbin Amendment.  Everybody said once interchange fees went

23  down, merchants would pass on their reaped benefits to

24  consumers.  We have yet to see that happen.  It may be too

25  soon, but I highly doubt that will happen.  Um, so it's kind

1   of the same case here.  Merchants may be able to arrange for

2   cheaper ways to process the payment, but it would — it

3   probably won't be reflected in terms of what is back in the

4   consumer's pocket.

5          Um, the second point is what we've raised

6   again and again, is: the point of this law is for consumer

7   protection.  We're not talking about making an application

8   to see where your friend is instantaneously.  We're talking

9   about people's money, and for the most part, it's people who

10  are unbanked and underbanked who are using these types of

11  transmission services and it will increasingly be so as the

12  numbers are been very staggering as to the number of people

13  who are using mobile devices to conduct every form of

14  business including payments.  So the - the first and

15  foremost, um, it would be that consumer protection should

16  precede any other — any other concern.

17          CHAIRMAN DICKINSON:  So, so at least from

18  your point of view you don't see barriers to entry, at least

19  in this endeavor, as, um, adversely affecting consumers in

20  terms of competition because you don't believe they'll see

21  the benefit of competition, were there greater competition

22  in this - in this marketplace, and you're concerned about

23  compromising other protections.  Is that the gist of how

24  you're looking at it?

25

1          MS. JUN:  I mean we don't sit nearly as

2   closely as DFI in terms of the different inquiries and

3   applications that they obtain, but there are companies that

4   are newer that are more innovative who have been complying

5   with the regulation and have acquired licenses and succeeded

6   in doing so.  Um, so that does not appear to be a barrier of

7   entry.

8          CHAIRMAN DICKINSON:  Okay.

9          MS. JUN:  A barrier to entry.

10         CHAIRMAN DICKINSON:  Okay.  And Mr. Muller, I

11  promised I'd come back and you can certainly talk about this

12  current question on the table if you want, but I'd also like

13  to come back to, uh, your intriguing remark about some

14  improvements could be made in the statute, not withstanding

15  your as I get it, your general satisfaction with the way

16  it's operating with respect to PayPal.

17         MR. MULLER:  Uh, so just to start on the

18  competition point, um, you know, we do see, uh, increased

19  competition, certainly over the last three years, um, and I

20  think certainly the regulations that the Commissioner

21  mentioned will probably help.  Uh, I think there's at least

22  a perceived, uh, lack of clarity as to what the boundaries

23  of the Act are.  Um, and uh, but I think we do see

24  competitors who both build their business around, um, what

25  I'm going to call more "pure" payment processing models, and

1    are therefore able to stay outside of the regulation of the

2    Act, and others who make that choice, um, and have been able

3    to get licensed, some companies in recent years like

4    Facebook and Google, who have been able to get licensed and

5    start up their payments business, and smaller ones as well.

6    Um, so uh, so I think the regulations will help and I think

7    the competitive landscape for payments is certainly very

8    vibrant.  Um, and more, now more than ever.

9              Um, on uh, on the question about improvements

10   that we see to the Act, again, you know, trying not to get

11   too technical, but Mr. Barnett mentioned the receipt and the

12   right to refund wording.  Um, you know the right to refund,

13   again, is premised on a delay in the transmission reaching

14   the recipient, among other things, um and in many cases,

15   both through PayPal and through many of our competitors, uh,

16   the recipient knows right away that the funds have reached

17   their account.  Um, so, the wording, uh, you know we do

18   deliver a receipt, we don't have any problem with delivering

19   a receipt to both sides of the transaction, it's simply a

20   question of the specific wording that is mandated by the

21   statute currently, uh, which can be confusing, um, to the

22   sender and the receiver both.  Um, so that's one example.

23             Um, another one relates to, um, the way the

24   statute deals with agency relationships.  Um, again, based

25   largely on a model of traditional money remittance, um,

1  where the Western Unions and MoneyGrams of the world work

2  through, um, stores and agents around the world.  Um, in our

3  case, for instance, we're also trying to deliver, uh, more

4  service, and make on-line and mobile shopping more available

5  now to the underbanked, working with companies like, like a

6  CoinStar and a MoneyGram.  Um, so if MoneyGram, which is

7  itself a licensed company and has been for a long, long time

8  — um, should they be treated as if they were just an agent,

9  or a corner store with respect to PayPal when PayPal and

10 MoneyGram are working together.  So we think there's, um,

11 opportunity there to make some changes to the Act that can

12 help clarify, um, these new types of relationships.

13              CHAIRMAN DICKINSON:  Well thank you.  I think

14 there's one other aspect of this competition issue, um, or

15 service issue, that strikes me and that's whether there are

16 certain categories of consumers that aren't getting service

17 that could, or could get better service, so it's another

18 aspect of this, but we'll leave that for another day to

19 explore, unless there are questions from other members…

20              ASSEMBLYMAN ACHADJIAN:  I'm just watching the

21 clock to see if we can bring it to an end because we have

22 another commitment…

23              CHAIRMAN DICKINSON:  Right, that's what we're

24 aiming at, so, uh, so thank you all for — I appreciate your

25 comments very much and certainly as we look at trying to

1  shape something productive out of the legislation I've

2  introduced I'm sure we'll be continuing this discussion with

3  you and others.

4                    MR. BARNETT:  Thank you.

5                    MR. BROWN:  Thanks.

6                    CHAIRMAN DICKINSON:  Thank you all again.

7  Uh, and now, uh, we will take public testimony, uh, briefly,

8  so if there are people here who would like to address the

9  Committee, we can — we can do that now.  So if you could

10  tell us who you are, and uh, I know in at least one case we

11  have a lengthy letter; we're going to need to keep your

12  comments to a couple minutes, so I'll — I'll just let you

13  know when you hit that marker.

14                    MR. GREENSPAN:  Good afternoon.

15                    CHAIRMAN DICKINSON:  Good afternoon.

16                    MR. GREENSPAN:  My name is Aaron Greenspan.

17  I am the CEO of Think Computer Corporation, a startup in

18  Palo Alto, and a CodeX Fellow at Stanford Law School.

19  There's no way that I can fit everything I have to say about

20  the MTA and AB 786 into a few minutes, but it is my hope

21  that if you come away with anything from this hearing, it is

22  the following: which is that, with the MTA, *we all lose*.

23                    It is not difficult to see what I have lost.

24  In 2009, I started working full-time on a mobile payments

25  project called FaceCash.  FaceCash's origins go back to my

1   time at Harvard College, from which I graduated early with a

2   degree in economics in 2004.  As a freshman at Harvard I

3   enrolled in a seminar about facial recognition, and I later

4   realized that some of the insights I gained from this course

5   could be used to make payments safer.  The patent on this

6   technology will granted tomorrow as it turns out.

7            So as everyone here surely knows, identity

8   theft is an extremely serious problem; according to a recent

9   Javelin report, identity thieves stole $54 billion in 2009.

10  I'm sure it's higher now.  Much of this can be attributed to

11  the fact that the plastic payment card networks that we all

12  use daily are fundamentally insecure and for a number of

13  reasons cannot be upgraded.  The only way to make the

14  network more secure is to build a new one.  So that is what

15  I set out to do.

16           After substantial investment of approximately

17  $1 million of my own money, FaceCash went live in April,

18  2010.  It was shut down on June 30th, 2011 at the request of

19  the California Department of Financial Institutions due to

20  the new MTA.  I tried to apply for a license, but at my

21  mandatory pre-application interview, among other self-

22  contradictory, ignorant, confusing and false statements,

23  Deputy Commissioner Venchiarutti personally threatened to

24  call law enforcement officials with instructions to throw me

25  in jail because he did not like the kinds of questions I had

1   been asking him about the MTA — so I felt as though I had no

2   choice but to abandon my investment, my product, and my

3   employees.

4            So that's what I lost.  But again, with the

5   MTA, we all lose.  My employees lost their jobs, the state

6   lost tax revenue, and this is all because the MTA is a

7   protectionist law written solely for the purpose of

8   preserving the monopoly power of a few financial

9   institutions represented by the law's initial and sole

10  sponsor, The Money Services Round Table.  The Round Table's

11  monopoly allows its members, and banks who also benef —

12  benefit from the law, to keep charging consumers outrageous

13  prices for basic financial services whose actual marginal

14  cost is near zero.

15           When the MTA was proposed, it was described

16  in terms of quote "consumer protection;" the same is now

17  true, as we've been discussing, of AB 786.  But the truth of

18  the matter is that both the MTA and AB 786 *harm* consumers,

19  and especially entrepreneurs.  So do the Round Table's

20  members — one of them, MoneyGram, recently settled with the

21  U.S. Department of Justice for $100 million over criminal

22  charges filed regarding an even larger decade-long fraud.

23  In effect, thanks to the money transmission laws like the

24  MTA, consumers have been forced into the arms of corporate

25  criminals because of these pointless barriers to entry based

1  on this totally false premise that rich people are

2  inherently more trustworthy.

3          Another Round Table member, Sigue

4  Corporation, settled with the DOJ in 2008 for $15 million

5  for failing to comply with Bank Secrecy Act requirements.

6  Both still are licensed by the DFI. Perhaps this is why the

7  DFI's own General Counsel told me that he was personally

8  "appalled" by the MTA.

9          Today, Assembly Bill 786 only stands to make

10 the presently bad situation far worse. In particular, the

11 proposed new thought crime in AB 786 section 2155 is

12 completely outrageous, and broadly interpreted, would allow

13 the DFI to lock me up in a federal prison just for having

14 asked what the Deputy Commissioner considered to be the

15 "wrong" questions a year and a half ago.

16         CHAIRMAN DICKINSON: Mr. Greenspan, uh, I —

17 you're perfectly free to criticize, I don't have a problem

18 with that, just I have a problem with time, and I have given

19 you, uh, an extra, minute. Because I know you have a lot to

20 say. We will take your letter into account. But if you, if

21 you could, because we have an unforgiving time constraint

22 this afternoon, if there's one more thing you would like to

23 say in summary, why don't you give that to us, and then this

24 conversation will go on.

25

1           MR. GREENSPAN:  I will give you the laundry

2    list of why I believe the — the MTA should be repealed, and

3    is unconstitutional.  And I say it should be repealed not

4    because I'm a libertarian who hates regulation.  I think

5    there should be federal regulation of this; I know that

6    Congress is looking at it.  But the states – I like your

7    airline analogy from before – uh, the states are not in a

8    position to regulate internet transmissions.  The courts

9    have already said so, but aside from that it doesn't make

10   any sense.  It's like having a different FAA in each state.

11   It's incredibly dangerous.

12           CHAIRMAN DICKINSON:  Okay.  I know you've got

13   more to say, but let's leave it there, it's a good one.

14           MR. GREENSPAN:  I understand.

15           CHAIRMAN DICKINSON:  Okay.  Next.

16           MR. GARRET:  Um, thank you, my – I'll try to

17   be as quick as I can.  My name is Ron Garret.  Um…

18           CHAIRMAN DICKINSON:  Welcome.

19           MR. GARRET:  I…  Thank you.  Um, I sent a

20   letter into the public comments which was not included in

21   the public comments.  It's two pages long; I'll read as much

22   of it as I can before I run out of time.

23           Um, I'm here mainly in my capacity as a

24   consumer whose interests the MTA is ostensibly designed to

25   protect, but also as a software engineer, entrepreneur and

1  an investor who has significant experience in digital

2  security technology and financial systems.  Since I'm

3  claiming some domain expertise, let me provide my

4  credentials.

5           I hold a Ph.D. in Computer Science and

6  Applications from Virginia Tech, I've had substantial

7  industrial experience designing and implementing secure

8  financial systems, I wrote the billing system for the

9  original release of Google AdWords in September of 2000, and

10  I subsequently designed and implemented the billing system

11  for two other startups.

12           In December of 2008 I launched a – an effort

13  to start a company whose goal was to eliminate credit card

14  fraud.  The upshot of the story is that the company never

15  got off the ground, in large measure – measure because of

16  regulatory hurdles.  It is because of this experience that I

17  can definitely say that extant financial regulations in the

18  United States in general, and the California MTA in

19  particular, are doing more harm than good, at least when

20  measured according to how well they concept – protect

21  consumers from fraud.  To back up this claim, let me tell

22  you my story.

23           The fundamental problem with all non-cash

24  payment methods currently in used – currently in use in the

25  United States, which includes credit cards, checks, and

1    debit cards, is that they are based on fundamentally

2    insecure protocols designed in the 1950s.  To conduct a

3    transaction the buyer must provide the seller with

4    information: account number, expiration date, billing zip

5    code, whathaveyou.  The exact nature and quantity of this

6    information is not relevant.  What matters is that the

7    information is bound to a particular transaction.  It's

8    reusable.  This is the basis for all credit card fraud and

9    it cannot be fixed, except by making a fundamental change to

10   the protocol.

11              With the advent of electronic commerce, the

12   risk of a fraudster being caught has been reduced nearly to

13   zero.  The result, unsurprisingly, has been an epidemic of

14   credit card fraud that we are all familiar with.

15              There is a technological solution to this

16   problem: it's called Public Key Encryption.  I don't want to

17   get into the details of that, you'll just have to take my

18   word for it for now, but using PKE it is possible to design

19   protocols where the information provided a buyer to conduct

20   a transaction is strongly bound to that particular

21   transaction, and so cannot be reused.  The adoption of this

22   technology would completely solve the credit card fraud

23   problem.

24              And in the interest of time, I will just tell

25   you that after three years I gave up on this effort, and the

1  last straw was exploring the possibility of getting a money

2  transmitter license.  It turned out, that the process turned

3  out to be so expensive and time-consuming and unpredictable

4  that I decided not to pursue it.

5          CHAIRMAN DICKINSON:  Okay.  Thank you.  Uh,

6  and I, uh, am informed that we did include your letter in

7  the materials that were made available to the public.

8          MR. GARRET:  Oh, it was?  I must have missed

9  it then.

10          CHAIRMAN DICKINSON:  It was included in the –

11  it was included in the materials the Committee members

12  received, and it is on the Committee's web site, so we have

13  made it part of the record, and thank — thank you.

14          MR. GARRET:  Good enough.

15          MR. COSME:  Hi, I'll be brief and to the

16  point.  My name is Manuel Cosme.  I'm the co-owner of

17  Professional Small Business Services.  We're one of the

18  payroll providers that was discussed a little bit earlier.

19  And um, and I'm also the California Chairperson for the

20  National Federation of Independent Businesses.

21          CHAIRMAN DICKINSON:  Welcome.

22          MR. COSME:  Thank you for this opportunity.

23  Uh, as I understand it, um, according to the statute,

24  there's a $5,000 non-refundable license fee, I think, and

25  there's a $500,000 minimum for surety bond, right?  We

1  provide payroll services for small businesses.  The average

2  employees is about *four*.  That billing runs between 72 to

3  100 dollars a month.  And, and to require the, um, payroll

4  service bureaus to come up with those kinds of funds doesn't

5  make sense.  Um, the services we provide, um, is that in the

6  statute according to what I read, is that we issue

7  executable checks.  These executable checks, when signed,

8  becomes negotiable.  But that's only when they are signed by

9  the owners.

10          So, okay, I would like to see a little

11 clarity on this law, so there is a distinction between the

12 services we provide, which goes directly from the business

13 owner to IRS or EDD, or those that, uh, perhaps take funds –

14 what happened in, uh, with this, Sacramento.

15          CHAIRMAN DICKINSON:  Mm-hmm.

16          MR. COSME:  Where the funds was actually sent

17 to a trust fund, and then from there they paid the agencies

18 and there was a — by the way the State of New York had a

19 similar problem.

20          CHAIRMAN DICKINSON:  Well, the other firm was

21 in New York that, that was a victim, so, yeah.

22          MR. COSME:  That's – yeah, exactly, so um but

23 there is a distinction between the — the small payroll

24 service bureaus that are throughout the State of California,

25 as opposed to those.  Um, so…

71

1              CHAIRMAN DICKINSON:  Right, and I certainly

2  by my comments didn't mean to suggest that all payroll

3  forms, uh, firms, or anything like that — I mean, that's –

4  that's the aberration, but, to be sure.

5              MR. COSME:  Yeah, um, and so, quite a few

6  comments were mentioned today and I thought they were

7  excellent.  Um, and I'm hoping that um, you take some of

8  those into consideration, especially from the representative

9  of ADP.

10              CHAIRMAN DICKINSON:  Okay.

11              MR. COSME:  Alright?

12              CHAIRMAN DICKINSON:  Yes.  Thank you for all

13  three very much.  Appreciate your testimony.  And if there's

14  no one else who wishes to address the Committee this

15  afternoon, we — we are adjourned.

16

17  (Hearing adjourned at 3:45 P.M.)

18

19

20

21

22

23

24

25

1                                CERTIFICATION

2

3        I, Aaron Greenspan, certify that the foregoing is a

4   correct transcript from the official digital video recording

5   of the proceedings in the above-entitled matter.

6

7

8   _____                    March 13, 2013

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT D**
**March 11, 2013 California State Assembly Banking and Finance Committee Hearing**
**Testimony and Public Comment Materials**

# TESTIMONY
# AND
# PUBLIC COMMENT

Statement of

Thomas P. Brown

Lecturer, Berkeley Law School, University of California

and

Partner, Paul Hastings LLP

before the

Banking and Finance Committee

California State Assembly

State Capitol, Room 444

Sacramento, California

March 11, 2013

Chairman Dickinson, members of the Committee, thank you for inviting me to appear

before you today to discuss the California Money Transmission Act and its effect on innovation

in the payments industry.[1] With this written submission, I intend to (1) provide the Committee

with some background on the role that California has played in incubating new technologies for

value exchange, (2) sketch the regulatory framework that governs the payment industry; (3)

discuss some of the issues that have arisen since the California Money Transmission Act was last

amended; and (4) offer some thoughts about possible modifications to the California Money

Transmission Act that would address some of these issues.

### INTRODUCTION

California is widely regarded as the nation's innovation and technology capital. Many of

the technologies that shape the modern economy were conceived, developed and perfected in

California. The smart phone, integrated circuit, and, of course, the World Wide Web have

changed how people work and live. Each was brought to life by people and businesses resident

in California.

California has also served as an incubator for innovation in industries not generally

associated with technology. In particular, California has been home to companies that have

shaped the consumer financial services industry. Since A.P. Giannini founded the Bank of Italy

in San Francisco in 1904, California businesses and entrepreneurs have played key roles in the

development of consumer credit, credit cards, debit cards and electronic payments.[2] These

---

[1] I am appearing today in my capacity as an adjunct professor at Berkeley Law School. In my
private practice, I have represented and currently represent a number of clients that participate in
the payments industry. The opinions expressed in today's testimony are my own and may not
represent those of my firm or my clients.

[2] The Money Transmission Act itself recognizes California's status as a hub of innovation. *See*
Cal. Fin. Code § 2001(a) ("Money transmission businesses conduct a significant amount of

developments not only provided millions of consumers with access to services that were once reserved for the nation's elite, but they also enabled California companies to take on and, in some instances, replace well-financed incumbents.

Unfortunately, recent legislative changes have cast a shadow on California's legacy of innovation in the financial services industry. One of these legislative changes is California's Money Transmission Act ("MTA")—the subject of today's hearing. The recent effort to amend the MTA, which underwent a substantial renovation in 2010, could have significant impact on businesses that operate in California and with California consumers.

While the Legislature certainly has an interest in protecting California consumers from the risk of loss associated with entrusting funds to an intermediary, the difficulty that the Legislature faces in amending the MTA lies in properly situating the statute within the complicated scheme of overlapping laws and regulations already directed at companies in the financial services sector. The payment industry, in particular, is heavily regulated both by the State and at the federal level. In some cases, California companies that do business in other states are subject to those states' laws on top of the existing California and federal regulations. Thus, the Legislature should keep in mind the web of regulation with which California companies are already burdened as it considers making amendments to the MTA. Some of the existing regulation to which companies in the payments industry are already subject is outlined below.

### Existing Regulatory Framework

In 2010, the Legislature significantly increased the regulatory burden facing innovators in the electronic payment industry with the passage of the MTA. Before the MTA was signed,

---

business in this state and technological advances are occurring in the provision of money transmission services.").

California only required companies that issued money orders and travellers checks or that helped to move money abroad to obtain a license to operate their businesses. The MTA extended this licensing requirement to *domestic* money transmitters—*i.e.*, any person that engages in money transmission *with*, *to*, or *from* persons located in California—as well as to stored valued providers.

Following the passage of the MTA, California firms seeking to enter the payment business face a stark choice: find a suitable regulated chartered partner (*i.e,.* a bank or other depository institution) or obtain licenses from all 50 states as a money services provider. The first option brings the electronic payments provider under the indirect supervision of the state and federal agencies responsible for regulating the chartered partner (*e.g.,* FDIC or OCC). This option also carries costs associated with revenue-sharing and compliance, although some compliance costs and responsibilities may be shared with the chartered partner. The second option brings the electronic payments provider under the direct supervision of various state entities. It also brings with it the initial burden of acquiring state licenses—potentially a multi-year process with associated fees and costs that can easily exceed a million dollars. Annual maintenance costs for state licensing can also be significant.

Other states that regulate "money transmission" activity typically require a license from the state's department of financial institutions, or equivalent body. The licensing requirements can vary widely, but in general, demand that an applicant demonstrate good character and sound financial standing, competency to operate, reasonable promise of success, intent to comply with laws and regulations, and perhaps most importantly, impose substantial capital requirements. The application itself is a substantial undertaking for any business—but especially for a new company in its early stages of fundraising. An MTL application typically requires detailed

information on the applicant; personal information about the officers, directors, or control

persons; financial statements (often required for the applicant and its board); and criminal and

litigation records. State regulators may also have broad discretion to seek additional information

they deem necessary. Application filing fees can range from a few hundred dollars to several

thousand, and yearly fees are typically imposed after the license is granted. Moreover, a

requirement of a surety bond or deposit of other eligible securities is typically imposed. The

bonding requirements can range from $10,000 to $7 million. Cumulatively, these requirements

impose a significant burden on a company engaged in money transmission activity. Multiplied

by the number of individual states that might demand the company to obtain a license, the cost

and effort required to obtain state-by-state MTLs could be prohibitive for a startup or other new

business venture.

Companies engaged in money transmission activity are also subject to regulation by the

federal government. The Financial Crimes Enforcement Network ("FinCEN"), an arm of the

United States Treasury, has been delegated the authority to administer the Bank Secrecy Act

("BSA").[3] The BSA grants FinCEN the authority to regulate "money services businesses," a

term that is defined categorically under FinCEN's regulations. A person who provides "money

transmission services" qualifies as an omnibus category of "money services businesses" under

the BSA.[4] "Money transmission services" are further defined as "the acceptance of currency,

funds, or other value that substitutes for currency from one person *and* the transmission of

currency, funds, or other value that substitutes for currency to another location or person by any

---

[3] Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), P.L. 107-56, 115 Stat. 296, amends certain provisions of the BSA. *See* 12 U.S.C. §§ 1829b, 1951-1959e, and 31 U.S.C. §§ 5311-5314e, 5316-5332e. Title III of the USA PATRIOT Act is separately referred to as the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001.

[4] 31 C.F.R. § 1010.100(ff)(5).

means."[5] Such businesses are required to register with FinCEN and file reports with FinCEN regarding suspicious transactions.[6]

Aside from the overlapping regulatory regimes through which money transmitters must navigate, firms in the payment industry must comply with a long list of laws and regulations. Regulation of consumer financial services is complicated. Payments companies are typically bound by federal law providing consumers with recourse in the event of a disputed charge.[7] Firms that rely on a stored value purse to support their payment applications may be required to implement Customer Identification Programs and to report suspicious transactions to FinCEN.[8] Firms must scrutinize their operations for compliance with the requirements laid down by the Office of Foreign Assets Control ("OFAC").[9] Firms that store customer bank account or other

---

[5] *Id.*

[6] 31 C.F.R. § 1022.320(a).

[7] For example, for mobile payment transactions involving credit cards, Regulation Z, which implements the Federal Truth in Lending Act, limits a cardholder's liability to $50 for unauthorized charges. 12 C.F.R. § 226.12(c). Likewise, the federal Electronic Fund Transfer Act provides similar limitations on liability for unauthorized debit card charges. 15 U.S.C. § 1693g(a).

[8] All federally regulated banks are required to have a written CIP pursuant to section 326 of the USA PATRIOT Act. FinCEN has imposed similar requirements on non-bank providers and sellers of what it defines as "prepaid access." 76 FR 45403-02, 45414 (imposing CIP requirements on sellers of prepaid access that "mirror the customer identification programs required of other financial institutions"); 31 C.F.R. § 1026.220(a)(1) (imposing CIP requirements on futures commission merchants and introducing bankers); 31 C.F.R. § 1024.220(a)(1) (same for mutual funds); 31 C.F.R. § 1023.220(a)(1) (same for securities broker-dealers).

[9] *See* Trading With the Enemy Act ("TWEA"), 50 U.S.C. App. § 1–44; International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*; Antiterrorism and Effective Death Penalty Act ("AEDPA"), 8 U.S.C. §1189, 18 U.S.C. § 2339B; United Nations Participation Act ("UNPA"), 22 U.S.C. § 287c; Cuban Democracy Act ("CDA"), 22 U.S.C. § 6001–10; The Cuban Liberty and Democratic Solidarity Act ("Libertad Act"), 22 U.S.C. § 6021–91; The Clean Diamonds Trade Act, Pub. L. No. 108-19; Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. § 1901–1908, 8 U.S.C. § 1182; Burmese Freedom and Democracy Act of 2003, Pub. L. No. 108–61, 117 Stat. 864 (2003); The Foreign Operations, Export Financing and Related Programs Appropriations Act, Sec 570 of Pub. L. No. 104-208, 110 Stat. 3009-116 (1997); The Iraqi Sanctions Act, Pub. L. No. 101-513, 104 Stat. 2047-55 (1990); The

payment account data are also subject to state laws governing notification to customers and state entities when that personal information is compromised.[10]   Finally, although the full scope is still being fleshed out, the Consumer Financial Protection Bureau has supervisory authority over certain "covered persons," including nonbanks.[11]

### THE CALIFORNIA MONEY TRANSMISSION ACT

Since the recent overhaul of the MTA in 2010, California companies and other stakeholders have struggled to understand the explicit requirements of the statute, which are, at times, vague and open-ended.  These challenges have been compounded by the absence of published regulations from the Department of Financial Institutions' ("DFI") interpreting the MTA.  The need for interpretive regulations is partially a product of the statute.  In its current form, the MTA does not define many of its key terms, and even where terms are defined, the statutory definitions are vague and, in at least two instances, circular.

**What is "money transmission"?**  Ironically, one of the statute's key terms—money transmission—suffers from a vague and circular definition that offers almost no guidance to any company seeking to determine whether it is regulated under the MTA.  The statute defines "money transmission" as "[r]eceiving money for transmission."[12]  It later defines "receiving

International Security and Development Cooperation Act, 22 U.S.C. § 2349 aa8–9; The Trade Sanctions Reform and Export Enhancement Act of 2000, Title IX, Pub. L. No. 106-387 (October 28, 2000).

[10] At this time, forty-six states, the District of Columbia, Puerto Rico, and the Virgin Islands have enacted such statutes.  The National Conference of State Legislatures publishes a comprehensive list, *available at* http://www.ncsl.org/issues-research/telecom/security-breach-notification-laws.aspx.  Such firms must also comply with industry standards set by the PCI Security Standards Council, *available at* https://www.pcisecuritystandards.org.

[11] *See* 12 U.S.C. § 5514(a)(1)(C).

[12] Cal. Fin. Code § 2003(o)(3).  Also included within the definition of "money transmission" are the activities of "[s]elling or issuing payment instruments," and "[s]elling or issuing stored value."  Cal. Fin. Code § 2003(o)(1), (2).

money for transmission" as "receiving money or monetary value ... for transmission ... ."[13] This last phrase, if read literally, appears to embrace every person, household, and company in California. Everyone receives money from some and delivers it to others.

**Who must obtain a license, and who is exempt?** Another source of confusion in the current version of the statute is the provision stating that certain companies may qualify for exemption. The MTA authorizes the Commissioner of DFI to exempt certain entities from the statute's licensing requirements, if he or she "finds such action to be in the public interest and that the regulation of such persons or transactions is not necessary."[14] The statute does not define or provide guidance as to when the granting of an exemption is considered to be "in the public interest," and this omission has created a great deal of confusion in the industry.

While it is clear that DFI has exercised this authority and granted exemptions to certain unspecified firms, DFI has not made publicly available any explanation as to how or why it has exercised this authority in some instances but not others. Recently, DFI has released a limited number of its letters and memoranda issued in response to requests for advice or opinions regarding its interpretation and enforcement policies under the MTA.[15] This limited release of its opinion and advice letters indicates that DFI believes that the "public interest exemption" covers at least three categories of firms: (1) agents of an FDIC-insured bank; (2) companies that are subject to regulation by another California agency; and (3) firms that fall outside DFI's interpretation of "money transmitters." Moreover, these letters indicate that DFI has interpreted "not necessary" to mean duplicative of (or overlapping with) another licensing regime. But

---

[13] Cal. Fin Code § 2003(s).

[14] Cal Fin. Code § 2011.

[15] *See* http://www.dfi.ca.gov/legal/default.asp (explaining that the selected group of letters may not necessarily be in line with current Department policy, warning against reliance on the published letters, and reserving the right to qualify, withdraw or retract any of the letters).

informal standards are not available within the statute, and these interpretive letters provide no sound policy or regulation under which stakeholders may determine whether they are operating within a permissible zone of exemption.

**What must a prospective licensee do in order to obtain a license?** The proposed amendments to Section 2040(a) of the Financial Code create two classes of MTL applicants: those who must possess and maintain a minimum net worth of between $100,000 and $500,000, and those who must maintain up to $2 million "if the commissioner determines with respect to the applicant or license holder, that a higher net worth is necessary to achieve the purposes of this division." The proposed amendment goes on to list eleven factors the Commissioner should use to make the determination that a higher net worth is required.

Although this revision appears to provide some additional clarity, it places the discretion to grant exemptions wholly within the hands of DFI. This may lead to the same problems that have plagued its prior administration of the exemption provision. In the past three years, DFI has offered not issued any public regulations explaining what it has concluded a prospective licensee must do to obtain an MTL—in particular, the necessary amount of shareholders' equity required for each applicant. In other instances, companies have reported that DFI has required them to have shareholders' equity in excess of $500,000 threshold set by the statute. This capital requirements are in addition to the already onerous requirements that applicants obtain a surety bond somewhere in the range of $250,000 and $7 million, and pay an annual license fee of at least $2,500.[16] The lack of transparency and certainty with regard to the obligations has slowed innovation and is likely to continue to do so unless the MTL application requirements are made more explicit.

---

[16] Cal. Fin. Code § 2037(c)–(e).

**DFI Has Not Issued Interpretative Regulations**

To date, the challenge of reconciling the MTA with rapidly evolving technology and the web of regulation facing California companies has fallen to DFI. The Legislature has authorized DFI to administer the MTA and to issue interpretive regulations. But in the three years that have elapsed since the California legislature enacted the MTA, DFI has yet to issue a single regulation.[17]

DFI's failure to subject its interpretations of the MTA to notice-and-comment rulemaking has deprived it of a wealth of expertise and information that could be brought to bear on the challenging issues underlying the MTA. Moreover, entrepreneurs and businesses seeking to expand into the payment business do not know whether they need to obtain a license from DFI or whether their activities are exempt from regulation. Where so much is at stake for private industry, an open rulemaking process is certain to attract talent and energy commensurate with the complexity and significance of the issues. This promises a quality resolution for the state of California. And, as so often in the past, California's solution could provide an example for other states and the nation as a whole.

**SUGGESTED IMPROVEMENTS**

I would recommend that the Committee consider making changes to the current MTA regime that would reduce uncertainty, increase transparency and relieve concerns about inconsistent enforcement of the statute that have been reported among the industry and other stakeholders in the past few years. These improvements include revising and creating new statutory definitions, allowing for reciprocity of money transmission licenses, and creating a pilot

---

[17] In January of this year, DFI publicly announced its intention to issue regulations, but that effort is likely to be stalled further in light of the impending revisions to the MTA.

program to allow companies to test new money transmission concepts without needing to obtain an MTL.

### New and Revised Definitions

As noted above, many of the MTA's statutory definitions are vague and, in some cases, circular. I would recommend that the Legislature take this opportunity to write more detailed definitions for the term "money transmission" and/or "receiving money for transmission."

The Legislature should also consider creating a statutory definition (or set of definitions) clarifying the scope of the act. Leaving this decision solely up to the discretion of the Commissioner, under a standard as vague as "in the public interest," has not proven to be an effective solution thus far. Clarifying the expectations and obligations of both regulator and the regulated would benefit all. To that end, I would also recommend a statutory requirement that DFI publish a list of companies that have applied for, and received, an exemption under the statute. Under the current regime, DFI only publishes information about new applicants and licensees, but information about companies that have been administratively recognized as exempt from the requirements of the MTA is unavailable to the public. This has led to confusion and distrust among the relevant stakeholders, with some companies informally reporting that they have been granted exempt status but without any formal recognition of that status.

Along these lines, I would recommend that the Legislature consider a statutory exemption covering entities that operate under the "payee-agent" model. Some states explicitly recognize a relationship through which a financial institution acts as the agent of the payee as grounds for exemption from money transmission regulation. For example, New York's money

transmission statute explicitly exempts agents of "payees" provided there is an agency agreement that ensures that the "payors" bear no risk of loss if the agent fails to remit the funds.[18]

The idea behind the "payee-agent" model is that payment to the agent is deemed payment to the payee. For instance, the New York State Banking Department authorized this exemption under the reasoning that if there is no risk of loss to the payor in the event the agent fails to remit the funds to the payee, then there is no greater risk than if the funds were tendered by the customers directly to the payees.

Two other states, Nevada and Ohio, also explicitly recognize the payee agent exemption (and it is likely that other states implicitly recognize the payee agent exemption). Nevada's Issuers of Instruments for Transmission or Payment of Money statute provides: "A person shall not engage in [the business of receiving for transmission or transmitting money] as an agent except as an agent of a licensee *or a payee*."[19] Similarly, Ohio's Money Transmitters statute provides that money transmission does not include "transactions in which the recipient of the money or its equivalent is the principal or *authorized representative of the principal* in a transaction for which the money or its equivalent is received."[20]

Similar to these states, California should consider including an explicit "payee-agent" exemption in the MTA. The basic purpose of money transmitter regulation is to protect consumers in the event that an intermediary holding funds payable to a third party defaults on that obligation. That risk is not present when an intermediary (B) holds funds transferred from a consumer (A) that are payable to a third party (C), and the receipt of funds from A to B is deemed to extinguish A's obligation to C.

---

[18] *See* N.Y. Banking Law § 641.1.

[19] Nev. Rev. Stat. Ann. § 671.040 (emphasis added).
[20] Or. Rev. Stat. § 1315.01 (emphasis added).

### Reciprocity Program

I would also suggest that California (and other states) eliminate the requirement that an entity must be licensed by all 50 states to operate nationally. There is no apparent benefit, from a prudential standpoint, of such a fragmented regulatory regime. This is not to say that licensing itself has no value—as in the banking industry, some supervision likely helps ensure that electronic payment companies can meet their obligations to consumers. This value becomes diluted, however, when that company must contend with the overlapping, but not identical, regulatory requirements across the 50 states. In other contexts, state-regulated entities are able to "passport" a single state license across all 50 states, so that compliance with that individual state's regulations suffices to allow those entities to do business nationwide.[21]

Accordingly, I would recommend that the Legislature consider a reciprocity program that allows companies already licensed in other states to engage in money transmission activities in California so long as certain requirements were satisfied, *e.g.*, assurance that the company meets the California MTA's capital thresholds and files a certification with California DFI.

### Pilot Program

Finally, I would propose that the Legislature consider creating a new pilot program available under the MTA that would offer a temporary exemption for companies seeking to pilot in-state money transmission programs. Qualification for the program would be subject to statutorily defined constraints, *e.g.*, limitation on the duration and size of the program, segregation of customer funds from operating funds, compliance with applicable Federal money

---

[21] For example, under the Federal Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE Act"), 12 U.S.C. § 5100 *et seq.*, mortgage loan originators enjoy uniform licensing standards nationwide, either through their home states' participation in the Nationwide Mortgage Licensing System and Registry or by those states' establishing individual systems that comply with certain federal standards.

laundering requirements, and registration with DFI 30 days prior to inception of the pilot.[22]

Once the pilot program exemption status came to an end, the company would have the option of either (1) applying for an MTL or (2) seeking exempt status from DFI, through a separate application or otherwise. Those applications and their disposition would subsequently be made publicly available after DFI had made a determination as to the applicant's licensing, or exempt status.

**CONCLUSION**

This is an exciting time for the payment industry. Emerging technologies are creating opportunities for financial institutions, merchants and consumers to reinvent commerce. The Legislature should keep this in mind in its effort to amend California's MTA, a statute that has created confusion and uncertainty, threatening to stifle the innovation for which this State is known. Through certain improvements and clarifications, the MTA can both operate to protect consumers from risk of loss, as well as serve the electronic payments companies that are creating innovations serving those consumers.

Thank you again for inviting me to appear today. I am happy to answer any of the committee's questions.

---

[22] Texas has a temporary license regime that is directionally consistent, though much more limited than this proposal. *See* Tex. Fin. Code § 151.306.

### COMMENTS OF MATTHEW OPPENHEIMER, PRESIDENT OF REMITLY, INC. REGARDING THE REFORM OF CALIFORNIA MONEY TRANSMISSION LAWS BEFORE THE BANKING AND FINANCE COMMITTEE HEARING FOR ASSEMBLY BILL 786

### Introduction

Remitly, Inc. ("Remitly") is a money transmitter licensed in the state of California. We generally support the proposed changes to the Money Transmission law. However, for the reasons stated below we encourage the Banking and Finance Committee to consider further modifying the minimum net worth related provisions. By creating a definite, consistently applied, risk based capital requirement the Assembly will promote a more competitive money transfer industry that better serves state residents.

### Remitly Overview

Remitly, Inc. ("Remitly"), is an international money transmitter licensed in thirteen states, including California. By leveraging digital channels Remitly allows California residents to send money from the U.S. to the Philippines faster, better, and cheaper compared to more traditional money transfer services. Since its inception in 2011 Remitly has raised over $5.0 Million in capital from investors such as Trilogy Partnership, Founders CoOp, Bezos Expeditions, and TomorrowVentures.

I started Remitly after living in Nairobi, Kenya where I ran mobile and internet banking initiatives for the second largest bank in Kenya. I saw firsthand how difficult and expensive it was for immigrants to send money back to their loved ones. Upon returning to the U.S., I partnered with Josh Hug (Co-founder, Chief Product Officer) and Hilton Hewitt (Compliance Officer) to build Remitly. Josh has several years of e-commerce experience, most recently at Amazon.com, while Hilton has had a long compliance career in both the public and private sectors.

The entire team is committed to building a less expensive and more convenient remittance product for customers. According to the World Bank, the average fee for sending $200 from the USA to the Philippines was 5.93%.[1] Remitly fees generally range from 1-3%, which is less than half the prevailing cost. Of equal importance, customers have a much better experience by using digital channels.

While we are still a small company, we have strong customer loyalty and have never had a customer complaint registered with any state agency. We also take pride in our risk and compliance systems that help us protect customer funds and stay fully compliant with state and federal requirements.

We also work closely with the California Department of Financial Institutions and appreciate their experience and willingness to work with us as a relatively new business.

---

[1] http://remittanceprices.worldbank.org/Country-Corridors/United-States/Philippines/

## Commitment to Consumer Protection

Remitly strongly supports existing and proposed regulations that serve consumer protection. As a newly licensed money transmitter we understand that our business is built on trust. This trust requires that we offer our customers a secure environment and real privacy protection. We believe that all money service businesses should be held to this same high standard of consumer protection.

We also believe that consumers are well served by the product and service innovation that naturally arises from a competitive marketplace. Accordingly, Remitly also fully supports laws and regulations that encourage new entrants to our industry.

## Improving the Net Worth Requirement

Our comments regarding Assembly Bill 786 specifically relate to the continuing lack of a truly risk based net worth requirement. While we realize the goal of consumer protection that underlies both the net worth and surety bond requirements, we strongly believe that they should correlate to the amount of consumer funds actually at risk.

Currently, the applicable provision of the proposed bill states that the *minimum* net worth requirement will remain at $500,000. However, the practice of the DFI has been to enforce a $1,000,000 requirement for start-up companies. Because the law presumes that most startups lose money at the outset, they are actually required to have closer to $1,500,000 to $2,000,000 in order to allow for initial losses, though this number is ambiguous. This is in addition to the required $500,000 surety bond, which is additive to the net worth requirement.

The challenge with the net worth requirement is not the principle but the magnitude of the requirement. For example -- let's take a company that transfers $12,000,000 per year. As with most modern startups, funds are available immediately after being sent so the average time from transfer to pickup is 24 hours. Therefore -- the *daily* average amount of funds outstanding is only ~$33,000 ($12,000,000/365 days). In order to acquire a license, this startup company must have $1,500,000 to protect the $33,000 in outstandings. The requirement is that $45 has to be set aside for each $1 outstanding ($1.5m/$33k) in addition to a surety bond requirement of $15 for every $1 outstanding ($500k/$33k). Of course, everyone hopes this startup company grows and eventually needs a higher net worth but variance in the current outstandings and required net worth seems out of balance.

Achieving a balance is important because raising approximately $1,500,000 in capital is difficult without a product. And having a product is illegal without a license. Remitly was able to raise its capital without a product based on Remitly's management team and experience but we are the exception. Few companies can raise this much capital without a proven product. Fewer companies unfortunately result in less competition, higher prices, and worse products for consumers.

<u>Proposed Change to Assembly Bill 786</u>

As a result of my experience building Remitly, my suggestion is to amend Section 2040 of the Financial Code by replacing paragraph (a) with the following:

<u>Section 2040:</u>

<u>(a) An applicant for a money transmission license must possess, and a money transmission license holder must maintain at all times, a minimum net worth computed in accordance with generally accepted accounting principles, in an amount not less than the aggregate amount of all of its outstanding payment instruments and stored value obligations issued or sold in the United States and all outstanding money received for transmission in the United States but not yet delivered. The amount of securities held by the licensee or a bond of a surety company required to be maintained by this division shall not be cumulative.</u>

<u>Conclusion</u>

I hope that these comments are useful to the Committee as it considers improvements to Assembly Bill 786.

Although I am currently CEO of Remitly, I have always been passionate about policy. I gave the keynote speech at the Idaho State Democratic Convention in Idaho in 2000 and then attended the Democratic National Convention later that year. I'm involved in politics because I know it provides a viable avenue to protect consumers and create a level playing field for all companies.

I appreciate both the committee's attention to this issue and the California Department of Financial Institution's productive and continued oversight.

Respectfully submitted,

Matt Oppenheimer
Remitly, Inc.
1725 Westlake Ave. North, Suite 105
Seattle, WA 98103
(206) 535-6152
matt@remitly.com



## NPRC

*National Payroll Reporting Consortium*

PO Box 850 ★ Henrietta, NY 14467-0850 ★ www.NPRC-Inc.org

# Testimony of the National Payroll Reporting Consortium
Money Transmission Act - Chapter 612, Laws 2010
California Assembly Banking & Finance Committee Hearing
March 11, 2013

The National Payroll Reporting Consortium (NPRC) appreciates this opportunity to provide comments for consideration by the Assembly Banking & Finance Committee concerning the Money Transmission Act, and in particular, whether it should apply to the payroll processing industry.

NPRC is a non-profit trade association whose member organizations provide payroll processing and related services to over 1.5 million employers nationwide, covering over one-third of the private sector work force. Payroll service providers have long served an important role in our nation's tax collection system as a conduit between employers and government tax authorities. Payroll service providers improve the efficiency of government tax collection and improve tax compliance.

Following is background on the payroll services industry; discussion of the potential impact of the Act on payroll service providers and their employer clients, and suggestions for improvements to the statute.

It is the position of the California Department of Financial Institutions (DFI or Department) that licensing of those payroll service providers that, in connection with such services, transfer funds, will be necessary under the Act.   However, the relevant provisions and stated purpose of the law is to improve consumer protection.  Payroll service providers generally do not sell money transmission services or instruments to consumers.  Our customers are employers.

The Money Transmission Act is appropriately focused on consumer transactions.  However, application of the law seems to go well beyond protection of consumers, and includes many business-to-business, non-consumer transactions, despite the apparent intent of the law.  Broad definitions of money transmission and other terms may inadvertently include activities well beyond the intent of the California legislature, pursuant to the legislative findings and declaration (Section 1801 of Assembly Bill 2789/Chapter 612), to address over-the-counter money transmission.   Application of the Money Transmission Act would impose substantial new costs on service providers and California employers, and could significantly disrupt the smooth functioning of payroll processing arrangements that have been in place for decades.

## Payroll Services Industry Background

The payroll services industry provides human resources administrative services to employers, including payroll processing and employment tax payment and filing services.  The industry acts as a third party between employers and employees.  At the most basic level, an employer



**NPRC**

contracts with a payroll service provider to perform the gross-to-net payroll calculations and maintain the proper compliance for those calculations. As such, payroll companies typically do not interact with or sell anything directly to employees (consumers). There are over 14,000 registered payroll service businesses nationwide according to the IRS.

Payroll processing arrangements vary widely. Many provide basic payroll calculations with executable checks drawn on client (employer) accounts. Some take the form of off-the-shelf software, and may have options permitting employers to delegate various payment and reporting functions to the payroll service firm. Others are more comprehensive, and include, for example, transfer of payroll tax withholding and other employer obligations to state and federal taxing authorities; remittance of child support and garnishment amounts withheld to obligees, and payment of net payroll amounts to employees via checks, direct deposit to a bank account and/or stored value instruments (payroll debit cards).

Since the early 1980's, at least 20% of California employers, who collectively employ roughly 35% to 40% of California workers, have come to rely on such services to assist them in complying with the many laws and regulations governing payroll administration.

**Payroll Service Organizations are Already Required to Comply with Stringent Federal Regulations, Including Disclosure Requirements**

Payroll service providers must provide initial and ongoing disclosures to clients, as defined in Internal Revenue Service (IRS) Revenue Procedure 2012–32. Such firms must notify their clients in writing at least quarterly that the employer remains liable for payment of employment taxes; must recommend that the employer use the IRS EFTPS system to periodically confirm that all tax funds have been timely deposited, and must advise that state tax authorities offer similar verification programs.

The disclosure serves an important function in reminding employers to be cautious in the selection and monitoring of any service provider entrusted with the administration of payroll and employment taxes.

Payroll service providers that originate funds transfers through the Automated Clearing House (ACH) are also required to perform annual audits of control systems.

**Consumers (Employees of Payroll Service Clients) Are Already Well Protected by California Labor Laws**

California employees enjoy some of the strongest protections afforded by Labor statutes in any state. The Department of Industrial Relations aggressively enforces workers' right to prompt payment of wages. Any difficulties in negotiating payroll checks or stored value instruments would fall under existing Labor code sections, and employers remain liable for any employee costs or difficulties as well as penalties for violations. Payroll service provider responsibilities to clients for errors in providing such services are set forth in payroll service contracts.

In our view, existing protections are so compelling that problems in the area of payment of wages to employees who are recognized as such and added to an employer's payroll system


NPRC

(as opposed to workers deemed by an employer to be an independent contractor, who are paid outside of employer payroll systems) are rare, and incidents are rapidly rectified. Consequently, application of the California Money Transmission Act to payroll payments would be duplicative, causing confusion and unwarranted costs.

**Many Elements of the Money Transmission Act Do Not Work in Non-Consumer Contexts**

Several examples follow:

Chapter 6. Consumer Disclosures. Section 2100 requirements for receipts are redundant and/or inapplicable in non-cash, bank-to-bank transmissions where other sources for evidence of the transactions exist. Employers require very detailed reports identifying each transaction, each deduction from each paycheck, and aggregate totals for the various amounts arising from every payroll processing. Reports that function in part as receipts are routinely provided on a pay-period basis, as well as quarterly and annual summaries. Deductions and remittances for net payroll checks, tax withholding, garnishments, employer taxes, insurance deductions and so forth are routinely documented to both employers in the reports referenced above and to the employees in the form of payroll statements ("pay stubs") and Forms W-2. Such reports and related statements from bank transactions serve as receipts. Thus, the receipt requirements of the Act are redundant in the context of payroll services.

Section 2101 requires that funds be forwarded within 10 days "unless otherwise ordered by his or her customer". The vast majority of payroll funds are disbursed on or immediately after each pay day. However, many state tax authorities do not permit or provide any means to remit tax amounts other than on the established payment schedule; e.g., unemployment insurance taxes.

A critical reason that employers hire a payroll service provider in the first place is so that the service provider can assume responsibility for paying all related obligations when due. Determination of due dates can be complex and often carries significant penalty exposure. Businesses do not want to be put in the position of advising that funds should be forwarded on some specific future date.

Section 2102 requires that funds be refunded upon request unless the funds have been forwarded or committed within 10 days of receipt, or the customer instructs that the funds be remitted beyond 10 days. This section provides for a specific disclosure statement which is clearly designed for consumers, and provides for a cause of action for money received, court costs, attorney's fees and penalties. This section could introduce significant conflicts and complexities. For example, tax payments are often established, formatted and committed long before the actual due date, which may not be apparent to a client who is only aware of a payment deadline. This could lead to confusion and disputes to the extent a business believes that the Money Transmitter Act may apply. Businesses are almost universally free to terminate payroll processing services and request refunds of undeposited funds, the detailed provisions of which are spelled out in service contracts. Consumers are unaffected.

Section 2104 requires prominent posting in a conspicuous location in the unobstructed view of the public within the premises or statements in letters not less than one-half inch in height that payment instruments are not insured.

First, payroll service providers are not generally open to the public. Consumers/employees do


NPRC

not visit payroll service offices other than to pick up reports and checks on behalf of the employer on occasion. Such posting requirements would serve no purpose, but could confuse clients (employers).

Secondly, payroll checks and stored value instruments typically enjoy FDIC insurance and other consumer protections far in excess of limits generally applicable to consumer accounts. Payroll debit cards are covered under Federal Regulation E, which requires many consumer protection provisions, including FDIC insurance, transaction and periodic statements, dispute resolution procedures and protection from losses due to fraudulent use.

Section 2039 requires the submission of several annual and quarterly reports to the DFI, including the total volume of activities, number of transactions conducted, and outstanding money transmission obligations categorized by type of transmission, average daily liabilities, etc. Although such reports are certainly feasible, without further consideration and modification for the context of payroll processing, such reports would likely serve no beneficial purpose and would add substantial costs that would ultimately be borne by California employers. Reporting requirements are primarily focused on payment instrument sales to consumers and do not adequately contemplate electronic money transfers or application in a payroll processing context.

Section 2042 provides for an annual assessment based on the aggregate face amount of payment instruments and stored value issued, which clearly did not contemplate applicability to aggregate annual earnings of California workers. Any assessment using this basis would impose substantial new costs on California employers and introduce a substantial disincentive from using payroll service providers.

In summary, the Committee asked whether the Money Transmission Act is working as intended. We believe that the answer is no, with respect to payroll services. Broad definitions appear to include activities well beyond the intended over-the-counter money transmission that the law was intended to regulate. Strict application of the statute to California constituents is likely to cause substantial harm.

The statute should be modified to clarify its intended purpose, which, in accordance with the apparent intentions of the California legislature, should be limited to governing over the counter cash-based individual consumer money transmission activities; e.g., sale of payment instruments directly to individuals. Consistent with the Act's intended purpose, we ask that the committee modify the legislation to establish a clear exemption from the Act for payroll services.


**NPRC**

Specifically, we would recommend that following changes to the California Money Services Act:

Section 1803 of the Financial Code

(o) "Money transmission" means any of the following:
(1) Selling or issuing payment instruments.
(2) Selling or issuing stored value.
(3) Receiving money for transmission, **primarily for personal, family, or household purposes**.

Section 1805 of the Financial Code

**(j) A person or entity that provides services to deliver money on behalf of employers to employees by check or deposit in a checking or savings account at the bank, saving bank, savings and loan association or credit union, or stored value account, or facilitates the payment of payroll taxes to state and federal agencies, makes payments for employee benefit plans, makes distribution of other authorized deductions from employee's wages or salary, or transmits other funds on behalf of an employer.**

**COMMENTS OF THE**

**COALITION FOR THE REFORM OF MONEY TRANSMISSION LAWS**

**BEFORE THE BANKING & FINANCE COMMITTEE HEARING FOR ASSEMBLY BILL 786**

The Coalition for the Reform of Money Transmission Laws ("CRMTL") welcomes the opportunity to provide the Committee with its comments as it reconsiders the California Money Transmission Act of 2010 (the "MTA"). CRMTL consists of a group of technology entrepreneurs, investors, and private citizens who share a common concern regarding the innovation stifling effects of the MTA and similar state laws nationwide. CRMTL applauds the Committee's decision to revisit the MTA in light of the unintended negative consequences of the law that the experience of the past several years has made apparent. We urge the Committee, and the Assembly, to act expeditiously to meaningfully reform the MTA.

CRMTL firmly believes that the MTA inhibits innovation and consumer choice in financial services without affording any offsetting benefits. In fact, as we explore below, consumers are actually harmed by the MTA and similar laws due to the substantial barriers to entry they impose which services to impede the development of competition in the industry. We are hopeful that we may provide the Committee with a perspective on the practical consequences of the MTA and assist the Committee as it considers ways to position California as a champion of innovation in the money transmission industry.

This comment letter is structured in four parts. First, we will discuss why California is ideally positioned, both from a market and regulatory perspective, to unleash a wave of innovation in the money transmission and payments industry. Second, we will discuss the harmful impacts that the MTA's licensing requirements have had upon aspiring payments startups within California, which ultimately harms competition and consumers. Third, based upon this discussion we provide a rationale for repeal as well as two approaches to amending the MTA that would address many of the objections to the existing law. Finally, in the Appendix, we present model amendments that could be quickly introduced and adopted by the Committee. While there are many approaches available to reform the MTA, we believe that the three options presented here provide the optimal avenue to unleashing a wave of innovative payments firms in California, which will spur competition and benefit consumers.

I.      **Why California Matters: Demographics, Innovation Hub & Regulatory Leadership**

California is uniquely positioned to be the home of the Nation's most innovative money transmission firms for three reasons: its size and demographic diversity; its recognized culture of innovation; and its status as a bellwether state for regulation. California is poised to lead on this issue if it is willing to consider how its laws can either enable – or hinder – innovation.

If demographics are destiny, California has natural advantages that would make it the natural launching pad for innovative payments providers. Beyond the multitude of daily payments exchanged among the State's 37 million residents, California is also the point of departure for billions of dollars in annual remittances from California residents to family and friends living abroad. California's size alone provides sufficient scale with which to launch and prove out an innovative business model. But beyond the mass-market, California boasts a number of sizeable niche markets, each of which could form the customer base for a sustainable business. Conversely, if a money transmitter is unable to do business in California, they will be hard pressed to build a sustainable national business. Without access to the nation's largest and most diverse market, with its economies of scale, it will be unlikely to succeed nationally. Simply put, the ability to operate in California can make or break a payments firm.

Compounding California's demographic advantages are its culture of innovation and its history of funding disruptive startups. California is by far the nation's leader in attracting venture investment, luring billions of dollars into the state annually. Half of the total venture capital invested nationally flows to California firms, a figure nearly five times that of the next most invested-in state.[1] The net result: over 1,200 California-based companies each year receive the funding with which to build large and sustainable businesses.[2] A virtuous cycle of innovation begetting investment has transformed California into the undisputed leader in technological innovation in addition to its claim as the birthplace of today's technology giants: Apple, eBay, Intel, Facebook, and Google, each of which were mere startups in the not-so-distant past. These companies and many others have a significant impact on the California economy, creating new industries and thousands of high paying, local jobs. Considering these home grown advantages, California is positioned as the ideal home base for an emerging money transmission startup.

---

[1]     *See* National Venture Capital Association, *Yearbook 2012* at 13, *available at*: http://www.nvca.org/index.php?option=com_docman&task=doc_download&gid=876.

[2]     *Id.* at 26.

In terms of regulation, California has a reputation for embracing innovative approaches to complex regulatory problems. As the old saying goes: "As California goes, so goes the country." On a range of topics from greenhouse gas regulation, immigration, and consumer protection measures, California acts a bellwether state for regulation. When California takes a leadership position on an issue, other states take notice and often gravitate towards California's model. Thus, California's consideration of money transmission reform will likely influence the development of similar laws across the country. It is not unrealistic to believe that a carefully considered money transmission law in California could become the standard elsewhere, lowering the barriers to entry for startups and lowering the costs of payments to consumers.

While some payments startups have had success in launching in spite of the MTA, or were lucky enough to get to scale before the MTA went into effect, it may never be known how many groundbreaking companies were never formed due to a regulatory regime that stood in the way.[3] California's structural advantages make it the natural launching point for an innovative payments firm. The question the Committee should be asking itself as it reconsiders the MTA is how to make it more likely that these advantages materialize into actual disruptive companies.

## II.     The Harmful Impacts of the MTA Upon Startups, Investment, and Consumers

The MTA, and similar laws around the country, erect significant barriers to competition for new entrants by imposing substantial up-front compliance costs that have little, if any, offsetting benefits. Simply to open one's doors as a money transmitter in California alone is an extremely expensive proposition. In contrast to the modest startup costs that would apply to any other technology industry, say in software or social media, a startup money transmitter hoping to operate nationally must satisfy the balkanized regulatory requirements of nearly fifty states. The collective compliance costs associated with the licensing effort, a multi-million proposition, is often prohibitive and works to chill potential market entry.

But perhaps a savvy startup, aware of the costs and the associated risks of national licensing roll-out, wishes to start small and obtain a license in a major state like California to serve as a test market and scale up once its business model has been tested and ultimately proven out. As discussed, California is one of the few states in which this assumption is realistic due to

---

[3]     Business Insider, *This Innovation-Killing California Law Could Get a Host of Startups in Money Trouble* (June 11, 2012), available at: http://www.businessinsider.com/california-money-transmitter-act-startups-2012-7 ("*Business Insider MTA Article*").

its natural advantages. Unfortunately, even if one were to initially adopt a one-State strategy, the costs to obtain a MTA license in California alone are significant enough to deter market entry.

To obtain a California MTA license involves the following conservative cost estimates:

- An net equity requirement of at least $1,000,000 and up to $2,000,000, permanently held in reserve.
- Annual surety bond premiums of at least $30,000 dollars per year, assuming a 3% premium rate on a $1,000,000 bond.
- Bond collateral of at least $100,000 to the extent required by bond issuers.
- An initial application fee of $5,000, exclusive of renewal fees.
- Legal fees estimated at $50,000 to $100,000 to draft and file the California application and respond to multiple rounds of regulatory correspondence.
- Accounting fees estimated at $25,000 per year on average to prepare audited financial reports required to apply.

Under these assumptions, the cost of doing business as a money transmitter in California alone is well over a million dollars – and this before a business case can even be tested. To put this in perspective, simply to earn back the simple compliance costs of obtaining a California MTA license, a money transmitter must realistically expect to process over 250,000 transactions at an estimated $5 in profit per transfer.[4] For business models premised upon low, or perhaps non-existent, per-transaction fees this figure would be far higher. In a market where transaction fees a primary basis of customer choice it is difficult to see how an entrant could pass along the compliance costs of the licensing regime and still remain cost-competitive.

As a corollary to the expense associated with obtaining an MTA license, these costs deter investment in the industry by creating a chicken-and-egg problem for potential investors and money transmission startups. A startup cannot obtain the required MTA license without obtaining well over a million dollars in up-front investment, but the startup cannot realistically obtain such a sizable investment without establishing a viable business case that is predicated upon licensure. Unfortunately, as has been documented in the financial press, the costs and uncertainties associated with money transmission licensure make the prospect of investing in a money transmission business a highly risky proposition, even for investors with high risk

---

[4]   This figure is based upon the fees associated with Western Union's transfer fees. *See* https://wumt.westernunion.com/WUCOMWEB/priceShopperRedirectAction.do?method=load&countryCode=US&languageCode=en&pid=usMenuPriceShopper.

tolerance.[5] In the competition for scarce venture capital it is easy to see why money transmitter businesses, with their millions of dollars in compliance-related startup costs, are at an automatic disadvantage to, say, a largely unregulated software startup. Would a rational investor choose to place a substantial investment in a money transmission company with the understanding that much of the investment must be parked in cash merely to comply with legal requirements when that money does nothing else to advance the company's business and marketing objectives? This barrier to investment only exacerbates the anti-competitive effects of these laws by limiting the available pool of competition to a fraction of the potential universe of entrants.

The expense and regulatory uncertainty that accompany the widespread adoption of inconsistent and burdensome money transmission laws makes the substantial fundraising needed to pursue licensure in the first instance highly improbable and thereby further reduce the pool of potential competitors. Viewed in this light, the net effect of these laws is straightforward: less competition from innovative startups, the entrenchment of established incumbents, and, ultimately, higher prices, borne by consumers, especially those low-income consumers and immigrant populations who depend upon money transmission services.

Ultimately, the MTA works as a silent tax paid by California consumers, especially low-income consumers and immigrants, who have little choice but to patronize entrenched industry incumbents when they send or receive money from foreign countries. Most obviously, the high costs of compliance are passed through to consumers by existing licensees. Additionally, the prices of funds transfers and currency conversion are considerably higher than they would otherwise be in the presence of competition, an outcome that is due, in large part, to the anti-competitive effect of the MTA. This need not be the case. Fortunately, alternatives exist.

## III.   Three Options for Relief: Repeal, an Online Carve-out, a Startup License

Outright repeal of the MTA would be the preferable solution and the arguments supporting that route are well founded.[6] We want to be absolutely clear: our unequivocal position is that the MTA is harmful to innovation and consumers without offering any offsetting benefits and should be repealed. However, we are also mindful of the difficulties associated with repeal, so in the interests of constructive engagement CRMTL propose two alternatives that would

---

[5]  See *Business Insider MTA Article*, *supra note 3*.

[6]  *See* A. Greenspan, *Held Hostage: How the Banking Sector Has Distorted Financial Regulation and Destroyed Technological Progress* (2011), *available at*: http://www.thinkcomputer.com/corporate/whitepapers/heldhostage.pdf.

ameliorate the worst harms of the current MTA.[7] In tandem, CRMTL recommends that should the Committee find net worth requirements to be absolutely necessary, those requirements under the full license MTA be aligned with a money transmitter's outstanding instruments, starting at zero or a nominal amount and scaling in proportion to actual transactions.[8] This would reduce the net worth requirement for many, and provide full licensees with the absolute certainty regarding the amount of equity required *before* a full MTA license is applied for.

### A.  Option A: Repeal the California Money Transmission Act of 2010

Where consumers are being harmed in a manner that can be effectively addressed by government intervention, legislative action is both justifiable and desirable. However, in the zeal to protect a state's consumers, it is possible that the unforeseen consequences of legislating in a field may outweigh the desired benefits. Money transmission licensing statutes are one such example where the actual costs of regulation outweigh the benefits.

The overarching purpose of money transmitting licensing statutes is to ensure that consumers do not entrust their money with an operation that may become insolvent, or worse, fraudulently disappear with their money. However, the bonding and net worth requirements that form the core of the MTA are not well equipped to combat these risks and should in no instance be grossly out of proportion to the actual dollar values at risk, as is presently the case.

In terms of identifying and disqualifying ill-equipped or potentially fraudulent applicants, it is naïve to think that companies formed for the exclusive purpose of defrauding the public would register with California authorities. By acting under the radar of state regulators, their actions evade review and the dishonest parties that were originally intended to be regulated run little risk of being disciplined. In this fashion, the costs of regulation are borne only by the honest parties, while the less scrupulous operate in the shadows. Once within a licensing scheme, bonding and net worth requirements do little to ensure ongoing compliance. Witness the recent case of MoneyGram, a licensed money transmitter, that was recently found to be implicated in a massive fraud lasting over five years.[9] Similarly, several Bitcoin exchanges have operated, and

---

[7]     In the interest of brevity we do not discuss any other amendments to the MTA. CRMTL supports the effort to significantly lower the MTA's net worth and bonding requirements.

[8]     Washington State takes such an approach. *See* Wash. Admin. Code § 280-690-060.

[9]     Reuters, *MoneyGram to forfeit $100 million to settle U.S. fraud case* (Nov. 9, 2012), *available at*: http://www.reuters.com/article/2012/11/09/us-moneygram-fraud-idUSBRE8A80WO20121109.  *Accord* U.S. Treasury Press Release, *Treasury Department Reaches Landmark Settlement with HSBC*, available at:

continue to operate, using the funds of California consumers and have lost funds in the process. For all its good intentions, the MTA does not and cannot prevent fraud.

It should be noted that the federal regulations on point, such as the Electronic Fund Transfer Act, Regulation E, and registration schemes contain no net worth or bonding requirements to act as a money transmitter. . Nor do other countries, such as Canada, require money transmitters to post bonds or meet net worth requirements. This is because setting a fixed net worth or bonding requirement that is not aligned with actual transactions does very little, if anything, to actually protect consumers. Given that the purported protections afforded under the MTA are duplicative of consumer protections already offered by state and federal statutes (especially the Bank Secrecy Act, which requires money transmitters to register with FinCEN and prepare Anti-Money Laundering plans; various criminal statutes outlawing theft, fraud, wire fraud, money laundering, transactions structured to evade reporting requirements, etc.), repealing the MTA would not adversely harm consumers. Repeal would also free up state resources to investigate fraudulent activity, rather than engage in lengthy examinations of license applicants. Regulation aside, banks and payments networks also have strong regulatory requirements and market incentives that provide assurance that any non-bank entities, such as money transmitters, that the underlying bank may contract with complies with state and federal law and does not otherwise engage in activity that may put the bank's charter at risk.

Repeal would greatly reduce the startup costs associated with launching an innovative payments company. This would finally enable widespread competition in the money transmission industry that would ultimately benefit consumers, lowering prices for payment services and making payments more convenient as mobile devices proliferate in today's society.

---

http://www.treasury.gov/press-center/press-releases/Pages/tg1799.aspx (detailing more than $1.9 billion in penalties assessed by federal agencies for HSBC's conduct in violation of the Bank Secrecy Act and U.S. sanctions).

### B.  Option B: A Carve-out for Online Only Money Transmitters

An alternative to the MTA is to exempt on-line only businesses in recognition that that money transmitters are already subject to substantial regulation by both federal, state, and private actors and the MTA's restrictions are costly duplications of these existing protections.

At the federal level, money transmitters are subject to the Electronic Fund Transfer Act, Regulations E and Z, Treasury Department Financial Crimes Enforcement Network ("FinCen") money service business ("MSB") registration and reporting requirements, Office of Foreign Assets Control ("OFAC") mandates, the Bank Secrecy Act and potentially many more, depending on the exact nature of the business. At the state level, even assuming that the MTA did not apply, they are subject to California's strong unfair and deceptive practices laws and the civil liability and available remedies that accompany it, as well as the threat of criminal prosecution for outright theft, conversion, check fraud, or the general fraud prohibitions ingrained in the California penal code. On a private level, money transmission businesses cannot operate unless they are enabled by a bank, regardless of whether they are doing VISA/MC or ACH transactions. Since the money transmitters' banking partners are in turn are regulated, by the state of federal banking authorities, they in turn ask for collateral, business practice assurances, and other verification requirements in order to meet their own regulatory obligations prior to agreeing to operate as a money transmitter's transactional partner.

Given the unique characteristics of internet-based money transmitters and the many federal, state, and private mechanisms by which they are already regulated, a carve-out would enable substantial competition in this area without sacrificing consumer protections. Just to take one example, money transmitters engaged in cross-border remittances would still have to comply with the substantial consumer protection requirements afforded by the Consumer Financial Protection Bureau under Regulation E,[10] register with FinCEN and report suspicious transactions, institute and monitor an anti-money laundering policy, comply with state unfair and deceptive practices law, and comply with banking partners' terms and conditions. To the extent that the Committee sees fit to exclude online-only money transmitters, the modification to the MTA is straightforward: exclude online-only money transmitters under Section 2010.

---

[10]     *See* 12 CFR Part 1005, *as amended* Feb. 7, 2012. 77 Fed. Reg. 6194.

### C.  Option C: A Right-sized Licensing Regime for Startup Money Transmitters

As an alternative to the above, a streamlined licensing scheme would be applied to startups with low transactional value or credit risk. In short, the law would operate as follows: for firms operating below a defined transaction volume the licensing regime would be substantially streamlined. A license would still be required, but startups would no longer shoulder the exact same regulatory burdens as the industry's largest players. Consumer protections and law enforcement mechanisms would remain available as needed, but for the vast majority of startups who wish to operate within the law, a lighter regulatory touch would be employed.

The contours of the proposed legislation are as follows. A startup money transmitter would file a short form application with the California Department of Financial Institutions ("DFI"), or alternative agency, and submit a basic application that includes the business' name, address, as well as those of its owners of over 25% of the business. Those parties would still be required to submit basic biographical information, fingerprints, and agree to a background check. A modest, capped filing fee would be imposed to account for the basic administrative function of verifying the veracity of the application. Provided that the owners pass a background check and submit a verified copy of the firm's Treasury Department FinCen MSB registration, a "startup" MTA license would be granted automatically, unless acted upon by the DFI within one month.

Since civil and criminal penalties may be imposed for violation of the FinCen MSB registration requirement, California would leverage the MSB application process to assure itself of compliance with applicable law and as a check on the veracity of the submitted information. A startup applicant would also agree to comply with applicable law and submit to California's jurisdiction (*i.e.* – the Electronic Fund Transfer Act, Reg E, state criminal law, *etc*.). To counter money laundering concerns, licensee would also be required to submit their anti-money laundering policy, a statement that the applicant has reviewed and will comply with federal OFAC requirements, and a requirement that suspicious activity reports filed with FinCen be concurrently filed with California. In this fashion, California can leverage the existing federal regime, while protecting its own consumers, in a manner that is not unnecessarily duplicative.

Unlike the full license, a startup licensee would not have to demonstrate a minimum net worth nor post a bond. In its place would be a required disclosure that the customer's funds are not deposits or obligation, are not insured by the FDIC or any other government agency, and are subject to possible loss. Backstopping the customer's funds would be the retention of

requirement that licensees maintain cash or eligible securities, as defined under Sections 2081 and 2082 of the MTA, commensurate to the value of their average daily outstanding obligations.[11] Rather than a fixed amount, as it is now, this would be scalable to the size of the business but still serve the purpose of ensuring that a licensee will be able to make payment on any outstanding obligations it might have. This properly separates the act of transmitting money from that of holding customer funds. The current law assumes that a certain amount of funding is necessary to engage in the act of money transmission, when it is only the holding of consumer funds that requires security and in an amount that can be known with some certainty. Simply put, if no consumer money is held, there is no credit risk that needs to be safeguarded against. Streamlining these requirements disposes with the need for a one-size-fits-all mandate that imposes three duplicative (and costly) forms of security: net worth, bonds, and eligible securities. Moreover, as recent events have made abundantly clear, bonds and net worth requirements are no substitute for customer trust and do not guarantee legal compliance or even good business judgment.[12] Rationalizing these two requirements of the MTA would strike a better balance between the goals of safety and soundness and providing open access to businesses that wish to enter the money transmission market.[13]

The DFI, or an alternative agency such as the Department of Corporations, would retain supervisory and enforcement authority. For example, DFI would be empowered to conduct audits of startup licensees to ensure compliance with applicable requirements. Licensees would still be required to file reports with the DFI, but only annually as opposed to quarterly.

When a money transmitter exceeds a given threshold of outstanding daily transactions the licensee would require a full money transmitter license. However, at this point they will have:

- proven their business model out or made necessary modifications based upon market feedback;

---

[11]   *See* Cal. Fin. Code. § 2081.

[12]   *See* Reuters MoneyGram Article, *supra note 9.*.

[13]   To the extent that a minimum net worth or security requirement is retained, only a minimal dollar amount should be required and, then, only to the extent necessary to ensure that that licensees have adequate resources to remain solvent. This was the original intent behind the Uniform Money Services Act when it was passed in 2001. *See* www.uniformlaws.org/shared/docs/money %20services/umsa_final04.pdf ("Only a minimal net worth requirement has been suggested because net worth is used as an additional requirement to make sure that license applicants and licensees have some resources for commencing and operating a money transmission business.").

- be better able to demonstrate to the DFI that their business model is effective upon application based upon actual operating results;

- a superior probability of being able to secure access to financing (if necessary); and

- a track record demonstrating that the firm is a trustworthy steward of consumer funds.

In this fashion a startup license would allow for a range of money transmission startups to launch within California at a low cost to allow for testing of concepts and prototypes. In the process, the Google of payments, launched in California, may be created.

**CONCLUSION**

The CRMTL urges the Committee to repeal or amend the MTA consistent with these comments to make it easier for innovative startups to do business in California. Even though uniform financial regulation of money transmitters is encouraged at a federal level, a lighter regulatory touch in California (and eventually in other states) will enable widespread competition in the money transmission industry that will ultimately benefit consumers. California has a unique opportunity to lead on this issue and much to gain if it does. We urge the Committee, and the Assembly at large, to seize this opportunity to rationalize its money transmission licensing regime and pave the way for innovation in the payments industry.


Respectfully submitted,


Aaron M. Gregory
**SNR DENTON US LLP**
1301 K Street, N.W.
East Tower, Suite 600
Washington, DC 20005
(202) 408-9149
aaron.gregory@snrdenton.com

*Counsel for the CRMTL*

Date: March 11, 2013

## APPENDIX

**Proposed Amendment to the California Money Transmission Act**

## OPTION B – CARVEOUT FOR ONLINE-ONLY MONEY TRANSMITTERS

1. Amend Section 2010 of the Financial Code by adding paragraph (j) to read as follows.

**Section 2010:**

**\*\*\*\*\***

**(j) A money transmitter who offers or provides their services exclusively through an online website, mobile application, or telecommunications service.**

2. Amend Section 2040 of the Financial Code by replacing paragraph (a) with the following.

**Section 2040:**

**(a) An applicant for a money transmission license must possess, and a money transmission license holder must maintain at all times, a minimum net worth computed in accordance with generally accepted accounting principles, in an amount not less than the aggregate amount of all of its outstanding payment instruments and stored value obligations issued or sold in the United States and all outstanding money received for transmission in the United States but not yet delivered. The amount of securities held by the licensee or a bond of a surety company required to be maintained by this division shall not be cumulative.**

## OPTION C – RATIONALIZED LICENSING REGIME FOR STARTUPS

1. Amend Section 2010 of the Financial Code by adding paragraph (j) to read as follows.

**Section 2010:**

**\*\*\*\*\***

**(j) A startup money transmitter, as defined in Section 2000-1, provided they comply with all requirements of that subchapter.**

2. Amend Section 2040 of the Financial Code by replacing paragraph (a) with the following.

**Section 2040:**

**(a) An applicant for a money transmission license must possess, and a money transmission license holder must maintain at all times, a minimum net worth computed in accordance with generally accepted accounting principles, in an amount not less than the aggregate amount of all of its outstanding payment instruments and stored value obligations issued or sold in the United States and all outstanding money received for transmission in the United States but not yet delivered. The amount of securities held by the licensee or a bond of a surety company required to be maintained by this division shall not be cumulative.**

3. Add Section 2000-1 of the Financial Code as follows.

**Section 2000-1-0. This division shall be known and may be cited as the Startup Money Transmitter Act of 2013.**

**Section 2001-1-1. License Required**

**A person who engages in the business of money transmission in this state in an amount less than [one hundred thousand dollars ($100,000)] average daily outstanding, as defined in Section 2003, as measured over a thirty day period and who is not otherwise exempt from licensure shall require licensure as a startup licensee under this division.**

**Section 2001-1-2. Startup License Application**

**(a) An applicant for a license under this subdivision shall do so in a form and in a medium prescribed by the commissioner by order or regulation. An applicant for licensure under this division shall pay to the commissioner a nonrefundable fee of not more than one thousand dollars ($1,000). The license fee must be refunded if the application is denied.**

**(b) The application shall state or contain all of the following:**

**(1) The legal name and residential business address of the applicant and any fictitious or trade name used by the applicant in conducting its business.**

**(2) The legal name, any fictitious or trade name, all business and residential addresses, and the employment, in the 5-year period next preceding the submission of the application, of each executive officer, manager, director, or person that has control of over 25% of the applicant, and the education background for each such person.**

**(3) A list of any criminal convictions and material litigation in which any executive officer, manager, director, or person that has control of over 25% of the applicant, that involved in the 10-year period next preceding the submission of the application.**

**(4) The name and address of the applicant's registered agent in this state.**

**(5) A verified copy of the applicant's registration as a money service business with the United Stated Department of the Treasury Financial Crimes Enforcement Network .**

**(6) If applicable, a list of other states in which the applicant is licensed to engage in money transmission and any license revocations, suspensions, or other disciplinary action taken against the applicant in another state.**

**(7) The name and address of any bank through which the applicant's payment instruments and stored value will be paid.**

**(8) A written copy of the applicant's Anti-Money Laundering Policy that complies with the above mentioned federal statutes.**

**(9) A statement, signed by an officer of the applicant, that the applicant has reviewed and will comply with all applicable federal laws and regulations (31 CFR 103) regarding the Bank Secrecy Act (BSA), Office of Foreign Asset Control (OFAC) and the USA PATRIOT Act.**

**(c) The commissioner may waive one or more requirements of subsections (b) and permit an applicant to submit other information in lieu of the required information.**

**Section 2001-1-3. Approval to Engage In Money Transmission as a Startup Licensee.**

**(a) When an application for approval under this section is complete, the commissioner shall promptly notify the applicant, in a record, of the date on which the request was determined to be complete and:**

**(1) the commissioner shall approve or deny the request within 30 days after that date; or**

**(2) if the request is not approved or denied within 30 days after that date the application is approved.**

**Section 2001-1-4. Approval to Engage In Money Transmission as a Startup Licensee.**

**(a) When an application for approval under this section is complete, the commissioner shall promptly notify the applicant, in a record, of the date on which the request was determined to be complete and:**

**(1) the commissioner shall approve or deny the request within 30 days after that date; or**

**(2) if the request is not approved or denied within 30 days after that date the application is approved.**

**Section 2001-1-5. Startup Licensee Security.**

**A startup licensee that engages in receiving money for transmission shall, at its election, maintain eligible securities on deposit in financial institution acceptable to the commissioner or a bond of a surety company in an amount not less than the aggregate amount of all of its outstanding payment instruments and stored value obligations issued or sold in the United States and all outstanding money received for transmission in the United States but not yet delivered. The amount of securities held by the licensee or a bond of a surety company required to be maintained by this subdivisions shall not be cumulative.**

**Section 2001-1-6. Startup Licensee Annual Reports**

-14-

**(a) Each licensee shall, not more than 45 days after the end of each calendar year, or within a longer period as the commissioner may by regulation or order specify, file with the commissioner a report containing all of the following:**

>**(1) Financial statements, including balance sheet, income statement, statement of changes in shareholders' equity, and statement of cashflows, for, or as of the end of, that calendar year, verified by two of the licensee's principal officers. The verification shall state that each of the officers making the verification has a personal knowledge of the matters in the report and that each of them believes that each statement on the report is true.**

>**(2) For issuers and sellers of payment instruments and stored value, a schedule of eligible securities owned by the licensee pursuant to Section 2081.**

>**(3) Other information as the commissioner may by regulation or order require.**

**(b) Each licensee, not more than 45 days after the end of each calendar year, shall file with the commissioner a report containing all of the following:**

>**(1) The total volume of activities, number of transactions conducted, and outstanding money transmission obligations in California under this division and in the United States in the calendar year quarter categorized by type of money transmission.**
>**(2) For money received for transmission, a report of the average daily outstanding transmission liabilities in California. For payment instruments and stored value, a report of the average daily outstanding payment instruments and stored value liabilities in California in that calendar year quarter.**

**(c) Other information as the commissioner may by regulation or order require.**

**(d) Each licensee shall file with the commissioner other reports as and when the commissioner may by regulation or order require.**

**Section 2001-1-7. Startup Licensee Disclosures**

**Each startup licensee or its agent shall make available a notice clearly stating that payment instruments are not insured by the federal government, the state government, or any other public or private entity. This notice shall be printed in English and in the same language principally used by the licensee or any agent of the licensee to advertise, solicit, or negotiate the purchase of payment instruments. The information required in this notice shall be clear and conspicuous and may be posted in an electronic format.**

**Section 2001-1-8. Audit and Enforcement Authority**

**(a) The commissioner may at any time and from time to time examine the business and any office, within or outside this state, of any licensee or any agent of a licensee in order to ascertain whether that business is being conducted in a lawful manner and whether all money transmission is properly accounted for.**

**(b) The directors, officers, and employees of any licensee or agent of a licensee being examined by the commissioner shall exhibit to the commissioner, on request, any or all of the licensee's accounts, books, correspondence, memoranda, papers, and other records and shall otherwise facilitate the examination so far as it may be in their power to do so.**

**(c) The commissioner shall make all reasonable efforts to minimize the cost and intrusion of the examination.**

**(d) If the commissioner finds that any of the factors set forth in Section 2149 is true with respect to any startup licensee and that it is necessary for the protection of the public interest, the commissioner may issue an order immediately suspending or revoking the startup licensee's license.**

**(e) The enforcement provisions of this division are in addition to any other enforcement powers that the commissioner may have under law.**

**Section 2001-1-9. Standard License Requirement**

**At any point in which the startup licensee exceeds more than [one hundred thousand dollars ($100,000)] in average daily outstanding, as measured over a thirty day period, a startup licensee shall be required to obtain a license pursuant to Sections 2000 to 2172. A startup license shall remain valid and effective during the application and review period.**

## <u>CRMTL MEMBERS</u>

Ron Garret, Ph.D.
Angel Investor
CEO, AWUn, L.L.C.


Aaron Greenspan
CEO, Think Computer Corporation
CodeX Fellow, Stanford Law School


P.J. Gupta
Entrepreneur
Former Chief Network Architect, Visa, Inc.


*Additional signatories to follow by email*



Think Computer Corporation
884 College Avenue
Palo Alto, CA  94306

*telephone* +1 415 670 9350
*toll free* +1 888 815 8599
*fax* +1 415 373 3959
*web* http://www.thinkcomputer.com

March 6, 2013


The Honorable Roger Dickinson
Chairman
Committee on Banking and Finance
California State Assembly
1020 N Street, Room 360B
Sacramento, CA  95814


Re:     Comments on the California Money Transmission Act of 2010 and Assembly Bill 786


Dear Chairman Dickinson:

In light of the upcoming March 11, 2013 public hearing concerning Assembly Bill 786, the California Money Transmission Act of 2010 ("MTA"), codified in California Financial Code Division 1.2, Chapter 1, [re-numbered] §§ 2000-2172, and the California Department of Financial Institutions ("DFI"), set forth below are the comments of Think Computer Corporation ("Think").

This is the fourth comment letter that Think has sent to you regarding the above topics. The first comment letter was sent on November 7, 2012 in anticipation of an MTA/DFI oversight hearing scheduled for November 13, 2012, which was cancelled and then never re-scheduled. The second comment letter could apparently not be included in the record in conjunction with the first. At your staff's request, the third letter combined them both; this version (again, at your staff's request) omits the names of, and points regarding, certain DFI staff.

Think is a computer software startup located in Palo Alto, California.  Its FaceCash® mobile payment system was operational until July 1, 2011, when Think was forced to shut it down due to the DFI's threats of incarceration due to lack of a license under the MTA.  Even after protracted attempts (including appeals to DFI's parent agency, the Governor, both houses of the California legislature, and Congress) to secure the information necessary to apply for a license, such as the *true* (and also unwritten) capital requirement under the new law, Think was unable to determine the DFI's demands, and Think eventually filed a federal

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 2

lawsuit against the Governor and the DFI in November, 2011.  The lawsuit is still pending.[1]  All of Think's employees were laid off.

Far from a devious plot to endanger the financial security of Californians, FaceCash is a modern replacement for plastic payment cards that makes point of sale transactions more secure, more convenient and less expensive than is possible with any other system.  In place of the traditional card signature on the back of the card, a digital image of the consumer's face is used to verify identity, and because all accounts are pre-funded, there is no need to use the aging plastic card technology infrastructure, saving on costs.  If the State of California used FaceCash, it would save millions of dollars per year on payment processing expenses.

I.      **Problems with State Money Transmission Laws Generally**

      A.      **Money Transmission Laws Protect Large Financial Companies, While Disproportionately Harming Low-Income Consumers and Small Businesses Through the Imposition of Monopoly Pricing**

Setting out the nominal purpose of the MTA, which is generally no different from that of other states' money transmission statutes, California Financial Code § 2001(d) states:

> "To protect the interests of consumers of money transmission businesses in this state, to maintain public confidence in financial institutions doing business in this state, and to preserve the health, safety, and general welfare of the people of this state, it is necessary to regulate money transmission businesses in this state."

This text was drafted by a lobbying group comprised of several multi-billion dollar financial institutions calling itself The Money Services Round Table ("TMSRT")[2], acting through its chief lobbyist, Ezra Levine (formerly of the defunct Howrey LLP, now with Morrison & Foerster LLP), with the additional frequent help of the DFI.  According to TMSRT's August 18, 2006 comment letter to the United States Department of the Treasury Financial Crimes Enforcement Network  (FinCEN) and the Federal Reserve System, the members of TMSRT are, "the leading national non-bank funds transmitters in the United States including: Western Union Financial Services, Inc., MoneyGram International, Travelex Currency Services, Inc., Integrated Payment Systems, American Express Travel Related Services, RIA Financial Services, Comdata Network, Inc. and Sigue Corporation."[3]

For roughly the past decade, Mr. Levine has literally made it his business to pass laws similar to the MTA in states throughout the nation, slightly modifying them in each instance to suit the particular fears of state legislators and bureaucrats—but most of all, to suit the needs of his clients, the member companies of TMSRT.  According to Mr. Levine's biography as prepared for the 2006 Global Consumers Money Transfer Conference, "He has had an active role in the enactment of the money transmitter laws in Oregon, Minnesota,

---

[1]      See https://www.facecash.com/legal/brown.html for a record of correspondence regarding Think's attempts to obtain a money transmission license under the MTA, and http://www.plainsite.org/flashlight/case.html?id=716056 for the latest docket information concerning the civil lawsuit in federal court.

[2]      TMSRT, formerly known as the Non-Bank Funds Transmitters Group, was the sole sponsor of the MTA.

[3]      According to a February 22, 2001 comment letter, members of the Non-Bank Funds Transmitters Group at that time also included Citicorp Services, Inc. and Thomas Cook, Inc.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 3

Washington, Iowa, West Virginia, Illinois, Wyoming, North Carolina, Florida, Idaho, North Dakota, New Jersey, Tennessee, Maine, Vermont, Arizona, the District of Columbia and Indiana." Since that biography was written, he and his clients have also succeeded in bending the law in Hawaii, and now, California.

As concerned as these multi-national conglomerates may be about consumers—and there is no evidence whatsoever that they actually are concerned—they are also clearly concerned about themselves, which is why they pay Mr. Levine to ensure that no new competitors with more advanced technologies are permitted to enter the payment industry and render their overpriced services obsolete. In other words, the thinly-veiled core purpose of the MTA is economic protectionism, and nothing more.

The effects of money transmission laws are mostly felt by low-income consumers, and especially immigrants, who have almost no choice but to patronize members of TMSRT when they send or receive money from foreign countries. The prices of funds transfers and currency conversion are considerably higher than they would otherwise be due to these laws.[4]

The laws also have a disproportionate effect on small businesses, who lack the bargaining power necessary to force credit and debit card issuers to lower interchange fees. This problem has recently been so pronounced that Congress acted through the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 to lower debit (but not credit) card interchange fees, perhaps not fully realizing the role of state laws in contributing to the unusual upward trend in interchange pricing. The most promising new payment models that compete with credit and debit cards necessarily involve money transmission.

Of course, when businesses are forced to charge higher prices to cover their payment processing costs, as many often do, average consumers end up hurt as well. In a time of economic instability, this is most unfortunate.

B. **Member Companies of The Money Services Round Table, Which Sponsored the Money Transmission Act, Have Repeatedly Engaged in Criminal Activity Involving Money Transmission**

On November 9, 2012, two days after Think's first letter was sent, the United States Department of Justice ("USDOJ") filed criminal felony charges against MoneyGram International, Inc. ("MoneyGram") in Pennsylvania Middle District Court, Case No. 1:12-cr-00291-CCC. MoneyGram is one of approximately six members of TMSRT, the lobbying group that was the sole sponsor of the MTA. The USDOJ accused MoneyGram of perpetrating a fraud costing the American public approximately $120 million over a period of almost a decade. Part of this fraud took place in California. Three weeks after the USDOJ filed charges, MoneyGram agreed to settle the allegations for $100 million. A division of MoneyGram, MoneyGram Payment Services, Inc., is still in possession of California Money Transmission License No. 1910 despite the USDOJ's serious allegations. See http://www.plainsite.org/flashlight/case.html?id=2334104 for more information. It appears the DFI has not revoked MoneyGram's money transmission license in California.

Similarly, in 2008, Sigue Corporation, another member of TMSRT, entered into a deferred prosecution

---

[4]      See "New Rules for Money Transfers, but Few Limits," Jessica Silver-Greenberg, *The New York Times*, June 1, 2012, http://www.nytimes.com/2012/06/02/business/new-rules-for-money-transfers-but-few-limits.html.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 4

agreement with the USDOJ and agreed to forfeit $15 million due to Bank Secrecy Act violations. Despite these serious transgressions, it still possesses California Money Transmission License No. 2062. See http://www.justice.gov/opa/pr/2008/January/08_crm_068.html for more information.

These criminal actions and the resulting federal investigations reinforce three points. First, the DFI has effectively failed to enforce the law it is charged with enforcing. Second, the federal government is in a far better position to investigate and regulate money transmission activity, both because the federal government has more resources, and money transmission by its very nature crosses state lines. Third, in addition to being unconstitutional, the MTA is ineffective at both preventing fraud and protecting consumers. It serves only the interests of the corporate criminals who wrote it and lobbied for its passage, by preventing competition at taxpayer expense. To some extent, the MTA forces consumers into the arms of licensed criminals.

### C.   Direct Conflicts with the United States Constitution in the Internet Age

Since the pioneers of traditional money orders began moving funds from place to place in the nineteenth century, the country has changed considerably. Today, the internet permits instant electronic funds transfers that until recently were inconceivable.

Money transmission laws started to come into being on a state-by-state basis in the 1960s in response to localized crises involving fraud. Federal law bolstering those state laws, in the form of 18 U.S.C. § 1960, came into being in 1992 as part of H.R. 5334, the Housing and Community Development Act.[5] It was not until 1995 that the National Science Foundation allowed the commercialization of the internet, meaning that the majority of today's regulatory regime concerning money transmission is obsolete, failing to account for massive changes in market conditions.

Fundamentally, in an environment where money can and often does change hands electronically in the blink of an eye, whether across a distance measured in feet or thousands of miles from coast to coast, there is no role for state regulation. According to Article I, Section 8, Clause 3 of the United States Constitution (commonly referred to as the Commerce Clause) and court decisions rendered relatively recently such as *American Libraries Assn. v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997), it is within Congress's purview—and only Congress's purview—to regulate internet commerce.[6] The reason why can be illustrated with a simple

---

[5]    Before and after the creation of 18 U.S.C. § 1960, several attempts were made in Congress to pass legislation that would have directed states to standardize money transmission laws, with the Treasury reporting to Congress on their progress. Such language is found in § 10 of H.R. 26, the Money Laundering Enforcement Amendments of 1991 ("Uniform State licensing and regulation of check cashing services."); § 7 of H.R. 3235, the Money Laundering Suppression Act of 1994 ("Uniform State licensing and regulation of check cashing, currency exchange, and money transmitting businesses."); and Title IV, § 407 of H.R. 3474, the Community Development Banking Act of 1994 (identical heading). Some of these bills passed in the House or the Senate, but not both simultaneously.

[6]    Although Congress is permitted to delegate its authority to regulate commerce to the states, and Congress may have done so implicitly via 18 U.S.C. § 1960, its delegation power is curtailed by the fact that for purposes of regulation, the internet is a "national preserve." *American Libraries Assn. v. Pataki*, *supra*. Even if delegation to the states did occur, it took place three years before the existence of the modern internet, which has come to dominate money transmission—especially those "emerging" forms of money transmission the MTA now restricts. (FaceCash, in fact, completely *depends* upon the internet to transfer the image of each consumer's face to internet-connected cash registers.) Although Congress's delegation may have been legitimate in 1992 when it was hardly considering mobile

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 5

analogy.

Commercial air traffic is regulated by the Federal Aviation Administration (FAA) because air travel almost by definition requires that aircraft cross state borders, and sometimes, international borders as well. Until the advent of the Global Positioning System, it was not always immediately clear which state a particular aircraft was in at any given time. Had states insisted on regulating the skies, airlines and pilots would have been subject to a system of regulatory chaos, endangering the lives of passengers.

Today, commercial internet traffic involving payments (also known as money transmission) is regulated by precisely such a system of regulatory chaos.[7] It is frequently unclear where a given sender or recipient of funds is physically located, even with available Internet Protocol (IP) address information; it is furthermore difficult to determine where the funds themselves, which are symbolic representations of value, are physically located. This problem is exacerbated by the steady march of internet-enabled devices in the direction of mobility. Cellular mobile devices rely on networks with pooled IP addresses that do not reveal the location of a user. (Every iPhone and Android device on the Sprint network appears to be in Kansas, for example. BlackBerry traffic worldwide often seems to originate in Canada.) In addition, TCP/IP packets representing transactions cross multiple state lines routinely within milliseconds, millions (if not billions or trillions) of times per day. Accordingly, the burden on emerging money transmitters, who must comply with the arcane and anachronistic regulations of some forty-six states (or by some counts, forty-seven) who are themselves scarcely able to monitor such activity, is immense. The only way to effectively monitor a modern-day money transmitter is in real-time, electronically, which not one government agency actually does.

Therefore, states lack not only the legal jurisdiction and authority to regulate money transmission in the modern world; they also lack the expertise and equipment necessary to track it. That is part of the reason why some states that have money transmission laws admit to prospective applicants that they do not even bother enforcing them unless the applicant has a physical presence in the state.

D.   **Wasteful Spending**

On average, no state has more than one hundred registered money transmitters. (According to the DFI web site, California has only sixty-five, a relatively high number given the number of publicly-traded technology companies in the state. Of those sixty-five, nine are now or at some point have been connected to TMSRT.) Despite the small scale of each state's licensing program, each money transmitter is subject to a complex litany of requirements that the state agency charged with enforcing the law must monitor. Such monitoring, usually conducted quarterly, requires manpower, and that manpower costs money.

Except on extremely rare occasions, state agencies rarely take action against unlicensed money transmitters. If they do take action, not all states bother, because doing so would be require duplicative effort, and they

---

payments, the heavy involvement of internet traffic today makes any supposed delegation presently unconstitutional.
[7]      On June 21, 2012, Mr. Levine *and* one of his clients, Western Union, each appeared before the United States House Committee on Financial Services at a hearing entitled, "Safe and Fair Supervision of Money Services Businesses." The attorney-client relationship was not explicitly disclosed, nor were any technology companies heard from. At the hearing, both Mr. Levine and his client lamented the absurd complexity of the regulatory system that they built, and unsurprisingly encouraged Congress to do nothing but further entrench the role of the states.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 6

instead allow one state agency to take the lead.  This model is nonsensical.  Even with coordinating groups such as the Money Transmission Regulators Association (MTRA) in place, it means that the same entity is often monitored by more than forty separate agencies so that only one may ultimately act, almost at random.  State regulators proudly declare this to be evidence of coordination; really, it is evidence of a broken system with gaping holes that allows financial fraud to go undetected.

Furthermore, due to the sweepingly broad scope of money transmission laws and the aforementioned constitutional issues, keeping such laws on the books requires funding for state Attorneys General to defend against lawsuits challenging their validity.  As previously mentioned, Think is presently engaged in one such federal lawsuit against the DFI.  Even though the MTA was largely written by enormous financial conglomerates, the law is actually defended by the California Attorney General *using taxpayer dollars*, making the extra budgetary strain on the state government particularly egregious.  In effect, the large financial institutions (whose own legal budgets are plenty large) have figured out a way not only to protect their own economic interests, but to charge the taxpayer and the state for defending those interests in court as well.

Laws that cost society more than they benefit society fail the test for constitutionality set out by the Supreme Court in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  Here, the costs of money transmission laws are felt by countless consumers, businesses, and state governments.  The benefits accrue to less than ten companies.

For all of these reasons, the Commerce and Consumer Affairs Committee of the State of New Hampshire House of Representatives recently concluded a study of a bill, H.B. 1700 (2012) that would completely repeal that state's own money transmission law, Chapter 399-G.  As of October 2, 2012, the bill to repeal the law has been recommended for legislation in 2013 by a vote of 8 in favor, 3 against.

Before Mr. Levine and local attorney Marvin S.C. Dang began their extensive lobbying efforts in Hawaii on behalf of TMSRT in 2006, the Auditor of the State of Hawaii issued a report to the Governor and the Legislature of that state entitled, "Sunrise Analysis: Money Transmitters," regarding H.B. No. 2428 of the 2004 Regular Session.  The report's conclusion was clear: "Money transmitters pose little risk of harm to consumers and the public.  Some protections already exist, and regulation would likely benefit certain money transmitters more than consumers.  We conclude that the bill should not be enacted."

Once TMSRT's Act 153 was signed anyway in 2006, the *Honolulu Star Bulletin* wrote about the new law, which was passed without Mr. Dang being able to cite even a single complaint about money transmitters.[8]

> Sen. Gordon Trimble (R, Downtown–Waikiki) cast the sole dissenting vote against Hawaii's first regulation of the money transmitters industry because he said he felt it would raise costs for consumers and put some small operations out of business.

> "Many people chose to use unregulated money transmitters because they provide better service for a lower price," said Trimble, who first got exposed to the cottage side of the industry while serving as a peace corps volunteer in the Philippines.  "This legislation is only going to force people to pay a lot more to send money home."

---

[8]     See "New law regulates transmitters of money," Allison Schaefers, *Honolulu Star Bulletin*, June 7, 2006, http:// archives.starbulletin.com/2006/06/07/business/story02.html.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 7

E.    **Redundancy**

The federal prosecutors who most often handle cases involving complex financial crimes already have an arsenal of statutes at their disposal. Money transmission laws are rarely invoked and generally redundant in the context of these other statutes. Covering a roughly twenty-year period, nationwide case data from PlainSite (http://www.plainsite.org) show:

- **18 U.S.C. § 1341 (Frauds and swindles):** 3,515 cases
  *See http://www.plainsite.org/laws/index.html?id=14176*
- **18 U.S.C. § 1343 (Fraud by wire, radio, or television):** 2,565 cases
  *See http://www.plainsite.org/laws/index.html?id=14178*
- **18 U.S.C. § 1956 (Laundering of monetary instruments):** 3,297 cases
  *See http://www.plainsite.org/laws/index.html?id=14422*
- **18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity):** 749 cases
  *See http://www.plainsite.org/laws/index.html?id=14423*
- **18 U.S.C. § 2314 (Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting):** 913 cases
  *See http://www.plainsite.org/laws/index.html?id=13668*
- **31 U.S.C. § 5324 (Structuring transactions to evade reporting requirement prohibited):** 352 cases
  *See http://www.plainsite.org/laws/index.html?id=30138*

Compare these figures to:

- **18 U.S.C. § 1960 (Prohibition of unlicensed money transmitting businesses):** 66 cases
  *See http://www.plainsite.org/laws/index.html?id=14426*

Of the few cases invoking 18 U.S.C. § 1960, many also invoke at least one of the other statutes listed above. Clearly, prosecutors can still easily do their jobs when it comes to financial crime without state money transmission laws. After all, stealing money still involves stealing.

F.    **Surety Bonds are Ineffective, Inefficient and Costly Insurance Mechanisms That Will Become Increasingly Insufficient with the Rise of Mobile Payments**

A money transmitter wishing to do business in the United States of America must presently pay for almost fifty surety bonds of varying amounts with a total worth of approximately $20 million—annually. Even at a premium rate of 5%, this represents a $1 million annual expenditure. Aside from being impossible to afford for most startups, who might be lucky to raise a fraction of that amount in angel or venture capital financing, the insurance mechanism doesn't even make sense.

The MTA's maximum bond requirement is $9 million according to Financial Code § 2037(f), which explicitly combines the $2 million maximum for "stored value" with the $7 million maximum for "receiving money for transmission." Aside from the fact that these numbers are totally arbitrary, they are also far too small. A large money transmitter such as PayPal holds far more than $9 million in consumer funds. If PayPal's parent

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 8

company, eBay, were to suffer a sudden collapse for whatever reason, the funds held by PayPal's customers would be mostly uninsured.  PayPal customers would be lucky to receive pennies on the dollar.

Contrast this to FDIC insurance, which presently covers every bank account in the United States up to $250,000.  All banks pay premiums to the FDIC based on risk, and those pooled premiums serve as insurance. This system works because the risk of one bank failing is spread out across all banks.

For money transmitters, each entity is required to shoulder the full burden of its own potential failure.  Even though an insurance provider backing surety bonds can collect premiums from multiple money transmitters, offsetting that provider's *own* risk, this does nothing to offset the risk to *customers* of any one failure, because the bonds only insure one party each.

In short, the surety bond system used in place of FDIC insurance for money transmitters is little more than smoke and mirrors.  It offers too little protection for large players, and is prohibitively expensive for small ones.

As mobile payments (and therefore money transmission) become more prevalent, more money will be entrusted with money transmitters, and less with chartered banks.  *Under the current model, surety bonds alone, in any amount, will not be able to adequately protect increasing amounts of funds.*  Government officials at all levels ignore this inevitable trend at their own peril.

### G.   Capital Requirements Have Been Repeatedly Proven Ineffective as Regulatory Mechanisms in a Non–Banking Context

Banks (which have the option of obtaining national charters) require minimum levels of capital because they make loans.  If too much money has been loaned out at the same time by a bank and there is a spike in demand for deposits on hand at that bank, a run can result, leaving the bank insolvent.

Money transmitters do not make loans.  Money transmitters therefore do not suffer from the same problem as banks, and capital requirements must be evaluated in a different light.  Every dollar entrusted to a money transmitter is available to its holder at all times.  The key regulatory objectives are merely ensuring that customer funds are not co-mingled with the money transmitter's operational funds, and that customers have access to their funds as needed.  In essence, maintaining the distinction between consumer accounts and operational accounts is a matter of good record keeping.

Nonetheless, ignoring this logic, many (but not all) money transmission laws regulate commercial activity on the basis of surety bonds (as previously discussed) and capital requirements. The conventional wisdom is that financial institutions with greater levels of capital are more trustworthy.  Simply put, this conventional wisdom is wildly wrong.

One only need recall the events of 2008 to see that capital amounts in absolute terms (as opposed to reserve ratios) only go so far. The creditors of Lehman Brothers, an entity once managing $600 billion of assets, were

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 9

hardly protected by the firm's immense reserves of capital when it declared bankruptcy on September 15, 2008. Bear Stearns suffered a similar fate. Bernard Madoff's investment firm had many millions of dollars in its accounts before it was discovered to be a Ponzi scheme of unprecedented scale.[9] Although these entities were not money transmitters and in many cases used leverage to attempt to bolster their returns, extremely large companies such as MF Global (with $41 billion in total assets and $39.7 billion of debt according to its bankruptcy filing)[10] and Peregrine Financial Group operated much more like money transmitters (not making loans) and suffered the same fate.[11] Yet financial regulators continue to place trust in capital alone.

At least in the case of MF Global, wire transfers of *hundreds of millions of dollars* were made without any regulators noticing that customer funds and operational funds were being co-mingled.[12] Were MF Global a money transmitter instead of a futures brokerage, under the MTA, it would have had no problem obtaining a money transmission license given the written $500,000 tangible net worth requirement, or even the unwritten $1 million-plus tangible net worth requirement. Nonetheless, its management would not have been any more trustworthy.

This all goes to show that there is no relationship between capital and trust. Even if such a relationship did exist, the actions of large banks in the 2008 financial crisis suggests that it would be inverse and certainly not strong enough for policy to be based on its existence. Therefore, basing the licensure process on absolute amounts of capital, as the MTA does, accomplishes nothing except to discriminate against small firms just starting out who inevitably cannot meet the requirements on day one of business.

## H.    The Domino Effect

Virtually every state money transmission application asks the applicant to present a list of all other states in which licenses have been obtained or applied for. Rejections must also be noted, often in answer to a yes-or-no question asking whether the applicant has ever been rejected for a money transmission application in any other state. If the answer to this question is "yes," then the chances that the instant application will also be rejected increase dramatically. (This question is often next to other questions concerning whether any of the applicants' officers have criminal records.)

As a result of the domino effect, applicants cannot risk applying for licenses in states where it seems possible that their application might be rejected for any reason, including insufficient capital. Applying anyway could easily and irreversibly jeopardize that applicant's chances at doing business nationwide.

## I.    Chilling Effects on Innovation and Investment

---

[9]      Money transmission laws are also flawed in that they rely heavily on third-party audits to assess capital levels, *paid for by the applicant, the same entity being audited*. This perverse incentive structure gives the auditor a strong desire to please its customer, not the government, lest it not get paid. It partially explains how Madoff was able to hide his fraud for so long. It also makes compliance that much more expensive: Think paid $18,000 for useless MTA audits.

[10]      See "MF Global Holdings Amends Agreement to Use JPMorgan Cash," Tiffany Kary, *Bloomberg*, http://www.bloomberg.com/news/2012-09-07/mf-global-holdings-amends-agreement-to-use-jpmorgan-cash.html.

[11]      See "MF Global redux as regulator says PFGBest client funds missing," *Reuters*, July 10, 2012, http://www.reuters.com/article/2012/07/10/us-broker-pfgbest-mfglobal-idUSBRE86905120120710.

[12]      See "Investigators Scrutinize MF Global Wire Transfers," Azam Ahmed and Ben Protess, *The New York Times*, February 26, 2012, http://dealbook.nytimes.com/2012/02/26/investigators-scrutinize-mf-global-wire-transfers/.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 10

The conventional retort to the argument that capital requirements are too high is that institutional investors, such as venture capitalists, are plentiful (especially in Silicon Valley) and willing to fund important payment innovations.  If this was ever true, it is no longer.

Venture capitalists are indeed plentiful in Silicon Valley, and they are willing to fund payment innovations, but only incremental innovations that do not involve money transmission as part of their business model.   They are well aware of the MTA and laws like it.  Entrepreneurs wishing to make large, systemic, and important changes to the way payments are made are repeatedly told to "partner" with banks or other existing financial institutions in order to avoid the regulatory nightmare.  Banks and other existing financial institutions in turn have their own regulations to worry about.  They routinely refuse these partnership offers, which they see as enormous liabilities, often because they also promise to cannibalize banks' existing revenue streams, namely debit and credit card interchange fees.  Those few entrepreneurs who persist are told by investors that they should find something else to do, because the risk to investors is high in more ways that one.

## J.      Criminalization of Legitimate Entrepreneurship

### 1.      Controlling Federal Law

Perhaps the most counter-productive aspect of 18 U.S.C. § 1960 is part (a), which reads:

> Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

In effect, while the CEOs of failed banks that caused the 2008 financial crisis walk free, entrepreneurs trying to improve upon the enormous mess they have left behind are told that if they do not comply perfectly with forty-six (or forty-seven) incredibly confusing and contradictory state laws (as explained in part (b)), they might well go to jail, along with their investors, directors, and even shareholders.  Never has there been such a stark disincentive to enter an industry.

The fact that failing to comply with *any* state law is a federal crime, combined with the naturally interstate nature of money transmission, means that compliance with *all* state laws is required at all times, even if it is not clear which states regulate which aspects of commerce (which it is not, as applicants for licenses are frequently told to write to state agencies for determination letters, which can take months or years).  Compliance with even a few state laws can be prohibitively expensive for a new entrant, which typically must hire an army of lawyers to explain forms, compile documentation, assemble notarized affidavits, etc.

In the end, the result is that fewer entrepreneurs have any interest in entering an industry where punishments are plentiful and rewards are hard to come by.  Suffice it to say that PayPal (whose headquarters is apparently slated to host the Committee's hearing) would not have been able to succeed as quickly as it did, if at all, had a law such as the MTA existed in California in 1999.

Most states are hardly in a position financially to crush non-polluting, efficiency-driving businesses who hire workers and pay taxes. Yet that is exactly what they have done with money transmission laws.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 11

2. **Assembly Bill 786 is EXTREMELY DANGEROUS in its Current Form, Paints a Target on the Backs of Entrepreneurs, and Completely Disregards the Input of Silicon Valley**

Before Assembly Bill 786 was introduced, in the fall of 2012, this Committee promised to hold a public hearing about the MTA, and when that hearing was cancelled, "working groups" in its place. These "working groups" never materialized. Therefore, this Committee received no input on the MTA from the general public prior to this hearing.[13] (The original MTA hearing in 2010, like most, was hardly publicized.)

Foremost among the extremely serious problems with Assembly Bill 786 is the Bill's creation of a new kind of crime that does not require *mens rea* and can make potential future actions, such as thinking about starting a payment company, "evidence" of a crime in the present. Defining potential future action as a crime is completely outrageous. If this Bill is passed, innocent entrepreneurs could become and will likely become the targets of any vindictive DFI Commissioner or subordinate who views innovation as a threat. Given that the current DFI Deputy Commissioner for Money Transmission unfortunately espouses this exact viewpoint—as he indicated when he personally threatened me—this concern is not merely hypothetical.

To reiterate, 18 U.S.C. § 1960 makes the violation of any state money transmission statute a federal crime. As a friend and colleague of internet activist Aaron Swartz, a recent victim of overzealous, vindictive and ignorant federal prosecutors who pursued their target *because of his political activism*, this concerns me a great deal. I have been vocal about my criticisms of the DFI and the MTA.

Although Assembly Bill 786 may be a "starting point," it is an incredibly biased, wrong, and unpopular starting point that has no basis in fact and no business being on the Assembly floor.

To the extent that Assembly Bill 786 was influenced by TMSRT, the DFI, or some party to further discourage innovation that might threaten incumbents in the payments industry, the bill must be radically changed, ideally to repeal the MTA in its entirety. States have no proper role regulating interstate or international money transmission, and even if they could be argued to have such a role in certain situations, they are exceedingly bad at it. Like air traffic regulation, money transmission regulation is appropriate only at the federal level.

---

[13] For almost two years, Think, along with the Coalition for the Reform of Money Transmission Laws ("CRMTL"), has petitioned this Committee as well as the corresponding committee in the California Senate, to fix the MTA. This committee received Think's comment letter on November 7, 2012 and exchanged a number of e-mails before and after that letter.

Though Think does not itself represent the CRMTL, *every single suggestion* made by Think and by members of the CRMTL was disregarded by this Committee in the drafting of Assembly Bill 786. In fact, many of Assembly Bill 786's goals are the *exact opposite* of what Think and CRMTL members suggested, making the existing problems with the MTA far worse. All the while, this Committee promised action sometime in the future, and yet when the future finally arrived last Friday, its consultant regretted that it was too late for anything to be done and refused to respond to Think's requests.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 12

## II.   Problems with the California Money Transmission Act of 2010 and the California Department of Financial Institutions's Enforcement Thereof Specifically

Although state money transmission laws clearly have many problems associated with them, the MTA is particularly flawed, both in its design and in the manner in which it is enforced.

### A.   The Money Services Round Table Sold the Money Transmission Act to the Legislature Under the False Pretense of "Consumer Protection"

That the interests of large financial companies are really the motivating force behind the MTA's myriad restrictions is self-evident from the bulleted prospectus that Mr. Levine and his colleagues supplied to the DFI in late February, 2010.  Under the bold heading of "ADVANTAGES," this unsigned document on no letterhead states that the new proposed law would reduce administrative burden for DFI and "industry"; would bring California's financial laws "into the mainstream" (whatever that means); would give DFI more power (to harass the competitors of TMSRT's members); and apparently reflects "a DFI-Industry consensus." This last statement is blatantly false unless the capitalized "Industry" is a code word for TMSRT.  Consumers are mentioned only in passing as the supposed beneficiaries of additional disclosures required "with regard to emerging electronic technologies"—obstacles clearly targeted at Silicon Valley high technology startups that naturally threaten TMSRT members.

Conspicuously missing from TMSRT's bulleted list was a mention of any specific event or scientific study that would suggest that a change in the law was necessary in the first place.  This is because the MTA represented nothing more than a naked power grab on behalf of both TMSRT and the DFI.

This is not to say that consumer protection is not a legitimate state interest, for it clearly is.  Unfortunately, the MTA lacks any effective means by which consumers would actually be protected, and even if it did contain such effective means, the DFI has shown time and again that it has no intention of actually enforcing the law in a manner that would protect consumers.

### B.   The Money Transmission Act's Scope is So Broad as to Encompass Virtually All Aspects of Routine Commerce

Under the MTA, every law firm that maintains a trust account or remits funds to government agencies on behalf of clients is a money transmitter.  Every payroll company that drafts and holds onto client funds is a money transmitter.  Every private university that operates a pre-paid debit system for students, allowing them to purchase goods and services at on-campus third-party merchants, is a money transmitter.  Every construction company, real estate agency, escrow service, and political donation aggregator (such as those used by many of the members of the California legislature in yesterday's election) is a money transmitter. The definition of "money transmission" in Financial Code § 2003(o) is so absurdly broad as to encompass much of the daily activity that keeps California's economy running.  Of course, a good number of technology startups are also unwittingly money transmitters under this definition, even if their core business has nothing to do with payments.

Almost none of these types of entities listed above have licenses, let alone licenses nationwide; after all,

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 13

California only has sixty-five licensed companies[14] with the MTA having been in effect for almost two years. Meanwhile, as the MTA claims to regulate everything, the DFI does almost nothing to enforce it, save for threatening those prospective applicants who dare to ask questions.

Assembly Bill 786's attempt to solve this problem by exempting certain types of transactions involving payroll fails completely. Payroll companies handle several kinds of transactions that are currently deemed money transmission, to say nothing of lawyers, escrow services, real estate agents, construction companies, private universities, and other businesses that regularly handle client funds.

C.     **The Money Transmission Act is Inconsistent with the Requirements of Other Similar Laws, Which Are Also Inconsistent with Each Other**

Even assuming for the sake of argument that the MTA is a valid law with effective measures to accomplish a reasonable goal—which it is not and does not have—other state money transmission laws have requirements that are considerably different. There does not appear to be any particular logic to the specific figures in the MTA ($500,000; $2 million; $7 million) except that they are big, round numbers.

In contrast to the MTA's $500,000 (but really not) minimum tangible net worth requirement and $750,000 aggregate surety bond requirement, Alabama requires $5,000 in minimum tangible net worth and a surety bond anywhere from $10,000 to $50,000. The MTA's non-refundable application fee is $5,000; in Alabama, the total fee is $500.

Ohio requires a minimum net worth of $25,000 but a $300,000 surety bond.  Oregon requires $100,000 in net worth but a $25,000 minimum surety bond—except that it defines "money transmission" in a way that exempts payment processors such as FaceCash.[15]  Maryland's application fee changes depending upon whether one applies in an even-numbered or odd-numbered year.[16]  Clearly it is impossible to find much consistency between the various laws, but even given the variation built into the regulatory regime, the MTA is an order of magnitude more expensive to comply with, and therefore more restrictive.

State laws that are completely inconsistent with one another are often found to be unconstitutional by federal courts as they tend to impede interstate commerce.

D.     **The Money Transmission Act Has Already Been Rendered Toothless by a Federal Judge**

On October 25, 2012, in a decision in an ongoing federal civil lawsuit between a minor and Facebook, Inc. (Northern District of California, Case No. 4:12-cv-01894-CW), District Judge Claudia Wilken established

---

[14]     This represents $325,000 of application fee revenue for the DFI, enough to cover the salary and benefits of only 1-2 bureaucrats to oversee the program. Yet the sacrificed tax revenues are in the tens of millions.

[15]     According to FinCEN, money transmitters are distinct from payment processors.  Even though this distinction is embodied in the Code of Federal Regulations, the DFI and certain other state agencies choose to actively ignore it.  See FinCEN Rulings 2003-8; FIN-2008-R005; FIN-2009-R001; and FIN-2009-R004.

[16]     See "Held Hostage: How the Banking Sector Has Distorted Financial Regulation and Destroyed Technological Progress," Aaron Greenspan, Think Computer Corporation, August 15, 2011, http://www.thinkcomputer.com/corporate/whitepapers/heldhostage.pdf.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 14

a new definition of "open-loop" pertaining directly to the MTA that has no foundation in the MTA or prior caselaw. According to Judge Wilken, Facebook Credits are not considered money transmission or stored value, and are "closed-loop," because Facebook users do not make use of their Credits "for goods and services outside the Facebook site."

The MTA does make an exemption for closed-loop systems (e.g. in-store retail credit) involving "affiliates" of a given entity, but the MTA defines affiliates in Financial Code § 2003(a) as:

> "any person controlling, controlled by, or under common control with, that specified person, directly or indirectly through one or more intermediaries. For purposes of subdivisions (q) and (v), a specified person is affiliated with another person if that person controls, is controlled by, or under common control through the ownership directly or indirectly of shares or equity securities possessing more than 50 percent of the voting power of that specified person."

This does not describe Facebook's situation. On the Facebook web site, users can purchase Facebook Credits that are redeemable with completely independent corporations, such as Zynga, Inc., among many other game developers who are not affiliates of Facebook, Inc. or Facebook Payments, Inc. under the MTA.

By conflating corporate ownership with technological tricks, Judge Wilken has effectively opened a loophole in the MTA large enough to drive a truck through. According to her definition, FaceCash is closed-loop because everything works through a single web site; PayPal, the classic example of a money transmitter, is as well. By this new definition, there is no reason for the MTA or any money transmission law to exist at all, so long as one can afford to purchase a domain name.

It is possible that this ruling will eventually be overturned, but in the meantime, it amply demonstrates that the MTA is so confusing and ill-conceived in the context of internet commerce, even federal judges have a difficult time figuring it out.

### E.     The Money Transmission Act Encourages Abuse of Discretion by the DFI

The MTA gives the DFI *carte blanche* to do whatever it wants with respect to money transmission licensure. The issuance of licenses can be put on hold for up to a year, giving an applicant's competition more than enough time to gain traction illegally. Or, as happened to Think, applicants can be told that they will simply never be granted a license, no matter what—but that they should try applying anyway, so long as they remember that the application fee is non-refundable.

### 1.     The DFI Invented Its Own Set of Unwritten Regulations Not Subject to a Notice and Comment Period In Violation of Government Code § 11346.8(c) and 1 C.C.R. § 44

Relying on what he called his "personal experience," a DFI Deputy Commissioner explained at Think's mandatory pre-application interview (held at the DFI's office in San Francisco on June 14, 2011) that the MTA gave him unbridled discretion to set the tangible net worth requirement as high as he desired so long as it exceeded the $500,000 statutory figure. During the meeting, he cited minimum net worth

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 15

figures of $1 million, $2 million, $20 million, and as high as *$80 million* as potentially necessary to obtain a license. When Ms. Eileen Newhall, Staff Director of the California Senate Banking, Finance & Insurance Committee inquired again on behalf of Think after the meeting, the Deputy Commissioner told her that the number was $1.5 million, but did not put this statement in writing. Without clarity as to the *actual* threshold used to evaluate applications, Think was unable to apply for a license without running a significant risk of rejection that would ultimately trigger irreversible nationwide ramifications, due to the aforementioned "domino effect."

Although the Commissioner (or practically speaking, the Deputy Commissioner) can increase the tangible net worth requirements on any given licensee pursuant to Financial Code § 2081(b), there is no direct oversight mechanism that would prevent a DFI Commissioner or subordinates from picking "favorites" and selectively raising the capital requirements of particular companies for little to no reason at all, as the DFI appears to already be doing.

Courts tend to look rather unfavorably on statutes that grant unfettered discretion to bureaucrats, or even elected officials. "We hold those portions of the Lakewood ordinance giving the mayor unfettered discretion to deny a permit application and unbounded authority to condition the permit on any additional terms he deems 'necessary and reasonable,' to be unconstitutional." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988).

After Think filed suit against the DFI, an undated "Money Transmitters FAQ" page spontaneously appeared on the DFI web site at http://www.dfi.ca.gov/resources/faqs/faqs_tms.asp, to supposedly clarify the following (emphasis added):

> "**Q.** What is the capital requirement?
>
> **A.** The capital requirement *varies based on the licensee's plan of operation and risk profile*. The amount of tangible net worth stated in the Financial Code, $500,000, is *not* the amount required for licensing, but rather the *minimum* allowed for existing licensees. A new licensee would typically be required to have more tangible net worth, *at least* $1 million, to offset the *expected losses* of a new transmitter and support its operational needs at all times."

The DFI therefore pre-supposes that all applicants will immediately lose more than $1 million. This is simply not so.

When questioned by Magistrate Judge Howard Lloyd about the ever-changing requirements for licensure during oral argument on April 17, 2012, according to the official transcript Deputy Attorney General Ryan Marcroft, representing the DFI, stated, "As far as that issue goes, it's kind of a confusing issue, it was to me at least."

In essence, the DFI's interpretation of the MTA requires that applicants pay a non-refundable fee of $5,000 and risk nationwide rejection *before* learning what the requirements even are to apply for a money transmission license in California. This is a gross perversion of due process, rendering the MTA unconstitutional for yet another reason.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 16

### 2. The DFI Has Threatened to Bankrupt Applicants via the Audit Power Granted by the Money Transmission Act

In the past, the DFI has specifically threatened that it can abuse its audit power pursuant to Financial Code § 2120 to drive an applicant into bankruptcy if that applicant attempted to apply for a license and managed to somehow be successful in obtaining one. Undoubtedly, the DFI was referring to the fact that licensees are required to pay for the "reasonable costs" of audits. (Of course, no cost is really reasonable because such audits could be conducted for the most part electronically if the DFI were properly equipped to regulate money transmission.)

### 3. The DFI Bases Its Policy on a Magic Number with No Foundation

As the basis for many assertions and rationales, DFI personnel stated that as a rule it took three years for money transmitters to become profitable. These staff members offered no justification for this arbitrary figure other than his own personal experience. The three-year rule was repeated in discussions between Think and DFI Senior Counsel Tony Lehtonen. No authoritative source for the rule was ever provided.

### F. The MTA's Geographic Scope is Unconstitutional On Its Face and As Applied

On October 13, 2011, in response to Think's repeated inquiries about the actual tangible net worth requirement and the potential liability that Think would assume as a California company conducting *licensed* money transmission activity outside of California (in Alabama and Idaho specifically), the DFI issued an Order exempting Think from the MTA so long as it effectively promised not to do business as a money transmitter in California. This necessarily implies that the MTA polices the entire United States of America outside of California, which is not possible or permissible given that the MTA is a state, and not federal, law.

To the extent that the MTA does police money transmission activity anywhere outside of California, the MTA is again unconstitutional.

### G. The DFI Has Enforced the Money Transmission Act in an Arbitrary and Capricious Manner

Adding insult to injury, the DFI seems indifferent toward the countless companies violating the MTA on a daily basis.

### 1. The DFI Has Failed to Respond to Formal Complaints Concerning the Money Transmission Act

Think filed no less than thirty-four (34) different formal complaints with the DFI in November, 2011, referenced in the lawsuit. No action that has been made public has resulted from their investigation. Namely, many of the startup companies conducting money transmission in California in violation of the MTA are still conducting money transmission in California in violation of the MTA. Meanwhile, Think's inability to operate FaceCash means that its competitors have an unfair advantage in the marketplace.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 17

The DFI has now had a full year to act since the complaints were filed in or before November, 2011.

**2.      The DFI Has Made False Statements to the Press Concerning the Existence of the Complaints**

In a July 11, 2012 article by Owen Thomas on the *Business Insider* web site entitled, "This Innovation-Killing California Law Could Get A Host Of Startups In Money Trouble" (http://www.businessinsider. com/california-money-transmitter-act-startups-2012-7), DFI spokesperson Alana Golden was quoted as saying, "Thankfully, none," in response to the reporter's question about how many formal complaints the DFI had received about unlicensed money transmitters.  Ms. Golden's statement is demonstrably false.

Approximately two months prior, on April 17, 2012 at oral argument, Deputy Attorney General Marcroft stated, "Well, to answer Your Honor's question, my client mentioned this morning they are looking into those complaints," in response to the Judge Lloyd's question as to what had happened to Think's thirty-four formal complaints.

**3.      The DFI Granted License Applications in Record Time to Entities in Active Violation of the Money Transmission Act**

Facebook Payments, Inc., a wholly-owned subsidiary of Facebook, Inc. began conducting money transmission through its Facebook Credits program sometime in early 2011, but did not apply for a money transmission license until after Think filed a formal complaint about its activity in November, 2011.  This is significant insofar as Facebook missed the application cutoff date of July 1, 2011 prescribed by Financial Code § 2172(a)[17] that would have allowed it to continue operating legally as a money transmitter.  In other words, it broke the law, fully aware of its existence.

Nonetheless, the DFI looked the other way, ignoring Facebook's illegal activity, and approved its application for a license in just three months, leaving plenty of time before the company's initial public offering in May, 2012 when it would undergo extreme scrutiny by the United States Securities and Exchange Commission. A cursory review of public records concerning license applications reveals that most are not approved within less than six months, while many take a full year to review.  Since there are no published standards outlining the DFI's application review process, it is not clear why such discrepancies exist.

Already no stranger to lawsuits, which apparently did not factor into the DFI's decision making process, since receiving its license, Facebook has faced a flurry of new class-action lawsuits, including the aforementioned pending federal suit concerning its Facebook Credits program, which among other problems, does not comply with any of the ill-conceived receipt requirements of the MTA.

**H.      The DFI's Own Lawyers Are "Appalled At" the Money Transmission Act**

In speaking with Think, DFI Senior Counsel Tony Lehtonen remarked that he was surprised by the reasonableness of Think's requests.  On September 13, 2011, he admitted that his own personal view, shared by other DFI legal staff, was that, "We have been appalled at the new law.  Even though some of us may have

---

[17]      According to the official text provided by the State, Financial Code § 2172 was not properly re-numbered, and still references pre-2012 section numbers in the text of the statute itself.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 18

been complicit in it, the view from Legal is: what are we doing here?"

On October 17, 2011, Mr. Lehtonen refused to communicate with Think any further, despite his earlier promise that he would be glad to talk any time.  Given the DFI's open hostility, this left Think with no channels of communication to the DFI.

I.    **The MTA and DFI Have Engendered a Culture of Fear, Making Money Transmission More Dangerous**

Institutional investors are not the only ones who have taken note of the DFI's arbitrary and capricious actions with respect to the MTA, not to mention the Byzantine and draconian nature of the MTA itself. Entrepreneurs are very much aware of the DFI's antipathy towards their work on improving payments. Consequently, those entrepreneurs most affected by the MTA are afraid to come forward, for those who identify themselves are most likely to be targets of reprisals (as Think has been).

Further aware of the DFI's lackluster record in enforcing the MTA, many entrepreneurs also correctly calculate their risk of being prosecuted for running an unlicensed money transmission business as being low if they simply stay quiet, and proceed with money transmission activities regardless. This has the ironic effect of endangering consumers, who may be able to turn to the DFI for help with a handful of giant, licensed conglomerates, but not for help with most other smaller businesses of which the DFI is unaware.  For example, in the past few months alone, several unlicensed Bitcoin startups have cost consumers hundreds of thousands, if not millions, of dollars. Were there reasonable federal money transmission regulations in effect, these consumers might have some recourse, but alas, they do not.

Ironically, the 2006 version of Mr. Levine would agree here.  As he wrote in that same comment to FinCEN and the Federal Reserve in which he disclosed TMSRT's members, "The bottom line is that from the standpoint of law enforcement and for national security, it is far better for all financial transactions to be conducted through legitimate financial institutions rather than illicit operators who maintain no transaction records accessible to law enforcement, file no reports and have no BSA compliance costs.  Therefore, neither law enforcement nor the overall security of the United States is served by promulgating regulatory requirements which have the effect, at least insofar as MSB customers are concerned, of driving funds underground by providing an unintentional incentive for customers to use these illicit channels."

This is exactly what Mr. Levine's own laws, including the MTA, do.  They raise prices on the services provided by "legitimate financial institutions" and render all other channels "illicit."

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 19

## III.   Proposed Solutions

The problems described in these comments are surprisingly simple to fix, so long as the State of California is willing to admit that mistakes were made.

### A.   Immediate Repeal of the Money Transmission Act

As described herein, the MTA is fundamentally flawed and cannot be salvaged, nor would there be any point in trying to do so. No level of surety bonds or capital requirements can actually keep consumers safe; insurance only truly works in pooled networks. What *will* ensure that consumers funds are in safe hands are comprehensive background checks, character assessments, and real-time electronic auditing of money transmitters by a federal agency. There is no role for the State of California or any other state in such a regulatory regime, and consequently no need for the State of California to waste any more money on attempting to insert itself where it does not belong.

Notably, the steps for starting a money services business in Canada are much more straightforward, and Canada is hardly known as a hotbed of financial crime. It requires registration with one federal agency, the Financial Transactions Reports Analysis Centre (FINTRAC). There are no fees, no surety bonds, and no capital requirements.

### B.   Federal Regulation

The Consumer Financial Protection Bureau (CFPB) has expressed an interest in regulating non-banking entities such as money transmitters on a federal level. FinCEN already coordinates the registration of Money Services Businesses for Bank Secrecy Act purposes. The FDIC has considerable expertise in the area of financial account insurance. The DFI should encourage these agencies to work together to develop comprehensive federal regulations for money transmitters in a responsible manner reflecting the concerns raised in these comments, as soon as possible.

### C.   Diversity of Future Input

Every hearing about money transmission, on both the federal and state level, has been dominated by one group: TMSRT. Many hearings have been held on short notice and with little publicity. Many groups are affected by money transmission laws, from immigrant communities to small retailers to technology startups, and their input should be actively solicited. This Committee has repeatedly failed to solicit outside input, and now that a bill is already on the floor, debate is likely to be skewed as a result.

March 6, 2013
Comments on the California Money Transmission Act of 2010 and Assembly Bill 786
Page 20

## IV.   Conclusion

In its present form, Assembly Bill 786 makes the MTA even worse by granting the DFI even more unilateral discretion and inventing unnecessary crimes.  Consumers have not been and are not now protected by the MTA—instead, multi-billion dollar financial conglomerates are.  Think will not hesitate to sue the State of California and use any other legal means necessary to prevent these horrific changes from becoming law.


Sincerely,


Aaron Greenspan
President & CEO
Think Computer Corporation


CC:   Chairman Spencer Bachus, U.S. House Committee on Financial Services
        James H. Clinger, Staff Director and General Counsel, U.S. House Committee on Financial Services
        Chairman Tim Johnson, U.S. Senate Committee on Banking, Housing & Urban Affairs
        Dwight Fettig, Staff Director, U.S. Senate Committee on Banking, Housing & Urban Affairs
        United States Representative Joe Baca
        United States Representative John Campbell
        United States Representative Anna G. Eshoo
        United States Representative Kevin McCarthy
        United States Representative Gary G. Miller
        United States Representative Edward R. Royce
        United States Representative Brad Sherman
        United States Representative Maxine Waters
        United States Senator Barbara Boxer
        United States Senator Dianne Feinstein
        Mark Farouk, Chief Consultant, California State Assembly Commitee on Banking and Finance
        Eileen Newhall, Staff Director, California State Senate Banking, Finance & Insurance Committee
        Marc Hershman, District Director, State Senator Jerry Hill
        Harry Ermoian, Capitol Director, Assemblyman Richard Gordon
        Jeremy Dennis, District Director, Assemblyman Richard Gordon
        Samantha J. Pelosi, Manager, Retail Payments Section, Federal Reserve Board of Governors
        Cynthia Merritt, Retail Payments Risk Forum, Federal Reserve Bank of Atlanta
        Marianne Crowe, Vice President, Payment Strategies Group, Federal Reserve Bank of Boston
        Barbara Pacheco, Senior Vice President, Federal Reserve Bank of Kansas City
        Terri Bradford, Payments System Research Specialist, Federal Reserve Bank of Kansas City
        Peggy Twohig, Team Lead, Non–Bank Supervision, Consumer Financial Protection Bureau

I would like to have the following comments entered into the record for the March 11 hearing on the California Money Transmission Act. I believe that the MTA and Assembly Bill 786 do nothing to protect me as a consumer. To the contrary, they erect barriers to entry that favor existing players, suppress competition, and thus ultimately hurt consumers such as myself. More effective consumer protections come from the very technologies that the MTA prevents from entering the marketplace and that our payment systems presently cannot support. I urge the legislature to repeal the MTA.

Judi Greenspan
20560 Shelburne Road
Shaker Heights, OH 44122

John Duhring
2271 Dartmouth Street
Palo Alto, CA 94306

Robert D. Swanson
Sunnyvale, CA

Anahita Safavi

Denise Drake
29 Olmsted Rd.
Stanford, CA 94305

Timothy Suen, PhD
San Jose, CA 95112-5211

Ying Lei
2050 Ashton Ave
Menlo Park, CA 94025

Jeffrey M. Heckler
2141 Princeton Street
Palo Alto, CA 94306

Matthew Soldo

Noah Barr
1072 Ashbury St.
San Francisco, CA 94117

Virgil Griffith

Chris Abrams

Anne Talbot
2324 Yale St.
Palo Alto, CA 94306

Eric Teasley
47 Olmsted Rd. Apt #123
Stanford, CA 94305

Nik Ingle
Palo Alto, CA 94306

Zachary Kruth
555 Salvatierra Walk
Stanford, CA 94305

Jeffrey M. Heckler
2141 Princeton Street
Palo Alto, CA 94306

David Phillip Oster

David Grayson

Lazslo Smith

Anahita Safavi

Elikem Adadevoh

Raj Gurung

Martin Haeberli
525 Nimitz Ave
Redwood City, CA 94061-4227

Jason Pope

Matthew N. Montag

Alfred Brown

Verdere C. Philpot
2270 Yale Str
Palo Alto, CA. 94306

To Whom It May Concern:

Yifeng Huang submits the following comments for consideration at the Committee's March 11, 2013 hearing regarding the the California Money Transmission Act of 2010.

We are aware that the Coalition for the Reform of Money Transmission Laws submitted comments supporting the Committee's efforts to reconsider the Act. I support the Coalition's comments and encourage the Assembly to strongly consider the Coalition's suggested modifications to the law. Once these needed modifications have been made to the Committee's draft legislation, we urge the Assembly to act quickly to provide the relief that is necessary to ensuring that consumers derive the full benefits of a competitive payments marketplace.

I hope that you will see that consumer choice in itself is an effective way to prevent fraud. Because of the most fundamental laws of economics, when the consumer has the choice to "vote with their feet", i.e. to choose a different service, the competing companies must, by definition, in order to survive, do the thing which is best for the consumer. No consumer would willingly pick a company which is known to fraudulent. Remember that profits are the metric which drive all company behavior: giving startups and other companies a potentially profitable opportunity to do better will be much more effective at improving the security of the money transaction system than relying on the incumbent players to try to improve their own security, out of "goodwill", and when doing so in no way impacts their own profits.

Thank you for the opportunity to provide these comments and we strongly encourage the Committee to proceed to adopt the Coalition's proposed alternatives as soon as possible.

Respectfully submitted,
Yifeng Huang, Stanford student


To Whom It May Concern:

Dr. Xavier Cadena submits the following comments for consideration at the Committee's March 11, 2013 hearing regarding the the California Money Transmission Act of 2010.

We are aware that the Coalition for the Reform of Money Transmission Laws submitted comments supporting the Committee's efforts to reconsider the Act. I support the Coalition's comments and encourage the Assembly to strongly consider the Coalition's suggested modifications to the law. Once these needed modifications have been made to the Committee's draft legislation, we urge the Assembly to act quickly to provide the relief that is necessary to ensuring that consumers derive the full benefits of a competitive payments marketplace.

Thank you for the opportunity to provide these comments and we strongly encourage the Committee to proceed to adopt the Coalition's proposed alternatives as soon as possible. Respectfully submitted,

Dr. Xavier Cadena

To Whom It May Concern:

I, Scott L. Burson, submit the following comments for consideration at the Committee's March 11, 2013 hearing regarding the the California Money Transmission Act of 2010:

I am aware that the Coalition for the Reform of Money Transmission Laws submitted comments supporting the Committee's efforts to reconsider the Act. I support the Coalition's comments and encourage the Assembly to strongly consider the Coalition's suggested modifications to the law. Once these needed modifications have been made to the Committee's draft legislation, I urge the Assembly to act quickly to provide the relief that is necessary to ensuring that consumers derive the full benefits of a competitive payments marketplace.

Specifically, with reference to the Coalition's letter, although I think any of the options suggested therein would be an improvement over the current situation, I particularly support what it calls "Option C" ("A Right-Sized Licensing Regime for Startup Money Transmitters"). (A typo on p. 8 shows this as "C. Option B"; clearly "Option C" is intended.) Although this option is the most complex of the three to implement, I believe it best balances the State's responsibility to protect consumers against the potential benefits, to those same consumers, of new technologies and business models.

I believe those potential benefits to be quite substantial. Technologies have been developed that can greatly reduce the incidence of fraudulent transactions. The savings realized as a result can be passed quite directly back to consumers in the form of reduced transaction fees. These fees are currently a significant drag on our economy.

I believe that the only way we are likely to realize these benefits is by allowing entrepreneurs some freedom to experiment with these technologies and models on a small scale, with safeguards appropriate to the amount of money at risk. The established players are not innovative by nature, and have little incentive to upset a system from which they benefit.

Thank you for the opportunity to provide these comments. I urge the Committee to adopt one of the Coalition's proposed alternatives as soon as possible.

Respectfully submitted,

Scott L. Burson
900 Pepper Tree Lane #713
Santa Clara, CA 95051

To Whom It May Concern:

I would like to submit the following comments for consideration at the Committee's March 11, 2013 hearing regarding the the California Money Transmission Act of 2010.

I am aware that the Coalition for the Reform of Money Transmission Laws submitted comments supporting the Committee's efforts to reconsider the Act. I support the Coalition's comments and encourage the Assembly to strongly consider the Coalition's suggested modifications to the law. Once these needed modifications have been made to the Committee's draft legislation, I urge the Assembly to act quickly to provide the relief that is necessary to ensuring that consumers derive the full benefits of a competitive payments marketplace.

Thank you for the opportunity to provide these comments and I strongly encourage the Committee to proceed to adopt the Coalition's proposed alternatives as soon as possible. Respectfully submitted,

Shane Mason

To Whom It May Concern:

Timothy Suen submits the following comments for consideration at the Committee's March 11, 2013 hearing regarding the California Money Transmission Act of 2010.

I am aware that the Coalition for the Reform of Money Transmission Laws submitted comments supporting the Committee's efforts to reconsider the Act. I support the Coalition's comments and encourage the Assembly to strongly consider the Coalition's suggested modifications to the law. Once these needed modifications have been made to the Committee's draft legislation, we urge the Assembly to act quickly to provide the relief that is necessary to ensuring that consumers derive the full benefits of a competitive payments marketplace.

Thank you for the opportunity to provide these comments and I strongly encourage the Committee to adopt the Coalition's proposed alternatives as soon as possible.

Respectfully submitted,
Timothy Suen, PhD
San Jose, CA  95112-5211

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| AL | Ala. Code §§ 8-7-1 *et seq.* (Sale of Checks Act) | Ala. Admin. Code r. 830-X-7-.01 | **Application** for license (Ala. Code § 8-7-5, Ala. Admin. Code r. 830-X-7-.01) – Minimum Requirements: <br><br> The application shall state the full name and street address of: <br><br> • The proprietor, if the applicant is an individual. <br><br> • Every member, if the applicant is a partnership or association. <br><br> • The corporation and each officer and director of a corporate applicant. <br><br> **Fees:** <br><br> • <u>Application/investigation fee</u> (Ala. Code § 8-7-6): <br>     o $250, nonrefundable <br><br> • <u>Annual License Fee</u> (Ala. Code § 8-7-9): <br>     o Principal office: $250 <br>     o Additional locations: $5 <br>     o Maximum: $500 <br>     o Refunded if license application denied <br><br> **Minimum net worth** (Ala. Code § 8-7-7)**:** <br>     o $5,000 <br><br> **Security** (Ala. Code § 8-7-7, Ala. Admin. Code r. 830-X-7-.01): <br><br> • Corporate surety bond or deposit of state/municipal bonds: <br>     o Minimum principal sum: $10,000 <br>     o Additional locations: $5,000 <br>     o Maximum principal sum: $50,000 | **Investigation upon application:** Upon filing of complete license application, Alabama Securities Commission shall investigate the financial responsibility, financial and business experience, character and general fitness of the applicant and, if it deems it advisable, of its officers and directors. (Ala. Code § 8-7-8) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • May be increased by commission at any time, if in its opinion the protection of the public so requires, but in no case shall the principal sum of the required bond or deposit exceed the maximum limit. (Ala. Code § 8-7-14) | |
| AK | Alaska Stat. §§ 06.55.101 *et seq.* (Alaska Uniform Money Services Act) | Alaska Admin. Code tit. 3, §13.010 | **Application** for license (Alaska Stat. § 06.55.102) – Minimum  requirements:<br><br>• (1) legal name and residential and business addresses of the applicant and any fictitious or trade name used by the applicant in conducting the applicant's business;<br><br>• (2) list of any criminal convictions of the applicant and any material litigation in which the applicant has been involved in the 10-year period next preceding the submission of the application;<br><br>• (3) description of any money services previously provided by the applicant and the money services that the applicant seeks to provide in this state;<br><br>• (4) list of the applicant's proposed authorized delegates and the locations in this state where the applicant and its authorized delegates propose to engage in money transmission or provide other money services;<br><br>• (5) list of other states in which the applicant is licensed to engage in money transmission or provide other money services and any license revocations, suspensions, or other disciplinary action taken against the applicant in another state;<br><br>• (6) information concerning any bankruptcy or receivership proceedings affecting the applicant;<br><br>• (7) sample form of contract for authorized delegates, if applicable, and a sample form of payment | **Investigation upon application**: Upon filing of complete license application, the department shall investigate the applicant's financial condition and responsibility, financial and business experience, character, and general fitness. The department may conduct an on-site investigation of the applicant, the reasonable cost of which the applicant shall pay. (Alaska Stat. § 06.55.105)<br><br>**Examination by department** (Alaska Stat. § 06.55.401):<br>• Annual: The department may conduct an annual examination of a money services licensee or of any of its authorized delegates upon 45 days' notice in a record to the money services licensee.<br>• Without Notice: The department may examine a money services licensee or its authorized delegate, at any time, without notice, if the department has reason to believe that the money services licensee or authorized delegate is engaging in an unsafe or unsound practice or has violated or is violating this chapter or a regulation adopted under this chapter or an order issued under this chapter.<br><br>**Independent report in lieu of on-site examination** (Alaska Admin. Code tit. 3, §13.210):  The department will accept the audit of a licensed certified public accountant, if: |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | instrument or instrument on which stored value is recorded, if applicable;<br><br>• (8) name and address of any bank through which the applicant's payment instruments and stored value will be paid;<br><br>• (9) description of the source of money and credit to be used by the applicant to provide money services;<br><br>• (10) if applicable, the date of the applicant's incorporation or formation and state or country of incorporation or formation;<br><br>• (11) if applicable, a certificate of good standing from the state or country in which the applicant is incorporated or formed;<br><br>• (12) if applicable, a brief description of the structure or organization of the applicant, including any parent or subsidiary of the applicant, and whether any parent or subsidiary is publicly traded;<br><br>• (13) if applicable, the legal name, any fictitious or trade name, all business and residential addresses, and the employment, in the 10-year period next preceding the submission of the application of each executive officer, manager, director, or person who has control of the applicant;<br><br>• (14) if applicable, a list of any criminal convictions and material litigation in which any executive officer, manager, director, or person in control of the applicant has been involved in the 10-year period next preceding the submission of the application;<br><br>• (15) if applicable, a copy of the applicant's audited financial statements for the most recent fiscal year and, if available, for the two-year period next preceding the submission of the application; | • (1) the applicant, money services licensee, or authorized delegate pays the costs of the audit;<br><br>• (2) the audit is equal in scope to the investigation or examination required by the department;<br><br>• (3) the licensee provides prior notice in writing that the licensee is having the audit prepared instead of the investigation or examination required by the department; and<br><br>• (4) the department has given prior written approval for the person to conduct the audit.<br><br>**Investigation fees:**<br><br>• Applicant or licensee shall pay the department for each representative of the department who is reasonably necessary to conduct the investigation or examination.  (Alaska Admin. Code tit. 3, § 13.210)<br><br>• <u>On-site investigation</u>:  $75 per hour for each representative of the department who is reasonably necessary to conduct the investigation or examination (Alaska Stat. § 06.55.401, Alaska Admin. Code tit. 3, § 13.840)<br><br>• <u>Travel expenses</u>:  Reimbursement for the actual expenses of required travel, including transportation, lodging, and per diem expenses related to any on-site investigation (Alaska Admin. Code tit. 3, |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • (16) if applicable, a copy of the applicant's unconsolidated financial statements for the current fiscal year, whether audited or not, and, if available, for the two-year period next preceding the submission of the application;<br><br>• (17) if the applicant is publicly traded, a copy of the most recent report filed with the United States Securities and Exchange Commission under 15 U.S.C. 78m (Securities Exchange Act of 1934);<br><br>• (18) if the applicant has a registered agent in this state, the name and address of the applicant's registered agent in this state; and<br><br>• (19) any other information the department reasonably requires with respect to the applicant.<br><br>**Reciprocity** (Alaska Stat. § 06.55.103, Alaska Admin. Code tit. 3, § 13.020, Alaska Admin. Code tit. 3, § 13.840):<br><br>Person licensed to engage in money transmission in a state which has enacted the Uniform Money Services Act (or a substantially similar act) may engage in money transmission without being licensed if the person submits to the Alaska Department of Commerce, Community, and Economic Development:<br><br>• in a record, an application for approval to engage in money transmission, currency exchange, or both money transmission and currency exchange in this state without being licensed;<br><br>• a nonrefundable application fee of $250;<br><br>• a fee for the first year of operating with the approval given under this section (refunded if the application is denied) of $500;<br><br>• a certification of license history in the other state; | §13.850)<br><br>**Annual renewal report** (Alaska Stat. § 06.55.106): Licensee shall submit annual renewal report (along with annual renewal fee) which must contain, at a minimum:<br><br>• (1) copy of the money transmission licensee's most recent audited annual financial statement;<br><br>• (2) number and monetary amount of payment instruments and stored value sold by the money transmission licensee in this state that have not been included in a renewal report, and the monetary amount of payment instruments and stored value currently outstanding;<br><br>• (3) description of each material change in information submitted by the money transmission licensee in its original license application that has not been reported to the department on any required report;<br><br>• (4) list of the money transmission licensee's permissible investments and a certification that the money transmission licensee continues to maintain permissible investments;<br><br>• (5) proof that the money transmission licensee continues to maintain adequate security; and<br><br>• (6) list of the locations in this state where the money transmission licensee or an authorized delegate of the money transmission licensee engages in money transmission or provides other money |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | <ul><li>satisfactory proof that the person holds a license in good standing to engage in money transmissions in at least one other state that has either adopted the Uniform Money Services Act or has money transmission laws that are substantially similar to those of this state;</li><li>satisfactory proof that the person has obtained the required security and that the security is in force; and</li><li>signed release of information that allows the Alaska Department of Commerce, Community, and Economic Development to obtain information from licensing agencies of other states necessary to verify the person's eligibility to engage in money transmission under Alaska Stat. § 06.55.103.</li></ul>**Fees** (Alaska Stat. § 06.55.102, Alaska Admin. Code tit. 3, § 13.840):<ul><li>Application/investigation fees:<ul><li>Principal office: $500</li><li>Additional locations: $100</li><li>Nonrefundable</li></ul></li><li>Annual License Fee<ul><li>Principal office: $500</li><li>Additional locations: $50</li><li>Refunded if license application denied</li></ul></li><li>Annual License Renewal Fee: $500</li></ul>**Minimum net worth:** $25,000 (Alaska Stat. § 06.55.107)<br>**Maintenance of permissible investments:**  A money services licensee shall maintain at all times permissible investments that have a market value computed under | services. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments and stored value obligations issued or sold in all states and money transmitted from all states by the money services licensee.  (Alaska Stat. § 06.55.501)<br><br>**Security** (Alaska Stat. § 06.55.104, Alaska Admin. Code tit. 3, § 13.030):<br>• Surety bond, a letter of credit, or another similar security, in the amount of:<br>   o   Minimum amount: $25,000<br>   o   Additional locations: $5,000<br>   o   Maximum amount: $125,000<br>• May be increased by department if the financial condition of a money transmission licensee requires the increase, as evidenced by reduction of net worth, financial losses, or other relevant criteria, but in no case shall the principal sum of the required bond or deposit exceed the maximum limit. (Alaska Stat. § 06.55.104) | |
| AZ | Ariz. Rev. Stat. §§ 6-1201 *et seq.* (Transmitters of Money) | None. | **Application** for license (Ariz. Rev. Stat. § 6-1204) – Minimum requirements:<br><br>• (1) Copies of the articles of incorporation for the applicant, a listing of all trade names or fictitious names used by the applicant and other information concerning the corporate status of the applicant.<br>• (2) The address of the applicant's principal place of business, the address of each location where the applicant intends to transact business in this state, including any branch offices, and the name and address of each location of any authorized delegates.<br>• (3)For each executive officer and director of the applicant and for each executive officer and director of | **Investigation upon application:**  On the filing of a complete application, the superintendent shall investigate the financial condition and responsibility, financial and business experience, character and general fitness of the applicant. In his discretion, the superintendent may conduct an on-site investigation of the applicant, the reasonable cost of which shall be borne by the applicant. (Ariz. Rev. Stat. § 6-1206)<br><br>**Examination by superintendent:**<br>• <u>Authorized delegate</u>: An authorized delegate is subject to examination by the superintendent at the discretion of the |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | any controlling person, unless the controlling person is a publicly traded company on a recognized national exchange and has assets in excess of four hundred million dollars, a statement of personal history in the form prescribed by the superintendent.<br><br>• (4) An identification statement for each branch manager and responsible individual.<br><br>• (5) The name and address of each authorized delegate.<br><br>• (6) The identity of any account in any financial institution through which the applicant intends to conduct any business regulated under this chapter.<br><br>• (7) A financial statement audited by a licensed independent certified public accountant.<br><br>**Fees** (Ariz. Rev. Stat. § 6-126):<br><br>• <u>Application/investigation fees</u>:<br>  o Principal office: $1,500<br>  o Additional locations: $25<br>  o Maximum: $4,500<br>  o Nonrefundable<br><br>• <u>Annual License Fee</u>:<br>  o Principal office: $500<br>  o Additional locations: $25<br>  o Maximum: $2,500<br>  o Paid upon issuance of license, prorated according to number of quarters remaining until date of next renewal<br><br>**Minimum net worth** (Ariz. Rev. Stat. § 6-1205.01):<br>• Principal location: $100,000<br>• Each additional location: $50,000<br>• Maximum: $500,000.<br>• Up to an additional $500,000 net worth required for | superintendent. (Ariz. Rev. Stat. § 6-1209)<br><br>• <u>Periodic</u>: The superintendent shall examine or cause to be examined the business and affairs of any enterprise (including a money transmitter) for the purpose of administering and enforcing this title at the superintendent's discretion but at least once in a five year period. (Ariz. Rev. Stat. § 6-122)<br><br>• <u>Inspection for violations</u>: On request of the attorney general, all licensees, authorized delegates, money transmitters and financial institutions shall make their books and records available to the attorney general during normal business hours for inspection and examination in connection with an investigation conducted by the attorney general to determine if a licensee, authorized delegate, money transmitter, financial institution or person engaged in a trade or business has failed to file a report required by this article or has engaged or is engaging in an act, practice or transaction that constitutes a money laundering violation. (Ariz. Rev. Stat. § 6-1242)<br><br>**Independent report in lieu of on-site examination:** Superintendent may accept the examination report of an agency of this state or of another state or of the federal government or a report prepared by an independent licensed certified public accountant. (Ariz. Rev. Stat. § 6-1213)<br><br>**Examination fees:**<br><br>• <u>Authorized delegates</u>: Licensee is responsible for the payment of an |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | high volume money transmitters (more than $500,000 in transactions that involve amounts of $1,000 or more during the preceding year). <br><br> **Maintenance of permissible investments:** Every licensee shall maintain at all times permissible investments that comply with either of the following: (1) A market value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments; or (2) A net carrying value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments, provided the market value of these permissible investments is at least ninety-five per cent of the net carrying value.  (Ariz. Rev. Stat. § 6-1212) <br><br> **Security (Ariz. Rev. Stat. § 6-1205):** <br> o  Surety bond or cash deposit <br> o  Five (5) or fewer locations: $25,000 <br> o  Six (6) to twenty (20) locations: $100,000 <br> o  Each additional location in excess of twenty (20) but fewer than two hundred one (201): $5,000, up to a maximum of $250,000 <br> o  Each location in excess of two hundred (200), $5,000, up to a maximum of $500,000. | assessment for the examination of its authorized delegates to the extent that the examination relates to the activities conducted by the authorized delegate on behalf of the licensee.  (Ariz. Rev. Stat. § 6-1209) <br><br> • <u>Hourly rate</u>:  Rate set by the superintendent but not to exceed $65 per hour for each examiner employed. (Ariz. Rev. Stat. § 6-125) <br><br> • <u>Travel out of state</u>:  For a financial institution or enterprise maintaining an office outside this state, the superintendent shall make an additional assessment equal to the travel and subsistence expense incurred in the examination of the office in the foreign state or country. (Ariz. Rev. Stat. § 6-125) |
| AR | Ark. Code Ann. §§ 23-55-101 *et seq.* (Uniform Money Services Act) | 003-14-010 Ark. Code R. § 102 *et seq.* (Money Services Rules) | **Application** for license (Ark. Code Ann. § 23-55-202) – Minimum requirements: <br><br> • (1) the legal name and residential and business addresses of the applicant and any fictitious or trade name used by the applicant in conducting its business; <br><br> • (2) a list of any criminal convictions of the applicant and any material litigation in which the applicant has been involved in the 10-year period next preceding the | **Examination upon application:** When an application is filed under this article, the Securities Commissioner shall investigate the applicant's financial condition and responsibility, financial and business experience, character, and general fitness. The commissioner may conduct an on-site investigation of the applicant, the reasonable cost of which the applicant must pay.  (Ark. Code Ann. § 23-55-205) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | submission of the application;<br><br>• (3) a description of any money services previously provided by the applicant and the money services that the applicant seeks to provide in this State;<br><br>• (4) a list of the applicant's proposed authorized delegates and the locations in this State where the applicant and its authorized delegates propose to engage in money transmission or provide other money services;<br><br>• (5) a list of other States in which the applicant is licensed to engage in money transmission or provide other money services and any license revocations, suspensions, or other disciplinary action taken against the applicant in another State;<br><br>• (6) information concerning any bankruptcy or receivership proceedings affecting the licensee;<br><br>• (7) a sample form of contract for authorized delegates, if applicable, and a sample form of payment instrument or instrument upon which stored value is recorded, if applicable;<br><br>• (8) the name and address of any bank through which the applicant's payment instruments and stored value will be paid;<br><br>• (9) a description of the source of money and credit to be used by the applicant to provide money services;<br><br>• (10) the date of the applicant's incorporation or formation and State or country of incorporation or formation;<br><br>• (11) if applicable, a certificate of good standing from the State or country in which the applicant is incorporated or formed;<br><br>• (12) a brief description of the structure or organization | **Examinations by commissioner** (Ark. Code Ann. § 23-55-601):<br><br>• <u>Annual</u>: of a licensee or of any of its authorized delegates upon 45 days' notice in a record to the licensee.<br><br>• <u>Without notice</u>: examination of a licensee or its authorized delegate, at any time, without notice, if the Securities Commissioner has reason to believe that the licensee or authorized delegate is engaging in an unsafe or unsound practice or has violated or is violating this chapter or a rule adopted under this chapter or an order issued under this chapter.<br><br>**Extent of examination** (Ark. Code Ann. § 23-55-601):<br><br>Pursuant to his powers to examine licensees, the commissioner may:<br><br>• require or permit a person to file a sworn, written statement or submit any other form of evidence concerning the matter to be investigated.<br><br>• administer oaths and affirmations;<br><br>• subpoena and compel the attendance of witnesses;<br><br>• take evidence; and<br><br>• require the production of books, papers, correspondence, memoranda, agreements, or other documents or records that the commissioner deems relevant or material to the inquiry.<br><br>**Examination fees** (Ark. Code Ann. § 23-55- |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | of the applicant, including any parent or subsidiary of the applicant, and whether any parent or subsidiary is publicly traded;<br><br>• (13) the legal name, any fictitious or trade name, all business and residential addresses, and the employment, in the 10-year period next preceding the submission of the application of each executive officer, manager, director, or person that has control, of the applicant;<br><br>• (14) a list of any criminal convictions and material litigation in which any executive officer, manager, director, or person in control of, the applicant has been involved in the 10-year period next preceding the submission of the application;<br><br>• (15) a copy of the applicant's audited financial statements for the most recent fiscal year and, if available, for the two-year period next preceding the submission of the application;<br><br>• (16) a copy of the applicant's unconsolidated financial statements for the current fiscal year, whether audited or not, and, if available, for the two-year period next preceding the submission of the application;<br><br>• (17) if the applicant is publicly traded, a copy of the most recent report filed with the United States Securities and Exchange Commission under § 13 of the federal Securities Exchange Act of 1934, 15 U.S.C. § 78m (1994 & Supp. V 1999);<br><br>• (18) evidence of the applicant's registration or qualification to do business in this state;<br><br>• (19) if the applicant has a registered agent in this State, the name and address of the applicant's registered agent in this State; and<br><br>• (20) any other information the commissioner | 601):<br><br>• Daily fee:  Maximum examination fee of $150 per examiner for each day or for part of a day during which the examiner is absent from the office for the purpose of conducting the examination.<br><br>• Travel:  Licensee or applicant may be required to pay the actual hotel and traveling expenses of each examiner traveling to and from the office of the commissioner while the examiner is conducting the examination.<br><br>**Annual renewal report** (Ark. Code Ann. § 23-55-206):<br><br>Licensee shall submit annual renewal report (accompanied by annual renewal fee) which must contain, at a minimum:<br><br>• (1) the number and monetary amount of payment instruments and stored-value sold by the licensee in this State which have not been included in a renewal report and the monetary amount of payment instruments and stored value currently outstanding;<br><br>• (2) a description of each material change in information submitted by the licensee in its original license application which has not been reported to the commissioner on any required report;<br><br>• (3) a list of the licensee's permissible investments and a certification that the licensee continues to maintain permissible investments according to the requirements set forth in §§ 23-55-701 and 23-55-702; |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | reasonably requires with respect to the applicant.<br><br>**Fees** (Ark. Code Ann. § 23-55-202):<br>• Application/investigation fee:<br>  o $1,500 nonrefundable<br>• Annual License Fee:<br>  o $750, refunded if license application denied<br>**Minimum net worth** (Ark. Code Ann. § 23-55-207): $250,000<br>**Maintenance of permissible investments:** A licensee shall maintain at all times permissible investments that have a market value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments and stored value obligations issued or sold in all states and money transmitted from all states by the licensee.  (Ark. Code Ann. § 23-55-701)<br>**Security** (Ark. Code Ann. § 23-55-204):<br>• Surety bond<br>  o Minimum principal sum: $50,000<br>  o Additional locations: $10,000<br>  o Maximum principal sum: $300,000<br>• Arkansas Securities Commissioner may increase the amount of security required to a maximum of $1,000,000 if the financial condition of a licensee so requires, as evidenced by reduction of net worth, financial losses, or other relevant criteria. | and<br><br>• (4) proof that the licensee continues to maintain adequate security as required by § 23-55-204. |
| CA | Cal. Fin Code §§ 2000 *et seq.* (Money Transmission Act) | None. | **Application** for license (Cal. Fin Code § 2032) – Minimum requirements:<br><br>• (1) The legal name and residential business address of the applicant and any fictitious or trade name used by the applicant in conducting its business. | **Examination upon application:** The commissioner may conduct an examination of the applicant and the applicant shall pay the reasonable cost of the examination.  (Cal. Fin Code § 2033) |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • (2) A list of any criminal convictions of the applicant and any material litigation in which the applicant has been involved in the 10-year period next preceding the submission of the application.<br><br>• (3) A description of any money transmission services previously provided by the applicant and the money transmission services that the applicant seeks to provide in this state.<br><br>• (4) A list of the applicant's proposed agents and the locations in this state where the applicant and its agents propose to engage in money transmission.<br><br>• (5) A list of other states in which the applicant is licensed to engage in money transmission and any license revocations, suspensions, or other disciplinary action taken against the applicant in another state.<br><br>• (6) Information concerning any bankruptcy or receivership proceedings affecting the licensee.<br><br>• (7) A sample form of payment instrument or instrument upon which stored value is recorded, if applicable.<br><br>• (8) A sample form of receipt for transactions that involve money received for transmission.<br><br>• (9) The name and address of any bank through which the applicant's payment instruments and stored value will be paid.<br><br>• (10) A description of the source of money and credit to be used by the applicant to provide money transmission services.<br><br>• (11) The date of the applicant's incorporation or formation and the state or country of incorporation or formation.<br><br>• (12) A certificate of good standing from the state or | **Examination by commissioner:** The commissioner may at any time and from time to time examine the business and any office, within or outside this state, of any licensee or any agent of a licensee in order to ascertain whether that business is being conducted in a lawful manner and whether all money transmission is properly accounted for. (Cal. Fin Code § 2120)<br><br>**Examination fees**: Seventy-five dollars ($75) per hour for each examiner engaged in the examination of a licensee, agent of licensee or applicant, plus, if it is necessary for any examiner engaged in the examination to travel outside this state, the travel expenses of the examiner. (Cal. Fin. Code § 2038)<br><br>**Quarterly reports (**Cal. Fin Code § 2039):<br><br>Each licensee shall, not more than 45 days after the end of each calendar year quarter, or within a longer period as the commissioner may by regulation or order specify, file with the commissioner a report containing all of the following:<br><br>• (1) Financial statements, including balance sheet, income statement, statement of changes in shareholders' equity, and statement of cashflows, for, or as of the end of, that calendar year quarter, verified by two of the licensee's principal officers. The verification shall state that each of the officers making the verification has a personal knowledge of the matters in the report and that each of them believes that each statement on the report is true.<br><br>• (2) The current address of each branch |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | country in which the applicant is incorporated or formed. <br><br> • (13) A description of the structure or organization of the applicant, including any parent or subsidiary of the applicant, and whether any parent or subsidiary is publicly traded. <br><br> • (14) The legal name, any fictitious or trade name, all business and residential addresses, and the employment, in the 10-year period next preceding the submission of the application, of each executive officer, manager, director, or person that has control, of the applicant, and the education background for each such person. <br><br> • (15) A list of any criminal convictions and material litigation in which any executive officer, manager, director, or person in control, of the applicant has been involved in the 10-year period next preceding the submission of the application. <br><br> • (16) A copy of the applicant's audited financial statements for the most recent fiscal year and, if available, for the two-year period next preceding the submission of the application. <br><br> • (17) A copy of the applicant's unconsolidated financial statements for the current fiscal year, whether audited or not, and, if available, for the two-year period next preceding the submission of the application. <br><br> • (18) If the applicant is publicly traded, a copy of the most recent report filed with the United States Securities and Exchange Commission under Section 13 of the federal Securities Exchange Act of 1934 (15 U.S.C. § 78m). <br><br> • (19) The name and address of the applicant's registered agent in this state. | office of the licensee in this state. If a branch office was opened or closed during the calendar year quarter, the date it was opened or closed. If a branch office was relocated during the calendar year quarter, the addresses of the old and new locations and the date of relocation. <br><br> • (3) The name of each person who acted as an agent in this state of the licensee during the calendar year quarter and the address for each agent branch office. If a person was appointed or terminated as an agent during the calendar year quarter, the date of appointment or termination. If an agent branch office relocated, the addresses for the old and new locations and the date of relocation. <br><br> • (4) The total volume of activities, number of transactions conducted, and outstanding money transmission obligations in California under this chapter and in the United States in the calendar year quarter categorized by type of money transmission. For money received for transmission, a report of the average daily outstanding transmission liabilities in California, and, if applicable, a schedule of each foreign country to which money was sent, along with the total amount of money sent to that foreign country in that calendar year quarter. For payment instruments and stored value, a report of the average daily outstanding payment instruments and stored value liabilities in California in that calendar year quarter. <br><br> • (5) Other information as the commissioner |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|----------------|------------------------|------------------------|--------------------------|
|       |                |                        | • (20) The applicant's plan for engaging in money transmission business, including without limitation three years of pro forma financial statements.<br><br>• (21) Any other information the commissioner requires with respect to the applicant.<br><br>**Fees:**<br><br>• Application/investigation fee (Cal Fin Code § 2032, 2038):<br>   o   $5,000, nonrefundable<br><br>• Annual License Fee (Cal Fin Code § 2038):<br>   o   Principal office: $2,500<br>   o   Additional licensee locations: $125<br>   o   Additional agent locations: $25<br><br>• Annual License Renewal Fee:<br>   o   $500<br><br>• Annual assessment (Cal Fin Code § 2042):<br>   o   The proportion that the total amount of money received for transmission by the licensee in California bears in relation to the total amount of money received for transmission by all licensees in California, as shown by the reports of licensees to the commissioner for the preceding calendar year.<br>   o   Maximum: one dollar ($1) per one thousand dollars ($1,000) of money received for transmission in California by the licensee.<br><br>**Maintenance of adequate eligible securities** (Cal Fin Code § 2081)**:**  A licensee shall at all times own eligible securities having an aggregate market value computed in accordance with United States generally accepted | may by regulation or order require. |

-14-

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | accounting principles of not less than the aggregate amount of all of its outstanding payment instruments and stored value obligations issued or sold in the United States and all outstanding money received for transmission in the United States.<br><br>**Security** (Cal. Fin. Code § 2037):<br>• Surety bond or securities on deposit<br>• Principal sum in amount greater than the average daily outstanding obligations for money received for transmission in California<br>• Minimum principal sum: $250,000<br>• Maximum principal sum: $7,000,000 | |
| **CO** | Colo. Rev. Stat. §§ 12-52-101 *et seq.* (Money Transmitters Act) | 3 Colo. Code Regs. 701-7 | **Application** for license (Colo. Rev. Stat. §12-52-106, 3 Colo. Code Regs. 701-7 (MO4)) – Minimum requirements:<br><br>• (1) The exact name of the applicant, the applicant's principal address, any fictitious or trade name used by the applicant in the conduct of its business and the location of the applicant's business records.<br><br>• (2) The history of the applicant's material litigation and criminal convictions for the five (5) year period prior to the date of the application.<br><br>• (3) A description of the activities conducted by the applicant and a history of operations.<br><br>• (4) A description of the business activities in which the applicant seeks to be engaged in the State.<br><br>• (5) A list identifying the applicant's proposed agents in the State, if any, at the time of the filing of the license application.<br><br>• (6) A sample agent contract, if applicable.<br><br>• (7) A sample form of payment instrument, if applicable. | **Examination upon application:** Upon the filing of an application, the commissioner shall investigate the applicant.  (Colo. Rev. Stat. § 12-52-108)<br><br>**Examination by commissioner:**  The commissioner may examine the books and records of a licensee using risk-based criteria and considering other available regulatory mechanisms as directed by the banking board; shall make and file in the office of the commissioner a correct report in detail disclosing the results of such examination; and shall mail a copy of such report to the licensee examined. (Colo. Rev. Stat. § 12-52-110)<br><br>**Independent report in lieu of examination:** In lieu of any examination required by this section to be made by the commissioner, the commissioner may accept the audit of an independent certified public accountant or an independent registered accountant, but the cost of such audit shall be borne by the licensee. (Colo. Rev. Stat. § 12-52-110) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | • (8) The location(s) at which the applicant and its agents, if any, propose to conduct the licensed activities in the State.<br><br>• (9) The name and address of the clearing bank or banks on which the applicant's payment instruments will be payable.<br><br>• (10) The date of the applicant's incorporation and state of incorporation.<br><br>• (11) A certificate of good standing from the state in which the applicant was incorporated.<br><br>• (12) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded on any stock exchange.<br><br>• (13) The name, business and residence addresses, and employment history for the past five (5) years of the applicant's executive officers and the officer(s) or managers who will be in charge of the applicant's activities to be licensed hereunder.<br><br>• (14) The name, business and residence address and employment history for the period of five (5) years prior to the date of the application of any key shareholder of the applicant.<br><br>• (15) The history of material litigation and criminal convictions for the five (5) year period prior to the date of the application of every current director, executive director, or key shareholder of the applicant.<br><br>• (16) A copy of the applicant's most recent audited financial statement (including balance sheet, state of income or loss, statement or changes in shareholder equity and statement of changes in financial position) and, if available, the applicant's audited financial | **Examination Fees:** $48/hour plus reasonable expenses as normally paid by the state.<br><br>*See* http://www.colorado.gov/cs/Satellite?c=Document_C&childpagename=DORA-DB%2FDocument_C%2FCBONAddLinkView&cid=1251630233841&pagename=CBONWrapper |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | statements for the immediately preceding two (2) year period. | |

Continued licensing requirements:

- (17) Copies of all filings, if any, made by the applicant with the United States Securities and Exchange Commission, or with a similar regulator in a country other than the United States, within the year preceding the date of filing of the application.

**Fees:**

- <u>License fee</u> (Colo. Rev. Stat. § 12-52-109):
  - o $7,500 (between January 1 and June 30)
  - o $3,750 (between July 1 and December 31)
- <u>Annual License Renewal Fee</u>:
  - o $2,500

*See* [http://www.colorado.gov/cs/Satellite?c=Document_C&childpagename=DORA-DB%2FDocument_C%2FCBONAddLinkView&cid=1251630233841&pagename=CBONWrapper](http://www.colorado.gov/cs/Satellite?c=Document_C&childpagename=DORA-DB%2FDocument_C%2FCBONAddLinkView&cid=1251630233841&pagename=CBONWrapper).

**Minimum net worth** (3 Colo. Code Regs. 701-7(MO4)):

- Principal location: $50,000
- Each additional location or authorized agent: $25,000
- Maximum: $100,000
- The Banking Board may require a net worth of up to $100,000, regardless of the number of locations or agents in this state, subject to consideration of the following:
  - o (1) The nature and volume of the business or proposed business of the applicant;
  - o (2) The amount, nature, quality, and liquidity of the

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | assets of the applicant;<br><br>o (3) The amount and nature of the liabilities, including contingent liabilities, of the applicant;<br><br>o (4) The history of, and prospect for, the applicant to earn and retain income;<br><br>o (5) The quality of the operations of the applicant:<br><br>o (6) The quality of the management of the applicant; and<br><br>o (7) Any other factor the Banking Board deems relevant.<br><br>**Security** (Colo. Rev. Stat. § 12-52-107):<br>• Corporate surety bond or deposit of securities<br>• Default principal sum: $1,000,000 (may vary based on financial condition or solvency of licensee)<br>• Minimum principal sum: $250,000<br>• Maximum principal sum: $2,000,000 | |
| CT | Conn. Gen. Stat. §§ 36a-595 *et seq.* (Money Transmission Act) | None. | **Application** for license (Conn. Gen. Stat. § 36a-598) – Minimum requirements:<br><br>• (1) The exact name of the applicant and, if incorporated, the date of incorporation and the state where incorporated;<br><br>• (2) The complete address of the principal office from which the business is to be conducted and of the office where the books and records of the applicant are to be maintained;<br><br>• (3) The complete name and address of each of the applicant's branches, subsidiaries, affiliates and agents, if any, engaging in this state in the business of selling or issuing Connecticut payment instruments, or engaging in the business of money transmission;<br><br>• (4) The name, title, address and telephone number of | **Investigation upon application**: Upon the filing of an application for an original license, and the payment of the fees for investigation and license, the commissioner shall investigate the financial condition and responsibility, financial and business experience, character and general fitness of the applicant.  (Conn. Gen. Stat. § 36a-600)<br><br>**Fingerprints and criminal background check:** The commissioner may conduct a state and national criminal history records check of the individual applicant and of each partner, director, trustee, principal officer, member and shareholder owning ten per cent or more of each class of the securities of the applicant. (Conn. Gen. Stat. § 36a-598) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | the person to whom notice of the commissioner's approval or disapproval of the application shall be sent and to whom any inquiries by the commissioner concerning the application shall be directed; <br><br>• (5) The name and residence address of the individual, if the applicant is an individual; the partners, if the applicant is a partnership; the directors, trustees, principal officers, and any shareholder owning ten per cent or more of each class of its securities, if the applicant is a corporation or association; or the members, if the applicant is a limited liability company; <br><br>• (6) The most recently audited unconsolidated financial statement of the applicant, including its balance sheet and receipts and disbursements for the preceding year, prepared by an independent certified public accountant acceptable to the commissioner; <br><br>• (7) A list of the applicant's permissible investments, the book and market values of such investments, and the dollar amount of the applicant's aggregate outstanding payment instruments (A) as of the date of the financial statement filed in accordance with subdivision (6) of this subsection; and (B) as of a date no earlier than thirty business days prior to the filing of the application; <br><br>• (8) The history of material litigation for the five-year period prior to the date of the application of the individual, if the applicant is an individual; the partners, if the applicant is a partnership; the directors, trustees, principal officers and any shareholder owning ten per cent or more of each class of its securities, if the applicant is a corporation or association; or the members, if the applicant is a limited liability company, and sufficient information pertaining to the history of material litigation, in a form acceptable to the commissioner, on such individual or | **Investigation by commissioner:** <br><br>• <u>General authority</u>: The commissioner, in the commissioner's discretion, may make such public or private investigations or examinations within or outside this state, concerning any person subject to the jurisdiction of the commissioner, as the commissioner deems necessary to carry out the duties of the commissioner.  (Conn. Gen. Stat. § 36a-17) <br><br>• <u>Agents</u>: In connection with the examination of a licensee, the commissioner may also examine the agents of such licensee. <br><br>**Independent report in lieu of examination:** The commissioner, in lieu of conducting an examination, may accept the report of examination of any other state or federal supervisory agency or any organization affiliated with or representing such supervisory agency, or a report prepared by an independent accounting firm, and reports so accepted are considered as an official examination report of the commissioner. (Conn. Gen. Stat. § 36a-605) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | the partners, directors, trustees, principal officers, members and any shareholder owning ten per cent or more of each class of the applicant's securities; <br><br> • (9) (A) The history of criminal convictions of the individual, if the applicant is an individual; the partners, if the applicant is a partnership; the directors, trustees, principal officers and any shareholder owning ten per cent or more of each class of its securities if the applicant is a corporation or association; or the members, if the applicant is a limited liability company, and (B) sufficient information pertaining to the history of criminal convictions, in a form acceptable to the commissioner, on such individual or the partners, directors, trustees, principal officers, members and any shareholder owning ten per cent or more of each class of the applicant's securities; <br><br> • (10) A statement of whether the applicant will engage in the business of issuing money orders, travelers checks or electronic payment instruments or engage in the business of money transmission in this state; and <br><br> • (11) Any other information the commissioner may require. <br><br> • The commissioner, in accordance with section 29-17a, may conduct a state and national criminal history records check of the individual applicant and of each partner, director, trustee, principal officer, member and shareholder owning ten per cent or more of each class of the securities of the applicant. <br><br> **Fees** (Conn. Gen. Stat. § 36a-599): <br><br> • <u>Application/investigation fee</u>: $650 <br>  ○ Nonrefundable |  |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | • <u>License fee</u>: $2,500<br><br>  o  Initial license fee refunded if application is denied, may be prorated to $1,250<br><br>  o  **NOTE:** Connecticut Department of Banking website may display higher/lower amounts. See <u>http://www.ct.gov/dob/cwp/view.asp?a=2232&q=297846</u><br><br>• <u>Annual License Renewal Fee</u>: $2,500,<br><br>  o  Refunded if commissioner refuses to issue renewal license<br><br>**Minimum net worth:** $500,000 (Conn. Gen. Stat. § 36a-604)<br><br>**Maintenance of permissible investments** (Conn. Gen. Stat. § 36a-603): Each licensee shall at all times maintain permissible investments having a value, computed in accordance with generally accepted accounting principles, at least equal to the aggregate amount of its outstanding Connecticut payment instruments and stored value.<br><br>**Security** (Conn. Gen. Stat. § 36a-602):<br>• Surety bond or investments<br>• $300,000, if lesser of average weekly amount of money or monetary value received or transmitted during two previous reporting quarters was $150,000 or less.<br>• $500,000, if greater of average weekly amount of money or monetary value received or transmitted during two previous reporting quarters was more than $150,000 but less than $250,000.<br>• $1,000,000, if greater of average weekly amount of money or monetary value received or transmitted during the two previous reporting quarters was $250,000 or greater. |  |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| DE | 5 Del. Code §§ 2301 *et seq.* (Sale of Checks Act) | 5 Del. Code Regs. §§ 2301 *et seq.* | **Application** for license (5 Del. Code § 2306) – Minimum requirements include the name and business and business and residence address of the corporation and each officer and director thereof, if the applicant is a corporation, stating the date and the state of incorporation. **Fees:** <br>• Investigation fee (5 Del. Code § 2307): <br>  o  $172.50, nonrefundable <br>• Initial license fee (5 Del. Code §§ 2307, 2310): <br>  o  Principal location: $230 <br>  o  Each additional location: $4.60 <br>• Annual license renewal fee (5 Del. Code § 2310): <br>  o  Principal location: $ 230 <br>  o  Each additional location: $ 4.60 <br>**Minimum net worth** (5 Del. Code § 2305): <br>• $100,000 <br>**Security** (5 Del. Code § 2309): <br>• Corporate surety bond or irrevocable letter of credit <br>• Minimum principal sum: $25,000 <br>• Each additional locations: $5,000 <br>• Maximum principal sum: $250,000 | **Investigation upon application:** <br>• Upon the filing of the application and the payment of the investigation fee and the annual license fee, the Commissioner shall, to the extent the Commissioner deems advisable, investigate the financial responsibility, financial condition, financial and business experience, character and general fitness of the applicant.  (5 Del. Code § 2308) <br>• The Commissioner may investigate and consider the qualifications of the applicant including principals, officers and directors of an applicant in determining whether the applicant has the financial responsibility, financial condition, financial and business experience, character and general fitness such as reasonably to warrant the belief that applicant's business will be conducted honestly, carefully and efficiently.  (5 Del. Code § 2305) <br>**Investigation by commissioner:** The Commissioner may examine the business, books and records of the licensee at any time, the reasonable cost of such examination to be paid by licensee.  (5 Del. Code § 2314) <br>**Investigation fee:** Examination fee based on the actual costs of the examination, including direct salaries paid and fringe benefits for salaries, charges and fees for filing, copying, inspecting and other services rendered.   (5 Del. Code § 127) |
| FL | Fla. Stat. | Fla. Admin. Code | **Application** for license (Fla. Stat. § 560.141, 560.205) – | **Examinations by office:** |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | § 560.204 *et seq.* | Ann. r.69V-560.1012 *et seq.* | Minimum requirements:<br><br>• (1) The legal name and address of the applicant, including any fictitious or trade names used by the applicant in the conduct of its business.<br><br>• (2) The date of the applicant's formation and the state in which the applicant was formed, if applicable.<br><br>• (3) The name, social security number, alien identification or taxpayer identification number, business and residence addresses, and employment history for the past 5 years for each officer, director, responsible person, the compliance officer, each controlling shareholder, and any other person who has a controlling interest in the money services business as provided in s. 560.127.<br><br>• (4) A description of the organizational structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded.<br><br>• (5) The applicant's history of operations in other states if applicable and a description of the money services business or deferred presentment provider activities proposed to be conducted by the applicant in this state.<br><br>• (6) If the applicant or its parent is a publicly traded company, copies of all filings made by the applicant with the United States Securities and Exchange Commission, or with a similar regulator in a country other than the United States, within the preceding year.<br><br>• (7) The location at which the applicant proposes to establish its principal place of business and any other location, including branch offices and authorized vendors operating in this state. For each branch office | • Examination for violations: The office may conduct examinations and investigations, within or outside this state to determine whether a person has violated any provision of this chapter and related rules, or of any practice or conduct that creates the likelihood of material loss, insolvency, or dissipation of the assets of a money services business or otherwise materially prejudices the interests of their customers. (Fla. Stat. § 560.109)<br><br>• Periodic: The office may, without advance notice, examine or investigate each licensee as often as is warranted for the protection of customers and in the public interest. However, the office must examine each licensee at least once every 5 years. (Fla. Stat. § 560.109)<br><br>**Contents of examination** (Fla. Stat. § 560.109):<br><br>• The office, or any of its employees holding a title of attorney, area financial manager, or higher may issue, revoke, quash, or modify subpoenas and subpoenas duces tecum under the seal of the office or cause any such subpoena or subpoena duces tecum to be issued by any county court judge or clerk of the circuit court or county court to require persons to appear before the office at a reasonable time and place to be named and to bring such books, records, and documents for inspection as may be designated. Such subpoenas may be served by a representative of the office or as otherwise provided by law for the service |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | and each location of an authorized vendor, the applicant shall include the nonrefundable fee required by s. 560.143. <br><br> • (8) The name and address of the clearing financial institution or financial institutions through which the applicant's payment instruments are drawn or through which the payment instruments are payable. <br><br> • (9) The history of the applicant's material litigation, criminal convictions, pleas of nolo contendere, and cases of adjudication withheld. <br><br> • (10) The history of material litigation, arrests, criminal convictions, pleas of nolo contendere, and cases of adjudication withheld for each executive officer, director, controlling shareholder, and responsible person. <br><br> • (11) The name of the registered agent in this state for service of process unless the applicant is a sole proprietor. <br><br> • (12) A fingerprint card for each officer, director, responsible person, the compliance officer, each controlling shareholder, and any other person who has a controlling interest in the money services business as provided in s. 560.127. <br><br> • (13) A copy of the applicant's written anti-money laundering program required under 31 C.F.R. s. 103.125. <br><br> • (14) A sample authorized vendor contract, if applicable. <br><br> • (15) A sample form of payment instrument, if applicable. <br><br> • (16) Documents demonstrating that the net worth and bonding requirements specified in s. 560.209 have | of subpoenas. <br><br> • The office may allow a person to file a statement in writing, under oath, or otherwise as to facts and circumstances specified by the office. <br><br> **Examination fees:** <br><br> • <u>Reimbursement of costs incurred</u>: Examinee pays reasonable and necessary costs incurred by the office or third parties authorized by the office in connection with examinations or investigations may be assessed against any person subject to this chapter on the basis of actual costs incurred.  Assessable expenses include, but are not limited to, expenses for: interpreters; certified translations of documents into the English language required by this chapter or related rules; communications; legal representation; economic, legal, or other research, analyses, and testimony; and fees and expenses for witnesses.  (Fla. Stat. § 560.1092) <br><br> • <u>Hourly fees</u>:  Range from $28/hour (Financial Examiner/Analyst) to $42/hour (Area Financial Manager and above).  (Fla. Admin. Code Ann. r. 69V-560.504) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | been fulfilled. | |

Licensing Requirements (continued):

- (17) A copy of the applicant's financial audit report for the most recent fiscal year. If the applicant is a wholly owned subsidiary of another corporation, the financial audit report on the parent corporation's financial statements shall satisfy this requirement.

- (18) Any other information specified in this chapter or by rule.

**Fees** (Fla. Stat. § 560.143):

- Application/investigation fee:
  - Primary location: $375
  - Each branch office: $38
  - Nonrefundable

- Fingerprint fees:
  - Prescribed by rule, currently $40.50 per person (chief executive officer, chief financial officer, chief operations officer, chief legal officer, chief compliance officer, BSA/AML compliance officer, director, member, sole proprietor, controlling shareholder and responsible person for the applicant).  See http://www.flofr.com/PDFs/OFR-560-01.pdf.

- Annual license renewal fee:
  - Primary location: $750
  - Each branch office: $38

**Minimum net worth** (Fla. Stat. § 560.209):

- Principal location: $100,000
- Each additional location: $10,000

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • Maximum: $2 million<br><br>**Maintenance of permissible investments:** A licensee must at all times possess permissible investments with an aggregate market value, calculated in accordance with generally accepted accounting principles, of at least the aggregate face amount of all outstanding money transmissions and payment instruments issued or sold by the licensee or an authorized vendor in the United States. (Fla. Stat. § 560.210)<br><br>**Security** (Fla. Stat. § 560.209):<br>• Corporate surety bond or alternative security device (including deposit of cash or securities)<br>• Minimum principal sum: $50,000<br>• Maximum principal sum: $200,000 | |
| GA | Ga. Code Ann. §§ 7-1-680 *et seq.* (Sale of Checks or Money Orders) | Ga. Comp. R. & Regs. r. 80-3-1-.01 *et seq.* | **Application** for license (Ga. Code Ann. § 7-1-683) – Minimum requirements:<br><br>• (1) The legal name and principal office address of the corporation applying for the license;<br><br>• (2) The name, residence, and business address of each director or equivalent official and of each officer who will be involved in selling checks in this state;<br><br>• (3) The date and place of incorporation;<br><br>• (4) If the applicant has one or more branches, subsidiaries, affiliates, agents, or other locations at or through which the applicant proposes to engage in the business of selling or issuing checks within the State of Georgia, the complete name of each and the address of each such location;<br><br>• (5) The location where its initial registered office will be located in this state; and<br><br>• (6) Such other data, financial statements, and | **Investigation upon application:** Upon the filing of the complete application, the department shall conduct an investigation to determine if the criteria established by Code Section 7-1-682 have been satisfied. (Ga. Code Ann. § 7-1-684)<br><br>**Fingerprints and criminal background checks:** The department shall be authorized to obtain conviction data with respect to any applicant or any person who is a director, officer, partner, agent, employee, or ultimate equitable owner of 10 percent or more of the applicant or licensee or any individual who directs the affairs or establishes policy for the applicant or licensee. Upon receipt of information from the Georgia Crime Information Center that is incomplete or that indicates an applicant or any person who is a director, officer, partner, agent, employee, or ultimate equitable owner of 10 percent or more |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | pertinent information as the department may require with respect to the applicant, its directors, trustees, officers, members, branches, subsidiaries, affiliates, or agents and any individual who directs the affairs or establishes policy for the applicant or licensee.<br><br>**Fees** (Ga. Code Ann. § 7-1-683)<br><br>*See* http://dbf.georgia.gov/sites/dbf.georgia.gov/files/related_files/document/SOC_MoneyTransmissionApplicationJuly2012.pdf<br><br>• Investigation fee (Ga. Comp. R. & Regs. r. 80-5-1-.02):<br>   o $2,250<br>   o Nonrefundable; serves as license fee for first year if license approved.<br>• Annual license fee (Ga. Comp. R. & Regs. r. 80-5-1-.02):<br>   o $2,000<br>• Annual license renewal fee (Ga. Comp. R. & Regs. r. 80-5-1-.02):<br>   o $1,000<br><br>**Security** (Ga. Code Ann. § 7-1-683):<br>• Corporate surety bond<br>• Minimum principal sum: $50,000<br>• Each additional locations: $5,000<br>• Maximum principal sum: $250,000 | of the applicant or licensee or any individual who directs the affairs or establishes policy for the applicant or licensee has a criminal record in a state other than Georgia, the department shall submit to the Georgia Crime Information Center two complete sets of fingerprints of such applicant or such person, the required records search fees, and such other information as may be required. (Ga. Code Ann. § 7-1-682)<br><br>**Investigation by department** (Ga. Code Ann. § 7-1-684.1):<br><br>• Renewal: To assure compliance with the provisions of this article and in consideration of any application to renew a license, the department or its designated agent may examine the books and records of any licensee to the same extent as it is authorized to examine financial institutions under this chapter.<br><br>• Inspection for violation: The department may, in its discretion, make such public or private investigations within or outside of this state as it deems necessary to determine whether any person has violated this article or any rule, regulation, or order under this article, to aid in the enforcement of this article, or to assist in the prescribing of rules and regulations pursuant to this article<br><br>**Investigation by commissioner:** The commissioner may (1) request financial data from a licensee in addition to that required under this article; and (2) conduct an on-site examination of a licensee, agent, or location of |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        |                        | a licensee within this state without prior notice to the agent or licensee if the commissioner has a reasonable basis to believe that the licensee or agent is not in compliance with this article. The agent or licensee shall pay all reasonably incurred costs of the examination when the commissioner examines an agent's operations.  (Ga. Code Ann. § 7-1-684.1) <br><br> **Independent reports in lieu of investigation:** The commissioner, in lieu of an on-site examination, may accept the examination report of an agency of another state or a report prepared by an independent accounting firm and reports so accepted shall be considered for all purposes as an official report of the commissioner.  (Ga. Code Ann. § 7-1-684.1) <br><br> **Extent of examination** (Ga. Code Ann. § 7-1-684.1): The department shall have the power to: <br><br> • administer oaths, to call any party to testify under oath in the course of such investigations, to require the attendance of witnesses, to require the production of books, records, and papers, and to take the depositions of witnesses <br><br> • issue a subpoena for any witness or for the production of documentary evidence. <br><br> **Examination fees:** <br><br> • The department shall remit all examination fees paid by licensees and registrants in accordance with Code Section 7-1-43, net of any cost paid to third parties authorized by the department to perform such examination services.  (Ga. Code Ann. § 7- |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | | 1-704)<br><br>• <u>Hourly rate</u>:  $65 per examiner-hour but not less than $500 per examination, unless such examination is conducted in conjunction with another ongoing examination in which case there shall be no minimum charge. (Ga. Comp. R. & Regs. r. 80-5-1-.03)<br><br>• <u>Background checks</u>: Fees for background checks that the department administers shall be submitted to the department by applicants and licensees. (Ga. Code Ann. § 7-1-682) |
| HI | Haw. Rev. Stat. § 489D-1 (Money Transmitters Act) | Haw. Code R. §§ 16-24-1 *et seq.* | **Application** for license (Haw. Rev. Stat.  § 489D-9) – Minimum requirements:<br><br>• (1) The exact name of the applicant, any fictitious or trade name used by the applicant in the conduct of its business, the applicant's principal address, and the location of the applicant's business records;<br><br>• (2) The history of the applicant's material litigation and criminal convictions for the five-year period prior to the date of the application;<br><br>• (3) A description of the business activities conducted by the applicant and a history of operations;<br><br>• (4) A description of the business activities in which the applicant seeks to engage within the state;<br><br>• (5) A list identifying the applicant's proposed authorized delegates in the state, if any, at the time of the filing of the license application;<br><br>• (6) A sample authorized delegate contract, if applicable; | **Investigation upon application:**  Upon the filing of a complete application, the commissioner shall investigate the financial condition and responsibility, financial and business experience, character, and general fitness of the applicant. The commissioner may conduct an on-site investigation of the applicant, the reasonable cost of which shall be borne by the applicant. (Haw. Rev. Stat. § 489D-11)<br><br>**Examinations by Commissioner** (Haw. Rev. Stat. § 489D-17):<br><br>• <u>On-site</u>: The commissioner may conduct an annual on site examination of a licensee upon sixty days written notice to the licensee.<br><br>• <u>Inspection for violations</u>: The commissioner may examine a licensee without prior notice if the commissioner has a reasonable basis to believe that the licensee is not in |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | • (7) A sample form of payment instrument, if applicable; <br><br> • (8) The locations where the applicant and its authorized delegates, if any, propose to conduct their licensed activities in the state; <br><br> • (9) The name and address of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which payment instruments will be payable; <br><br> • (10) Disclosure of any pending or final suspension, revocation, or other enforcement action by any state or governmental authority for the five-year period prior to the date of the application; <br><br> • (11) The date of the applicant's incorporation and state of incorporation; <br><br> • (12) A certificate of good standing from the state in which the applicant was incorporated; <br><br> • (13) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary company of the applicant, and the disclosure of whether any parent or subsidiary company is publicly traded on any stock exchange; <br><br> • (14) The name, business and residence address, and employment history, for the past five years, of the applicant's executive officers and the officers or managers who will be in charge of the applicant's activities to be licensed under this chapter; <br><br> • (15) The name, business and residence address, and employment history of any key shareholder of the applicant, for the period of five years before the date of the application; <br><br> • (16) For the five-year period prior to the date of the | compliance with this chapter. <br><br> • Without notice: The commissioner may request financial data from a licensee or conduct an on site examination of any authorized delegate or location of a licensee within the state without prior notice to the authorized delegate or licensee only if the commissioner has a reasonable basis to believe that the licensee or authorized delegate is not in compliance with this chapter. <br><br> **Independent reports in lieu of examination:** The commissioner, in lieu of an on site examination, may accept the examination report of the federal government, an agency of another state, or an independent accounting firm. (Haw. Rev. Stat. § 489D-17) <br><br> **Fees** (Haw. Rev. Stat. § 489D-17): <br><br> • The licensee shall bear the cost of reasonable expenses incurred by the division, agencies of another state, or an independent licensed or certified public accountant in conducting an examination or making a report. <br><br> • Examination fee:  Based upon the cost per hour per examiner. Effective July 1, 2008, the hourly fee shall be $60. <br><br> • Travel expenses:  In addition to the examination fee, the commissioner shall charge any money transmitter or authorized delegate examined or investigated by the commissioner or the commissioner's staff, additional amounts for travel, per diem, mileage, and other reasonable expenses |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | application, the history of material litigation involving, and criminal convictions of, every executive officer or key shareholder of the applicant;<br><br>• (17) A copy of the applicant's most recent audited financial statement, including balance sheets, statements of income or loss, statements of changes in shareholder equity and statement of changes in financial position, and, if available, the applicant's audited financial statements for the preceding two-year period;<br><br>• (18) Copies of all filings, if any, made by the applicant with the United States Securities and Exchange Commission, or with a similar regulator in a country other than the United States, within the year preceding the date of filing of the application; and<br><br>• (19) Information necessary to conduct a criminal history record check in accordance with section 846-2.7 of each of the executive officers, key shareholders, and managers who will be in charge of the applicant's activities, accompanied by the appropriate payment of the applicable fee for each record check; and<br><br>• (20) Any other information the commissioner may require;<br><br>**Fees** (Haw. Rev. Stat. § 489D-10):<br><br>• <u>Application/investigation fees</u>:<br><br>    ○ Primary location: $$2,000<br><br>    ○ Each additional: $300<br><br>    ○ Maximum: $15,000<br><br>    ○ Nonrefundable<br><br>• <u>Annual license fee</u>: | incurred in connection with the examination.<br><br>**Records that must be made available for inspection** (Haw. Code R. § 16-24-31):  In addition to those records listed by statute that the licensee shall make, keep, preserve, and make available for inspection by the commissioner, the following shall also be made, kept, preserved, and made available for inspection by the commissioner:<br><br>• Written procedures created and provided by licensees to their authorized delegates;<br><br>• Records of transmissions made;<br><br>• Evidence, in a form satisfactory to the commissioner, of compliance with the requirements of section 489D-20(b), Haw. Rev. Stat.;<br><br>• Records of refund requests received and of refunds made; and<br><br>• Records of theft or loss of payment instruments, including reports made by authorized delegates to the licensee, of theft or loss of payment instruments. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | <ul><li>Primary location: $2,000</li><li>Each additional location: $300</li><li>Maximum: $15,000</li><li>Refunded if application is denied</li></ul>**Minimum net worth** (Haw. Rev. Stat. § 489D-6)**:** $1,000<br><br>**Maintenance of permissible investments** (Haw. Rev. Stat. § 489D-8):<br><br>• A licensee, at all times, shall possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate amount of all outstanding payment instruments issued or sold by the licensee in the United States.<br><br>• The commissioner may waive this requirement if the dollar volume of a licensee's outstanding payment instruments does not exceed the bond or other security devices posted by the licensee pursuant to section 489D-7.<br><br>**Security (Haw. Rev. Stat. § 489D-7):**<br>• Surety bond, irrevocable letter of credit, or other similar security device or deposit of certain cash, interest-bearing stocks and bonds, notes, debentures, or other obligations<ul><li>Minimum principal sum: $1,000</li><li>Maximum: $500,000</li></ul>• The commissioner may increase the amount of the security device from the minimum upon the basis of the impaired financial condition of a licensee, as evidenced by a reduction in net worth, financial losses, or other relevant criteria. | |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|----------------|------------------------|------------------------|--------------------------|
| ID | Idaho Code § 26-2901 (Idaho Money Transmitters Act) | None. | **Application** for license (Idaho Code § 26-2907) – Minimum requirements:<br><br>• (1) The exact name of the applicant, the applicant's principal address, any fictitious or trade name used by the applicant in the conduct of its business and the location of the applicant's business records;<br><br>• (2) The history of the applicant's material litigation for the five (5) year period prior to the date of the application and any nontraffic related criminal convictions or withheld judgments;<br><br>• (3) A description of the activities conducted by the applicant and a history of operations;<br><br>• (4) A description of the business activities in which the applicant seeks to be engaged in this state;<br><br>• (5) A list identifying the applicant's proposed authorized representatives in this state;<br><br>• (6) A sample authorized representative contract, if applicable;<br><br>• (7) A sample form of payment instrument, if applicable;<br><br>• (8) The location(s) at which the applicant and its authorized representatives, if any, propose to conduct the licensed activities in this state; and<br><br>• (9) The name and address of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which such payment instruments will be payable.<br><br>• (10) The date of the applicant's incorporation and state of incorporation;<br><br>• (11) A certificate of good standing from the state in | **Investigation upon application:**  Upon the filing of a complete application, the director shall investigate the financial condition and responsibility, financial and business experience, character and general fitness of the applicant. The director may conduct an on-site investigation of the applicant, the actual cost of which shall be borne by the applicant. (Idaho Code § 26-2910)<br><br>**Examinations by director:**  For the purpose of discovering violations of this chapter or rules adopted under this chapter, discovering unsafe and unsound practices, or securing information lawfully required under this chapter, the director may at any time, either personally or by designee, investigate or examine the business and wherever located, the books, accounts, records, papers, documents, files and other information used in the business of every applicant, licensee or its authorized representatives, and of every person who is engaged in the business of providing money transmission services, whether the person acts or claims to act under or without the authority of this chapter.  (Idaho Code § 26-2914)<br><br>**Extent of examination** (Idaho Code § 26-2914): For the purposes of examinations, the director or designated representative:<br><br>• shall have free access to the offices and places of business, books, accounts, papers, documents, other information, records, files, safes and vaults of all such persons;<br><br>• may require the attendance of and examine under oath all persons whose testimony |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | which the applicant was incorporated;<br><br>• (12) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded on any stock exchange;<br><br>• (13) The name, business and residence address, and employment history for the past five (5) years of the applicant's executive officers and the officer(s) or manager(s) who will be in charge of the applicant's activities to be licensed hereunder;<br><br>• (14) The name, business and residence address, and employment history for the five (5) year period preceding the date of the application of any key shareholder of the applicant;<br><br>• (15) The history of material litigation and nontraffic related criminal convictions or withheld judgments for the five (5) year period preceding the date of the application of every current director, executive officer, or key shareholder of the applicant;<br><br>• (16) A copy of the applicant's most recent audited financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder equity and statement of changes in financial position, and, if available, the applicant's audited financial statements for the immediately preceding two (2) year period; and<br><br>• (17) Copies of all filings, if any, made by the applicant with the United States securities and exchange commission, or with a similar regulator in a country other than the United States, within the year preceding the date of filing of the application.<br><br>**Fee:** Each application must be accompanied by a | may be required about the business or the subject matter of any investigation, examination or hearing and may require such person to produce books, accounts, papers, documents, records, files and any other information the director or designated person declares is relevant to the inquiry;<br><br>• may require the production of original books, accounts, papers, documents, records, files and other information;<br><br>• may require that such original books, accounts, papers, documents, records, files and other information be copied; or may make copies himself or herself or by designee of such original books, accounts, papers, documents, records, files or other information;<br><br>• may issue a subpoena or subpoena duces tecum requiring attendance or compelling production of the books, accounts, papers, documents, records, files or other information.<br><br>**Independent reports in lieu of on-site investigation:** The director, in lieu of an on-site examination, may accept the examination report of an agency of another state, or a report prepared by an independent accounting firm, and reports so accepted are considered for all purposes as an official report of the director. (Idaho Code § 26-2914)<br><br>**Fees:**  Should the director conclude that an on-site examination of a licensee is necessary, the licensee shall pay all the actual costs of such examination. (Idaho Code § 26-2914) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | nonrefundable application fee in the amount of one hundred dollars ($100) for the license. The application fee shall also constitute the license fee for the applicant's first year of activities if the license is granted.  (Idaho Code § 26-2909)<br><br>**Minimum net worth** (Idaho Code § 26-2905):<br><br>• Principal office: $50,000<br><br>• Each additional location or authorized delegate: $25,000<br><br>• Maximum: $250,000<br><br>**Maintenance of permissible investments** (Idaho Code § 26-2906):<br><br>• Each licensee licensed under the provisions of this chapter must at all times possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate face amount of all outstanding payment instruments issued or sold by the licensee in the United States.<br><br>• The director may waive this requirement if the dollar volume of a licensee's outstanding payment instruments does not exceed the bond or other security devices posted by the licensee.<br><br>**Security** (Idaho Code § 26-2908):<br>• Surety bond, irrevocable letter of credit, or other similar security device or deposit of certain cash, interest-bearing stocks and bonds, notes, debentures, or other obligations<br>• Minimum principal sum: $10,000<br>• Each additional location: $5,000<br>• Maximum: $500,000 |  |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| IL | 205 Ill. Comp. Stat. 657/1 (Transmitters of Money Act) | 38 Ill. Code R. 205.10 *et seq.* | **Application** for license (205 Ill. Comp. Stat. 657/25) – Minimum requirements:<br><br>• (1) The name of the applicant and the address of the principal place of business of the applicant and the address of all locations and proposed locations of the applicant in this State.<br><br>• (2) The form of business organization of the applicant, including a copy of its articles of incorporation and amendments thereto and a copy of its bylaws, certified by its secretary, if the applicant is a corporation.<br><br>• (3) The name, business and home address, and a chronological summary of the business experience, material litigation history, and felony convictions over the preceding 10 years of each officer, director, and controlling person, if the applicant is a corporation; and each person in a position to exercise control over, or direction of, the business of the applicant.<br><br>• (4) Financial statements, not more than one year old, prepared in accordance with generally accepted accounting principles and audited by a licensed public accountant or certified public accountant showing the financial condition of the applicant and an unaudited balance sheet and statement of operation as of the most recent quarterly report before the date of the application, certified by the applicant or an officer or partner thereof.<br><br>• (5) Filings of the applicant with the Securities and Exchange Commission or similar foreign governmental entity (English translation), if any.<br><br>• (6) A list of all other states in which the applicant is licensed as a money transmitter and whether the license of the applicant for those purposes has ever been withdrawn, refused, canceled, or suspended in | **Investigation upon application:**  On the filing of a complete application, the Director shall investigate the financial condition and responsibility, financial and business experience, and character and general fitness of the applicant. In his discretion, the Director may conduct an on-site investigation of the applicant, the reasonable cost of which shall be borne by the applicant.  (205 Ill. Comp. Stat. 657/35)<br><br>**Examination by director:**<br><br>• Examination of licensee:  The Director at any time either in person or through an appointed representative may visit and examine a licensee.  (205 Ill. Comp. Stat. 657/55)<br><br>• Examination for verification: The Department may conduct an examination for the purpose of verifying that the licensee has taken necessary actions to correct violations of the Act and/or related rules. (38 Ill. Code R. 205.30)<br><br>**Extent of examination:**  In conducting the examination, the Director or appointed representative shall have full and free access to all the books, papers, and records of the licensee that relate to its business and to the books, papers, and records kept by any of its authorized sellers and may examine the directors, officers, members, agents, and employees of any licensee or authorized seller or any other person in relation to its affairs, transactions, and condition. (205 Ill. Comp. Stat. 657/55) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | any other state, with full details. | **Fees:** |
| | | | • (7) A list of all money transmitter locations and proposed locations in this State. | • For the purpose of defraying examination expenses incurred by the Director, a licensee or authorized seller shall pay an examination fee established by rule and the actual expenses of the examination. (205 Ill. Comp. Stat. 657/55) |
| | | | • (8) A sample of the contract for authorized sellers. | |
| | | | • (9) A sample form of the proposed payment instruments to be used in this State. | • <u>Examination of Records</u>: $ 400 for each examiner day or part thereof and actual travel costs for any examination of records conducted pursuant to the Act. (38 Ill. Code R. 205.30) |
| | | | • (10) The name and business address of the clearing banks through which the applicant intends to conduct any business regulated under this Act. | |
| | | | • (11) A written consent to service of process. | • <u>On-site Examination</u>: The $550 for each examiner day or portion thereof, when the Director determines the verification examination must be performed on site at any facility of the licensee. (38 Ill. Code R. 205.30) |
| | | | • (12) A written statement that the applicant is in full compliance with and agrees to continue to fully comply with all state and federal statutes and regulations relating to money laundering. | |
| | | | • (13) All additional information the Director considers necessary in order to determine whether or not to issue the applicant a license under this Act. | |
| | | | **Fees** (205 Ill. Comp. Stat. 657/45): | |
| | | | • <u>Application/investigation fee</u>: | |
| | | | ○   $100, nonrefundable | |
| | | | • <u>Annual license fee</u>: | |
| | | | ○   Primary location: $100 | |
| | | | ○   Each additional location: $10 | |
| | | | ○   Refunded if application is denied | |
| | | | **Minimum net worth** (205 Ill. Comp. Stat. 657/20): | |
| | | | • Principal office: $35,000 | |
| | | | • Increases with number of locations in the state | |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | • Maximum: $500,000 (25 or more locations) **Maintenance of permissible investments:** A licensee shall maintain at all times permissible investments that have an aggregate market value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all its outstanding payment instruments and other transfers, except to the extent the amount is reduced from permissible investments under its method of accounting.  (205 Ill. Comp. Stat. 657/50) **No felony convictions:**  To be qualified for a license, applicant must not have been convicted within the 10 years preceding the application of a felony under the laws of Illinois, another state, the United States, or a foreign jurisdiction.  Additionally, no officer, director, controlling person, or principal of the applicant may have been convicted within the 10 years preceding the application of a felony under the laws of this State, another state, the United States, or a foreign jurisdiction. (205 Ill. Comp. Stat. 657/20) **Security** (205 Ill. Comp. Stat. 657/30): • Bond ○ Minimum: the greater of $100,000 or an amount equal to the daily average of outstanding payment instruments for the preceding 12 months or operational history, whichever is shorter ○ Maximum: $2,000,000. • If the amount of the required bond exceeds $1,000,000, the applicant or licensee may, in the alternative, post a bond in the amount of $1,000,000 plus a dollar for dollar increase in the net worth of the applicant or licensee over and above the minimum net worth requirement, up to a total amount of $ 2,000,000. | |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| IN | Ind. Code Ann. § 28-8-4-1 (Money Transmitters) | None. | **Application** for license (Ind. Code Ann. § 28-8-4-24) – Minimum requirements:<br><br>• (1) The name of the applicant.<br><br>• (2) The applicant's principal address.<br><br>• (3) A fictitious or trade name, if any, used by the applicant in the conduct of its business.<br><br>• (4) The location of the applicant's business records.<br><br>• (5) The history of the applicant's: (A) material litigation; and (B) criminal indictments, convictions, and guilty or nolo contendere pleas for felonies involving fraud, deceit, or misrepresentation under the laws of Indiana or any other jurisdiction.<br><br>• (6) A description of: (A) the activities conducted by the applicant;  (B) the applicant's history of operations; and  (C) the business activities in which the applicant seeks to be engaged in Indiana.<br><br>• (7) A list identifying the applicant's proposed authorized delegates in Indiana.<br><br>• (8) A sample authorized delegate contract, if applicable.<br><br>• (9) A sample form of payment instrument, if applicable.<br><br>• (10) The location or locations at which the applicant and its authorized delegates propose to conduct the licensed activities in Indiana. If any business, other than the business of money transmission under this chapter, will be conducted by the applicant or another person at any location identified under this subdivision, the applicant shall indicate for each location at which another business will be conducted: (A) the nature of the other business;  (B) the name | **Investigation upon application:**  The director shall begin an investigation after an application is complete.  The director shall investigate the financial condition and responsibility, financial and business experience, and character and general fitness of: (1) the applicant and any significant affiliate of the applicant; (2) each executive officer, director, or manager of the applicant, or any other individual having a similar status or performing a similar function for the applicant; and (3) if known, each controlling person.  The director may conduct an onsite investigation of the applicant, the reasonable cost of which shall be borne by the applicant. (Ind. Code Ann. § 28-8-4-35)<br><br>**Criminal background checks ("evidence of compliance"):**<br>• Director may order (1) criminal background checks, including a national criminal history background check by the Federal Bureau of Investigation for each executive officer, director, or manager of the applicant, or any other individual having a similar status or performing a similar function for the applicant; and if known, each controlling person; (2) credit histories; and (3) other background checks considered necessary by the director.<br>• The director may request evidence of compliance with this section at: (1) the time of application; (2) the time of renewal of a license; or (3) any other time considered necessary by the director. (Ind. Code Ann. § 28-8-4-20)<br><br>**Examination by director:** |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | under which the other business operates; (C) the address of the principal office of the other business; (D) the name and address of the business's resident agent in Indiana; and (E) any other information that the director may require.<br><br>• (11) The name and address of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which such payment instruments will be payable.<br><br>• (12) Documents revealing that the applicant has sufficient net worth (see below).<br><br>• (13) State of incorporation or organization.<br><br>• (14) Date of incorporation or organization.<br><br>• (15) A certificate from the state in which the applicant was incorporated or organized stating that the entity is in good standing.<br><br>• (16) A description of the organizational structure of the applicant, including the following:  (A) The identity of the parent of the applicant; (B) The identity of each subsidiary of the applicant; and (C) The names of the stock exchanges, if any, in which the applicant, the parent, and the subsidiaries are publicly traded.<br><br>• (17) The (A) name;  (B) business address; (C) residence address; and (D) employment history; for each executive officer, director, or manager of the applicant, or any other individual having a similar status or performing a similar function for the applicant; and if known, each controlling person.<br><br>• (18) The: (A) history of material litigation; and (B) history of criminal indictments, convictions, and guilty or nolo contendere pleas for felonies involving fraud, deceit, or misrepresentation under the laws of Indiana or any other jurisdiction; for each executive officer, | • <u>Annual:</u> The director may conduct an annual onsite examination of a licensee or an authorized delegate of a licensee.  If the director determines, based on the licensee's financial statements and past history of operations in Indiana, that an onsite examination is unnecessary, the director may waive the onsite examination. (Ind. Code Ann. § 28-8-4-41)<br><br>• <u>Investigation for violation:</u>  If the director has a reasonable basis to believe that a licensee or an authorized delegate of a licensee is in violation of this chapter, the director may: (1) request financial data from the licensee; or (2) conduct an in-state, onsite examination of an authorized delegate's operation or a licensee's location without prior notice to the authorized delegate or licensee.  (Ind. Code Ann. § 28-8-4-41, § 28-8-4-41)<br><br>**Examination fees:**<br><br>• <u>Reasonable costs:</u>  All reasonable costs of an examination for violation are to be paid by the: (1) authorized delegate whose operation is examined; or (2) the licensee whose location is examined.<br><br>• <u>On-site examination:</u>  Currently set at $80/hour (which may be offset by application/renewal fees.  (Ind. Code Ann. § 28-8-4-41)  *See* http://www.in.gov/dfi/Con_Cr_Fee_7-1-11to6-30-12.pdf**.**<br><br>**Annual renewal report** (Ind. Code Ann. § 28-8-4-38): Licensee may renew license by filing annual renewal report with accompanying |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | director, or manager of the applicant, or any other individual having a similar status or performing a similar function for the applicant; and, if known, each controlling person.<br><br>• (19) Copies of the applicant's audited financial statements for the current year and, if available, for the preceding two (2) years, including a: (A) balance sheet; (B) statement of income or loss; (C) statement of changes in shareholder equity; and (D) statement of changes in financial position.<br><br>• (20) Copies of filings, if any, made by the applicant with the United States Securities and Exchange Commission, or with a similar regulator in a country other than the United States, not more than one (1) year before the date of filing of the application.<br><br>**Fees** (Ind. Code Ann. § 28-8-4-32):<br><br>*See* http://www.in.gov/dfi/files/48009.pdf.<br><br>• <u>Application/investigation fee</u>:<br>  o $1,000, nonrefundable<br>  o That amount constitutes the license fee for the applicant's activities through March 31 of the year in which the license is granted.<br><br>• <u>License renewal fee</u>:<br>  o Primary location: $600<br>  o Each additional location: $10<br>  o Maximum: $2,000<br><br>**Minimum net worth** (Ind. Code Ann. § 28-8-4-24):<br><br>• Principal office: $100,000<br><br>• Each additional location and/or authorized delegate: | renewal fee.  The annual report must contain, at a minimum:<br><br>• (1) a copy of the licensee's most recent audited consolidated annual financial statement, including a balance sheet, a statement of income or loss, a statement of changes in shareholder's equity, and a statement of changes in financial position; or<br><br>• (2) The number of payment instruments sold by the licensee in Indiana, the dollar amount of those instruments, and the dollar amount of outstanding payment instruments sold by the licensee calculated from the most recent quarter for which data is available before the date of the filing of the renewal application, but in no event more than one hundred twenty (120) days before the renewal date;<br><br>• (3) Material changes to the information submitted by the licensee on its original application that have not been reported previously to the director on any other report required to be filed under this chapter;<br><br>• (4) A list of the licensee's permissible investments;<br><br>• (5) A list of the locations within Indiana at which business regulated by this chapter will be conducted by either the licensee or its authorized delegate, including information concerning any business, other than the business of money transmission under this chapter, that will be conducted at each identified location, as required under section 24(10) [Ind. Code 28-8-4-24(10)] of this chapter. |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | $50,000 | |
| | | | • Maximum: $500,000 | |
| | | | **Maintenance of permissible investments** (Ind. Code Ann. § 28-8-4-33): | |
| | | | • A licensee must at all times possess permissible investments with an aggregate market value calculated in accordance with generally accepted accounting principles of not less than the aggregate face amount of all outstanding payment instruments issued or sold by the licensee or an authorized delegate of the licensee in the United States. | |
| | | | • The director may waive the permissible investments requirement if the dollar volume of a licensee's outstanding payment instruments does not exceed: (1) the security device posted by the licensee of this chapter; or (2) the deposit made by the licensee. | |
| | | | **Security** (Ind. Code Ann. § 28-8-4-27, Ind. Code Ann. § 28-8-4-29): | |
| | | | • Security device or deposit of certain cash, interest-bearing stocks and bonds, notes, debentures, or other obligations | |
| | | | • STEP ONE: Subtract one (1) from the number of locations where the applicant proposes to engage in business under the license. | |
| | | | • STEP TWO: Multiply the difference determined under STEP ONE by ten thousand dollars ($10,000). | |
| | | | • STEP THREE: Add two hundred thousand dollars ($200,000) to the product determined under STEP TWO. | |
| | | | • STEP FOUR: Pay the amount that is the lesser of: (1) the sum determined in STEP THREE; or (2) three hundred thousand dollars ($300,000). | |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| IA | Iowa Code § 533C.201 *et seq.* (Uniform Money Services Act) | None. | **Application** for license (Iowa Code § 533C.202) – Minimum requirements:<br><br>• (1) The legal name and residential and business addresses of the applicant and any fictitious or trade name used by the applicant in conducting its business.<br><br>• (2) A list of any criminal convictions of the applicant and any material litigation in which the applicant has been involved in the ten-year period next preceding the submission of the application.<br><br>• (3) A description of any money services previously provided by the applicant and the money services that the applicant seeks to provide in this state.<br><br>• (4) A list of the applicant's proposed authorized delegates and the locations in this state where the applicant and its authorized delegates propose to engage in money transmission or provide other money services.<br><br>• (5) A list of other states in which the applicant is licensed to engage in money transmission or provide other money services and of any license revocations, suspensions, or other disciplinary action taken against the applicant in another state.<br><br>• (6) Information concerning any bankruptcy or receivership proceedings affecting the licensee.<br><br>• (7) A sample form of contract for authorized delegates, if applicable, and a sample form of payment instrument or instrument upon which stored-value is recorded, if applicable.<br><br>• (8) The name and address of any bank through which the applicant's payment instruments and stored-value will be paid. | **Investigation upon application:** When an application is filed under this article, the superintendent shall investigate the applicant's financial condition and responsibility, financial and business experience, character, and general fitness. The superintendent may conduct an on-site investigation of the applicant, the reasonable cost of which the applicant must pay. (Iowa Code § 533C.204)<br><br>**Examination by superintendent:**<br><br>• <u>Annual</u>: The superintendent may conduct an annual examination of a licensee or any authorized delegate upon reasonable notice in a record to the licensee and/or the authorized delegate. (Iowa Code § 533C.501)<br><br>• <u>Examination for violation</u>: The superintendent may examine a licensee or its authorized delegate, at any time, without notice, if the superintendent has reason to believe that the licensee or authorized delegate is engaging in an unsafe or unsound practice or has violated or is violating this chapter or a rule adopted or an order issued under this chapter. (Iowa Code § 533C.501)<br><br>**Fees:** The licensee shall pay the reasonable cost of the annual examination and examination upon belief of violation. (Iowa Code § 533C.501)<br><br>**Annual renewal report** (Iowa Code § 533C.205): A licensee under this article shall submit a renewal report with the annual license fee. The renewal report must state or contain |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | <ul><li>(9) A description of the source of money and credit to be used by the applicant to provide money services.</li><li>(10) The date of the applicant's incorporation or formation and state or country of incorporation or formation.</li><li>(11) If applicable, a certificate of good standing from the state or country in which the applicant is incorporated or formed.</li><li>(12) A brief description of the structure or organization of the applicant, including any parent or subsidiary of the applicant, and whether any parent or subsidiary is publicly traded.</li><li>(13) The legal name, any fictitious or trade name, all business and residential addresses, and the employment, in the ten-year period next preceding the submission of the application of each executive officer, manager, director, or person that has control, of the applicant.</li><li>(14) A list of any criminal convictions and material litigation in which any executive officer, manager, director, or person in control of the applicant has been involved in the ten-year period next preceding the submission of the application.</li><li>(15) A copy of the applicant's audited financial statements for the most recent fiscal year and, if available, for the two-year period next preceding the submission of the application.</li><li>(16) A copy of the applicant's unconsolidated financial statements for the current fiscal year, whether audited or not, and, if available, for the two-year period next preceding the submission of the application.</li><li>(17) If the applicant is publicly traded, a copy of the most recent report filed with the United States</li></ul> | at a minimum: <ul><li>(1) A copy of the licensee's most recent audited annual financial statement or, if the licensee is a wholly owned subsidiary of another corporation, the most recent audited consolidated annual financial statement of the parent corporation or the licensee's most recent audited consolidated annual financial statement.</li><li>(2) The number and monetary amount of payment instruments sold by the licensee in this state which have not been included in a renewal report, and the monetary amount of payment instruments and stored-value currently outstanding.</li><li>(3) A description of each material change in information submitted by the licensee in its original license application which has not been reported to the superintendent on any required report.</li><li>(4) A list of the licensee's permissible investments and a certification that the licensee continues to maintain permissible investments according to the requirements set forth in sections 533C.601 and 533C.602.</li><li>(5) Proof that the licensee continues to maintain adequate security as required by section 533C.203; and</li><li>(6) A list of the locations in this state where the licensee or an authorized delegate of the licensee engages in money transmission or provides other money</li></ul> |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | securities and exchange commission under section 13 of the federal Securities Exchange Act of 1934, 15 U.S.C. § 78m.<br><br>• (18) If the applicant has a registered agent in this state, the name and address of the applicant's registered agent in this state.<br><br>• (19) Any other information the superintendent reasonably requires with respect to the applicant.<br><br>**Fees** (Iowa Code § 533C.202):<br><br>• Application/investigation fee:<br>　o $1,000, nonrefundable<br><br>• Annual license fee:<br>　o Primary location: $500<br>　o Each additional location: $10<br>　o Maximum: $5,000<br>　o Refunded if the application is denied<br>　o If the licensee has no locations in this state at which business is conducted through authorized delegates or employees of the licensee, the license fee shall be set by the superintendent, but shall not exceed $5,000.<br><br>• Criminal records search:<br>　o $15 per request<br>　o If the applicant is a corporation, the applicant shall pay the fee associated with a criminal history record check for the directors and officers of the corporation.<br>　o If the applicant is a partnership, the applicant shall pay the fee associated with a criminal history | services. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | record check for each of the partners.<br><br>○ If the applicant is a publicly traded corporation or a subsidiary or affiliate of a publicly traded corporation, no criminal history record check shall be required.<br><br>**Minimum net worth** (Iowa Code § 533C.206):<br><br>• Principal location: $100,000<br><br>• Each authorized delegate: $10,000<br><br>• Maximum: $500,000<br><br>• If the licensee has no locations in this state at which business is conducted through authorized delegates or employees of the licensee, the minimum net worth, not to exceed five hundred thousand dollars ($500,000), shall be set by the superintendent.<br><br>**Maintenance of permissible investments:** A licensee shall maintain at all times permissible investments that have a market value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments and stored-value obligations issued or sold and money transmitted by the licensee in the United States.  (Iowa Code § 533C.601)<br><br>**Criminal record:** Superintendent will only grant license if applicant has not been convicted of or pled guilty to a felony or an indictable misdemeanor for financial gain within the past ten years. (Iowa Code § 533C.204)<br><br>**Security** (Iowa Code § 533C.203):<br>• Surety bond, letter of credit, or other security device<br><br>○ Minimum principal sum: $50,000<br><br>○ Each additional location: $10,000 |  |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | |    o  Maximum: $350,000<br><br>• If the licensee has no locations in this state, the superintendent shall set the bond amount not to exceed three hundred thousand dollars.<br>• The superintendent may increase the amount of security required to a maximum of one million dollars ($1,000,000) if the financial condition of a licensee so requires, as evidenced by reduction of net worth, financial losses, or other relevant criteria. | |
| **KS** | Kan. Stat. Ann. § 9-508 *et seq.* (Kansas money transmitter act) | None. | **Application** for license submitted on forms prescribed by the commissioner (Kan. Stat. Ann. § 9-509):<br><br>**Fees:** Application fee established by commissioner. (Kan. Stat. Ann. § 9-509)<br><br>**Minimum net worth:** $250,000  (Kan. Stat. Ann. § 9-509)<br><br>**Maintenance of permissible investments** (Kan. Stat. Ann. § 9-513b):<br><br>• Each licensee under this act shall at all times possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate amount of all outstanding payment instruments issued or sold by the licensee in the United States.<br><br>• The commissioner may waive this requirement if the dollar volume of a licensee's outstanding payment instruments does not exceed the bond or other security devices posted by the licensee.<br><br>**Security** (Kan. Stat. Ann. § 9-509):<br>• Surety bond or deposit of cash or securities<br>   o  Minimum principal sum: $200,000<br>   o  Maximum: $350,000 | **Examination by commissioner:** The commissioner shall have the authority to examine the books and records of any person operating in accordance with the provisions of this act at such person's expense to verify compliance with state and federal law. (Kan. Stat. Ann. § 9-509) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • The commissioner may increase the amount of cash or securities required up to the maximum amount upon the basis of the impaired financial condition of a person, as evidenced by a reduction in net worth, financial losses or other relevant criteria as determined by the commissioner. | |
| KY | Ky. Rev. Stat. § 286.11-001 (Kentucky Money Transmitters Act of 2006) | None. | **Application** for license (Ky. Rev. Stat. § 286.11-009) – Minimum requirements:<br><br>• (1) The legal name of the applicant, business addresses, and residential addresses, if applicable, of the applicant, and any fictitious or trade name used by the applicant in conducting its business;<br><br>• (2) The legal name, residential and business addresses, date of birth, Social Security number, and employment history for the five (5) year period preceding the filing of the application, of the applicant's proposed responsible individual;<br><br>• (3) A list and description of any criminal conviction, other than a traffic violation, of the applicant and proposed responsible individual, for the ten (10) year period preceding the filing of the application. The commissioner may request a copy of any criminal conviction from the applicant, which shall be promptly provided by the applicant to the commissioner within ten (10) working days of the request;<br><br>• (4) A list and description of any material litigation of the applicant and proposed responsible individual, for the ten (10) year period preceding the filing of the application. The commissioner may request a copy of any material litigation from the applicant, which shall be promptly provided by the applicant to the commissioner within ten (10) working days of the request; | **Investigation upon application:**  Upon the filing of a complete application, the commissioner shall investigate the competence, experience, character, financial condition, and responsibility of the applicant. The commissioner may conduct an on-site investigation of the applicant, the reasonable cost of which shall be paid by the applicant. (Ky. Rev. Stat. § 286.11-019)<br><br>**Examination by commissioner:**  The commissioner may conduct an examination or investigation of a licensee or any of its agents, as it relates to the business of money transmission.  (Ky. Rev. Stat. § 286.11-027)<br><br>**Independent report in lieu of examination:** Instead of an examination, the commissioner may accept the examination report of an agency of this state or of another state or of the federal government or a report prepared by an independent licensed or certified public accountant. (Ky. Rev. Stat. § 286.11-027)<br><br>**Fees:** The reasonable expenses incurred by the department, other Kentucky agencies, agencies of another state, agencies of the federal government, or an independent licensed or certified accountant in making an examination under, investigation, or report under Ky. Rev. Stat. § 286.11-027 shall be |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • (5) A description of the activities conducted by the applicant and a history of operations, including, if applicable, a description of any money transmission that has been previously provided by the applicant in this state;<br><br>• (6) A list of other states or countries in which the applicant is licensed to engage in money transmission or other similar money services, and any license revocations, suspensions, restrictions, or other disciplinary action taken against the applicant in another state or country;<br><br>• (7) A list of any license revocations, suspensions, restrictions, or other disciplinary action taken against any money transmission business involving the proposed responsible individual;<br><br>• (8) A description of the source of money and credit to be used by the applicant to provide money transmissions;<br><br>• (9) A sample form of contract for an agent;<br><br>• (10) A sample form of payment instrument;<br><br>• (11) Information concerning any bankruptcy, reorganization, or receivership proceedings involving or affecting the applicant or the proposed responsible individual;<br><br>• (12) A list identifying the name, physical location or locations, and telephone number at which the applicant and its proposed agents intend to conduct money transmission business in the state at the time of the filing of the license application;<br><br>• (13) The name, address, and telephone number of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which | borne by the licensee.<br>**Annual renewal report** (Ky. Rev. Stat. § 286.11-021): A licensee under this article shall submit a renewal report with the annual license fee no later than September 20 of each year. The renewal report shall contain at a minimum:<br><br>• (1) A copy of the licensee's most recent audited annual financial statement, or if the licensee is a wholly owned subsidiary of another corporation, the most recent audited consolidated annual financial statement of the parent corporation, or the licensee's most recent audited financial statement;<br><br>• (2) For the most recent quarter for which data is available prior to the date of the filing of the renewal application, but in no event more than one hundred twenty (120) days prior to the renewal date, a list of the number of payment instruments sold by the licensee in the state, the dollar amount of those instruments, and the dollar amount of those instruments currently outstanding;<br><br>• (3) Any material changes to any of the information submitted by the licensee on its original application which have not previously been reported to the commissioner on any other report required to be filed under this subtitle;<br><br>• (4) A list of the licensee's permissible investments under this subtitle and a certification that the licensee continues to maintain permissible investments according to the requirements set forth in |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | such payment instruments will be payable;<br><br>• (14) A copy of the written procedures that will be provided by the applicant or licensee to its agent or agents;<br><br>• (15) That neither the applicant, nor any executive officer, nor person who exercises control over the applicant, nor key shareholder, nor any proposed agent, nor the proposed responsible individual, is listed on the specially designated nationals and blocked persons list prepared by the United States Department of the Treasury or the United States Department of State under Presidential Executive Order No. 13224 as a potential threat to commit terrorist acts and to finance terrorist acts; and<br><br>• (16) Any other information regarding the background, experience, character, financial responsibility, or general fitness of the applicant, the applicant's responsible individual, or agent that the commissioner may require by rule or order.<br><br>• (17) A copy of the applicant's filed articles of incorporation;<br><br>• (18) The name, address, and telephone number of the registered process agent of the applicant in this state;<br><br>• (19) If applicable, then a certificate of good standing from the state or country in which the applicant was incorporated or formed;<br><br>• (20) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded on any stock exchange;<br><br>• (21) The legal name, any fictitious or trade name, all business and residence addresses, date of birth, | Ky. Rev. Stat. § 286.11-015; and<br><br>• (5) A list of the locations, including names, physical addresses, and telephone numbers, in this state where the licensee or agent of the licensee engages in money transmission. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | Social Security number, and employment history for the ten (10) year period preceding the filing of the application for each executive officer, board director, key shareholder, or person that has control of the applicant; | |
|       |                 |                        | • (22) Copies and description of material litigation for the ten (10) year period prior to the filing date of the application of every executive officer or key shareholder of the applicant; | |
|       |                 |                        | • (23) Copies and descriptions of criminal convictions, other than traffic violations, for the ten (10) year period prior to the filing date of the application of every executive officer or key shareholder of the applicant; | |
|       |                 |                        | • (24) A copy of the applicant's audited financial statements for the most recent fiscal year or, if the applicant is a wholly owned subsidiary of another corporation, the most recent audited consolidated annual financial statement of the parent corporation or the applicant's most recent audited consolidated annual financial statements and, in each case, if available, for the two (2) year period preceding the filing of the application; | |
|       |                 |                        | • (25) A copy of the applicant's unconsolidated financial statements for the current fiscal year, whether audited or not, and, if available, for the two (2) year period preceding the filing of the application; | |
|       |                 |                        | • (26) If the applicant is publicly traded, then a copy of the most recent report filed with the United States Securities and Exchange Commission pursuant to 15 U.S.C. § 78m; | |
|       |                 |                        | **Fees** (Ky. Rev. Stat. § 286.11-017): | |
|       |                 |                        | • Application/investigation fee: | |

-51-

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | |   ○ $500, nonrefundable<br> • <u>Annual license fee</u>:<br>  ○ Nonrefundable<br>  ○ $500, if application made on or before March 31<br>  ○ $250, if application made after March 31<br>**Minimum net worth** (Ky. Rev. Stat. § 286.11-011):<br> • $500,000<br>**Maintenance of permissible investments:**  Every licensee shall, at all times, maintain permissible investments that have a market value that is computed in accordance with generally accepted accounting principles. These investments shall not be less than the aggregate amount of all outstanding payment instruments.  (Ky. Rev. Stat. § 286.11-015)<br>**Security** (Ky. Rev. Stat. § 286.11-013):<br> • Surety bond or other similar security<br>  ○ Minimum principal sum: $500,000<br>  ○ Maximum: $5,000,000<br> • The commissioner may increase the amount of cash or securities required up to the maximum amount upon the basis of the impaired financial condition of a person, as evidenced by a net worth, transaction volume, or other relevant criteria that the commissioner may establish by order or rule. | |
| **LA** | La. Rev. Stat. § 6:1031 (The Sale of Checks and Money Transmission Act) | La. Admin. Code 10 § XV.1101 | **Application** for license (La. Rev. Stat. § 6:1036) – At a minimum, the application shall state the full name and street address of:<br> • The proprietor, if the applicant is an individual.<br> • Every member, if the applicant is a partnership or | **Investigation upon application:** The commissioner shall, upon receiving the official, completed application, investigate to ascertain whether the applicant meets the qualifications established by La. Rev. Stat. §§ 6:1031 *et seq.*, for persons to engage in the business of |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | association.<br>• The corporation and each officer and director of a corporate applicant.<br>• The commissioner shall provide a detailed form, which each applicant shall mail, by certified mail, to the commissioner. (La. Rev. Stat. § 6:1038)<br>• **Note:** Louisiana Office of Financial Institutions link for license application directs applications to NMLS web page.<br>**Fees:**<br>• Application/investigation fee:<br>  o Principal location: $3,000<br>  o Each additional location: $25<br>  o Maximum additional: $3,000<br>  Nonrefundable, but constitutes license fee for first license year if license is granted.<br>**Minimum net worth** (La. Rev. Stat. § 6:1035):<br>• $100,000<br>**Security** (La. Rev. Stat. § 6:1035, La. Rev. Stat. § 6:1037):<br>• Corporate surety bond or deposit of cash or securities.<br>• The commissioner shall determine the required bond for each new licensee, based on the information provided by the applicant.<br>• Minimum amount: $25,000 | money transmission or selling checks in this state.<br>**Visitation and examination by commissioner:** The commissioner, either in person or through an employee appointed by him, shall visit and examine each licensee or agent on a recurring schedule or at any time whenever, in his judgment, an examination is necessary and expedient. (La. Rev. Stat. § 6:1044)<br>**Fees** (La. Admin. Code 10 § XV.1101):<br>• Hourly: $ 50 per hour for each examiner who participates in the examination or visitation;<br>• Travel: the actual cost of subsistence, lodging, and transportation for out-of-state examinations, not to exceed the amounts provided for in Division of Administration travel regulations in force at the time of such examination or visitation. |
| **ME** | 32 Me. Rev. Stat. § 6101 (Money | None. | **Application** for license (32 Me. Rev. Stat. § 6106) – Minimum requirements: | **Investigation upon application:** Upon the filing of a complete application, the administrator shall investigate the financial |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | Transmitters Act) | | • (1) The exact name of the applicant, the applicant's principal address, any fictitious or trade name used by the applicant in the conduct of its business and the location of the applicant's business records;<br><br>• (2) The history of the applicant's material litigation and criminal convictions for the 5-year period prior to the date of the application;<br><br>• (3) A description of the activities conducted by the applicant and a history of operations;<br><br>• (4) A description of the business activities in which the applicant seeks to be engaged in the State;<br><br>• (5) A list identifying the applicant's proposed authorized delegates in the State, if any, at the time of the filing of the license application;<br><br>• (6) A sample authorized delegate contract, if applicable;<br><br>• (7) A sample form of payment instrument, if applicable;<br><br>• (8) The locations at which the applicant and its authorized delegates, if any, propose to conduct the licensed activities in the State;<br><br>• (9) The name and address of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which the payment instruments will be payable;<br><br>• (10) The date of the applicant's incorporation and state of incorporation;<br><br>• (11) A certificate of good standing from the state in which the applicant was incorporated;<br><br>• (12) A description of the corporate structure of the applicant, including the identity of any parent or | condition and responsibility, financial and business experience, character and general fitness of the applicant. The administrator may conduct an on-site investigation of the applicant, the reasonable cost of which must be paid by the applicant.  (32 Me. Rev. Stat. § 6109)<br><br>**Examination by administrator** (32 Me. Rev. Stat. § 6113):<br><br>• <u>Annual</u>: The administrator may conduct an annual on-site examination of a licensee.<br><br>• <u>Financial Data</u>: The administrator may request financial data from a licensee.<br><br>• <u>On-site</u>: The administrator may conduct an on-site examination of any authorized delegate or location of a licensee within this State.<br><br>**Examination fees** (32 Me. Rev. Stat. § 6113):<br><br>• <u>On-site examination</u>:  The licensee shall pay all necessarily incurred costs of the annual on-site examination.<br><br>• <u>Examination of authorized delegate operations</u>:  authorized delegate shall pay all necessarily incurred costs of the examination.<br><br>• <u>Examination of licensee's location</u>: licensee shall pay all necessarily incurred costs of the examination.<br><br>**Annual renewal report** (32 Me. Rev. Stat. § 6110): A licensee under this article shall submit an annual renewal report with a nonrefundable application. The annual report shall contain at |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | subsidiary of the applicant, and whether any parent or subsidiary is publicly traded on any stock exchange;<br><br>• (13) The name, business and residence addresses, and employment history for the past 5 years of the applicant's executive officers and the officers or managers who will be in charge of the applicant's activities to be licensed;<br><br>• (14) The name, business and residence addresses and employment history for the period 5 years prior to the date of the application of any key shareholder of the applicant;<br><br>• (15) The history of material litigation and criminal convictions for the 5-year period prior to the date of the application of every executive officer or key shareholder of the applicant;<br><br>• (16) A copy of the applicant's most recent audited financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder equity and statement of changes in financial position, and, if available, the applicant's audited financial statements for the immediately preceding 2-year period; and<br><br>• (17) Copies of all filings, if any, made by the applicant with the United States Securities and Exchange Commission, or with a similar regulator in a country other than the United States within the year preceding the date of filing of the application.<br><br>**Fees** (32 Me. Rev. Stat. § 6108):<br><br>• Application/investigation fee:<br>   o $500, nonfundable<br>   o Constitutes license fee for applicant's first year of activities if license is granted | a minimum:<br><br>• (1) A copy of its most recent audited annual financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder's equity and statement of changes in financial position.<br><br>• (2) For the most recent quarter for which data are available prior to the date of the filing of the renewal application, but in no event more than 120 days prior to the renewal date, the number of payment instruments sold by the licensee in the State, the dollar amount of those instruments and the dollar amount of those instruments currently outstanding;<br><br>• (3) Any material changes to any of the information submitted by the licensee on its original application that have not previously been reported to the administrator on any other report required to be filed under this subchapter; and<br><br>• (4) A list of the locations within this State at which business regulated by this subchapter is being conducted by either the licensee or its authorized delegate. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • Delegate registration fee: <br>   ○ $50 for each authorized delegate <br>   ○ Up to a maximum of $2,500 <br> • Renewal application fee: <br>   ○ $250, nonrefundable <br>   ○ Plus a registration fee of $50 for each authorized delegate designated by a licensee, up to a maximum of $ 2,500 (32 Me. Rev. Stat. § 6110) <br> **Minimum net worth** (Me. Rev. Stat. § 6105): <br> • Principal location: $100,000 <br> • Each additional location or agent: $50,000 <br> • Maximum: $500,000. <br> **Security** (32 Me. Rev. Stat. § 6107): <br> • Surety bond, irrevocable letter of credit or similar security device, or deposit of cash, interest-bearing stocks and bonds, notes debentures of the United States or other state/municipality. <br> • Amount of security: $100,000 | |
| **MD** | Md. Code Ann., Fin. Inst. § 12-401 (Maryland Money Transmission Act) | None. | **Application** for license (Md. Code Ann., Fin. Inst. § 12-407) – Minimum requirements: <br> • (1) The trade name of the applicant, as filed with the State Department of Assessments and Taxation under § 1-406 of the Corporations and Associations Article, and any fictitious or other name used by the applicant in the conduct of the applicant's business; <br> • (2) The address of the principal executive office of the applicant and each branch location; <br> • (3) The name, business address, and nature of the business of each authorized delegate to be appointed by the applicant; | **Investigation upon application:** After the filing of a complete application, the Commissioner shall investigate the financial condition and responsibility, financial and business experience, character, and general fitness of the applicant.  (Md. Code Ann., Fin. Inst. § 12-409) <br> **Fingerprints and criminal records check:** In connection with an initial application for a license and at any other time that the Commissioner requests, an applicant or a |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | <ul><li>(4) The most recent unconsolidated financial statement of the applicant that shall: (i) Be prepared in accordance with generally accepted accounting principles applied on a consistent basis; (ii) Be a certified opinion audit prepared by an independent certified public accountant; (iii) Include a schedule of all permissible investments, if any, of the applicant; and (iv) Be no older than 12 months before the date of the application;</li><li>(5) The name, address, and telephone number of the applicant's resident agent in the State;</li><li>(6) A history of material litigation against the applicant, if any, for the past 3 years;</li><li>(7) Certified copies of the applicant's certificate of incorporation, articles of incorporation, or articles of organization, or other instrument incorporating or forming the applicant, as amended, corrected, or supplemented;</li><li>(8) The bylaws, operating agreement, or other equivalent internal governance documents, as amended or supplemented; and</li><li>(7) Any other information that the Commissioner reasonably requires.</li></ul>**Fees:**<ul><li><u>Application/investigation fee</u>:<ul><li>$1,000, nonrefundable</li></ul></li><li><u>Annual license fee</u>:<ul><li>$2,000 for each branch license, nonrefundable</li></ul></li><li><u>Nationwide licensing system</u>:  An applicant for an initial license shall pay to the nationwide licensing system the fee that the nationwide licensing system imposes in connection with processing the application for each branch license for which an applicant applies.</li></ul> | licensee shall provide fingerprints for use by the Central Repository to conduct criminal history records checks. (Md. Code Ann., Fin. Inst. § 12-408)<br>**Investigation by Commissioner:**<ul><li><u>Examination for violations</u>: To discover any violations of this subtitle or to obtain any information required by this subtitle, the Commissioner at any time may investigate the business of: (1) any licensee; (2) any person who is engaged or participating in the business of money transmission, whether as authorized delegate, principal, agent, or otherwise; and (3) any other person who the Commissioner has cause to believe is violating this subtitle or any regulation adopted under this subtitle whether that person claims to be within or beyond the scope of this subtitle. (Md. Code Ann., Fin. Inst. § 12-423)</li><li><u>With notice</u>: Commissioner may conduct an on-site examination of a licensee or authorized delegate with not less than 7 business days prior notice. (Md Md. Code Ann., Fin. Inst. § 12-424)</li><li><u>Without notice</u>: With good cause, the Commissioner may conduct an on-site examination of a licensee or authorized delegate with no prior notice. (Md. Code Ann., Fin. Inst. § 12-424)</li></ul>**Extent of examination** (Md. Code Ann., Fin. Inst. § 12-424): The Commissioner may:<ul><li>Examine all books, accounts, and records the Commissioner determines are</li></ul> |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|----------------|------------------------|------------------------|--------------------------|
| | | | **Minimum net worth** (Md. Code Ann., Fin. Inst. § 12-406):<br>• Principal location: $150,000<br>• Each additional location or authorized delegate: $10,000<br>• Maximum $500,000<br>• The Commissioner may require a net worth of up to $500,000, subject to consideration of the following: (1) The nature and volume of the business or proposed business of the applicant;  (2) The amount, nature, quality, and liquidity of the assets of the applicant; (3) The amount and nature of the liabilities, including contingent liabilities, of the applicant; (4) The history of, and prospects for, the applicant to earn and retain income; (5) The quality of the operations of the applicant; (6) The quality of the management of the applicant; (7) The nature and quality of the person that has control of the applicant; and (8) Any other factor the Commissioner deems relevant.<br><br>**Maintenance of permissible investments** (Md. Code Ann., Fin. Inst. § 12-418):<br><br>• Licensee shall have at all times permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate face amount of all outstanding payment instruments issued or sold by the licensee in the United States.<br><br>• The Commissioner may waive this requirement if the dollar volume of a licensee's outstanding payment instruments does not exceed the surety device.<br><br>**Minimum 3 years of experience** (Md. Code Ann., Fin. Inst. § 12-406):<br><br>Minimum 3 years of experience in the business of money transmission or other related financial services business under the following conditions: | necessary to conduct a complete examination; and<br><br>• Examine under oath any officer, director, or employee of the licensee, or any other individual who may provide information on behalf of the licensee.<br><br>**Independent in lieu of on-site examination:** The Commissioner, in lieu of an on-site examination, may accept the examination report of a responsible supervisory agency of another state, or a report prepared by an independent accounting firm.  (Md. Code Ann., Fin. Inst. § 12-424)<br><br>**Examination fees:**<br><br>• <u>Criminal background check</u>:  An applicant or a licensee who is required to provide fingerprints shall pay the processing or other fees required by the Central Repository, the Federal Bureau of Investigation, and the nationwide licensing system.  (Md. Code Ann., Fin. Inst. § 12-408)<br><br>• <u>On-site examination</u>:  The licensee shall pay all reasonably incurred costs of an on-site examination conducted under Section 12-424, including a per-day fee set by the Commissioner for each of the Commissioner's employees engaged in the examination.  (Md. Code Ann., Fin. Inst. § 12-424) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • If the applicant is a sole proprietor, the applicant shall have the required experience;<br>• If the applicant is a joint venture or partnership, at least one of the coventurers or general partners shall have the required experience; and<br>• If the applicant is any other type of business, at least one of the principal officers or members shall have the required experience.<br><br>**Security** (Md. Code Ann., Fin. Inst. § 12-412):<br><br>• Surety device<br>    ○ Minimum amount: $150,000<br>    ○ Maximum amount: $1,000,000<br><br>• The commissioner shall set the amount of the surety device after consideration of (1) The financial condition of the licensee or applicant (2) For a licensee, the average monthly outstanding payment instruments or outstanding money transmission liability for the previous 12 months; (3) For an applicant, the projected monthly payment instrument sales and money transmission volume in the State, the business experience, and any other factor deemed appropriate; and (4) The potential loss of buyers and holders of payment instruments or persons for whom or to whom money is transmitted if the applicant or licensee becomes financially impaired. | |
| MA | Mass. Gen. Laws ch. 169, § 1 (Receipts of Deposit for Transmittal to Foreign Countries) | 209 Mass. Code Regs. 44.01 (Licensing of Foreign Transmittal Agencies) | **Note:** Statute applies to persons engaged or financially interested in the business of receiving deposits of money for the purpose of transmitting the same or equivalents thereof *to foreign countries*.  (Mass. Gen. Laws ch. 169, § 1)<br><br>**Application** for license (Mass. Gen. Laws ch. 169, § 6) – Minimum requirements: | **Criminal background check:**  The commissioner may require a background investigation of each applicant for a license to receive deposits of money for the purposes of foreign transmission by means of fingerprint and state and national criminal history record checks by the department of criminal justice information services pursuant to section 172 of |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • Name and complete address where the business of such applicant is located and, if the applicant is a partnership, association, corporation or other business organization, the names and addresses of each member, director and principal officer thereof.<br><br>• Description of the activities of the applicant, in such detail and for such periods as the commissioner may require.<br><br>• Such further information as the commissioner may require.<br><br>**Fees** (Mass. Gen. Laws ch. 169, § 6):<br><br>• <u>Application/investigation fee</u>: determined annually by commissioner<br><br>• <u>Nationwide licensing system</u>:  The applicant shall pay directly to the multi-state licensing system any additional fees relating to participation in the multi-state licensing system.<br><br>**Security** (Mass. Gen. Laws ch. 169, § 2, § 3):<br><br>• Surety bond or deposit of money or government bonds<br><br>• Sum equal to twice the average weekly amount of money or equivalents thereof transmitted to foreign countries by such person, as determined by the commissioner of banks<br><br>• Minimum amount: $50,000<br><br>• The sum of such bond shall be increased on order of the commissioner at any time to such amount as shall be shown by examination to be necessary. | chapter 6 and the Federal Bureau of Investigation. If the applicant is a partnership, association, corporation or other form of business organization, the commissioner may require a background investigation for each member, director and principal officer of the applicant and any individual acting as a manager of an office location.  (Mass. Gen. Laws ch. 169, § 6)<br><br>**Inspection by commissioner:**  A licensee shall, when directed by the commissioner, permit the commissioner or his duly authorized representative to inspect its records and evidence of compliance with this chapter or any rule or regulation issued thereunder and with any other law, rule and regulation applicable to the conduct of its business. (Mass. Gen. Laws ch. 169, § 10)<br><br>**Extent of inspection:**  For the purposes of such inspection, the commissioner or his representative shall have access to the offices and place of business, books, accounts, papers, records and files of licensee. The commissioner and any person designated by him may require the attendance and testimony of all persons as he may deem necessary relative to the inspection of such business. (Mass. Gen. Laws ch. 169, § 10)<br><br>**Fees:**  Fee for non-depository examinations set at $60/hour. (Mass. Gen. Laws ch. 169, § 10, 801 Mass. Code Regs. 4.02) |
| **MI** | Mich. Comp. Laws § 487.1001 | None. | **Application** for license (Mich. Comp. Laws § 487.1012) – Minimum requirements: | **Investigation after application:**  When the commissioner receives a completed |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | *et seq.* (money transmission services act) | | • (1) The legal name and residential and business addresses of the applicant and any assumed or trade name used by the applicant in conducting its money transmission services business. <br><br>• (2) A list of any criminal convictions of the applicant and any material litigation in which the applicant was involved in the 10-year period preceding the submission of the application. <br><br>• (3) A description of any money transmission services previously provided by the applicant and the money transmission services that the applicant intends to provide in this state. <br><br>• (4) A list of the applicant's proposed authorized delegates and the locations in this state where the applicant and its authorized delegates propose to engage in providing money transmission services. <br><br>• (5) A list of all other states in which the applicant is licensed to engage in providing money transmission services and any license revocations, suspensions, or other disciplinary action taken against the applicant in any other state. <br><br>• (6) Information concerning any bankruptcy or receivership proceedings affecting the applicant. <br><br>• (7) The name and address of any depository financial institution through which the applicant's payment instrument will be paid. <br><br>• (8) A description of the source of money and credit to be used by the applicant to provide money transmission services. <br><br>• (9) The date of the applicant's incorporation or formation and state or country of incorporation or formation. | application for a license under this act, the commissioner shall investigate the financial condition and responsibility, financial and business experience, character, and general fitness of the applicant and may reasonably conduct a similar investigation of each control person of the applicant under this subsection. The commissioner may conduct an on-site investigation of the applicant.  (Mich. Comp. Laws § 487.1014) <br><br>**Investigation or examination by commissioner:**  The commissioner may conduct an examination or investigation of a licensee or any of its authorized delegates.  (Mich. Comp. Laws § 487.1021) <br><br>**Independent report in lieu of examination:**  The commissioner may accept an examination or investigation report of a department or agency of this state or of another state or of the federal government or a report prepared by a certified public accountant instead of conducting an examination or investigation.  (Mich. Comp. Laws § 487.1022) <br><br>**Examination fees:**  In addition to any fees established by the commissioner, a licensee shall pay the actual travel, lodging, and meal expenses incurred by any agency employee who travels outside of this state to examine the records of the licensee or investigate the licensee.  (Mich. Comp. Laws § 487.1016) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | • (10) A brief description of the structure or organization of the applicant, including any parent or subsidiary of the applicant, and whether the applicant or a parent or subsidiary of the applicant is publicly traded.<br><br>• (11) The name, all assumed or trade names, and all business addresses of the applicant.<br><br>• (12) The name, all assumed or trade names, all business and residential addresses, and the employment history for the 10-year period preceding the submission of the application of each control person of the applicant.<br><br>• (13) A list of any criminal convictions and material litigation in which any control person of the applicant has been involved in the 10-year period preceding the submission of the application.<br><br>• (14) If the applicant is publicly traded, a copy of the most recent report filed with the securities and exchange commission under section 13 of the federal securities exchange act of 1934, 15 U.S.C. § 78m.<br><br>• (15) If the applicant has a registered agent in this state, the name and address of that registered agent.<br><br>• (16) Any other information the commissioner reasonably requires with respect to the applicant.<br><br>**Fees** (effective through December 31, 2012): *See* http://www.michigan.gov/documents/cis/Schedule_of_Fees_MT_203971_7.pdf<br><br>• Application/investigation fee:<br>    o   $600, nonrefundable<br><br>• Annual license fee:<br>    o   Primary location: $2,500 | |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  |   o  Each additional location: $50 <br><br>   o  Maximum: $3,000 <br><br>   o  Refunded if application is denied <br><br> **Minimum net worth** (Mich. Comp. Laws § 487.1013): <br><br> • Principal location: $100,000.000 <br><br> • Each additional location or authorized delegate: $25,000 <br><br> • Maximum: $1,000,000 <br><br> **Maintenance of permissible investments:** A licensee shall maintain at all times permissible investments that have a market value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments issued or sold and money transmitted by the licensee. (Mich. Comp. Laws § 487.1031) <br><br> **Security** (Mich. Comp. Laws § 487.1013): <br><br> *See* http://www.michigan.gov/documents/cis/Schedule_of_Fees_MT_203971_7.pdf <br> • Surety bond <br> • Minimum principal sum: $500,000 <br> • Each additional location: $10,000 <br> • Maximum: $1,500,000 |  |
| **MN** | Minn. Stat. §§ 53B.01 *et seq.* (Minnesota Money Transmitters Act) | None. | **Application** for license (Minn. Stat. § 53B.07) – Minimum requirements: <br><br> • (1) the exact name of the applicant, the applicant's principal address, any fictitious or trade name used by the applicant in the conduct of its business, and the location of the applicant's business records; <br><br> • (2) the history of the applicant's or any controlling | **Investigation upon application:** Upon the filing of a complete application, the commissioner shall investigate the financial condition and responsibility, financial and business experience, character, and general fitness of the applicant. The commissioner may conduct an on-site investigation of the applicant. (Minn. Stat. § 53B.10) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | person's material litigation during the preceding ten years and criminal convictions;<br><br>• (3) a description of the activities conducted by the applicant and a history of operations;<br><br>• (4) a description of the business activities in which the applicant seeks to be engaged in the state;<br><br>• (5) a list identifying the applicant's proposed authorized delegates in the state, if any, at the time of the filing of the license application;<br><br>• (6) a sample authorized delegate contract, if applicable;<br><br>• (7) a sample form of payment instrument, if applicable;<br><br>• (8) the location or locations at which the applicant and its authorized delegates, if any, propose to conduct the licensed activities in the state; and<br><br>• (9) the name, address, and account numbers for the clearing bank or banks on which the applicant's payment instruments will be drawn or through which these payment instruments will be payable.<br><br>• (10) the date of the applicant's incorporation and state of incorporation;<br><br>• (11) a certificate of good standing from the state in which the applicant was incorporated;<br><br>• (12) a description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded on any stock exchange;<br><br>• (13) the name, business and residence address, and employment history for the past five years of the applicant's executive officers and the officers or | **Investigations by commissioner** (Minn. Stat. § 46.04, Minn. Stat. § 53B.14):<br><br>• Periodic:  The commissioner of commerce, through examiners, shall examine each financial institution at least once every 24 calendar months.  It shall be the principal purpose of these examinations to inspect and verify the assets and liabilities of each and so far investigate the character and value of the assets of each institution as to determine with reasonable certainty that the values are correctly carried on its books. It shall be the further purpose of these examinations to assess the adequacy of capital protection and the capacity of the institution to meet usual and reasonably anticipated deposit withdrawals and other cash commitments without resorting to excessive borrowing or sale of assets at a significant loss, and to investigate each institution's compliance with applicable laws and rules.<br><br>• Special examinations:  The commissioner may also make additional examinations as deemed necessary or advisable.<br><br>**Extent of examination** (Minn. Stat. § 46.04):  The commissioner:<br><br>• shall investigate the methods of operation and conduct of these institutions and their systems of accounting, to ascertain whether these methods and systems are in accordance with law and sound banking principles.<br><br>• may make requirements as to records as deemed necessary to facilitate the carrying |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | managers who will be in charge of the applicant's activities to be licensed under this chapter; | out of the commissioner's duties and to properly protect the public interest. |
| | | | • (14) the name, business and residence address, and employment history for the period five years prior to the date of the application of any key shareholder of the applicant; | • may examine, or cause to be examined by these examiners, on oath, any officer, director, trustee, owner, agent, clerk, customer, or depositor of any financial institution touching the affairs and business thereof, and may issue, or cause to be issued by the examiners, subpoenas, and administer, or cause to be administered by the examiners, oaths. |
| | | | • (15) the history of material litigation during the preceding ten years and criminal convictions of every executive officer or key shareholder of the applicant; | |
| | | | • (16) a copy of the applicant's most recent audited financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder equity, and statement of changes in financial position, and, if available, the applicant's audited financial statements for the immediately preceding two-year period. | • has the power possessed by courts of law to issue subpoenas and cause them to be served and enforced, and all officers, directors, trustees, and employees of state banks, savings banks, trust companies, savings associations, and other financial institutions within the state, and all persons having dealings with or knowledge of the affairs or methods of these institutions, shall afford reasonable facilities for these examinations, make returns and reports to the commissioner of commerce as the commissioner may require; attend and answer, under oath, the commissioner's lawful inquiries; produce and exhibit any books, accounts, documents, and property as the commissioner may desire to inspect, and in all things aid the commissioner in the performance of duties. |
| | | | • (17) copies of all filings, if any, made by the applicant with the United States Securities and Exchange Commission, or with a similar regulator in a country other than the United States, within the year preceding the date of filing the application. | |
| | | | **Fees:** | |
| | | | • Application/investigation fee (Minn. Stat. § 53B.09): | |
| | | |    o $4,000, nonrefundable | |
| | | | • Annual renewal fee (Minn. Stat. § 53B.11): | |
| | | |    o $2,500 | |
| | | | **Minimum net worth** (Minn. Stat. § 53B.05): | **Fees:** The reasonable costs of any onsite investigation conducted after application will be borne by the applicant. (Minn. Stat. § 53B.10) |
| | | | • $25,000 if three or fewer locations in the state | |
| | | | • $50,000 if four to six locations in the state | **Annual renewal report** (Minn. Stat. § 53B.11): A licensee under this article shall submit an |
| | | | • $100,000 if more than six locations in the state, plus | |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • an additional $50,000 for each location or authorized delegate located in the state in excess of seven<br>• Maximum: $500,000.<br>**Maintenance of permissible investments** (Minn. Stat. § 53B.06):<br>• Each licensee under this chapter must at all times possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate face amount of all outstanding payment instruments sold by the licensee or reported as sold by an authorized delegate in the United States.<br>• The commissioner may waive this requirement if the dollar volume of a licensee's outstanding payment instruments does not exceed the bond or other security devices posted by the licensee under section 53B.08.<br>**Security** (Minn. Stat. § 53B.08):<br>• Surety bond, irrevocable letter of credit or other similar security device, or deposit of cash, interest-bearing stocks and bonds, notes, debentures or other federal/state/municipal obligations<br>• Up to three locations: $25,000<br>• Four to six locations: $50,000<br>• Each location over six: $50,000<br>• Maximum: $250,000 | annual renewal report and the annual renewal fee. The annual report shall contain at a minimum:<br>• (1) a copy of its most recent audited consolidated annual financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder's equity, and statement of changes in financial position;<br>• (2) for the most recent quarter for which data are available prior to the date of the filing of the renewal application, but in no event more than 120 days prior to the renewal date, the licensee must provide the number of payment instruments sold by the licensee in the state, the dollar amount of those instruments, and the dollar amount of those instruments currently outstanding;<br>• (3) any material changes to any of the information submitted by the licensee on its original application that have not previously been reported to the commissioner on any other report required to be filed under this chapter;<br>• (4) a list of the licensee's permissible investments; and<br>• (5) a list of the locations within this state at which business regulated by this chapter is being conducted by either the licensee or its authorized delegate. |
| **MS** | Miss. Code Ann. § 75-15-1 | None. | **Application** for license (Miss. Code Ann. § 75-15-9) – Minimum requirements: The application shall state the full | **Investigation upon application:**  Upon the filing of the complete application, the |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | (Mississippi Money Transmitters Act) | | name and business address of:<br><br>• The proprietor, if the applicant is an individual;<br><br>• Every member, if the applicant is a partnership or association;<br><br>• The corporation and each executive officer and director thereof, if the applicant is a corporation;<br><br>• Every trustee and officer if the applicant is a trust;<br><br>**Fees:**<br><br>• Application/investigation fee (Miss. Code Ann. § 75-15-9):<br>  ○ $50<br><br>• Initial license fee (Miss. Code Ann. § 75-15-15):<br>  ○ $750<br><br>• Annual license renewal fee (Miss. Code Ann. § 75-15-15):<br>  ○ Primary location: $400<br>  ○ Each additional location: $50<br>  ○ Maximum: $1,000<br><br>**Criminal record** (Miss. Code Ann. § 75-15-9, § 75-15-11):  The department shall not issue a license if it finds that the applicant, or any person who is an owner, partner, director or executive officer of the applicant, has been convicted of:<br><br>• a felony in any jurisdiction; or<br><br>• a crime that, if committed within the state, would constitute a felony under the laws of this state; or<br><br>• a misdemeanor of fraud, theft, forgery, bribery, embezzlement or making a fraudulent or false | commissioner shall investigate the financial responsibility, financial and business experience, character and general fitness of the applicant, and, if he deems it advisable, of its officers and directors.  (Miss. Code Ann. § 75-15-13)<br><br>**Fingerprints and criminal background check:**  Applicant must submit with application a set of fingerprints from any local law enforcement agency for (i) each owner of a sole proprietorship, (ii) partners in a partnership or (iii) principal owners of a limited liability company that own at least ten percent (10%) of the voting shares of the company, (iv) shareholders owning ten percent (10%) or more of the outstanding shares of the corporation, except publically traded corporations and their subsidiaries, and (iv) any other executive officer with significant oversight duties of the business.  In order to determine the applicant's suitability for license, the commissioner shall forward the fingerprints to the Department of Public Safety for a state criminal history records check, and the fingerprints shall be forwarded by the Department of Public Safety to the FBI for a national criminal history records check. (Miss. Code Ann. § 75-15-11)<br><br>**Examination by commissioner:** The commissioner may conduct or cause to be conducted an annual examination or audit of the books and records of any licensee at any time or times he deems proper, the cost of the examination or audit to be borne by the licensee. (Miss. Code Ann. § 75-15-19)<br><br>**Examination fees:**  Minimum inspection fee of |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | statement in any jurisdiction.<br>• A person shall be deemed to have been convicted of a crime if the person has pleaded guilty to a crime before a court or federal magistrate, or plea of nolo contendere, or has been found guilty of a crime by the decision or judgment of a court or federal magistrate or by the verdict of a jury, irrespective of the pronouncement of sentence or the suspension of a sentence, unless the person convicted of the crime has received a pardon from the President of the United States or the Governor or other pardoning authority in the jurisdiction where the conviction was obtained.<br><br>**Minimum net worth** (Miss. Code Ann. § 75-15-9):<br>• Principal location: $25,000<br>• Each additional location: $15,000<br>• Maximum: $250,000.00<br>**Maintenance of permissible investments** (Miss. Code Ann. § 75-15-12):<br>• Licensee must possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate amount of all outstanding checks issued or sold or money received for transmission by the licensee in the United States.<br>• The commissioner may waive this requirement if the dollar volume of a licensee's outstanding checks does not exceed the bond or other security devices posted by the licensee.<br>**Security** (Miss. Code Ann. § 75-15-11):<br>• Surety bond or deposit of treasurer bonds or other obligations of the United States<br>• Minimum principal sum: | Three Hundred Dollars ($300.00) and up to Six Hundred Dollars ($600.00) for each licensed office, plus any actual expenses incurred while examining the licensee's records or books that are located outside the State of Mississippi. (Miss. Code Ann. § 75-15-19) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | o $25,000 or an amount equal to outstanding money transmissions in Mississippi, whichever is greater<br><br>• Maximum: $500,000<br>• The commissioner may increase the required amount of the bond upon the basis of the impaired financial condition of a licensee as evidenced by a reduction in net worth, financial losses or other relevant criteria. | |
| MO | Mo. Rev. Stat. § 361.700 *et seq.* (Sale of Checks Law) | None. | **Application** for license (Mo. Rev. Stat. § 361.707) – Minimum requirements:<br><br>The application shall state the full name and business address of:<br><br>• The proprietor, if the applicant is an individual;<br><br>• Every member, if the applicant is a partnership or association;<br><br>• The corporation and each executive officer and director thereof, if the applicant is a corporation;<br><br>• Every trustee and officer if the applicant is a trust;<br><br>**Fees:**<br><br>• Application/investigation fee (Mo. Rev. Stat. § 361.707):<br><br>o $50, nonrefundable,<br><br>o Applies to license fee for first year if license is granted<br><br>• Annual license fee: $100 (Mo. Rev. Stat. § 361.715)<br><br>**Reserve required:** Every licensee shall at all times have on demand deposit in a federally insured depository institution or in the form of cash on hand or in the hands of his agents or in readily marketable securities an amount equal to all outstanding unpaid checks sold by him or his | **Investigation upon application:**  Upon the filing of the completed application, the director shall cause, investigate, and determine whether the character, responsibility, and general fitness of the principals of the applicant or any affiliates are such as to command confidence and warrant belief that the business of the applicant will be conducted honestly and efficiently and that the applicant is in compliance with all other applicable state and federal laws. (Mo. Rev. Stat. § 361.715)<br><br>**Examinations by director:**<br><br>• Special examination:  Whenever in the director's judgment it is necessary or expedient, the director may perform a special examination of any person licensed under sections 361.700 to 361.727 with all authority under section 361.160 as though the licensee were a bank. The cost of such examination shall be paid by the licensee. (Mo. Rev. Stat. § 361.711)<br><br>• General examination authority:  The director, or the deputy or examiners designated by the director for that purpose, shall have power to examine any licensee whenever, in the director's judgment, it may be deemed necessary or expedient. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | agents in Missouri, in addition to the amount of his bond. (Mo. Rev. Stat. § 361.718) **Security** (Mo. Rev. Stat. § 361.711): <br>• Surety bond or irrevocable letter of credit <br>• Initial minimum principal sum: $100,000 <br>• Principal sum upon license renewal: be five times the greatest amount transmitted in a single day during the previous year <br>• Minimum: $100,000 <br>• Maximum: $1,000,000 <br>• If in the opinion of the director the bond shall at any time appear to be inadequate, insecure, exhausted, or otherwise doubtful, additional bond in form and with surety satisfactory to the director shall be filed within fifteen days after notice of the requirement is given to the licensee by the director. | (Mo. Rev. Stat. § 361.160) <br>• <u>Investigations for violations</u>:  The director may also make such special investigations as the director deems necessary to determine whether any individual or corporation has violated any of the provisions of this law. (Mo. Rev. Stat. § 361.160) <br>**Extent of examination** (Mo. Rev. Stat. § 361.160): <br>• The director and the director's deputy and examiners shall have power to administer oaths to any person whose testimony may be required in such examination or investigation of any such corporation or agency, and to compel the appearance and attendance of any person for the purpose of any such examination or investigation. <br>• On every such examination inquiry shall be made as to the condition and resources of such corporation, the mode of conducting and managing its affairs, the actions of its directors or trustees, the investment of its funds, the safety and prudence of its management, the security afforded to its creditors, and whether the requirements of its charter and of law have been complied with in the administration of its affairs, and as to such other matters as the director may prescribe. <br>**Proof of required reserve:**  Upon demand by the director, licensees must immediately provide proof of sufficient funds or securities to meet the required reserve. The director may |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | | make such demand as often as reasonably necessary and shall make such demand to each licensee, without prior notice, at least twice each license year.  (Mo. Rev. Stat. § 361.718) |
| **MT** | Currently no regulation of money transfer. | | | |
| **NE** | Neb. Rev. Stat. §§ 8-1001 *et seq.* (Nebraska Sale of Checks and Funds Transmission Act) | None. | **Application** for license (Neb. Rev. Stat. § 8-1005) – Minimum requirements:<br><br>The application shall state the full name and business address of:<br><br>• The proprietor, if the applicant is an individual;<br><br>• Every member, if the applicant is a partnership or association;<br><br>• The corporation and each executive officer and director thereof, if the applicant is a corporation;<br><br>• Every trustee and officer if the applicant is a trust;<br><br>**Fees:**<br><br>• Application/investigation fee:<br><br>  ○ $1,000, nonrefundable<br><br>  ○ Constitutes license fee for first year if license is granted (Neb. Rev. Stat. § 8-1006)<br><br>• Annual license fee (Neb. Rev. Stat. § 8-1009):<br><br>  ○ $250<br><br>**Minimum net worth:** $50,000 (Neb. Rev. Stat. § 8-1004)<br><br>**Security** (Neb. Rev. Stat. § 8-1004):<br>• Surety bond or deposit of interest-bearing stocks and bonds, notes, debentures or other obligations of the | **Investigation upon application:**<br><br>• Upon the filing of a completed application, the director shall investigate to ascertain whether the qualifications for licensing have been met.  (Neb. Rev. Stat. § 8-1007)<br><br>• Applicant shall have the financing responsibility, financial condition, business experience, character, and general fitness of the applicant shall be such as reasonably to warrant the belief that applicant's business will be conducted honestly, carefully, and efficiently. To the extent deemed advisable by him or her, the director may investigate and consider the qualifications of officers and directors of an applicant in determining whether this qualification has been met. (Neb. Rev. Stat. § 8-1004)<br><br>**Examinations by commissioner** (Neb. Rev. Stat. § 8-1012.01):<br><br>• Books, accounts and records:  The director may examine the books, accounts, and records of each licensee.<br><br>• Business conduct:  The director may request information from a licensee |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | United States or any agency or instrumentality thereof<br>• Minimum principal sum: $100,000<br>• Each additional location: $5,000<br>• Maximum: $250,000 | regarding the conduct of its business or matters incidental to the business.<br><br>**Examination fees:** The cost of any examination conducted under this section shall be paid by the licensee. (Neb. Rev. Stat. § 8-1012.01) |
| **NV** | Nev. Rev. Stat. Ann. § 671.010 et seq. (Issuers of Instruments for Transmission or Payment of Money) | Nev. Admin. Code §§ 671.005 *et seq.* | **Application** for license (Nev. Rev. Stat. Ann. § 671.050) – Minimum requirements:<br><br>• (1) The name and principal business address of the applicant and, if incorporated, the date and place of its incorporation;<br><br>• (2) The name and address of each of the applicant's branch offices, subsidiaries or affiliates, if any, which will be operated under the license;<br><br>• (3) The name and addresses, business and residential, of the proprietor or partners of the applicant or, if the applicant is a corporation or association, of each of the directors, trustees and principal officers, and of any stockholder who owns 20 percent or more of the applicant's stock; and<br><br>• (4) Such other pertinent information as the commissioner requires.<br><br>**Age and citizenship:**<br><br>• In addition to any other requirements set forth by specific statute, each person who applies for a license to engage in the business of selling or issuing checks or of receiving for transmission or transmitting money or credits must submit proof satisfactory to the Commissioner that the person: (1) **is** at least 21 years of age; and (2) is a citizen of the United States or lawfully entitled to remain and work in the United | **Investigation upon application:** Upon the filing of a complete application, the commissioner shall investigate the financial condition and responsibility, the financial and business experience, and the character and general fitness of the applicant and may investigate any partners, directors, trustees or principal officers of the applicant. (Nev. Rev. Stat. Ann. § 671.060)<br><br>**Examination by commissioner:**<br><br>• <u>Annual:</u> Once each year the Commissioner shall examine the financial accounts of each licensee and any other documents relevant to the conduct of the licensee's business, and the Commissioner may conduct examinations at additional times. For the purpose of the examinations, the Commissioner may enter upon any of the business premises of a licensee or the licensee's agents and obtain access to the relevant documents. Any obstruction or denial of such an entry or access is a violation of this chapter. (Nev. Rev. Stat. Ann. § 671.120)<br><br>• <u>Examinations for violations:</u> The Commissioner may conduct any necessary investigations and hearings to determine whether any licensee or other person has |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | States. (Nev. Rev. Stat. Ann. § 671.055)<br><br>• If an application for a license is submitted by a business entity, the Commissioner will not issue a license to the applicant unless each partner, principal officer, director and trustee, whichever are applicable to the business entity, satisfies the requirements of NRS 671.055. (Nev. Admin. Code § 671.007)<br><br>**Fees** (Nev. Rev. Stat. Ann. § 671.050, Nev. Admin. Code § 671.020, Nev. Admin. Code § 671.060):<br><br>• <u>Application/investigation fee</u>:<br>   o $375, plus any additional expenses incurred in the process of investigation as the Commission deems necessary<br><br>• <u>Initial license fee</u>:<br>   o $300, prorated on the basis of the licensing year<br><br>• <u>Annual assessments</u><br>   o $300, to cover costs related to the employment of a certified public accountant and the performance of audits and examinations conducted by the Division.<br>   o Additional amount to cover the costs of legal services provided by the Attorney General to the Commissioner and the Division<br><br>**Minimum net worth:** $100,000, unless the applicant's surety bond or securities deposited in lieu of a security bond are in an amount at least twice the minimum required net worth. (Nev. Rev. Stat. Ann. § 671.050)<br><br>**Security (Nev. Rev. Stat. Ann. § 671.050):**<br>• Surety bond or deposit of interest-bearing stocks and bonds, notes, debentures or other obligations of the United States or any agency or instrumentality thereof | violated any of the provisions of this chapter or whether any licensee has conducted himself or herself in a manner which requires the suspension, revocation or denial of renewal of his or her license. (Nev. Rev. Stat. Ann. § 671.170)<br><br>**Extent of examination:** In conducting any investigation or hearing pursuant to this chapter, the Commissioner, or any person designated by the Commissioner, may require the attendance and testimony of any person and compel the production of all relevant books, records, accounts and other documents.   (Nev. Rev. Stat. Ann. § 671.170)<br><br>**Independent report in lieu of examination:** The Commissioner may accept a report of an audit of the licensee which covers the most recent fiscal year in lieu of conducting an examination. (Nev. Rev. Stat. Ann. § 671.120)<br><br>**Fees:** $30 per hour for any supervision, examination, audit, investigation or hearing conducted pursuant to chapter 671 of NRS (Nev. Rev. Stat. Ann. § 671.120, Nev. Admin. Code § 671.010)<br><br>• **NOTE:** Nev. Rev. Stat. Ann. § 671.170 appears to cap rate at $10/hour |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • Minimum principal sum: $10,000<br>• Each additional location: $5,000<br>• Maximum: $250,000 | |
| NH | N.H. Rev. Stat. Ann. § 399-G:1 et seq. (Licensing of Money Transmitters) | None. | **Application:** for license (N.H. Rev. Stat. Ann. § 399-G:5) – Minimum requirements:<br><br>• (1) primary business address of the applicant;<br><br>• (2) applicant's tax identification number;<br><br>• (3) address of applicant's principal office and all authorized delegates located or to be located within the state;<br><br>• (4) copy of its FinCEN Form 107 Registration of Money Services Business filing;<br><br>• (5) list of the principals of the applicant;<br><br>• (6) each principal shall provide their social security number and shall authorize the commissioner to conduct a background check;<br><br>• (7) whether the applicant or any of its principals has ever been issued or been the subject of an injunction or administrative order, has ever been convicted of a misdemeanor involving the financial services industry or any aspect of the financial services business, or has ever been convicted of any felony;<br><br>• (8) statement of net worth; and<br><br>• (9) any other information that the commissioner may require including, but not limited to, the applicant's form and place of organization, the applicant's proposed method of doing business, the qualifications and business history of the applicant and those persons listed in the application, and the applicant's financial condition and history. | **Investigation upon application:**  Upon the applicant's filing of the complete application and payment of the required fee, the commissioner shall have up to 120 days to investigate and determine whether the applicant's financial resources, experience, personnel, and record of past or proposed conduct warrant the public's confidence and the issuance of a license. (N.H. Rev. Stat. Ann. § 399-G:5)<br><br>**Fingerprints and criminal background check** (N.H. Rev. Stat. Ann. § 399-G:5):<br><br>• Unless the applicant is a publicly traded corporation, the department shall complete a background investigation and criminal history records check on the applicant's principals and any person in a similar position or performing similar functions. If the applicant is a subsidiary, the department shall complete a background investigation and criminal history records check on individuals who are indirect owners.<br><br>• The applicant's principals and any person in a similar position or performing similar functions shall submit to the department a notarized criminal history records release form, as provided by the New Hampshire division of state police, which authorizes the release of the person's criminal records, if any. The person shall submit with the release form a complete set of |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | **Fees:**<br><br>• Application/investigation fee (N.H. Rev. Stat. Ann. § 399-G:5):<br>    ○ Nonrefundable<br>    ○ Principal location: $500<br>    ○ Each authorized delegate registration: $25<br>    ○ Maximum: $5,000<br><br>• Annual renewal fee (N.H. Rev. Stat. Ann. § 399-G:8):<br>    ○ Principal location: $500<br>    ○ Each authorized delegate registration: $25<br>    ○ Maximum: $5,000<br><br>**Minimum net worth:** The lesser of (i) its average daily outstanding money transmissions for the prior calendar year or (ii) $1,000,000. (N.H. Rev. Stat. Ann. § 399-G:5)<br><br>**Surety bond:** Each money transmitter applicant shall post a continuous surety bond in the amount of $100,000. (N.H. Rev. Stat. Ann. § 399-G:5) | fingerprints taken by a qualified law enforcement agency or an authorized employee of the banking department. In the event that the first set of fingerprints is invalid due to insufficient pattern, a second set of fingerprints is necessary in order to complete the criminal history records check.<br><br>**Examinations by banking department** (N.H. Rev. Stat. Ann. § 399-G:13):<br>• Compliance examination: The department may examine the business affairs and records of any licensee, authorized delegate, or any other person, whether licensed or not, as it deems necessary to determine compliance with this chapter and the rules adopted pursuant to it.<br>• Affairs and records: The affairs and records of every licensee shall be subject at any time to such periodic, special, regular, or other examination by the banking department with or without notice to the licensee. All books, papers, files, related material, and records of assets of the licensee shall be subject to the banking department's examination.<br>• Business affairs:  Any agent of the department may make a thorough examination into the business affairs of each licensee and shall report any violations of law, rule, or standard business practice to the department.<br><br>**Extent of examination** (N.H. Rev. Stat. Ann. § 399-G:13):<br>• In determining compliance, the department may examine the books, accounts, |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | | records, files, and other documents or matters of any licensee or person. The department shall have the power to subpoena witnesses and administer oaths in any adjudicative proceedings, and to compel, by subpoena duces tecum, the production of all books, records, files, and other documents and materials relevant to its investigation.<br><br>• In discovery violations, the banking department shall have access to the books, papers, records, files, and vaults of all such persons. The banking department shall also have authority to examine, under oath, all persons whose testimony it may require relative to such loans or business.<br><br>**Examination fees:**<br>• Background investigation: The department may require the applicant or licensee to pay the actual costs of each background investigation and criminal history records check. (N.H. Rev. Stat. Ann. § 399-G:5)<br>• Investigation assessment: The bank commissioner shall, each fiscal year, charge and collect from money transmitters, the total amount appropriated for the bank commissioner's department. Said sum shall be collected as follows: from each such institution examined a sum equal to the product of the average daily rate of overall salary costs, including the benefits portion thereof, and expenses of all examining personnel employed in making examinations, multiplied by the number of personnel days devoted to the examination of the particular institution, |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | | provided, however, that no such institution shall be charged or pay for less than one full day. The balance of said sum remaining after the charges provided for in paragraph I have been deducted from the total sum shall be charged and collected as follows: each licensee and registrant shall be charged and shall pay such proportion of said balance applicable to the consumer credit administration division under the banking department's accounting unit designation as the gross revenue received from the money transmitted from each licensee's New Hampshire business bears to the total gross revenue received from the total dollar volume of all such money transmitted, from New Hampshire business by such licensees during the preceding calendar year ending December 31, as shown by their annual reports to the commissioner.  (N.H. Rev. Stat. Ann. § 399-G:13, N.H. Rev. Stat. Ann. § 383:11) |
| NJ | N.J. Stat. Ann. §§ 17:15C-1 *et seq.* (New Jersey Money Transmitters Act) | N.J. Admin. Code §§ 3:27-1.1 *et seq.* | **Application** for license (N.J. Stat. Ann. § 17:15C-7) – Minimum requirements:<br><br>• (1) The exact name of the applicant, the applicant's principal address, any fictitious or trade name used by the applicant in the conduct of its business and the location of the applicant's business records;<br><br>• (2) The history, if any, of the applicant's material litigation and criminal convictions for the five-year period prior to the date of the application;<br><br>• (3) A description of the activities conducted by the applicant and a history of operations;<br><br>• (4) A description of the business activities in which the | **Investigation upon initial/renewal application:**  Upon the filing of a complete initial/renewal application, the commissioner shall investigate the financial condition and responsibility, financial and business experience, character and general fitness of the applicant for an initial license or a renewal license. The commissioner may conduct an on-site investigation of the applicant for an initial license, the reasonable cost of which shall be borne by the applicant.  (N.J. Stat. Ann. § 17:15C-9)<br><br>**Fingerprints:** Except in the case of a publicly traded corporation, its subsidiaries and |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | applicant seeks to be engaged in the State; <br><br> • (5) A list identifying the applicant's proposed authorized delegates in the State, if any, at the time of the filing of the license application;\ <br><br> • (6) A sample authorized delegate contract, if applicable; <br><br> • (7) A sample form of payment instrument, if applicable; <br><br> • (8) Each location at which the applicant and its authorized delegates, if any, propose to conduct the licensed activities in the State; <br><br> • (9) The name and address of each clearing bank on which the applicant's payment instruments will be drawn or through which those payment instruments will be payable; <br><br> • (10) A list identifying each country to which an applicant proposes to transmit money or from which an applicant proposes to receive money transmissions; <br><br> • (11) Federal tax identification number; and <br><br> • (12) Non-refundable application fee as prescribed by regulation by the commissioner in an amount not to exceed $ 1,000. <br><br> • (13) The date of the applicant's incorporation and state of incorporation; <br><br> • (14) A certificate of good standing from the state in which the applicant was incorporated; <br><br> • (15) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded on | affiliates, or a bank, bank holding company, subsidiaries and affiliates thereof, license application must include fingerprints of each of the applicant's executive officers and of each officer or manager who will be in charge of the applicant's activities to be licensed hereunder. (N.J. Stat. Ann. § 17:15C-7) <br><br> **Investigation and examination by commissioner** (N.J. Stat. § 17:15C-11): <br><br> • Compliance examination:  The commissioner may investigate and examine any licensee or other person the commissioner deems necessary to determine compliance with this act and the orders, rules and regulations issued hereunder. <br><br> • Financial data: The commissioner may request additional financial data from a licensee or conduct an on-site examination or investigation of any authorized delegate or location of a licensee within this State without prior notice to the authorized delegate or licensee if the commissioner has a reasonable basis to believe that the licensee or authorized delegate is not in compliance with this act. <br><br> **Extent of examination:**  The commissioner may examine the books, accounts, records, and other documents or matters of any licensee or other person. The commissioner shall have the power to compel by subpoena the production of all relevant books, records and other documents and materials relative to an examination or investigation. The cost of the investigations and examinations shall be |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | any stock exchange;<br><br>• (16) The name, business and residence address, social security number, date of birth and employment history for the past five years of each of the applicant's executive officers and of each officer or manager who will be in charge of the applicant's activities to be licensed under this act;<br><br>• (17) The name, business and residence address, social security number, date of birth and employment history for the period five years prior to the date of the application of each key shareholder of the applicant;<br><br>• (18) The history, if any, of material litigation and criminal convictions for the five-year period prior to the date of the application of every executive officer or key shareholder of the applicant;<br><br>• (19) A copy of the applicant's most recent audited financial statements (including balance sheet, statement of income or loss, statement of changes in shareholder equity and statement of changes in financial position) prepared by a certified public accountant or public accountant in good standing and, if available, the applicant's audited financial statements for the immediately preceding three-year period;<br><br>• (20) Copies of all filings, if any, made by the applicant with the Securities and Exchange Commission, or with a similar regulator in a country other than the United States, within the year preceding the date of filing of the application; and<br><br>**Fees:**<br><br>• <u>Application fee</u> (N.J. Admin. Code § 3:27-3.2, N.J. Admin. Code § 3:23-2.1): | borne by the licensee.  (N.J. Stat. Ann. § 17:15C-11)<br><br>**Examination fees:**  Covered by annual assessment. (N.J. Admin. Code § 3:5-4.4)<br><br>**Annual renewal report** (N.J. Stat. Ann. § 17:15C-12):<br><br>The licensee shall include in its annual report:<br><br>• (1) A copy of its most recent audited consolidated annual financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder's equity and statement of changes in financial position; for a person licensed to engage only in the business of a foreign money transmitter must include, a copy of its most recent compiled annual financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder's equity and statement of changes in financial position, except that the commissioner may, for good cause, request a foreign money transmitter to submit an audited financial statement;<br><br>• (2) for the most recent quarter for which data is available prior to the date of the filing of the annual report, but in no event more than 120 days prior to the annual report filing date, the licensee shall provide the number of payment instruments sold by the licensee in the State, the dollar amount of those instruments and the dollar amount of those instruments currently outstanding;<br><br>• (3) any material changes to any of the |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | ○  $700.<br><br>• Annual assessment (N.J. Admin. Code § 3:5-4.4):<br><br>• Based on the dollar volume of money transmitted, the dollar volume of bills paid and the dollar volume of checks sold by each licensee for the preceding calendar year as reported in the licensee's annual report<br><br>**Minimum net worth** (N.J. Stat. Ann. § 17:15C-5, N.J. Admin. Code §):<br><br>• Principal office: $100,000<br><br>• Each additional location or agent: $25,000<br><br>• Maximum: $1,000,000<br><br>• For persons licensed to engage in business in this State only as a foreign money transmitter: (1) principal office: $50,000, (2) each additional location or agent: $10,000, (3) maximum: $400,000.<br><br>**Maintenance of permissible investments:**<br><br>• Each licensee shall at all times possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate face amount of all outstanding payment instruments issued or sold by the licensee in the United States.<br><br>• The commissioner may waive this requirement if the dollar volume of a licensee's outstanding payment instruments does not exceed the bond or other security devices posted by the licensee pursuant to section 8 of this act.  (N.J. Stat. § 17:15C-6)<br><br>**Security** (N.J. Stat. Ann. § 17:15C-6, N.J. Stat. Ann. § 17:15C-8):<br>• Surety bond, irrevocable letter of credit or other | information submitted by the licensee on its original application which have not previously been reported to the commissioner on any other report required to be filed under this act;<br><br>• (4) a list of the licensee's permissible investments;<br><br>• (5) a list of the locations within this State at which business regulated by this act is being conducted by either the licensee or its authorized delegate; and<br><br>• (6) such other information as the commissioner may require by regulation. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | security device or deposit of cash, interest-bearing stocks and bonds, notes, debentures or other obligations of the United States or any agency or instrumentality thereof<br><br>o   Minimum principal sum: $100,000<br><br>o   Maximum: $1,000,000<br><br>• For application to engage only in the business of a foreign money transmitter, security device shall be in amount which is based on the annual volume of business in this State as reported in the most recent annual report, ranging from $25,000 (annual volume of business up to and including $500,000) to $100,000 (annual volume of business over $14,000,000 and up to and including $15,000,000).  The security device amount required on an annual volume of business in excess of $15 million shall be $100,000 plus an additional amount set by the commissioner by regulation not to exceed $900,000. | |
| NM | N.M. Stat. Ann. § 58-20-1 | None. | **Application** for license – Minimum requirements:<br><br>• (1) the full name and business address of the applicant;<br><br>• (2) a financial statement of the applicant as of the end of the last fiscal year for which an annual statement has, in accordance with normal accounting practice, been prepared, certified by a certified public accountant or a registered public accountant;<br><br>• (3) letters of recommendation from the banks with which the applicant does business;<br><br>• (4) list of the locations, including agencies, at which the applicant engages in the business of issuing or selling checks or money orders; and<br><br>• (5) any other pertinent data that the director may | **Investigation upon application:** Upon the filing of the application, the payment of the investigation fee and the approval by the director of the financial institutions division of the regulation and licensing department of the bond, the director shall investigate the financial responsibility, financial and business experience, character and general fitness of the applicant.<br><br>**Examination by director:**  The director of the financial institutions division of the regulation and licensing department may at any time examine all the books, records, papers, assets and liabilities of every kind of any licensee to determine its financial condition and business methods. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | require by regulation.<br><br>**Fees:**<br>• Application/investigation fee:<br>  o Nonrefundable, constitutes license fee for first year if license is granted<br>  o Principal location: $150<br>  o Each agent: $25<br>• Annual renewal fee:<br>  o Principal location: $150<br>  o Each agent: $25<br>**Minimum net worth:** $100,000.<br>**Security:**<br>• Corporate surety bond or deposit of cash, interest-bearing stocks and bonds, notes, debentures or other obligations of the United States or any agency or instrumentality thereof<br>  o Minimum principal sum: $10,000<br>  o Each additional location: $5,000<br>  o Maximum: $200,000 | **Examination fee:**  One hundred fifty dollars ($150) a day or any portion thereof for the conduct of the examination. |
| NY | N.Y. Banking Law §§ 640 *et seq.* (Transmitters of Money) | | **Application** for license (N.Y. Banking Law § 641) – Minimum requirements:<br><br>• The exact name of the applicant and, if incorporated, the date of incorporation and the state where incorporated.<br><br>• The complete address of the principal office from which the business is to be conducted, and where the books and records of the applicant are maintained and to be maintained, showing the street and number, if | **Investigation upon application:** Upon the filing of an application, and the payment of the fees for investigation and license, the superintendent shall investigate the financial condition and responsibility, financial and business experience, character and general fitness of the applicant.  (N.Y. Banking Law § 642)<br><br>**Investigations by superintendent:** The |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | any, and the municipality and county;<br><br>• If the applicant has one or more branches, subsidiaries or affiliates engaging in this state in the business of selling or issuing checks, or of receiving money for transmission or transmitting the same, the complete name and address of each;<br><br>• The name and residence address of the applicant, if an individual or, if a partnership, of its partners or, if a corporation or association, of the directors, trustees and principal officers thereof, and of any stockholder owning twenty per centum or more of any class of its stock; and<br><br>• Such other pertinent information as the superintendent may require.<br><br>**Fees** (N.Y. Banking Law § 641):<br><br>*See* http://www.dfs.ny.gov/banking/ialfmti.htm<br><br>• Non-refundable investigation fee of $3,000<br><br>**Maintenance of permissible investments:** Every licensee shall at all times maintain permissible investments having (i) a market value, computed in accordance with generally accepted accounting principles, at least equal to the aggregate of the amount of all its outstanding payment instruments and all its outstanding traveler's checks or (ii) a net carrying value, computed in accordance with generally accepted accounting principles, at least equal to the aggregate of the amount of all its outstanding payment instruments and all its outstanding traveler's checks so long as the market value of such permissible investments is at least eighty per centum of the net carrying value.  (N.Y. Banking Law § 651)<br><br>**Security** (N.Y. Banking Law § 643):<br><br>• Corporate surety bond or deposit of cash, interest- | superintendent shall have the power to make such investigations and conduct such hearings as he shall deem necessary to determine whether any licensee or any other person has violated any of the provisions of this article, or whether any licensee has conducted himself in such manner as would justify the suspension or revocation of his license. (N.Y. Banking Law § 646)<br><br>**Extent of investigation:** In making any investigation or conducting any hearing pursuant to the provisions of this article, the superintendent, or any person duly designated by him, shall have the power at all times to subpoena witnesses; to take depositions of witnesses residing without the state, in the manner provided for in civil actions in courts of record; to pay such witnesses the fees and mileage for their attendance provided for witnesses in civil actions in courts of record; and to administer oaths. He shall also have the power to compel by order or subpoena the production of and to examine all relevant books, records, accounts and other documents. (N.Y. Banking Law § 646)<br><br>*See* http://www.dfs.ny.gov/banking/mtexam.htm<br><br>**Investigation fees:** Annual assessment<br><br>*See* http://www.dfs.ny.gov/banking/billassess.htm |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | bearing stocks and bonds, notes, debentures or other obligations of the United States or any agency or instrumentality thereof | |
| | | | • Minimum principal sum: $500,000 | |
| | | | • In making any determination of minimum bond amount, the superintendent may take into account the financial condition of the licensee, the number of locations in this state at which the licensee, either directly or through agents, transacts the business of selling New York instruments or New York traveler's checks, the controls imposed on such agents, and the possible exposure of purchasers and holders of New York instruments and New York traveler's checks to loss in the event of the insolvency, bankruptcy or other financial impairment of the licensee. | |
| | | | • Superintended may modify or dispense with security requirement if superintendent finds that a licensee has transacted the business of money transmission in this state for a period of five (5) consecutive years and that such business has been conducted honestly, efficiently and safely and that the licensee's financial condition is sound and that its New York instruments are insured. | |
| NC | N.C. Gen. Stat. §§ 53-208.1 *et seq.* (Money Transmitters Act) | 4 N.C. Admin. Code §§ 3F.0201 *et seq.* | **Application** for license (N.C. Gen. Stat. § 53-208.7, 4 N.C. Admin Code § 3F.0301) – Minimum requirements:<br><br>• (1) The exact name of the applicant, the applicant's principal address, any assumed or trade name used by the applicant in the conduct of its business, and the location of the applicant's business records.<br><br>• (2) The history of the applicant's material civil litigation for a 10-year period prior to the date of the application and a record of any criminal convictions.<br><br>• (3) A description of the activities conducted by the | **Investigation upon application:** Upon the filing of a complete application, the Commissioner shall investigate the financial condition and responsibility, financial and business experience, and the character and general fitness of the applicant. The Commissioner may conduct an on-site investigation of the applicant, the reasonable cost of which shall be borne by the applicant. (N.C. Gen. Stat. § 53-208.10)<br><br>**Examinations by commissioner** (N.C. Gen. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | applicant and a history of operations. | Stat. § 53-208.15): |
|       |                 |                        | • (4) A description of the business activities in which the applicant seeks to be engaged in the State. | • <u>Annual</u>:  The Commissioner may conduct an annual on-site examination of a licensee. If the Commissioner determines, based on the licensee's financial statements and past history of operations in the State, that an on-site examination is unnecessary, then the on-site examination may be waived by the Commissioner. |
|       |                 |                        | • (5) A list identifying the applicant's proposed authorized delegates in the State, if any, at the time of the filing of the license application. |  |
|       |                 |                        | • (6) A sample authorized delegate contract, if applicable. |  |
|       |                 |                        | • (7) A sample form of payment instrument, if applicable, which bears the name and address or telephone number of the issuer clearly printed on the payment instrument. | • <u>Without notice</u>: The Commissioner may examine a licensee without prior notice if the Commissioner has a reasonable basis to believe that the licensee is not in compliance with this Article. |
|       |                 |                        | • (8) The location or locations at which the applicant and its authorized delegates, if any, propose to conduct the licensed activities in the State. | • <u>Financial data</u>: If the Commissioner has a reasonable basis to believe that the licensee or authorized delegate is not in compliance with this Article, the Commissioner may (i) request financial data from a licensee in addition to that required under G.S. 53-208.11, or (ii) conduct an on-site examination of any authorized delegate or of any location of a licensee within this State without prior notice to the authorized delegate or licensee. |
|       |                 |                        | • (9) The name and address of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which the payment instruments will be payable. |  |
|       |                 |                        | • (10) The date of the applicant's incorporation and state of incorporation. |  |
|       |                 |                        | • (11) A certificate of good standing from the state in which the applicant was incorporated. |  |
|       |                 |                        | • (12) A certificate of authority from the Secretary of State to conduct business in this State, if required by the North Carolina Business Corporations Act, Chapter 55 of the General Statutes. | **Examination fees:** |
|       |                 |                        |  | • <u>On-site examination</u>:  Licensee shall pay all reasonably incurred costs of the examination. (N.C. Gen. Stat. § 53-208.15) |
|       |                 |                        | • (13) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant and the disclosure of whether any parent or subsidiary is publicly traded on | • <u>Examination of authorized delegate operations</u>:  authorized delegate shall pay all reasonably incurred costs of the examination. (N.C. Gen. Stat. § 53-208.15) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | any stock exchange.<br><br>• (14) The name, business and residence address, and employment history for the past five years of the applicant's executive officers and the officers or managers who will be in charge of the applicant's activities to be licensed pursuant to this Article.<br><br>• (15) The name, business and residence address, and employment history for the period five years prior to the date of the application of any key shareholder of the applicant.<br><br>• (16) The history of material civil litigation for a 10-year period prior to the date of the application and a record of any criminal conviction for every executive officer or key shareholder.<br><br>• (17) A copy of the applicant's most recent audited financial statement, including the balance sheet, statement of income or loss, statement of changes in shareholder equity, and statement of changes in financial position and, if available, the applicant's audited financial statements for the immediately preceding two-year period.<br><br>• (18) Copies of all filings, if any, made by the applicant with the United States Securities and Exchange Commission, or with a similar regulator in a country other than the United States, within the year preceding the date of filing of the application.<br><br>• (19) The applicant's Articles of Incorporation, limited partnership agreement, or other organizational documents, where applicable.<br><br>• (20) A certified copy of the applicant's Assumed Name Certificate, where applicable.<br><br>• (21) A description of the applicant's business | • <u>Examination of licensee's location within state</u>:  Licensee shall pay all reasonably incurred costs of the examination. (N.C. Gen. Stat. § 53-208.15)<br><br>• <u>Fees</u>:  Hourly rate ($25 - $75) plus travel expenses and the per diem subsistence allowance provided for State employees. (4 N.C. Admin. Code § 3C.1601, 4 N.C. Admin. Code § 3F.0602)<br><br>**Independent report in lieu of on-site examination:** The Commissioner, in lieu of an on-site examination, may accept the examination report of an agency of another state, or a report prepared by an independent accounting firm, and reports so accepted are considered for all purposes as an official report of the Commissioner.<br><br>**Annual renewal report** (N.C. Gen. Stat. § 53-208.11): Licensee shall submit annual renewal report (accompanied by annual license fee) which must contain, at a minimum:<br><br>• (1) A copy of its most recent audited consolidated annual financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder's equity, and statement of changes in financial position.<br><br>• (2) For the most recent quarter for which data is available prior to the date of the filing of the renewal application, but in no event more than 120 days prior to the renewal date, the licensee shall provide the number of payment instruments sold by the licensee in the State, the dollar amount of |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | experience, operations and organizational structure;<br><br>• (22) The identity of the applicant's controlling persons and their percentage of equity ownership;<br><br>• (23) If the applicant is not a publicly traded corporation, or a subsidiary of such corporation, the identity, business experience, education and financial information of its executive officers and directors;<br><br>• (24) Disclosure of any criminal proceedings pending against or criminal convictions entered against the applicant, its directors or executive officers;<br><br>• (25) Disclosure of any civil proceedings pending against or civil judgments entered against the applicant, its directors or executive officers which involve fraud or dishonesty;<br><br>• (26) Disclosure of any of the following proceedings involving the applicant, its subsidiaries or parent: bankruptcy; assignment for the benefit of creditors; receivership; conservatorship; enforcement proceedings resulting in the revocation or suspension of a license or other privilege to sell or issue checks in any state;<br><br>• (27) The name and location of each agent and subagent authorized by the applicant to sell its checks in this State;<br><br>• (28) A certified consolidated financial statement of the applicant for the previous fiscal year.<br><br>• (29) A specimen copy of the checks to be sold or issued by the applicant within this State;<br><br>• (30) A copy of the applicant's authorized agent agreement or contract;<br><br>**Fees** (N.C. Gen. Stat. § 53-208.9): | those instruments, and the dollar amount of those instruments currently outstanding.<br><br>• (3) Any material changes to any of the information submitted by the licensee on its original application, which have not previously been reported to the Commissioner on any other report required to be filed under this Article.<br><br>• (4) A list of the licensee's permissible investments.<br><br>• (5) A list of the locations within this State at which business regulated by this Article is being conducted by either the licensee or its authorized delegates, except for entities exempt under G.S. 53-208.4. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | • Application/investigation fee: <br>     o $500, nonrefundable <br> • License fee: <br>     o Principal location: $1,000 <br>     o Each additional location: $15 <br>     o Maximum: $5,000 per license per year <br> **Minimum net worth** (N.C. Gen. Stat. § 53-208.5): <br> • Principal office: $100,000 <br> • Each additional location: $10,000 <br> • Maximum: $500,000 <br> • Licensees with neither locations nor authorized delegates in this State shall have an additional net worth as established by the Commissioner in an amount not to exceed a maximum of five hundred thousand dollars ($500,000). <br> **Maintenance of permissible investments:** <br> • Each licensee shall possess at all times unencumbered permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate face amount of all outstanding payment instruments and stored value obligations issued or sold. <br> • The Commissioner may waive this requirement if the dollar volume of a licensee's outstanding payment instruments and stored value do not exceed the bond or other security devices posted by the licensee. (N.C. Gen. Stat. § 53-208.6) <br> **Security** (N.C. Gen. Stat. § 53-208.8): | |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
|  |  |  | • Surety bond or deposit of 1) Unencumbered cash; (2) Unencumbered interest-bearing bonds; (3) Unencumbered notes; (4) Unencumbered debentures; (5) Unencumbered obligations of the United States or any agency or instrumentality thereof, or guaranteed by the United States; (6) Unencumbered obligations of this State or of any political subdivision of the State, or guaranteed by this State.<br><br>  o Minimum principal sum: $150,000<br><br>  o Each additional location: $5,000<br><br>  o Maximum: $250,000<br><br>• In the case of an applicant that engages in business under this Article, but has no locations or authorized delegates in this State, the amount of the security bond may be increased at the Commissioner's discretion to a maximum of two hundred fifty thousand dollars ($250,000). |  |
| ND | N.D. Cent. Code §§ 13-09-01 *et seq.* (Money transmitters) | None. | **Application** for license (N.D. Cent. Code § 13-09-07) – Minimum requirements:<br><br>• (1) The exact name of the applicant, the applicant's principal address, any fictitious or trade name used by the applicant in the conduct of its business, and the location of the applicant's business records.<br><br>• (2) The history of the applicant's criminal convictions and material litigation for the five-year period before the date of the application.<br><br>• (3) A description of the activities conducted by the applicant and a history of operations.<br><br>• (4) A description of the business activities in which the applicant seeks to be engaged in the state.<br><br>• (5) A list identifying the applicant's proposed | **Investigation upon application:**  Upon the filing of a complete application, the commissioner shall investigate the financial condition and responsibility, financial and business experience, character, and general fitness of the applicant. The commissioner may conduct an onsite investigation of the applicant, the reasonable cost of which must be borne by the applicant.  (N.D. Cent. Code § 13-09-09)<br><br>**Examinations by commissioner:**<br><br>• <u>Annual</u>: The commissioner may conduct an annual onsite examination of a licensee upon reasonable written notice to the licensee. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
|  |  |  | authorized delegates in the state, if any, at the time of the filing of the license application.<br><br>• (6) A sample authorized delegate contract, if applicable.<br><br>• (7) A sample form of payment instrument, if applicable.<br><br>• (8) The locations at which the applicant and its authorized delegates, if any, propose to conduct the licensed activities in the state.<br><br>• (9) The name and address of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which the payment instruments will be payable.<br><br>• (10) The date of the applicant's incorporation and state of incorporation.<br><br>• (11) A certificate of good standing from the state in which the applicant was incorporated.<br><br>• (12) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded on any stock exchange.<br><br>• (13) The name, business and residence address, and employment history for the past five years of the applicant's executive officers and the officers or managers who will be in charge of the applicant's activities to be licensed hereunder.<br><br>• (14) The name, business and residence address, and employment history for the period five years prior to the date of the application of any key shareholder of the applicant.<br><br>• (15) The history of criminal convictions and material | • <u>Without notice</u>: The commissioner may examine a licensee without prior notice if the commissioner has a reasonable basis to believe that the licensee is in noncompliance with this chapter.<br><br>• <u>Financial data</u>: The commissioner may request financial data from a licensee or conduct an onsite examination of any authorized delegate or location of a licensee within this state without prior notice to the authorized delegate or licensee only if the commissioner has a reasonable basis to believe that the licensee or authorized delegate is in noncompliance with this chapter.<br><br>**Independent report in lieu of on-site examination:**  The commissioner, in lieu of an onsite examination, may accept the examination report of an agency of another state, or a report prepared by an independent accounting firm, and reports so accepted are considered for all purposes as an official report of the commissioner. The reasonable expenses incurred by the department, agencies of another state, or an independent licensed or certified public accountant in making the examination or report must be borne by the licensee. (N.D. Cent. Code § 13-09-13)<br><br>**Examination fees:**<br><br>• <u>On-site</u> examinations: Licensee shall pay an examination or visitation fee and the commissioner shall charge for the actual cost of the examination or visitation at an hourly rate set by the commissioner which |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | litigation for the five-year period before the date of the application of every executive officer or key shareholder of the applicant.<br><br>• (16) A copy of the applicant's most recent audited financial statement including balance sheet, statement of income or loss, statement of changes in shareholder equity, and statement of changes in financial position and, if available, the applicant's audited financial statements for the immediately preceding two-year period.<br><br>• (17) Copies of all filings, if any, made by the applicant with the United States securities and exchange commission, or with a similar regulator in a country other than the United States, within the year preceding the date of filing of the application.<br><br>**Fees:**<br><br>• Application/investigation fee (N.D. Cent. Code § 13-09-08):<br><br>  o  $450, nonrefundable<br><br>• License fee (N.D. Cent. Code § 13-09-08):<br><br>  o  $400, refunded if application is denied<br><br>• Annual renewal fee (N.D. Cent. Code, § 13-09-10):<br><br>  o  $450<br><br>**Minimum net worth** (N.D. Cent. Code, § 13-09-04):<br><br>  o  $100,000<br><br>**Maintenance of permissible investments:**<br><br>• Each licensee under this chapter must at all times possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the | is sufficient to cover all reasonable expenses associated with the examination or visitation. (N.D. Cent. Code § 13-09-13)<br><br>• Examination of authorized delegate operations:  authorized delegate shall pay all reasonably incurred costs of such examination.  (N.D. Cent. Code § 13-09-13)<br><br>• Examination of licensee's location within state: licensee shall pay all reasonably incurred costs of such examination. (N.D. Cent. Code § 13-09-13)<br><br>**Annual renewal report** (N.D. Cent. Code § 13-09-10):<br><br>Licensee shall submit annual renewal report (accompanied by nonrefundable annual renewal fee) which must contain, at a minimum:<br><br>• (1) A copy of its most recent audited consolidated annual financial statement including balance sheet, statement of income or loss, statement of changes in shareholder's equity, and statement of changes in financial position;<br><br>• (2) For the most recent quarter for which data is available before the date of the filing of the renewal application, but in no event more than one hundred twenty (120) days before the renewal date, the licensee must provide the number of payment instruments sold by the licensee in the state, the dollar amount of those instruments, and the dollar amount of those instruments currently outstanding; |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | aggregate face amount of all outstanding payment instruments and stored value issued or sold by the licensee in the United States.<br><br>• The commissioner may waive this requirement if the dollar volume of a licensee's outstanding payment instruments and stored value does not exceed the bond or other security devices posted by the licensee. (N.D. Cent. Code § 13-09-06)<br><br>**Security** (N.D. Cent. Code § 13-09-05):<br>• Security device or deposit of or deposit of cash, interest-bearing stocks and bonds, notes, debentures, or other obligations of the United States or any agency or instrumentality thereof.<br><br>  o   Minimum principal sum: $150,000<br><br>  o   Maximum: $500,000<br><br>• The commissioner may increase the amount of the bond or security device to the maximum amount for good cause. | • (3) Any material changes to any of the information submitted by the licensee on its original application which have not previously been reported to the commissioner on any other report required to be filed under this chapter;<br><br>• (4) A list of the licensee's permissible investments; and<br><br>• (5) A list of the locations, if any, within this state at which business regulated by this chapter is being conducted by either the licensee or its authorized delegates. |
| OH | Ohio Rev. Code Ann. §§ 1315.01 *et seq.* (Money Transmitters Law) | None. | **Application** for license shall be in the form prescribed by the superintendent of financial institutions. (Ohio Rev. Code Ann. § 1315.03)<br><br>**Application and license fees:** Application and license fee. (Ohio Rev. Code Ann. § 1315.13)<br><br>**Minimum net worth:** $500,000, excluding any assets that the superintendent disqualifies and including any off-balance sheet liabilities that the superintendent requires. (Ohio Rev. Code Ann. § 1315.04, Ohio Rev. Code Ann. § 1315.05)<br><br>**Maintenance of permissible investments:** Each licensee shall maintain permissible investments having an aggregate market value of not less than the aggregate amount of all of the licensee's outstandings received from | **Investigation upon application** (Ohio Rev. Code Ann. § 1315.04):  After accepting an application for a money transmitter license, the superintendent of financial institutions shall examine all the facts and circumstances relating to the application.  At the applicant's expense, the superintendent may conduct an on-site examination of the applicant's books, records, and operations.<br><br>**Fingerprints and criminal background check:**  Whenever the approval of the superintendent of financial institutions is required or under an order or supervisory action issued or taken under those sections, for a person to serve as an organizer, |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | persons in the United States, directly and through authorized delegates, to the extent reported to the licensee.  The superintendent of financial institutions may waive the requirement if the volume of a licensee's outstandings does not exceed the licensee's security device.  (Ohio Rev. Code Ann. § 1315.06)<br><br>**Security (ORC Ann. 1315.07):**<br>• Security device<br>    o Minimum principal sum: $300,000<br>    o Maximum: $2,000,000 | incorporator, director, executive officer, or controlling person of a licensee, or to otherwise have a substantial interest in or participate in the management of a licensee, the superintendent shall request the superintendent of the bureau of criminal identification and investigation, or a vendor approved by the bureau, to conduct a criminal records check based on the person's fingerprints. The superintendent of financial institutions shall request that criminal record information from the federal bureau of investigation be obtained as part of the criminal records check. (Ohio Rev. Code Ann. § 1315.141)<br><br>**Examination by superintendent of financial institutions:** As often as the superintendent of financial institutions considers necessary, the superintendent, or any deputy or examiner appointed or any contractor engaged by the superintendent for that purpose, thoroughly shall examine the records and affairs of each licensee. (Ohio Rev. Code Ann. § 1315.12)<br><br>**Extent of examination:**  Examinations shall include a review of all of the following: (1) Compliance with law; (2) Safety and soundness; (3) Other matters that the superintendent determines. (Ohio Rev. Code Ann. § 1315.12)<br><br>**Examination fees:**<br>• On-site applicant examination:  Applicant will bear the cost of any on-site examination.  If the superintendent requests, the applicant shall advance to the superintendent the superintendent's |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | | estimate of the cost of the on-site examination, with any unconsumed portion to be returned to the applicant.  (Ohio Rev. Code Ann. § 1315.04) |
| | | | | • Licensee examination:  The licensee shall bear the expense of any examination. If the superintendent requests, the licensee shall advance to the superintendent the superintendent's estimate of the cost of the examination, with any unconsumed portion to be returned to the licensee.  (Ohio Rev. Code Ann. § 1315.12) |
| | | | | • Criminal background checks:  Fee required for a criminal background check shall be paid by the person who is the subject of the request. (Ohio Rev. Code Ann. § 1315.141) |
| OK | 6 Okla. Stat. § 1511 (Oklahoma Financial Transaction Reporting Act) | Okla. Admin. Code §§ 85:15-1-1 *et seq.* | **Application** for license (Okla. Admin. Code § 85:15-3-2) – Permissible requirements:<br><br>• (1) the legal name and residential and business addresses of the applicant and any fictitious or trade name used by the applicant in conducting its business;<br><br>• (2) a list of any criminal convictions of the applicant and any material litigation in which the applicant has been involved in the 5-year period next preceding the submission of the application;<br><br>• (3) a description of all money transmission services currently provided anywhere by the applicant and the money transmission services that the applicant seeks to provide in this State;<br><br>• (4) a list of the applicant's proposed authorized | **Investigation upon application:**  When an application is filed under the Act, the Commissioner shall investigate the applicant's financial condition and responsibility, financial and business experience, character, and general fitness. The Commissioner may conduct an on-site investigation of the applicant, the cost of which the applicant must pay. (Okla. Admin. Code § 85:15-3-4)<br><br>**Examination by State Banking Commissioner** (Okla. Admin. Code § 85:15-7-1):<br><br>• With notice:  The Commissioner, or another state agency authorized by the Commissioner, may conduct an examination of a licensee or of any of its authorized delegates upon 10 days' notice |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | delegates and the locations in this State where the applicant and its authorized delegates propose to engage in money transmission; <br><br> • (5) a list of other States in which the applicant is licensed to engage in money transmission and any license revocations, suspensions, or other disciplinary action taken against the applicant in another State during the previous 10-year period; <br><br> • (6) information concerning any bankruptcy or receivership proceedings affecting the licensee during the previous 10-year period; <br><br> • (7) a sample form of contract for authorized delegates; <br><br> • (8) a description of the source of money and credit to be used by the applicant to provide money transmission services; and <br><br> • (9) the date of the applicant's incorporation or formation and State or country of incorporation or formation; <br><br> • (10) if applicable, a certificate of good standing from the State or country in which the applicant is incorporated or formed; <br><br> • (11) a brief description of the structure or organization of the applicant, including any parent or subsidiary of the applicant, and whether any parent or subsidiary is publicly traded; <br><br> • (12) the legal name, any fictitious or trade name, all business and residential addresses, and the employment, in the 5-year period next preceding the submission of the application of each executive officer, manager, director, or person that has control, of the applicant; <br><br> • (13) a list of any criminal convictions and material | in a record to the licensee. <br><br> • Without notice:  The Commissioner, or another state agency authorized by the Commissioner, may examine a licensee or its authorized delegate, at any time, without notice, if the Commissioner or such other agency has reason to believe that the licensee or authorized delegate is engaging in an unsafe or unsound practice or has violated or is violating any state or federal money laundering or criminal law. <br><br> **Examination fees:** <br><br> • On-site examination:  licensee shall pay the reasonable cost of the examination. (Okla. Admin. Code § 85:15-7-1) <br><br> • Hourly examination/audit fee:  Seventy-five Dollars ($75.00) per hour for each representative of the Commissioner required to conduct the examination or audit review plus travel expenses for each of the examining personnel.  (6 Okla. Stat. § 2113) <br><br> • Audit review:  If the Commissioner accepts an audit in lieu of the examination of the Commissioner, the Commissioner may review such audit and may charge to the licensee fees for such review at the rate prescribed above. <br><br> **Annual renewal report (**Okla. Admin. Code § 85:15-3-5)**:** <br><br> Licensee shall submit annual renewal report (accompanied by the annual license fee) which must contain, at a minimum: |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | litigation in which any executive officer, manager, director, or person in control of, the applicant has been involved in the 10-year period next preceding the submission of the application;<br><br>• (14) a copy of the applicant's audited financial statements for the most recent fiscal year and, if available, for the two-year period next preceding the submission of the application;<br><br>• (15) a copy of the applicant's unconsolidated financial statements for the current fiscal year, whether audited or not, and, if available, for the two-year period next preceding the submission of the application;<br><br>• (16) if the applicant is publicly traded, a copy of the most recent report filed with the United States Securities and Exchange Commission under Section 13 of the federal Securities Exchange Act of 1934 [15 U.S.C. § 78m (1994 & Supp. V 1999)];<br><br>• (17) if the applicant has a registered agent in this State, the name and address of the applicant's registered agent in this State; and<br><br>• (18) any other information the Commissioner reasonably requires with respect to the applicant.<br><br>**Fees** (Okla. Admin. Code § 85:15-3-2, Okla. Admin. Code § 85:15-3-5):<br><br>• <u>Application/investigation fee</u>:<br>  o $3,000, nonrefundable<br><br>• <u>License fee</u>:<br>  o Principal location: $2,000<br>  o Each authorized delegate: $50<br>  o Refunded if application is denied | • (1) a copy of the licensee's most recent audited annual financial statement or, if the licensee is a wholly owned subsidiary of another corporation, the most recent audited consolidated annual financial statement of the parent corporation or the licensee's most recent audited consolidated annual financial statement;<br><br>• (2) a description of each material change in information submitted by the licensee in its original license application which has not been reported to the Commissioner on any required report (6 Okla. Stat. § 2113)<br><br>• (3) a list of the licensee's permissible investments and a certification that the licensee continues to maintain permissible investments according to the requirements set forth in the Act;<br><br>• (4) proof that the licensee continues to maintain adequate security as required by this Chapter; and<br><br>• (5) a list of the locations in this State where the licensee or authorized delegates of the licensee engages in money transmission. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | **Age requirements:** No license shall be issued to an applicant: (1) If a natural person, unless he is over twenty-one (21) years of age; (2) If a partnership, unless each of the partners is over twenty-one (21) years of age; (3) If a joint-stock association, trust, unincorporated association or corporation, unless each of the officers, directors, trustees or other managing officials is over twenty-one (21) years of age. (6 Okla. Stat. § 2106)<br><br>**Minimum net worth** (Okla. Admin. Code § 85:15-3-6):<br><br>• $275,000, for one (1) to fifty (50) locations<br><br>• $500,000 for fifty-one (51) to three hundred (300) locations<br><br>• $1,500,000.00 for three hundred one (301) to eight hundred (800) locations<br><br>• $3,000,000 for over eight hundred (800) locations.<br><br>**Maintenance of permissible investments:**  A licensee shall maintain at all times permissible investments that have a market value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of money transmitted from all states by the licensee.  (Okla. Admin. Code § 85:15-9-1)<br><br>**Security** (Okla. Admin. Code § 85:15-3-3):<br>• Surety bond, letter of credit, or other similar security<br><br>   o  Minimum principal sum: $50,000<br><br>   o  Each additional location: $10,000<br><br>   o  Maximum: $500,000<br><br>• The Commissioner may increase the amount of security required to a maximum of $1,000,000 if the financial condition of a licensee so requires, as evidenced by reduction of net worth, financial losses, or other relevant criteria. | |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| **OR** | Or. Rev. Stat. §§ 717.200 *et seq.* (Money Transmission) | Or. Admin. R. 441-745-0000 *et seq.* | **Application** for license (Or. Rev. Stat. § 717.220) – Minimum requirements:<br><br>• (1) The exact name of the applicant, the applicant's principal address, any fictitious name, assumed business name or trade name used by the applicant in the conduct of its business and the location of the applicant's business records;<br><br>• (2) The history of the applicant's material litigation and criminal convictions for the five-year period prior to the date of the application;<br><br>• (3) A history of operations and a description of the business activities in which the applicant seeks to be engaged in this state;<br><br>• (4) A list identifying the applicant's proposed authorized delegates in the state, if any, at the time of the filing of the license application;<br><br>• (5) A sample authorized delegate contract, if applicable;<br><br>• (6) A sample form of payment instrument, if applicable;<br><br>• (7) The address of each location at which the applicant and its authorized delegates, if any, propose to conduct a money transmission business in this state;<br><br>• (8) The name and address of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which such payment instruments will be payable;<br><br>• (9) A business plan;<br><br>• (10) The date of the applicant's incorporation and state of incorporation; | **Investigation upon application:** Upon the filing of a complete application, the Director of the Department of Consumer and Business Services shall review the application and may investigate the financial condition and responsibility, financial and business experience, character and general fitness of the applicant. The director may conduct an on-site investigation of the applicant, the reasonable cost of which shall be paid by the applicant. (Or. Rev. Stat. § 717.235)<br><br>**Examination by director** (Or. Rev. Stat. § 717.255):<br><br>• Annual: The director may conduct an annual on-site examination of a licensee upon reasonable notice to the licensee. The examination may be conducted at the principal place of business of the licensee.<br><br>• With notice: Upon reasonable notice, the director may conduct an examination of any location of the licensee and its authorized delegates.<br><br>• Examination for violation: The director may conduct an on-site examination of a licensee or any authorized delegate without prior notice to the licensee or authorized delegate if the director has a reasonable basis to believe that the licensee or authorized delegate is in violation of any provision of Or. Rev. Stat. § 717.200 to 717.320, 717.900 and 717.905. The examination may be conducted at the principal place of business of the licensee or authorized |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | • (11) A certificate of good standing from the state in which the applicant was incorporated; <br><br> • (12) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded on any stock exchange; <br><br> • (13) The name, business and residence address, and employment history for the past five years of the applicant's executive officers and the officers or managers who will be in charge of the applicant's money transmission business; <br><br> • (14) The name, business and residence address, and employment history for the five-year period prior to the date of the application of any controlling shareholder of the applicant; <br><br> • (15) The history of material litigation and criminal convictions for the five-year period prior to the date of the application of every executive officer or controlling shareholder of the applicant; <br><br> • (16) A copy of the applicant's most recent audited financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder equity and statement of changes in financial position and, if available, a copy of the applicant's audited financial statements for the immediately preceding two-year period; and <br><br> • (17) Copies of all filings, if any, made by the applicant with the United States Securities and Exchange Commission, or with a similar regulator in a country other than the United States, within the year preceding the date of the application. <br><br> **Application and license fees:** | delegate. <br><br> **Extent of examination:** The director shall have authority to examine under oath all persons whose testimony the director may require in order to conduct the examination. (Or. Rev. Stat. § 717.255) <br><br> **Independent report in lieu of annual on-site examination:**  In lieu of an annual on-site examination, the director may accept the examination report of an agency of another state or a report prepared by an independent accountancy organization. (Or. Rev. Stat. § 717.255) <br><br> **Examination fees:** <br><br> • <u>Hourly fee</u>:  $75 an hour per person for the director and each examiner or other division employee used in an examination conducted under Or. Rev. Stat. § 717.255 and for extra services provided a license under 717.255(2). (Or. Admin. R. 441-745-0340) (**NOTE**: Or. Rev. Stat. § 717.255 sets rate at $60/hour) <br><br> • <u>Travel</u>:  If an examiner or other division employee or the Director is required to travel out of state in conducting the examination or providing the extra services, the rate of charge payable by the licensee is $75 an hour per person, plus actual cost of travel.  (Or. Admin. R. 441-745-0340) <br><br> • <u>Contract consultant</u>:  If the extra services or examination is performed by a consultant hired by contract for the particular service or examination, the |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | <ul><li>Application/investigation fee:<ul><li>$1,000, nonrefundable,</li><li>Constitutes the license fee for the applicant's first year of activities if the license is granted.  (Or. Rev. Stat. § 717.230)</li></ul></li><li>License renewal fee (Or. Rev. Stat. § 717.240):<ul><li>$500, nonrefundable</li></ul></li></ul>*See* http://licenseinfo.oregon.gov/?fuseaction=license_icon&link_item_id=1731<br><br>**Minimum net worth** (Or. Rev. Stat. § 717.215):<ul><li>Principal location: $100,000</li><li>Each additional location: $25,000</li><li>Maximum: $500,000</li></ul>**Maintenance of permissible investments:**  Each licensee shall at all times possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate face amount of all outstanding payment instruments issued or sold by the licensee in the United States.  (Or. Rev. Stat. § 717.215)<br><br>**Security** (Or. Rev. Stat. § 717.225):<ul><li>Security device or deposit of securities</li><li>Minimum principal sum: $25,000</li><li>Each additional location: $5,000</li><li>Maximum: $150,000</li></ul> | charge payable by the licensee is the actual cost to the division of the contract consultant.  (Or. Admin. R. 441-745-0340)<br><br>**Annual renewal report** (Or. Rev. Stat. §  § 717.240):<br><br>Licensee shall submit annual renewal report (accompanied by annual fee) which must contain, at a minimum:<ul><li>(1) A copy of the licensee's most recent audited consolidated annual financial statement, including a balance sheet, statement of income or loss, statement of changes in shareholder equity and statement of changes in financial position;</li><li>(2) For the most recent quarter for which data are available prior to the date of the renewal application, but not more than 120 days prior to the renewal date, a description of the number of payment instruments sold by the licensee in this state, the dollar amount of those instruments and the dollar amount of those instruments currently outstanding;</li><li>(3) A description of any material changes to any of the information submitted by the licensee on the licensee's original application that have not previously been reported to the director on any other report required to be filed with the director;</li><li>(4) A list of the licensee's permissible investments; and</li><li>(5) A list of the locations within this state at which regulated business is being conducted by either the licensee or its</li></ul> |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | | authorized delegate. |
| PA | 7 Pa. Stat. Ann. §§ 6101 *et seq.* (Transmitting Money or Credit) | 10 Pa. Code §§ 19.1 *et seq.* | **Application** for license (7 Pa. Stat. Ann. § 6105) – Among other things, the application shall state the full name of<br><br>• the applicant, if an individual;<br><br>• each partner, if the applicant is a partnership;<br><br>• each trustee and officer thereof, if the applicant is a trust;<br><br>• each officer and director thereof, if the applicant is a corporation, joint stock association or other unincorporated association;<br><br>• each other business in which applicant and any affiliated companies are engaged; and<br><br>• the name and address of each agent or subagent conducting business in this Commonwealth.<br><br>**Fees** (7 Pa. Stat. Ann. § 6106):<br><br>• Application/investigation fee:<br><br>   o $1,000, nonrefundable,<br><br>   o Constitutes the license fee for the first license period if the license is granted<br><br>• Annual renewal fee:<br><br>   o $300<br><br>**Minimum net worth** (7 Pa. Stat. Ann. § 6104):<br><br>   o $500,000<br><br>**Minimum experience:** In the case of an individual, at least five years' experience in business and be of good character and reputation. In the case of an organization, officers and directors who meet the experience requirements specified for an individual applicant. (7 Pa. | **Investigation upon application:** Upon the filing of an application and the payment of the fee for investigating the same, the Department of Banking shall make such investigation as is necessary to determine whether the applicant is qualified to receive a license under this act. (7 Pa. Stat. Ann. § 6107)<br><br>**Examinations by the Secretary:**  The Secretary of Banking, and any person designated by him for that purpose, shall at least once every two calendar years investigate the business and affairs and examine the books, accounts, papers, records, documents, and files of every licensee and of every person who shall be engaged in business contemplated by this act. (7 Pa. Stat. Ann. § 6115)<br><br>**Extent of examination:** For the purpose of its examination, the Secretary of Banking shall have free access to the offices and places of business, books, accounts, papers, records, documents, files, safes and vaults of all such persons. (7 Pa. Stat. Ann. § 6115)<br><br>**Examination fees:** The cost for examinations shall be paid by the licensee. (7 Pa. Stat. Ann. § 6115) |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | Stat. Ann. § 6104)<br><br>**Security** (7 Pa. Stat. Ann. § 6106):<br>• Surety bond or deposit of securities<br>• Minimum principal sum: $1,000,000 | |
| **RI** | R.I. Gen. Laws §§ 19-14-1, 19-14.3-1 *et seq.* (Sale of Checks and Electronic Money Transfers) | R.I. Code R. § 02-010-018 | **Application** for license (R.I. Gen. Laws § 19-14-3) – Minimum requirements:<br><br>• name and address or addresses where the business of the applicant is located<br><br>• if the applicant is a partnership, association, corporation or other form of business organization, the names and addresses of each member, director and principal officer thereof or any individual acting in the capacity of the manager of an office location<br><br>• description of the activities of the applicant, in such detail and for such periods as the director may require<br><br>• such further information as the director may require.<br><br>**Fees** (R.I. Gen. Laws § 19-14-3, 19-14-4):<br><br>• <u>Application/investigation fee</u>:<br>   o   $180<br><br>• <u>Annual license fee</u>:<br>   o   $360, paid upon approval of license<br><br>• <u>Multi-state licensing system</u>:<br>   o   Applicant may be required to pay additional fee for license or other participation in multi-state licensing system.<br><br>**Minimum net worth** (R.I. Gen. Laws § 19-14-5):<br><br>• $50,000<br><br>**Security** (R.I. Gen. Laws § 19-14-6, R.I. Gen. Laws § 19- | **Investigation upon application:** Upon the filing of a completed application, the payment of fees and the approval of the bond, the director or the director's designee shall commence an investigation of the applicant. (R.I. Gen. Laws § 19-14-7)<br><br>**Fingerprints and Criminal background check:** The director may require a background investigation of each applicant for a license by means of fingerprint checks, utilizing the federal bureau of investigation, or other agency as determined by the director for state and national criminal history record checks. If the applicant is a partnership, association, corporation or other form of business organization, the director may require a background investigation by means of fingerprint checks on each member, director, trustee or principal officer of such applicant and any individual acting in the capacity of the manager of an office location. (R.I. Gen. Laws § 19-14-3)<br><br>**Investigation by director** (R.I. Gen. Laws § 19-14-23):<br><br>• <u>Investigation for violations</u>: For the purpose of discovering violations of this title or securing information lawfully required, the director or the director's designee(s) may at any time investigate the loans and business and examine the books, |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | 14.3-2):<br>• Bond or deposit of United States government/agency obligation or state obligations<br>• Minimum amount: $50,000<br>• Each additional branch or agent location: $5,000<br>• Maximum: $150,000 | accounts, records and files used therein, of every licensee and person who shall be engaged in any activity that requires a license under this title, whether the person shall act or claim to act as principal or agent, or under or without the authority of this title.<br><br>• Periodic: The director or the director's designee shall make an examination of the affairs, business, office, and records of each licensee and branch location at least once every eighteen (18) months.<br><br>**Extent of examination:** In an investigation for the purpose of discovering violations, the director or the director's designee(s) shall have free access to the offices and places of business, books, accounts, paper, records, files, and safes, of all such persons. The director or the director's designee(s) shall have authority to require the attendance of and to examine under oath any person whose testimony may be required relative to the loans or the business or to the subject matter of any examination, investigation, or hearing. (R.I. Gen. Laws § 19-14-23)<br><br>**Examination fees** (R.I. Gen. Laws § 19-14-23):<br><br>• Costs of examination: (1) One hundred fifty percent (150%) of the total salaries and benefits plus one hundred percent (100%) for the travel and transportation expenses for the examining personnel engaged in the examinations; (2) All reasonable technology costs related to the examination process, including the actual |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | | cost of software and hardware utilized in the examination process and the cost of training examination personnel in the proper use of the software or hardware; and (3) All necessary and reasonable education and training costs incurred by the state to maintain the proficiency and competence of the examination personnel. <br><br> • Annual assessment:  The last two categories of expenses shall be allocated equally to each licensee no more frequently than annually and shall not exceed an annual average assessment of fifty dollars ($50.00) per company for any given three (3) calendar year period. <br><br> **Annual report:** Licensee shall submit annual report (accompanied by $55 per license) which must contain, at a minimum, any relevant information that the director or the director's designee may reasonably require concerning the business and operations during the preceding calendar year of each licensed place of business conducted by the licensee within the state.  (R.I. Gen. Laws § 19-14-22) |
| SC | Currently no regulation of money transfer or check selling. | | | |
| SD | S.D. Codified Laws §§ 51A-17-1 *et seq.* (Money Transmission) | S.D. Admin. R. 20:07:21:01 *et seq.* | **Application** for license (S.D. Codified Laws § 51A-17-12, 51A-17-13) – Minimum requirements: <br><br> • (1) The exact name of the applicant, the applicant's principal address, any fictitious or trade name used by the applicant in the conduct of its business, and the location of the applicant's business records; <br><br> • (2) The history of the applicant's material litigation for | **Investigation upon application:**  Upon receiving a complete application, the director shall investigate the financial condition and responsibility, financial and business experience, character, and general fitness of the applicant. The director may conduct an on-site investigation of the applicant, the reasonable cost of which shall be borne by the |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|----------------|------------------------|------------------------|--------------------------|
| | | | the five-year period prior to the date of the application; | applicant. (S.D. Codified Laws § 51A-17-17) |
| | | | • (3) Two sets of completed fingerprint cards and a signed waiver to authorize the division to conduct a criminal background investigation of the applicant; | **Fingerprints and criminal background check:**  Each applicant for licensure under this chapter, except publicly traded corporations and their subsidiaries, shall submit to a state and federal criminal background investigation by means of fingerprint checks by the Division of Criminal Investigation and the Federal Bureau of Investigation.  (S.D. Codified Laws § 51A-17-11) |
| | | | • (4) A description of the activities conducted by the applicant and a history of operations; | |
| | | | • (5) A description of the business activities in which the applicant seeks to be engaged in the state; | |
| | | | • (6) A list identifying the applicant's proposed authorized delegates in the state, if any, at the time of the filing of the license application; | **Examination by director:** |
| | | | • (7) A sample authorized delegate contract, if applicable; | • <u>Annual</u>: The director may conduct an annual on-site examination of a licensee upon reasonable notice to the licensee. The director may examine a licensee without prior notice if the director has a reasonable basis to believe that the licensee is in noncompliance with this chapter. |
| | | | • (8) A sample form of payment instrument, if applicable; | |
| | | | • (9) Each location at which the applicant and its authorized delegates, if any, propose to conduct the licensed activities in the state; | |
| | | | • (10) The name and address of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which such payment instruments will be payable; | • <u>Examination for violation</u>: The director may request financial data from a licensee or conduct an on-site examination of any authorized delegate or location of a licensee within this state without prior notice to the authorized delegate or licensee only if the director has a reasonable basis to believe that the licensee or authorized delegate is in noncompliance with this chapter. (S.D. Codified Laws § 51A-17-28) |
| | | | • (11) The date of the applicant's incorporation and state of incorporation; | |
| | | | • (12) A certificate of good standing from the state in which the applicant was incorporated; | |
| | | | • (13) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded on any stock exchange; | **Independent report in lieu of on-site examination** (S.D. Codified Laws § 51A-17-27): |
| | | | | • The director, in lieu of an on-site |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • (14) The name, business and residence address, and employment history for the past five years of the applicant's executive officers and any officer or manager who will be in charge of the applicant's activities to be licensed; <br><br> • (15) The name, business and residence address, and employment history for the period five years prior to the date of the application of any key shareholder of the applicant; <br><br> • (16) The history of material litigation for the five-year period prior to the date of the application of every executive officer or key shareholder of the applicant; <br><br> • (17) Two sets of completed fingerprint cards and a signed waiver to authorize the division to conduct a criminal background investigation of every executive officer or key shareholder of the applicant; <br><br> • (18) A copy of the applicant's most recent audited financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder equity, and statement of changes in financial position, and, if available, the applicant's audited financial statements for the immediately preceding two-year period. <br><br> • (19) Copies of all filings, if any, made by the applicant with the United States Securities and Exchange Commission, or with a similar regulator in a country other than the United States, within the year preceding the date of filing of the application. <br><br> **Fees** (S.D. Codified Laws § 51A-17-16; S.D. Admin. R. 20:07:21:01, 20:07:21:02): <br><br> • Application/investigation fee: <br> ○ $500, nonrefundable | examination, may accept the examination report of any governmental agency, and reports so accepted are considered for all purposes as an official report of the director. <br><br> • The director may waive an on-site examination and only require a self-examination or a report prepared by an independent accounting firm. If a licensee conducts a self-examination, the licenses shall provide any information requested under oath and on forms provided by the division. The reasonable expenses incurred by the division, any governmental agency, or an independent licensed or certified public accountant in making such examination or report shall be borne by the licensee. <br><br> **Examination fees:** <br><br> • Criminal background investigation:  The applicant shall pay for any fees charged for the cost of fingerprinting or the criminal background investigation. (S.D. Codified Laws § 51A-17-11) <br><br> • On-site examination:  licensee shall pay all reasonably incurred costs of such examination. (S.D. Codified Laws § 51A-17-27) <br><br> • Examination in lieu of on-site examination: The reasonable expenses incurred by the division, any governmental agency, or an independent licensed or certified public accountant in making any examination in lieu of an on-site examination or report shall be borne by the licensee. (S.D. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • <u>Initial license fee</u>: <br>    ○ $1,000, refunded if application is denied <br> • <u>Annual license renewal fee</u>: <br>    ○ $800 <br> **Minimum net worth:** $100,000  (S.D. Codified Laws § 51A-17-6) <br> **Maintenance of permissible investments** (S.D. Codified Laws § 51A-17-10): <br> • Each licensee under this chapter shall at all times possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate face amount of all outstanding payment instruments and stored value issued or sold by the licensee in the United States. <br> • This requirement may be waived by the director if the dollar volume of a licensee's outstanding payment instruments and stored value does not exceed the security devices posted by the licensee. <br> **Security** (S.D. Codified Laws § 51A-17-8): <br> • Security device or deposit of cash or securities <br>    ○ Minimum principal sum: $100,000 <br>    ○ Maximum: $500,000 <br> • The director may increase the amount of the security device to the maximum amount upon the basis of the impaired financial condition of a licensee, as evidenced by a reduction in net worth, financial losses, or other relevant criteria. | Codified Laws § 51A-17-27) <br> • <u>Examination of authorized delegate operations</u>:  Authorized delegate shall pay all reasonably incurred costs of such examination. (S.D. Codified Laws § 51A-17-28) <br> • <u>Examination of licensee's location within the state</u>:  licensee shall pay all reasonably incurred costs of such examination.  (S.D. Codified Laws § 51A-17-28) <br> **Annual renewal report** (S.D. Codified Laws § 51A-17-19): Licensee shall submit annual renewal report (accompanied by annual renewal fee of $800) which must contain, at a minimum: <br> • (1) A copy of its most recent audited consolidated annual financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder's equity, and statement of changes in financial position, or, in the case of a licensee that is a wholly owned subsidiary of another corporation, the consolidated audited annual financial statement of the parent corporation may be filed in lieu of the licensee's audited annual financial statement; <br> • (2) The licensee shall provide the number of payment instruments sold by the licensee in the state, the dollar amount of those instruments, and the dollar amount of those instruments currently outstanding, for the calendar year or fiscal year immediately preceding the renewal period, or as much of this information as is |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | | available at the time of filing the renewal application;<br><br>• (3) Any material changes to any of the information submitted by the licensee on its original application which have not previously been reported to the director on any other report required to be filed under this chapter;<br><br>• (4) A list of the licensee's permissible investments; and<br><br>• (5) A list of the locations, if any, within this state at which business regulated by this chapter is being conducted by either the licensee or its authorized delegates. |
| TN | Tenn. Code Ann. § 45-7-201 (Tennessee Money Transmitter Act of 1994) | http://www.tennessee.gov/sos/rules/0180/0180-26.pdf | **Application** for license (Tenn. Code Ann. § 45-7-207) – Minimum requirements:<br><br>• (1) The exact name of the applicant, the applicant's principal address, any fictitious or trade name used by the applicant in the conduct of its business, and the location of the applicant's business records;<br><br>• (2) The history of the applicant's material litigation and criminal convictions for the ten-year period prior to the date of the application;<br><br>• (3) A description of the activities conducted by the applicant and a history of operations;<br><br>• (4) A description of the business activities in which the applicant seeks to be engaged in the state;<br><br>• (5) A list identifying the applicant's authorized agents in the state, if any, at the time of the filing of the license application; | **Investigation upon application:** Upon the filing of a complete application, the commissioner shall investigate the financial condition and responsibility, financial and business experience, character and general fitness of the applicant. The commissioner may conduct an on-site investigation of the applicant, the reasonable cost of which shall be borne by the applicant. (Tenn. Code Ann. § 45-7-210)<br><br>**Examination by commissioner:**  The commissioner may conduct periodic on-site examinations of a licensee. The commissioner may also examine a licensee's authorized or apparent agents. At the commissioner's discretion, written notice of the examination may be provided to the licensee or agents. In conducting the examination, the commissioner or the commissioner's staff has full and free access to all the books, papers and records of |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • (6) A sample authorized agent contract, if applicable;<br><br>• (7) A sample form of payment instrument, if applicable;<br><br>• (8) The location or locations at which the applicant and its authorized agents, if any, propose to conduct the licensed activities in the state;<br><br>• (9) The name and address of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which the payment instruments will be payable;<br><br>• (10) The date of the applicant's incorporation and state of incorporation;<br><br>• (11) A certificate of good standing from the state in which the applicant was incorporated;<br><br>• (12) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded on any stock exchange;<br><br>• (13) The name, business and residential address and employment history for the past ten (10) years of the applicant's executive officers and the officer or officers or managers who will be in charge of the applicant's activities to be licensed hereunder;<br><br>• (14) If the applicant is not a publicly traded corporation or a direct or indirect subsidiary of such a corporation, the name, business and residential addresses, and employment history of each of the applicant's directors for the ten-year period preceding the date of the application;<br><br>• (15) The name, business and residential address, and employment history of any current key shareholder of | the licensee and its agents and may summon and qualify as witnesses, under oath, and examine the directors, officers, members, agents and employees of any licensee or agent, and any other person concerning the condition and affairs of the licensee. (Tenn. Code Ann. § 45-7-214)<br><br>**Independent report in lieu of examination:** The commissioner, in lieu of an on-site examination, may accept the examination report of an agency of another state, or a report prepared by an independent accounting firm, and reports so accepted are considered for all purposes as an official report of the commissioner. (Tenn. Code Ann. § 45-7-214)<br><br>**Examination fees:** The licensee shall pay all reasonably incurred costs of the examination. The on-site examination may be conducted in conjunction with examinations to be performed by representatives of agencies of another state or states. (Tenn. Code Ann. § 45-7-214)<br><br>**Annual renewal report** (Tenn. Code Ann. § 45-7-211):<br><br>Licensee shall submit annual renewal report (accompanied by the annual renewal fee) which must contain, at a minimum:<br><br>• (1) A copy of its most recent audited unconsolidated annual financial statement (including balance sheet, statement of income or loss, statement of changes in shareholder's equity and statement of changes in financial position).  A licensee who does not transmit money in this state through more than an aggregate of four (4) locations may provide a financial statement |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | the applicant for the period ten (10) years prior to the date of the application;<br><br>• (16) The history of material litigation and criminal convictions of every current director, executive officer, or key shareholder of the applicant for the ten-year period prior to the date of the application;<br><br>• (17) Copies of the applicant's unconsolidated audited financial statements, including balance sheet, statement of income or loss, statement of changes in shareholder equity and statement of changes in financial position, for the current year and, if available, for the immediately preceding three-year period; and<br><br>• (18) Copies of all filings, if any, made by the applicant with the United States securities and exchange commission, or with a similar regulator in a country other than the United States, within the year preceding the date of filing of the application; and<br><br>**Fees:**<br>• Application/investigation fee (Tenn. Code Ann. § 45-7-209):<br>  o  Nonrefundable<br>  o  $250, for four (4) or fewer agents<br>  o  $500, for five (5) or more agents<br>• Annual license renewal fee (http://www.tennessee.gov/sos/rules/0180/0180-26.pdf)<br>  o  $50 per office, if no more than four (4) locations, branch offices or agents in TN<br>  o  $500 per office, if more than five (5) locations, branch offices or agents in TN<br>  o  Additional $12 for each location, branch office or | certified by the owner or manager of the licensee;<br><br>• (2) For the most recent quarter for which data is available prior to the date of the filing of the renewal application, but in no event more than one hundred twenty (120) days prior to the renewal date, the licensee must provide the number of payment instruments sold by the licensee in the state, the dollar amount of those instruments and the dollar amount of those instruments currently outstanding;<br><br>• (3) Any material changes to any of the information submitted by the licensee on its original application that have not previously been reported to the commissioner on any other report required to be filed under this part;<br><br>• (4) A list of the licensee's permissible investments;<br><br>• (5) A list of the locations within this state at which business regulated by this part is conducted by either the licensee or its authorized agent;<br><br>• (6) Notification of material litigation or litigation relating to money transmission; and<br><br>• (7) Other information the commissioner may deem appropriate for the proper enforcement of this part. |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | agent in excess of five (5) |  |
|  |  |  | **Minimum net worth** (Tenn. Code Ann. § 45-7-205): |  |
|  |  |  | • Principal location: $100,000 |  |
|  |  |  | • Each additional location or agent: $25,000 |  |
|  |  |  | • Maximum: $500,000 |  |
|  |  |  | **Criminal record:**  Subject to the commissioner's discretion, no person shall be licensed under this part to do business in the state if the person has been adjudged guilty of any felony within the last ten (10) years or if an executive officer, key shareholder or director of the person has been so adjudged.  **(**Tenn. Code Ann. § 45-7-205) |  |
|  |  |  | **Maintenance of permissible investments (Tenn. Code Ann. § 45-7-206):** |  |
|  |  |  | • Each licensee under this part must at all times possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the aggregate face amount of all outstanding payment instruments issued or sold by the licensee in the United States. |  |
|  |  |  | • The commissioner may waive this requirement if the dollar volume of a licensee's outstanding payment instruments does not exceed the bond or other security devices posted by the licensee. |  |
|  |  |  | **Security (Tenn. Code Ann. § 45-7-208):**<br>• Surety bond, irrevocable letter of credit or other similar security device<br>• Minimum principal sum: $50,000<br>• Each additional location: $10,000<br>• Maximum: $800,000 |  |
| **TX** | Tex. Fin. Code | 7 Tex. Admin. Code | **Application** for license (Tex. Fin. Code § 151.203) – | **Investigation upon application** (Tex. Fin. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | §§ 151.201 *et seq.* (General Qualifications and Provisions Applicable to Money Services Licenses), Tex. Fin. Code §§ 151.301 *et seq.* (Money Transmission License) | §§ 33.3 *et seq.* | Minimum requirements:<br><br>• (1) the legal name and residential and business address of the applicant and each principal of the applicant;<br><br>• (2) the taxpayer identification number, social security number, driver's license number, or other identifying information the commissioner requires of the applicant and each principal of the applicant; and<br><br>• (3) any other information or documentation the commissioner reasonably requires to determine whether the applicant qualifies for and should be issued the license for which application is made.<br><br>**Fees** (7 Tex. Admin. Code § 33.27):<br><br>• <u>Application/investigation fee</u>:<br>  o $2,500, nonrefundable<br><br>• <u>Additional application investigation fees</u>:<br>  o $75 per hour for each department examiner required to conduct the investigation and all associated travel expenses, if the commissioner determines that it is necessary to conduct an on-site investigation of applicant's business<br>  o the reasonable costs for the third-party investigation, if the commissioner determines that it is necessary to employ a third-party screening service to assist with the investigation of the license application<br><br>• <u>Annual renewal fee</u>:<br>  o $1,500<br><br>• <u>Criminal background check fees</u>:  If the commissioner determines it is necessary to perform background checks using fingerprint identification records, | Code § 151.204, 151.305):<br><br>On receipt of complete application, the commissioner shall investigate the applicant to determine whether the prescribed qualifications have been met. The commissioner may:<br><br>• conduct an on-site investigation of the applicant;<br><br>• employ a screening service to assist with the investigation;<br><br>• to the extent the commissioner considers reasonably necessary to evaluate the application and the applicant's qualifications, investigate the financial responsibility and condition, financial and business experience, character and general fitness of each principal of, person in control of, principal of a person in control of, or proposed responsible individual of the applicant or any other person that is or will be associated with the applicant's licensed activities in this state; or<br><br>• require additional information and take other action the commissioner considers reasonably necessary.<br><br>**Fingerprints and criminal background check:**  The commissioner, at the time the application is submitted or in connection with an investigation of the application, may require the applicant, the spouse of the applicant, a principal of, individual who is a person in control of, or proposed responsible individual of the applicant, or any other individual associated with the applicant and the proposed |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | applicant must either submit payment for the costs of this service at the time of filing the application or pay the department upon request.<br><br>**Criminal record** (Tex. Fin. Code § 151.202):<br><br>• The commissioner may not issue a license to an applicant if the applicant or one of the following persons has been convicted within the preceding 10 (10) years of a criminal offense specified below: (1) if the applicant is an individual, the spouse or proposed responsible individual or individuals of the applicant; (2) if the applicant is an entity that is wholly owned, directly or indirectly, by a single individual, the spouse of the individual; or (3) if the applicant is a person other than an individual, a principal of, person in control of, principal of a person in control of, or proposed responsible individual or individuals of the applicant.<br><br>• For purposes of this provision, a disqualifying conviction is a conviction for a felony criminal offense: (1) under state or federal law that involves or relates to: (A) deception, dishonesty, or defalcation;  (B) money transmission or other money services, including a reporting, recordkeeping or registration requirement of the Bank Secrecy Act, the USA PATRIOT ACT, or Chapter 271; (C) money laundering, structuring, or a related financial crime; (D) drug trafficking; or (E) terrorist funding; and (2) under a similar law of a foreign country unless the applicant demonstrates to the satisfaction of the commissioner that the conviction was based on extenuating circumstances unrelated to the person's reputation for honesty and obedience to law.<br><br>• For purposes of this provision, a person is considered to have been convicted of an offense if the person has been found guilty or pleaded guilty or nolo contendere | licensed activities, to provide the department a complete set of fingerprints for purposes of a criminal background investigation.  (Tex. Fin. Code § 151.203)<br><br>**Examination by commissioner** (Tex. Fin. Code § 151.601):<br><br>• Examination for compliance: The commissioner may examine a license holder or authorized delegate of a license holder as reasonably necessary or appropriate to administer and enforce this chapter and rules adopted and orders issued under this chapter and other applicable law, including the Bank Secrecy Act, the USA PATRIOT ACT, and Chapter 271.<br><br>• Annual: The commissioner may conduct an examination annually or at other times as the commissioner may reasonably require.<br><br>**Extent of examination** (Tex. Fin. Code § 151.601):<br><br>• The commissioner may conduct an on-site examination or an off-site review of records.<br><br>• The commissioner may summon and examine under oath a principal, responsible individual, or employee of a license holder or authorized delegate of a license holder and require the person to produce records regarding any matter related to the condition and business of the license holder or authorized delegate.<br><br>**Independent report in lieu of on-site examination:** The commissioner may accept |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | to the charge or has been placed on probation or deferred adjudication without regard to whether a judgment of conviction has been entered by the court.<br><br>**Minimum net worth** (Tex. Fin. Code § 151.307):<br><br>• $100,000, if business is proposed to be or is conducted, directly or through an authorized delegate, at four (4) or fewer locations<br><br>• $500,000, if business is proposed to be or is conducted, directly or through an authorized delegate, at five (5) or more locations.<br><br>• The commissioner may increase the amount of net worth required of an applicant or license holder, up to a maximum of $ 1 million ($1,000,000), if the commissioner determines that a higher net worth is necessary to achieve the purposes of this chapter based on: (1) the nature and volume of the projected or established business; (2) the number of locations at or through which money transmission is or will be conducted; (3) the amount, nature, quality, and liquidity of its assets; (4) the amount and nature of its liabilities; (5) the history of its operations and prospects for earning and retaining income;  (6) the quality of its operations; (7) the quality of its management; (8) the nature and quality of its principals and persons in control; (9) the history of its compliance with applicable state and federal law; and (10) any other factor the commissioner considers relevant.<br><br>**Maintenance of permissible investments:**  A money transmission license holder must maintain at all times permissible investments that have an aggregate market value computed in accordance with generally accepted accounting principles in an amount not less than: (1) if the license holder has a net worth of less than $ 5 million, the aggregate face amount of the license holder's average | the examination report of another state agency or an agency of another state or of the federal government, or a report prepared by an independent accounting firm, which on being accepted is considered for all purposes as an official report of the commissioner. (Tex. Fin. Code § 151.601)<br><br>**Examination fees:**<br><br>• <u>Investigation upon application</u>: The commissioner may collect from the applicant the reasonable expenses of an on-site examination or third-party investigation. Additionally, depending on the nature and extent of the investigation required in connection with a particular application, the commissioner may require an applicant to pay a nonrefundable investigation fee in an amount established by commission rule. (Tex. Fin. Code § 151.204)<br><br>• <u>Examination by Commissioner</u>: Unless otherwise directed by the commissioner, a license holder shall pay all costs reasonably incurred in connection with an examination of the license holder or the license holder's authorized delegate. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | outstanding money transmission obligations in the United States, computed in the manner prescribed by commission rule; or (2) if the license holder has a net worth of $ 5 million or more, 50 percent of the amount required by Subdivision (1). (Tex. Fin. Code § 151.309)<br><br>**Security** (Tex. Fin. Code § 151.304, Tex. Fin. Code § 151.308):<br>• Surety bond, an irrevocable letter of credit, or a deposit of United States currency, certificates of deposit, or other cash equivalents<br><br>    o Principal sum: one percent (1%) of the license holder's total yearly dollar volume of money transmission business in this state or the applicant's projected total volume of business in this state for the first year of licensure<br><br>    o Minimum principal sum: $300,000<br><br>    o Maximum: $2,000,000<br><br>• When the amount of the required security exceeds $1 million, the applicant or license holder may, in the alternative, provide security in the amount of $1 million, plus a dollar for dollar increase in the net worth of the applicant or license holder over the amount of net worth required, up to a total amount of $ 2 million. | |
| UT | Utah Code Ann. § 7-1-101 (Financial Institutions Act) | Utah Admin. Code r. 331-14-1 *et seq.* | **Fees:**<br>• Application filing fee:<br>    o $100, nonrefundable (Utah Admin. Code r. 331-14-4)<br><br>• Annual renewal fee:<br>    o $100 (Utah Admin. Code r. 331-14-5)<br><br>• Annual license fee: | **Examinations by commissioner:** The commissioner or the responsible supervisor shall visit and examine or cause to be visited and examined every depository institution and such other institutions subject to the jurisdiction of the department as the commissioner considers necessary or advisable.  (Utah Code Ann. § 7-1-314)<br><br>**Required examinations by board of directors:** The commissioner may at any time |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | ○  $200 (Utah Code Ann. § 7-1-401)<br>**Minimum net worth:** $1,000,000  (U.A.C. R331-14-4)<br>**Required deposits:**<br>• If the department finds any reasonable cause to believe that a licensee is in an unsafe or unsound condition or is unwilling or unable to pay its payment instruments when they come due, it may require the licensee to deposit funds in a financial institution(s) acceptable to the department in such amounts, for such period, and upon such conditions as the department may specify, and may prohibit the licensee from issuing payment instruments for sale in Utah in an aggregate unpaid amount exceeding the amount of any such required deposit or the amount actually deposited pursuant to such a requirement, whichever is less. (Utah Admin. Code r. 331-14-7)<br>**Surety bond:** A surety bond satisfactory to the department in the minimum sum of $50,000. (Utah Admin. Code r. 331-14-4**)** | require the board of directors of any or all institutions under his jurisdiction to fully examine or have fully examined the books, papers, and affairs of the institution of which they are directors and particularly the loans, discounts, and overdrafts of such institutions to ascertain the value and security thereof and the collateral security, if any, given in connection therewith and to inquire into such other matters as the commissioner may consider necessary and to have a report placed on file with the records of the institution, which report shall be subject to examination by the commissioner.  **(**Utah Code Ann. § 7-1-315)<br>**Examination fees:** $ 55 per hour for each examiner and per hour worked.  (Utah Code Ann. § 7-1-401) |
| **VT** | 8 Vt. Stat. Ann. § 2500 (Money Services) | | **Application** for license (8 Vt. Stat. Ann. § 2506) – Minimum requirements:<br>• (1) The legal name and residential and business addresses of the applicant and any fictitious or trade name used by the applicant in conducting its business;<br>• (2) a list of any criminal convictions of the applicant and any material litigation in which the applicant has been involved in the 10-year period next preceding the submission of the application;<br>• (3) a description of any money services previously | **Investigation upon application:**  Upon the filing of an application under this subchapter, the commissioner shall investigate the financial condition and responsibility, financial and business experience, character, and general fitness of the applicant, and any person named in the application. The commissioner may conduct an on-site investigation of the applicant, the cost of which the applicant shall bear. (8 Vt. Stat. Ann. § 2508)<br>**Fingerprints and criminal background check** (8 Vt. Stat. Ann. § 2506):  In connection with an application for a license, the applicant |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|----------------|------------------------|------------------------|--------------------------|
| | | | provided by the applicant and the money services that the applicant seeks to provide in this state;<br><br>• (4) a list of the applicant's proposed authorized delegates, and the locations in this state where the applicant and its authorized delegates propose to engage in money transmission or provide other money services;<br><br>• (5) a list of other states in which the applicant is licensed to engage in money transmission or provide other money services and information concerning any bankruptcy or receivership proceedings affecting the licensee, and any license revocations, suspensions, or any criminal or disciplinary action taken against the applicant in other states;<br><br>• (6) a sample form of contract for authorized delegates, if applicable, and a sample form of payment instrument or instrument upon which stored value is recorded if applicable;<br><br>• (7) the name and address of any financial institution through which the applicant's payment instruments and stored-value obligations will be paid;<br><br>• (8) a description of the source of money and credit to be used by the applicant to provide money services;<br><br>• (9) the date of the applicant's incorporation or formation, and state or country of incorporation or formation;<br><br>• (10) if applicable, a certificate of good standing from the state or country in which the applicant is incorporated or formed;<br><br>• (11) a brief description of the structure or organization of the applicant, including any parent or subsidiary of the applicant, and whether any parent or subsidiary is | and each executive officer, manager, director, and person that has control of the applicant shall furnish to the Nationwide Mortgage Licensing System and Registry information concerning the applicant's identity, including:<br><br>• Fingerprints for submission to the Federal Bureau of Investigation and to any other governmental agency or entity authorized to receive such information for a state, national, and international criminal history background check and authorization for the commissioner to obtain a criminal history background check.<br><br>• Personal history and experience in a form prescribed by the Nationwide Mortgage Licensing System and Registry, including the submission of authorization for the Nationwide Mortgage Licensing System and Registry and the commissioner to obtain: (A) An independent credit report and credit score from a consumer reporting agency described in subsection 603(p) of the Fair Credit Reporting Act, 15 U.S.C. § 1681a(p), for the purpose of evaluating the applicant's financial responsibility at the time of application and additional credit reports and credit scores to confirm the licensee's continued compliance with the financial responsibility requirements of this chapter; and (B) Information related to any administrative, civil, or criminal findings by any governmental jurisdiction.<br><br>• Any other information required by the Nationwide Mortgage Licensing System and Registry or the commissioner. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | publicly traded; <br><br> • (12) the legal name, any fictitious or trade name, all business and residential addresses, and the employment, in the 10-year period next preceding the submission of the application of each executive officer, manager, director of, or person that has control of, the applicant; <br><br> • (13) a list of any criminal convictions, material litigation or disciplinary actions in which any executive officer, manager, director of, or individual in control of, the applicant has been involved in the 10-year period next preceding the submission of the application; <br><br> • (14) a copy of the applicant's audited financial statements for the most recent fiscal year and, if available, for the two-year period next preceding the submission of the application; <br><br> • (15) a copy of the applicant's unconsolidated financial statements for the current year, whether audited or not, and, if available, for the two-year period next preceding the submission of the application;\ <br><br> • (16) if the applicant is publicly traded, a copy of the most recent 10-K report filed with the United States Securities and Exchange Commission; <br><br> • (17) if the applicant is a corporation, the name and address of the applicant's registered agent in this state; and <br><br> • (11) any other information the commissioner requires with respect to the applicant. <br><br> **Fees:** <br><br> • <u>Application fee</u> (8 Vt. Stat. Ann. § 2506): <br>    o   $1,000, nonrefundable | **Examination by commissioner:**  In addition to any authority allowed under this chapter or elsewhere and for the purpose of examination or discovering or investigating violations or complaints of or arising under this chapter or under any other applicable law, rule, order, directive, or regulation or of securing any information required or useful thereunder and for purposes of initial licensing, license renewal, license suspension, license conditioning, license revocation or termination, or general or specific inquiry or investigation, the commissioner or his or her duly designated representative shall have the authority to conduct investigations and examinations at any time. (8 Vt. Stat. Ann. § 2530) <br><br> **Extent of examination** (8 Vt. Stat. Ann. § 2530): Pursuant to the commissioner's examination powers, the commissioner may: <br><br> • Access, receive, and use any books, accounts, records, files, documents, information, or evidence including: (A) Criminal, civil, and administrative history information, including nonconviction data; (B) Personal history and experience information, including independent credit reports obtained from a consumer reporting agency described in subsection 603(p) of the Fair Credit Reporting Act, 15 U.S.C. § 1681a(p); and (C) Any other documents, information, or evidence the commissioner deems relevant to the inquiry or investigation regardless of the location, possession, control, or custody of such documents, information, or evidence. <br><br> • In making any examination or investigation |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | • <u>License fee</u> (8 Vt. Stat. Ann. § 2506): <br>    o Primary location: $500 <br>    o Each authorized delegate location: $25 <br>    o Refunded if application is denied <br> • <u>Annual renewal fee</u> (8 Vt. Stat. Ann. § 2509): <br>    o Primary location: $500 <br>    o Each authorized delegate location: $25 <br>    o Maximum: $3,500 <br> • <u>Annual assessment</u> (8 Vt. Stat. Ann. § 2509): <br>    o $ 0.0001 per dollar volume of money services activity performed for or sold or issued to Vermont customers for the most recent year ending December 31 <br>    o Minimum assessment: $100 <br>    o Maximum assessment: $15,000.00 <br> **Minimum net worth** (8 Vt. Stat. Ann. § 2510): <br> • $100,000.00 <br> **Maintenance of permissible investments:** A licensee shall maintain at all times permissible investments that have a market value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments and stored-value obligations issued or sold and money transmitted by the licensee or its authorized delegates. (8 Vt. Stat. Ann. § 2540) <br> **Security** (8 Vt. Stat. Ann. § 2507): <br> • Surety bond, an irrevocable letter of credit or similar security device | authorized by this chapter, the commissioner may control access to any documents and records of the licensee or person under examination or investigation. Unless the commissioner has reasonable grounds to believe the documents or records of the licensee have been or are at risk of being altered or destroyed for purposes of concealing a violation of this chapter, the licensee or owner of the documents and records shall have access to the documents or records as necessary to conduct its ordinary business affairs. <br><br> **Examination fees:** Licensee pays all fees, costs, and expenses of any examination, review, and investigation as prescribed by section 18 of this title, and those fees, costs, and expenses shall be billed when they are incurred. (8 Vt. Stat. Ann. § 2506) <br><br> **Annual renewal report** (8 Vt. Stat. Ann. § 2509): Licensee shall submit annual renewal report (accompanied by the annual renewal fee) which must contain, at a minimum: <br><br> • (1) a copy of the licensee's most recent audited annual financial statement or, if the licensee is a wholly owned subsidiary of another corporation, the most recent audited consolidated annual financial statement of the parent corporation or the licensee's most recent audited consolidated annual financial statement; <br><br> • (2) the number of payment instruments and stored-value obligations sold by the licensee in this state that have not been previously included in an annual report, the |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
|  |  |  | <ul><li>○ Minimum: $100,000</li><li>○ Each additional location: $10,000</li><li>○ Maximum: $500,000</li></ul> <ul><li>The commissioner may increase the amount of security required to a maximum of $2,000,000.00 based upon the financial condition of a licensee, as evidenced by reduction of net worth, financial losses, or other relevant criteria.</li></ul> | monetary amount of those instruments, and the monetary amount of those instruments currently outstanding;\ <ul><li>(3) a description of each material change in information submitted by the licensee in its original license application that has not been previously reported to the commissioner on any required report;</li><li>(4) a list of the licensee's permissible investments and a certification that the licensee continues to maintain permissible investments according to the requirements set forth in sections 2540 and 2541 of this title;</li><li>(5) proof that the licensee continues to maintain adequate security as required by section 2507 of this title;</li><li>(6) a list of the locations in this state where the licensee or an authorized delegate of the licensee engages in money transmission or provides other money services; and</li><li>(7) any other information the commissioner may require.</li></ul> |
| VA | Va. Code Ann. § 6.2-1900 (Money Order Sellers and Money Transmitters)<br><br>http://www.scc.virginia.gov/bfi/appli | 10 Va. Admin. Code 5-120-10 *et seq.* | **Application** for license (Va. Code Ann. § 6.2-1903) – Minimum requirements: <ul><li>(1) Name and address of the applicant, which shall be an entity</li><li>(2) a description of the manner in which and the locations at which it proposes to do business</li><li>(3) such additional relevant information as the</li></ul> | **Investigation by commissioner:** <ul><li><u>Examination for compliance</u>: The Commissioner may make such investigations as he deems necessary to determine if the applicant has complied with all applicable provisions of law and regulations adopted thereunder. (Va. Code Ann. § 6.2-1907)</li></ul> |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | c/trans.aspx | | Commission requires.<br><br>**Fees:**<br>• Application fee (Va. Code Ann. § 6.2-1903):<br>  ○ $1,000, nonrefundable<br>• Annual license renewal fee (Va. Code Ann. § 6.2-1905):<br>  ○ $750<br>• Annual assessment (Va. Code Ann. § 6.2-1905, 10 Va. Admin. Code 5-120-50):<br>  ○ $ 0.000047 per dollar of money orders sold and money transmitted by a licensee pursuant § 6.2-1900 *et seq.* of the Code of Virginia.<br>  ○ The assessment shall be based on the dollar volume of business conducted by a licensee, either directly or through its authorized delegates, during the calendar year preceding the year of the assessment.<br>  ○ The amount calculated using the above schedule shall be rounded down to the nearest whole dollar.<br>**Minimum net worth** (Va. Code Ann. § 6.2-1906):<br>• $200,000, up to a maximum of $1 million as determined by the Commission.<br>**Maintenance of permissible investments:** A licensee shall maintain at all times permissible investments that have a market value computed in accordance with generally accepted accounting principles of not less than the aggregate dollar amount of all of its (i) outstanding money orders from all states, and (ii) outstanding money transmission transactions from all states.  (Va. Code Ann. § 6.2-1918) | • Periodic examination: The Commission shall have authority to examine the books and records of all money transmitters, either directly or through authorized delegates. Except as provided herein, the Commission shall make an examination of the books and records of each licensee at least once in every three-year period.<br><br>• Authorized delegate:  The Commission may examine the books and records of any authorized delegate of a licensee as often as it is deemed to be in the public interest.<br><br>**Independent report in lieu of on-site examination:** The Commission, in lieu of an examination, may accept the examination report of the federal government or another state. (Va. Code Ann. § 6.2-1910)<br><br>**Examination fees:** In addition to the annual assessment, when it becomes necessary to examine or investigate the books and records of a licensee at a location outside the Commonwealth, the licensee shall be liable for and shall pay to the Commission within 30 days of the presentation of an itemized statement, the actual travel and reasonable living expenses incurred on account of its examination and supervision, or shall pay a reasonable per diem rate approved by the Commission.  (Va. Code Ann. § 6.2-1905) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | **Security** (Va. Code Ann. § 6.2-1904, 10 Va. Admin. Code 5-120-20, 10 Va. Admin. Code 5-120-30):<br>• Surety bond or deposit of cash or securities<br><br>　　o The bond amount shall be equal to the licensee's Virginia average monthly money order sales during the preceding two reporting periods, or its Virginia average monthly money transmission volume during such periods, or both, as applicable, rounded to the next highest multiple of $10,000, but not exceeding $ 500,000.<br><br>　　o Minimum: $25,000<br><br>　　o Maximum: $1,000,000<br><br>• The commissioner may increase the amount of bond required to the maximum amount upon the basis of the impaired financial condition of a licensee, as evidenced by net worth reduction, financial losses, or other relevant criteria. | |
| **WA** | Wash. Rev. Code §§ 19.230.005 *et seq.* (Uniform Money Services Act) | Wash. Admin. Code §§ 208-690-010 *et seq.* | **Application** for license (Wash. Rev. Code § 19.230.040, Wash. Admin. Code § 208-690-030) – Minimum requirements:<br><br>• (1) The legal name, business addresses, and residential address, if applicable, of the applicant and any fictitious or trade name used by the applicant in conducting its business;<br><br>• (2) The legal name, residential and business addresses, date of birth, social security number, employment history for the five-year period preceding the submission of the application of the applicant's proposed responsible individual, and documentation that the proposed responsible individual is a citizen of the United States or has obtained legal immigration status to work in the United States. | **Investigation upon application:** When an application for a money transmitter license is filed under this chapter, the director shall investigate the applicant's financial condition and responsibility, financial and business experience, competence, character, and general fitness. The director or the director's designee may conduct an on-site investigation of the applicant, the cost of which must be paid by the applicant as specified in RCW 19.230.320 or rules adopted under this chapter.  (Wash. Rev. Code § 19.230.070)<br><br>**Fingerprints and criminal background check:** The applicant shall provide the fingerprints of the proposed responsible individual upon the request of the director |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | • (3) For the ten-year period preceding submission of the application, a list of any criminal convictions of the proposed responsible individual of the applicant, any material litigation in which the applicant has been involved, and any litigation involving the proposed responsible individual relating to the provision of money services;<br><br>• (4) A description of any money services previously provided by the applicant and the money services that the applicant seeks to provide in this state;<br><br>• (5) A list of the applicant's proposed authorized delegates and the locations in this state where the applicant and its authorized delegates propose to engage in the provision of money services;<br><br>• (6) A list of other states in which the applicant is licensed to engage in money transmission or provide other money services, and any license revocations, suspensions, restrictions, or other disciplinary action taken against the applicant in another state;<br><br>• (7) A list of any license revocations, suspensions, restrictions, or other disciplinary action taken against any money services business involving the proposed responsible individual;<br><br>• (8) Information concerning any bankruptcy or receivership proceedings involving or affecting the applicant or the proposed responsible individual;<br><br>• (9) A sample form of contract for authorized delegates, if applicable;<br><br>• (10) A description of the source of money and credit to be used by the applicant to provide money services; and<br><br>• (11) Any other information regarding the background, experience, character, financial responsibility, and | (Wash. Rev. Code § 19.230.040).<br><br>**Investigation by director** (Wash. Rev. Code § 19.230.130, Wash. Admin. Code § 208-690-180): For the purpose of discovering violations of this chapter or rules adopted under this chapter, discovering unsafe and unsound practices, or securing information lawfully required under this chapter, the director may at any time, either personally or by designee, investigate or examine the business and, wherever located, the books, accounts, records, papers, documents, files, and other information used in the business of every licensee or its authorized delegates, and of every person who is engaged in the business of providing money services, whether the person acts or claims to act under or without the authority of this chapter.<br><br>**Extent of examination** (Wash. Rev. Code § 19.230.130, Wash. Admin. Code § 208-690-180):<br><br>• For the purposes of detecting violations, the director or designated representative shall have free access to the offices and places of business, books, accounts, papers, documents, other information, records, files, safes, and vaults of all such persons.<br><br>• The director or the director's designee may require the attendance of and examine under oath all persons whose testimony may be required about the business or the subject matter of any investigation, examination, or hearing and may require such person to produce books, accounts, |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | general fitness of the applicant, the applicant's responsible individual, or authorized delegates that the director may require in rule. <br><br> • (12) The date of the applicant's incorporation or formation and state or country of incorporation or formation; <br><br> • (13) If applicable, a certificate of good standing from the state or country in which the applicant is incorporated or formed; <br><br> • (14) A brief description of the structure or organization of the applicant, including any parent or subsidiary of the applicant, and whether any parent or subsidiary is publicly traded; <br><br> • (15) The legal name, any fictitious or trade name, all business and residential addresses, date of birth, social security number, and employment history in the ten-year period preceding the submission of the application for each executive officer, board director, or person that has control of the applicant; <br><br> • (16) If the applicant or its corporate parent is not a publicly traded entity, the director may request the fingerprints of each executive officer, board director, or person that has control of the applicant; <br><br> • (17) A list of any criminal convictions, material litigation, and any litigation related to the provision of money services, in the ten-year period preceding the submission of the application in which any executive officer, board director, or person in control of the applicant has been involved; <br><br> • (18) A copy of the applicant's audited financial statements for the most recent fiscal year; <br><br> • (19) A copy of the applicant's unconsolidated financial statements for the current fiscal year, whether audited | papers, documents, records, files, and any other information the director or designated person declares is relevant to the inquiry. <br><br> • The director may require the production of original books, accounts, papers, documents, records, files, and other information; may require that such original books, accounts, papers, documents, records, files, and other information be copied; or may make copies himself or herself or by designee of such original books, accounts, papers, documents, records, files, or other information. <br><br> • The director or designated person may issue a subpoena or subpoena duces tecum requiring attendance or compelling production of the books, accounts, papers, documents, records, files, or other information. <br><br> **Examination fees:** <br><br> • The licensee, applicant, or person subject to licensing under this chapter shall pay the cost of examinations and investigations. (Wash. Rev. Code § 19.230.130) <br><br> • Licensee pays seventy-five dollars ($75) per hour for investigations. (Wash. Admin. Code § 208-690-170) <br><br> • Licensee or applicant must pay the actual expenses of required out-of-state travel including, but not limited to, travel, lodging and per diem expense. (Wash. Admin. Code § 208-690-170) <br><br> **Annual report** (Wash. Rev. Code § 19.230.110, Wash. Admin. Code § 208-690- |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | or not, and, if available, for the two-year period preceding the submission of the application; <br><br> • (20) If the applicant is publicly traded, a copy of the most recent report filed with the United States securities and exchange commission under section 13 of the federal Securities Exchange Act of 1934 (15 U.S.C. Sec. 78m); <br><br> • (21) If the applicant has a registered agent in this state, the name and address of the applicant's registered agent in this state; and <br><br> • (22) Any other information that the director may require in rule regarding the applicant, each executive officer, or each board director to determine the applicant's background, experience, character, financial responsibility, and general fitness. <br><br> **Fees:** <br><br> • <u>Initial license fee</u> (Wash. Rev. Code § 19.230.040, Wash. Admin. Code § 208-690-130) *See* http://mortgage.nationwidelicensingsystem.org/slr/PublishedStateDocuments/WA-Money-Transmitter-Company-New-App-Checklist.pdf <br><br>    ○ Principal location: $1,000 <br><br>    ○ Each additional location: $100 <br><br>    ○ Maximum: $5,000 <br><br>    ○ Partially refundable if application is denied <br><br> • <u>Annual assessment</u> (Wash. Rev. Code § 19.230.110, Wash. Admin. Code § 208-690-140): <br><br>    ○ 0.0004 times the previous year's adjusted Washington volume of money transmission, currency exchange, stored value sales, and payment instrument sales. | 090): Licensee shall submit annual report (accompanied by annual assessment) which must contain, at a minimum: <br><br> • (1) a copy of the licensee's most recent audited annual financial statement; <br><br> • (2) a description of each material change, as defined in rule by the director, to information submitted by the licensee in its original license application which has not been previously reported to the director on any required report; <br><br> • (3) a list of the licensee's permissible investments and a certification that the licensee continues to maintain permissible investments according to the requirements set forth in Wash. Rev. Code 19.230.200 and 19.230.210; <br><br> • (4) If the licensee is a money transmitter, proof that the licensee continues to maintain adequate security as required by Wash. Rev. Code 19.230.050; and <br><br> • (5) A list of the locations in this state where the licensee or an authorized delegate of the licensee engages in or provides money services. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|  |  |  | o   Minimum assessment of $1,000<br><br>o   Maximum assessment of $100,000<br><br>o   The amount calculated using the above schedule shall be rounded down to the nearest whole dollar.<br><br>**Minimum tangible net worth** (Wash. Rev. Code § 19.230.060, Wash. Admin. Code § 208-690-060):<br><br>•   $10,000 for every one million dollars ($1,000,000) of money transmission and payment instrument dollar volume.<br><br>•   Minimum $10,000.<br><br>**Maintenance of permissible investments:**  A money transmitter licensee shall maintain, at all times, permissible investments that have a market value computed in accordance with generally accepted accounting principles of not less than the amount of the licensee's average outstanding money transmission liability. For the purposes of this section, average outstanding money transmission liability means the sum of the daily amounts of a licensee's money transmissions, as computed each day of the month divided by the number of days in the month.  (Wash. Rev. Code § 19.230.200)<br><br>**Security** (Wash. Rev. Code § 19.230.050, Wash. Admin. Code § 208-690-040, § 208-690-045, § 208-690-050):<br>•   Surety bond or other similar security or assignment of certificate of deposit in favor of director<br><br>o   Amount: Ten thousand dollars ($10,000) for every one million dollars ($1,000,000) of money transmission and payment instrument dollar volume.<br><br>o   Minimum: $10,000<br><br>o   Maximum: $550,000 |  |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | • The director may increase the amount of security required to a maximum of one million dollars ($1,000,000) if the financial condition of a money transmitter licensee so requires, as evidenced by reduction of net worth, financial losses, potential losses as a result of violations of this chapter or rules adopted under this chapter, or other relevant criteria specified by the director in rule. | |
| DC | D.C. Code §§ 26-1001 *et seq.* (Money Transmissions) | 26-C2200 D.C. Code Mun. Regs. §§ 2200.1 *et seq.* | **Application** for license (D.C. Code § 26-1006) – Minimum requirements:<br><br>• (1) The exact name of the applicant, the applicant's principal address, any fictitious or trade name used by the applicant in the conduct of its business, and the location of the applicant's business records;<br><br>• (2) The history of the applicant's material litigation and criminal convictions for the 5 year period prior to the date of the application;<br><br>• (3) A description of the activities conducted by the applicant and a history of operations;<br><br>• (4) A description of the business activities in which the applicant seeks to be engaged in the District of Columbia;<br><br>• (5) A list identifying the applicant's proposed authorized delegates in the District of Columbia, if any, at the time of the filing of the license application;<br><br>• (6) A sample authorized delegate contract, if applicable;<br><br>• (7) A sample form of payment instrument, if applicable;<br><br>• (8) The location or locations at which the applicant and its authorized delegates, if any, propose to conduct the licensed activities in the District of | **Investigation upon application:** Upon the filing of a complete application, the Superintendent [Commissioner] shall investigate the financial condition and responsibility, financial and business experience, character, and general fitness of the applicant. The Superintendent [Commissioner] may conduct an on-site investigation of the applicant, the reasonable cost of which shall be borne by the applicant. (D.C. Code § 26-1009)<br><br>**Examination by Superintendent [Commissioner]:**<br><br>• <u>With notice</u>: The Superintendent [Commissioner] may in his discretion conduct an on-site examination of a licensee upon 45 days written notice to the licensee.<br><br>• <u>Examination for violation</u>: The Superintendent [Commissioner] may (1) request financial data from a licensee or (2) conduct an on-site examination of a licensee, authorized delegate or location of a licensee within the District of Columbia without prior notice to the authorized delegate or licensee if the Superintendent [Commissioner] has a reasonable basis to |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | Columbia; and | believe that the licensee or authorized delegate is not in compliance with this chapter. |
| | | | • (9) The name and address of the clearing bank or banks on which the applicant's payment instruments will be drawn or through which such payment instruments will be payable. | **Independent report in lieu of on-site examination:** The Superintendent [Commissioner], in lieu of an on-site examination, may accept the examination report of an agency of another state; or a report prepared by an independent accounting firm; and reports so accepted shall be considered for all purposes as an official report of the Superintendent [Commissioner]. (D.C. Code § 26-1013) |
| | | | • (10) The date of the applicant's incorporation and state of incorporation; | |
| | | | • (11) A certificate of good standing from the state in which the applicant was incorporated; | |
| | | | • (12) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant, and the disclosure of whether any parent or subsidiary is publicly traded on any stock exchange; | **Examination fees:** |
| | | | • (13) The name, business and residence address, and employment history for the 5 years prior to the date of the application of the applicant's executive officers and the officer or managers who will be in charge of the applicant's activities to be licensed hereunder; | • <u>On-site investigations</u>:  Reasonable costs shall be borne by the applicant/licensee. The Department shall charge a fee of sixty dollars ($60) an hour per person including applicable travel time, plus all reasonably incurred costs, for conducting an on-site investigation of an applicant, and its authorized delegate(s), for a license. Reasonably incurred costs shall include, but are not limited to, airfare, lodging, food, parking, car usage out of state and mileage. (D.C. Code § 26-1009, § 26-1013, 26-C2208 D.C. Code Mun. Regs. § 2208.2) |
| | | | • (14) The name, business and residence address, and employment history for the 5 years prior to the date of the application of any key shareholder of the applicant; | |
| | | | • (15) The history of material litigation and criminal convictions for the 5 years prior to the date of the application of every executive officer or key shareholder of the applicant; | • <u>Examination of authorized delegate operations</u>:  Authorized delegate shall pay all reasonably incurred costs of the examination. (D.C. Code § 26-1013) |
| | | | • (16) A copy of the applicant's most recent audited financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder equity, and statement of changes in financial position, and, if available, the applicant's audited financial statements for the immediately | • <u>Lengthy examination fee</u>:  The licensee and its authorized delegate(s) shall each be assessed an examination fee of two |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | preceding 2 year period; and<br><br>• (17) Copies of all filings, if any, made by the applicant with the United States Securities and Exchange Commission, or with a similar regulator in a country other than the United States, within the year preceding the date of filing of the application.<br><br>**Fees:**<br><br>• <u>Application fee</u> (D.C. Code § 26-1008):<br>   ○ Principal location: $500<br>   ○ Each additional location: $25<br>   ○ Maximum: $2,500<br>   ○ Nonrefundable, constitutes the license fee for the first year if the license is granted<br><br>• <u>Annual renewal fee</u> (D.C. Code § 26-1010):<br>   ○ Principal location: $500<br>   ○ Each additional location: $25<br>   ○ Maximum: $2,500<br><br>**Minimum net worth** (D.C. Code § 26-1004):<br><br>• Principal office: $100,000<br><br>• Additional locations or authorized delegates in District: $50,000<br><br>• Maximum: $500,000<br><br>**Maintenance of permissible investments** (D.C. Code § 26-1005):<br><br>• Each licensee under this chapter shall at all times possess permissible investments having an aggregate market value, calculated in accordance with generally accepted accounting principles, of not less than the | hundred and fifty dollars ($250) per examination, plus sixty dollars ($60) per hour for each hour or fraction of each hour in excess of four (4) hours if an examination exceeds four (4) hours. (26-C2211 D.C. Code Mun. Regs. § 2211.3)<br><br>**Annual renewal report** (D.C. Code § 26-1010): Licensee shall submit annual renewal report (accompanied by the annual renewal fee) which must contain, at a minimum:<br><br>• (1) A copy of its most recent audited consolidated annual financial statement, including balance sheet, statement of income or loss, statement of changes in shareholder's equity and statement of changes in financial position;<br><br>• (2) The number of payment instruments sold by the licensee in the District of Columbia, the dollar amount of those instruments, and the dollar amount of those instruments currently outstanding for the most recent quarter for which data is available prior to the date of the filing of the renewal application, but in no event more than 120 days prior to the renewal date;<br><br>• (3) Any material changes to any of the information submitted by the licensee on its original application which have not previously been reported to the Superintendent [Commissioner] on any other report required to be filed under this chapter;<br><br>• (4) A list of the licensee's permissible investments; and |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | aggregate face amount of all outstanding payment instruments issued or sold by the licensee in the United States.<br><br>• Requirement may be waived by the Superintendent [Commissioner] if the dollar volume of a licensee's outstanding payment instruments does not exceed the bond or other security devices posted by the licensee.<br><br>**Security** (D.C. Code § 26-1007, 26-C2204 D.C. Code Mun. Regs. § 2204.1, 26-C2205 D.C. Code Mun. Regs. § 2205.1 ):<br>• Surety bond, irrevocable letter of credit or deposit of securities<br>• Minimum: $50,000<br>• Each additional location: $10,000<br>• Maximum: $250,000 | • (5) A list of the locations within the District of Columbia at which business regulated by this chapter is being conducted by either the licensee or its authorized delegate. |
| WV | W. Va. Code § 32A-2-1 (Checks and Money Order Sales, Money Transmission Services, Transportation and Currency Exchange) | None. | **Application** for license on a form prescribed by the commissioner. (W. Va. Code § 32A-2-4)<br><br>*See* http://www.dfi.wv.gov/mortgage/Documents/mtaapplication.pdf<br><br>**Fees** (W. Va. Code § 32A-2-4, W. Va. Code § 32A-2-5):<br>• Application fee:<br>  o Principal location: $1,000<br>  o Each additional location: $20<br>  o Maximum: $10,000<br>  o Nonrefundable, constitutes the license fee for the first year if the license is granted<br>• License renewal fee:<br>  o Principal location: $250 | **Investigation upon application:**  Before approving an application for a license of an applicant who has less than one year's experience in the proposed business governed by this article as a regulated entity in another state, or whose license has been suspended or revoked by another state, the commissioner may, in his or her discretion, conduct an on-site investigation of an applicant at the sole expense of the applicant and may require the applicant to pay a nonrefundable payment of the anticipated expenses for conducting the investigation.  (W. Va. Code § 32A-2-8)<br><br>**Fingerprints and criminal background check:**<br>• The commissioner may require a criminal background investigation, including requiring fingerprints for submission to the Federal Bureau of Investigation or any |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | |     o   Each additional location: $20<br><br>    o   Maximum: $10,000<br><br>**Minimum net worth** (W. Va. Code § 32A-2-8):<br><br>• Principal office: $50,000<br><br>• Additional locations: $25,000<br><br>• Maximum: $1,000,000<br><br>**Criminal record** (W. Va. Code § 32A-2-8):<br><br>A person is not eligible for a license or shall surrender an existing license if, during the previous ten (10) years, the person or a principal of the person, if a business:<br><br>• Has been convicted of a felony or a crime involving fraud, deceit, or moral turpitude under the laws of this state, any other state, or the United States;<br><br>• Has been convicted of a crime under the laws of another country that involves fraud, deceit, or moral turpitude or would be a felony if committed in the United States; or<br><br>• Has been convicted under a state or federal law relating to currency exchange or transmission or any state or federal monetary instrument reporting requirement; or<br><br>• The person, a principal of the person, or the spouse of the person or a principal of the person has been convicted of an offense under a state or federal law relating to drug trafficking, money laundering, or a reporting requirement of the Bank Secrecy Act (Pub. L. 91-508).<br><br>A person is not eligible for a license, and a person who holds a license shall surrender the license to the commissioner, if the person or a principal of the person | governmental agency or entity authorized to receive such information for a state, national or international criminal history check, of each applicant seeking a license to engage in the business of money transmission.  (W. Va. Code § 31A-2-4)<br><br>• The commissioner may refuse to grant a license or may suspend or revoke a license if the applicant or licensee fails to provide information required by § 31A-2-4, or other information sought by the commissioner relevant to conducting an adequate criminal background check. (W. Va. Code § 32A-2-9)<br><br>**Investigation by commissioner:**<br><br>• <u>Periodic</u>: Each licensee is subject to a periodic examination of the licensee's business records by the commissioner at the expense of the licensee. (W. Va. Code § 32A-2-11)<br><br>• <u>Books and records</u>: In addition to the examinations required by § 32A-2-11, the commissioner is authorized to inspect, examine and audit the books, records, accounts and papers of all licensees and their authorized delegates at times that the circumstances in his or her opinion may warrant.  (W. Va. Code § 32A-2-12)<br><br>**Examination fees:**  Licensee pays the cost of any on-site examination made by the commissioner, at a rate of fifty dollars ($50) for each examiner hour expended, together with all reasonable and necessary travel expenses incurred in connection with the examination. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | has at any time been convicted of:<br><br>• A felony involving the laundering of money that is the product of or proceeds from criminal activity under chapter sixty-one [§§ 61-1-1 *et seq.*] of this code, or a similar provision of the laws of another state or the United States; or<br><br>• A felony violation of 31 U.S.C. § 5313 or 5324 or a rule adopted under those sections.<br><br>**Security** (W. Va. Code § 32A-2-10):<br>• Security bond or deposit of cash or cash equivalent instruments<br><br>   o   Minimum: $300,000<br><br>   o   Each additional location: $25,000<br><br>   o   Maximum: $1,000,000<br><br>• If the commissioner at any time reasonably determines that the required bond or deposit is insecure, deficient in amount, or exhausted, in whole or in part, he or she may in writing require the filing of a new or supplemental bond or other security, up to a total amount of one million dollars ($1,000,000). | (W. Va. Code § 32A-2-11) |
| WI | Wis. Stat. §§ 217.01 *et seq.* (Seller of Checks Law) | None. | **Application** for license (Wis. Stat. § 217.05) – Minimum requirements:<br><br>• (1) The full name and business address of: (a) The applicant, if the applicant is an individual; (b) every member, if the applicant is a partnership, limited liability company or association; (c) every trustee and officer if the applicant is a trust; (d) the corporation and each officer and director thereof, if the applicant is a corporation.<br><br>• (2) The applicant's social security number, if an individual, or federal employer identification number, if | **Investigation by division:** The division may investigate, at any time, the business and examine the books, accounts, records and files used therein of every licensee or agent thereof.  (Wis. Stat. § 217.10) |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | not an individual. | |
| | | | • (3) Locations. A list of the locations in this state at which the applicant or its authorized agents, listing them by name, is engaged or proposes to engage in the business of selling checks. (Such list shall not be required of an applicant which tenders the maximum license fee and agrees to file or deposit, and does file or deposit, a bond or securities in the maximum sum of $300,000. | |
| | | | **Fees** (Wis. Stat. § 217.05): | |
| | | | • Application fee: | |
| | | |    o  $300, nonrefundable | |
| | | | • Additional investigation fee: If the cost of the applicant investigation exceeds $300, the applicant shall, on demand of the division, pay the excess cost. | |
| | | | • Annual license fee: | |
| | | |    o  Principal location: $500 | |
| | | |    o  Each additional location: $5 | |
| | | |    o  Maximum: $1,500 | |
| | | | **Security** (Wis. Stat. § 217.06): <br>• Security bond or deposit of interest-bearing obligations <br>• Minimum: $10,000 <br>• Each additional location: $5,000 <br>• Maximum: $300,000 | |
| **WY** | Wyo. Stat. Ann. §§ 40-22-101 et seq. (Wyoming Money Transmitters Act) | 21-070-001 Wyo. Code R. §§ 1 *et seq.* | **Application** for license (Wyo. Stat. Ann. § 40-22-108) – Minimum requirements: <br><br>• (1) The exact name of the applicant, the applicant's principal address, any fictitious or trade name used by the applicant in the conduct of its business and the | **Investigation upon application: A**fter the applicant files an application, the commissioner shall investigate the financial condition and responsibility, financial and business experience, character and general fitness of the applicant. The commissioner may conduct |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|----------------|------------------------|------------------------|--------------------------|
| | | | location of the applicant's business records;<br><br>• (2) The applicant's history of material litigation and criminal convictions for the five (5) year period prior to the date of the application;<br><br>• (3) A description of the activities conducted by the applicant and a history of operations;<br><br>• (4) A description of the business activities in which the applicant seeks to be engaged in the state;<br><br>• (5) A list identifying the applicant's proposed authorized delegates in the state, if any, at the time of the filing of the license application;<br><br>• (6) A sample authorized delegate contract, if applicable;<br><br>• (7) A sample form of payment instrument, if applicable;<br><br>• (8) The location at which the applicant and its authorized delegates, if any, propose to conduct the licensed activities in the state;<br><br>• (9) The name and address of the clearing bank on which payment instruments will be drawn or through which the payment instruments will be payable;<br><br>• (10) The date of the applicant's incorporation and state of incorporation;<br><br>• (11) A certificate of good standing from the state in which the applicant was incorporated;<br><br>• (12) A description of the corporate structure of the applicant, including the identity of any parent or subsidiary of the applicant and the disclosure of whether any parent or subsidiary is publicly traded on any stock exchange; | an on site investigation of the applicant, the reasonable cost of which shall be borne by the applicant. (Wyo. Stat. Ann. § 40-22-110)<br><br>**Examination by commissioner:** The commissioner may conduct examinations of persons licensed under this act at intervals he deems necessary to determine whether violations of this act and other applicable laws, rules and regulations pertaining to money transmissions are occurring and the frequency and seriousness of the violations. (Wyo. Stat. Ann. § 40-22-115)<br><br>**Examination fees:**  Each licensee or person subject to examination or investigation under this act shall pay to the commissioner an amount assessed by the commissioner to cover the direct and indirect cost of examinations or investigations conducted pursuant to this section. (Wyo. Stat. Ann. § 40-22-115)<br><br>**Annual renewal report** (Wyo. Stat. Ann. § 40-22-111): Licensee shall submit annual renewal report (accompanied by the annual renewal fee) which must contain, at a minimum:<br><br>• (1) A copy of the licensee's most recent audited consolidated annual financial statement including balance sheet, statement of income or loss, statement of changes in shareholder's equity and statement of changes in financial position;<br><br>• (2) For the most recent quarter for which data is available prior to the date of the filing of the renewal application, but in no event more than one hundred twenty (120) days prior to the renewal date, the licensee |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | • (13) The name, business and residence address and employment history for the past five (5) years of the applicant's executive officers and the officer or manager who will be in charge of the applicant's licensed activities in this state; <br><br> • (14) The name, business and residence address, and employment history for the period five (5) years prior to the date of the application of any key shareholder of the applicant; <br><br> • (15) The history of material litigation and criminal convictions for the five (5) year period prior to the date of the application of every executive officer or key shareholder of the applicant; <br><br> • (16) A copy of the applicant's most recent audited financial statement including balance sheet, statement of income or loss, statement of changes in shareholder equity and statement of changes in financial position and if available, the applicant's audited financial statements for the immediately preceding two (2) year period; and <br><br> • (17) Copies of all filings, if any, made by the applicant with the United States securities and exchange commission or with a similar regulator in a country other than the United States, within the year preceding the date of filing of the application. <br><br> **Fees:** <br><br> • <u>Application fee</u> (Wyo. Stat. Ann. § 40-22-109, 021-070-002 Wyo. Code R. § 2): <br>    o  $1,500, nonrefundable <br><br> • <u>Annual renewal fee</u> (021-070-002 Wyo. Code R. § 3): <br>    o  Principal location: $1,000 | shall provide the number of payment instruments sold by the licensee in the state, the dollar amount of those instruments and the dollar amount of those instruments currently outstanding; <br><br> • (3) Any material changes to any of the information submitted by the licensee on its original application which have not previously been reported to the commissioner on any other report required to be filed under this act; <br><br> • A list of the licensee's permissible investments; <br><br> • A list of the locations, if any, within this state at which business regulated by this act is being conducted by either the licensee or its authorized delegates; |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | | | o   Each additional location: $50<br><br>o   Maximum: $6,000<br><br>**Minimum net worth** (Wyo. Stat. § 40-22-105):<br><br>o   $25,000<br><br>**Maintenance of permissible investments** (Wyo. Stat. Ann. § 40-22-107):<br><br>• Each licensee shall at all times possess permissible investments having an aggregate market value calculated in accordance with generally accepted accounting principles, of not less than the aggregate face amount of all outstanding payment instruments and stored value issued or sold by the licensee in the United States.<br><br>• The commissioner may waive this requirement if the dollar volume of a licensee's outstanding payment instruments and stored value does not exceed the bond or other security devices posted by the licensee.<br><br>**Security** (Wyo. Stat. Ann. § 40-22-106):<br>• Surety bond, irrevocable letter of credit or other similar security device or deposit of securities<br><br>o   $10,000.00 or two and one-half (21/2) times the outstanding payment instruments, whichever is greater<br><br>• The commissioner may increase the required amount of the bond or security device to a maximum of five hundred thousand dollars ($500,000.00) upon the basis of the impaired financial condition of a licensee as evidenced by a reduction in net worth, financial losses or other relevant criteria. | |
| **PR** | P.R. Laws Ann. tit. 10, §§ 2551 *et* | | **Application** for license (P.R. Laws Ann. tit. 10, § 2556) – Minimum requirements: | **Investigation upon application:**  Every application for a license shall entail all those |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|---|---|---|---|---|
| | *seq.* (Act to Regulate Money Transfer Businesses) | | • (1) Full name and address of: (a) The petitioner; (b) All the partners, should the petitioner be an association or a partnership, and the name of the association or the partnership; (c) All the directors and officials, should the petitioner be a corporation.<br><br>• (2) The main business office or that of the resident agent to receive summons in Puerto Rico. The books and all documents related to its operations can be kept in a place outside of Puerto Rico.<br><br>• (3) The amount and description of his/her liquid assets certified under oath by the chief financial officers of the petitioner.<br><br>**Fees** (P.R. Laws Ann. tit. 10, § 2557, P.R. Laws Ann. tit. 10, § 2560):<br><br>• Application fee:<br>   o $2,500, nonrefundable<br><br>• Annual license fee:<br>   o Principal location: $2,500<br>   o Each agent: $50<br>   o Maximum: $25,000<br>   o Refunded if application is denied<br><br>**Minimum net worth** (P.R. Laws Ann. tit. 10, § 2555):<br>   o $500,000<br><br>**Maintenance of permissible investments:**  Minimum liquid assets valued at not less than one hundred thousand dollars ($100,000). (P.R. Laws Ann. tit. 10, § 2555)<br><br>**Security** (P.R. Laws Ann. tit. 10, § 2557):<br>• Bond | investigations considered proper and necessary in order to determine if the petitioner, and the partners, directors and officials, in the case of a partnership or a corporation, meet all the requirements established in § 2555 of this title. (P.R. Laws Ann. tit. 10, § 2558)<br><br>**Investigation by commissioner** (P.R. Laws Ann. tit. 10, § 2567):<br><br>• Annual: The Commissioner may conduct regular yearly inspections or audits of the operations of the concessionaire at his/her place of business after giving previous notice in writing fifteen (15) days prior to the inspection or audit.<br><br>• Special: The Commissioner may conduct special inspections as necessary, in his/her judgment.<br><br>**Examination fees** (P.R. Laws Ann. tit. 10, § 2567):<br><br>• Daily fee:  One hundred dollars ($100) for each day or fraction thereof, for each examiner or investigator who intervenes in any inspection, plus the expenses incurred for per diems and mileage, according to the norms established for officials and employees of the Commonwealth of Puerto Rico.<br><br>• Inspections outside of Puerto Rico: Concessionaire shall pay an inspection fee of one hundred dollars ($100) as established in subsection (b) of this section, plus all reasonable expenses incurred during said inspection, including |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | o  Minimum amount: $250,000<br><br>o  Each additional location or agent: $50,000<br><br>o  Maximum: $500,000<br><br>• The Commissioner may require a bond in excess of five hundred thousand dollars ($500,000), up to a maximum of one million dollars ($1,000,000), based on the volume of business and the financial situation of the concessionaire. | transportation expenses. |
| **USVI** | V.I. Code Ann. tit., 9 §§ 501 *et seq.* (Uniform Money Services Act) | None. | **Application** for license (V.I. Code Ann. tit., 9 § 512) – Minimum requirements:<br><br>• (1) the legal name and residential and business addresses of the applicant and any fictitious or trade name used by the applicant in conducting its business;<br><br>• (2) a list of any criminal convictions of the applicant and any material litigation in which the applicant has been involved in the 10-year period next preceding the submission of the application;<br><br>• (3) a description of any money services previously provided by the applicant and the money services that the applicant seeks to provide in this State;<br><br>• (4) a list of the applicant's proposed authorized delegates and the locations in this State where the applicant and its authorized delegates propose to engage in money transmission or provide other money services;<br><br>• (5) a list of other States in which the applicant is licensed to engage in money transmission or provide other money services and any license revocations, suspensions, or other disciplinary action taken against the applicant in another State; | **Investigation upon application:** When an application is filed under this subchapter, the Director shall investigate the applicant's financial condition and responsibility, financial and business experience, character, and general fitness. The Director may conduct an on-site investigation of the applicant, the reasonable cost of which the applicant must pay.  (V.I. Code Ann. tit., 9 § 514)<br><br>**Examination by commissioner** (V.I. Code Ann. tit., 9 § 551):<br><br>• <u>Annual</u>: The Director may conduct an annual examination of a licensee or of any of its authorized delegates upon 45 days' notice in a record to the licensee.<br><br>• <u>Examination for violation</u>: The Director may examine a licensee or its authorized delegate, at any time, without notice, if the Director has reason to believe that the licensee or authorized delegate is engaging in an unsafe or unsound practice or has violated or is violating this chapter or a rule adopted or an order issued under this chapter. |

**50-STATE SURVEY: Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | • (6) information concerning any bankruptcy or receivership proceedings affecting the licensee; <br><br> • (7) a sample form of contract for authorized delegates, if applicable, and a sample form of payment instrument or instrument upon which stored value is recorded, if applicable; <br><br> • (8) the name and address of any bank through which the applicant's payment instruments and stored value will be paid; <br><br> • (9) a description of the source of money and credit to be used by the applicant to provide money services; <br><br> • (11) the date of the applicant's incorporation or formation and State or country of incorporation or formation; <br><br> • (12) if applicable, a certificate of good standing from the State or country in which the applicant is incorporated or formed; <br><br> • (13) a brief description of the structure or organization of the applicant, including any parent or subsidiary of the applicant, and whether any parent or subsidiary is publicly traded; <br><br> • (14) the legal name, any fictitious or trade name, all business and residential addresses, and the employment, in the 10-year period next preceding the submission of the application of each executive officer, manager, director, or person that has control, of the applicant; <br><br> • (15) a list of any criminal convictions and material litigation in which any executive officer, manager, director, or person in control of, the applicant has been involved in the 10-year period next preceding the submission of the application; | **Examination fees:** If the Director concludes that an on-site examination is necessary for the annual examination, the licensee shall pay the reasonable cost of the examination. (V.I. Code Ann. tit., 9 § 551) <br><br> **Annual renewal report** (V.I. Code Ann. tit., 9 § 515): Licensee shall submit annual renewal report (accompanied annual license fee) which must contain, at a minimum: <br><br> • (1) a copy of the licensee's most recent audited annual financial statement; <br><br> • (2) the number and monetary amount of payment instruments and stored-value sold by the licensee in this State which have not been included in a renewal report, and the monetary amount of payment instruments and stored value currently outstanding; <br><br> • (3) a description of each material change in information submitted by the licensee in its original license application which has not been reported to the Director on any required report; <br><br> • (4) a list of the licensee's permissible investments and a certification that the licensee continues to maintain permissible investments according to the requirements set forth in sections 561 and 562; <br><br> • (5) proof that the licensee continues to maintain adequate security as required by section 513; and <br><br> • (6) a list of the locations in this State where the licensee or an authorized delegate of the licensee engages in money |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**
Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
|       |                 |                        | • (16) a copy of the applicant's audited financial statements for the most recent fiscal year and, if available, for the two-year period next preceding the submission of the application;<br><br>• (17) a copy of the applicant's unconsolidated financial statements for the current fiscal year, whether audited or not, and, if available, for the two-year period next preceding the submission of the application;<br><br>• (18) if the applicant is publicly traded, a copy of the most recent report filed with the United States Securities and Exchange Commission under Section 13 of the Federal Securities Exchange Act of 1934, 15 U.S.C. Section 78m (1994 and Supp. V 1999);<br><br>• (19) if the applicant has a registered agent in this State, the name and address of the applicant's registered agent in this State; and<br><br>• (20) any other information the Director reasonably requires with respect to the applicant.<br><br>**Fees** (V.I. Code Ann. tit., 9 § 512):<br><br>• <u>Application fee</u>:<br><br>   o   $2,000, nonrefundable<br><br>• <u>Annual license fee</u>:<br><br>   o   $2,000, refunded if application is denied<br><br>**Reciprocity** (V.I. Code Ann. tit., 9 § 517):  A person that is licensed to engage in money transmission in at least one other state, with the approval of the Director and in accordance with this section, may engage in money transmission in this state without being licensed pursuant to section 511 if the state in which the person is licensed has enacted the Uniform Money Services Act or money transmission laws that are substantially similar to those imposed by the law of the United States Virgin Islands, as | transmission or provides other money services. |

**50-STATE SURVEY:  Money Transmitter Licensing Requirements**

Provided by: Thomas Brown, Lecturer, UC Berkeley Law School and Partner, Paul Hastings LLP

| State | License Statute | Published Regulations? | Licensing Requirements | Examination Requirements |
|-------|-----------------|------------------------|------------------------|--------------------------|
| | | | determined by the Director, and  the person submits to the Director:<br><br>• (1) in a record a request for the approval to engage in money transmission and check cashing or currency exchange or both in this state without being licensed pursuant to section 511;<br><br>• (2) a non refundable fee of $1,000;<br><br>• (3) an application form; and<br><br>• (4) a certification of license history.<br><br>**Minimum net worth** (V.I. Code Ann. tit., 9 § 516):<br><br>• $25,000<br><br>**Maintenance of permissible investments:**  A licensee shall maintain at all times permissible investments that have a market value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments and stored value obligations issued or sold in all states and money transmitted from all states by the licensee. (V.I. Code Ann. tit., 9 § 561)<br><br>**Security** (V.I. Code Ann. tit., 9 § 513):<br>• Surety bond, letter of credit, or other similar security<br><br>○   Minimum amount: $50,000<br><br>○   Each additional location or agent: $10,000<br><br>○   Maximum: $250,000<br><br>• The Director may increase the amount of security required to a maximum of $1,000,000 if the financial condition of a licensee so requires, as evidenced by reduction of net worth, financial losses, or other relevant criteria. | |